# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| TRYSTAN SANCHEZ, by and through his parents, GERMAIN SANCHEZ and JENNIFER SANCHEZ, | \* \* \* |
| Petitioners, | \* \* \* |
| v. | \* \* |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | \* \* \* |
| Respondent. | \* |

No. 11-685V

Filed: February 17, 2016

Attorneys' Fees and Costs on an Interim Basis; Reasonable Basis; Reasonable Number of Attorney Hours.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>Lisa A. Roquemore</u>, Law Office of Lisa A. Roquemore, Rancho Santa Margarita, CA, for petitioners;
<u>Jennifer L. Reynaud</u>, United States Dep't of Justice, Washington, D.C., for respondent.

### PUBLISHED DECISION AWARDING
### <u>INTERIM ATTORNEYS' FEES AND COSTS</u>[1]

  Petitioners, Mr. and Mrs. Sanchez, seek compensation pursuant to the National Childhood Vaccine Injury Compensation Program, 42 U.S.C. § 300aa—10 through 34 (2012).  They allege that a set of vaccines that their son, Trystan, received on February 5, 2009, caused him to suffer fever and subsequent seizure activity / disorder leading to his developmental issues.  Pet. at 12.

---

[1] The E-Government Act, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this decision on its website.  Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4).  Any redactions ordered by the special master will appear in the document posted on the website.

While the question of whether petitioners are entitled to any compensation remains pending, they filed a motion requesting an award of attorneys' fees and costs on an interim basis. Pet'rs' Fee Appl'n, filed Sept. 16, 2014. The Secretary opposed this request. Resp't's Resp., filed Nov. 24, 2014. A detailed analysis shows that a reasonable amount of attorneys' fees and costs is **$94,885.35**.

## I.   <u>Procedural History</u>

The course of this case has been lengthy. It has moved through several discrete phases, which are summarized below.

### Events before the Ruling Finding Facts

An abbreviated recitation of the procedural history begins with the filing of the petition, medical records (exhibit 1), expert report of Lawrence Steinman, M.D. (exhibit 2), and affidavits (exhibits 3-8) on October 21, 2011. The medical records show that on February 5, 2009, Trystan received the diphtheria-tetanus-acellular pertussis ("DTaP"), hepatitis B, haemophilus influenzae type B, and pneumococcal conjugate vaccines.

In Mrs. Sanchez's affidavit, she asserted that Trystan was meeting all of his developmental milestones until he was six months old when he received vaccinations on February 5, 2009. Exhibit 3 at ¶ 4. Mrs. Sanchez asserted that on February 16, 2009, Trystan had a seizure. <u>Id.</u> at ¶ 6. She also maintained that between February 7, 2009 and April 29, 2009, Trystan's "developmental pace seemed to slow." <u>Id.</u> at ¶ 8.

Unlike most petitioners, the Sanchezes included a report from their expert, Dr. Steinman, in the initial submissions. Exhibit 2. Dr. Steinman accepted the accuracy of Mrs. Sanchez's allegations. Relying on Mrs. Sanchez's allegations, Dr. Steinman stated Trystan "may have had a seizure." <u>Id.</u> at 1. He proposed that the pertussis vaccine and the alum adjuvant in it can cause seizures. <u>Id.</u> at 10. Ultimately, Dr. Steinman opined that based upon the temporal relationship, his medical expertise, and the medical literature, Trystan would not have suffered from seizures and developmental delay had he not received the vaccinations. <u>Id.</u> at 14.

The Secretary filed her report pursuant to Vaccine Rule 4 on February 28, 2012, and indicated that petitioners were not entitled to compensation. The Secretary argued that although Dr. Steinman opined that Trystan had seizures

beginning 11 days after receiving his six-month vaccinations, no contemporaneous medical records indicated Trystan in fact suffered these seizures.  Id. at 12.[2]

The Sanchezes recognized that the recitation of events in the affidavits did not match the events in the contemporaneous medical records.  Pet'rs' Supp. to Pet., filed March 6, 2012.  The affidavits asserted that shortly after Trystan received his vaccinations, he experienced seizures and developmental delay.  However, there are no records from around February 2009 that discuss either seizures or developmental delay.  Because of this discrepancy, a fact hearing was held on May 15, 2012.  Mr. and Mrs. Sanchez testified as well as Germain's mother and aunt, Lupe Sanchez and Bertha Sanchez, and Jennifer's mother, Emma Fernandez.

### Ruling Finding Facts

On April 10, 2013, the undersigned issued a Ruling Finding Facts.  The Ruling Finding Facts generally accepted the accuracy of medical records created contemporaneously with events described in the records.  The ruling, therefore, generally did not credit testimony given much later in time.  For example, the Ruling Finding Facts expressly found that Trystan did not contort his arm in February 2009.  Ruling Finding Facts at 13, ¶ 11.  The Ruling Finding Facts also ordered the parties to provide the ruling to any expert they retained.

### Events from the Ruling Finding Facts through Anticipated Start of Hearing

On May 22, 2013, the Sanchezes filed an amended expert report by Dr. Steinman.  Exhibit 17.  Dr. Steinman repeatedly asserted that Trystan suffered from seizures.  Dr. Steinman stated that Trystan's arm contortions started as early as February 16, 2009.  Exhibit 17 at 2, n.1, 3.  However, these assertions did match the Ruling Finding Facts.  See order, issued June 14, 2013.  In addition, Dr. Steinman's May 17, 2013 report was not clear about the medically appropriate interval.  Thus, the Sanchezes were ordered to file another supplemental report from Dr. Steinman.

---

[2] With her report, the Secretary filed a report from Gerald Raymond, M.D.  Dr. Raymond disagreed with Dr. Steinman and concluded that although Trystan suffered from "developmental delay with associated imaging abnormalities," there was "no evidence that his condition resulted from or was exacerbated by any of the immunizations received."  Exhibit A at 7.

The Sanchezes filed a third report by Dr. Steinman on September 16, 2013. Exhibit 28.  Dr. Steinman again asserted that Trystan had a seizure on February 16, 2009.  Exhibit 28 at 2.  The Secretary questioned the basis for this assertion and also requested clarification as to whether Dr. Steinman believed that Trystan suffered other seizures.  The Sanchezes were ordered to file a status report addressing seizures.  Order, issued Dec. 11, 2013.[3]  In addition, the parties were ordered to plan for a hearing in July, August, or September 2014.

The Sanchezes filed the status report regarding seizure activity on December 18, 2013.  They maintained that Trystan suffered seizure activity, including arm contortions, in "March 2009, (April and May 2009 per Dr. Friedman medical record notes), August 2009, October/ November 2009 after another set of vaccinations, December 2009, September and October 2010."  Pet'rs' Status Rep., filed Dec. 18, 2013, at 4.

In a January 28, 2014 status conference held to discuss the petitioners' status report about seizures, the Secretary's attorney characterized the Sanchezes' position as "logical insanity."  In the Secretary's view, the Sanchezes could not rely upon Dr. Friedman's August 3, 2010 record to deviate from the findings of fact.

On April 4, 2014, the Secretary filed supplemental reports from Drs. Raymond and McGeady.  Exhibits E-F.  The Secretary added a report from Edward Cetaruk, a toxicologist.  Exhibit G.  Respondent's experts criticized Dr. Steinman's reports, noting his reliance on allegations unsubstantiated by the medical record or medical literature.  Drs. Raymond and Cetaruk also indicated that Trystan had not been diagnosed with any particular condition, and a lack of diagnosis makes Dr. Steinman's attempt to link Trystan's condition to the vaccinations scientifically inappropriate.  Exhibit E at 2; exhibit G at 17.  Both doctors stated that additional testing would be necessary to diagnose Trystan definitively and accurately.

In an April 10, 2014 status conference, the undersigned extensively reviewed the criticisms of Dr. Steinman's opinions, beginning with the lack of

---

[3] After Dr. Steinman's September 13, 2013 report and before the December 6, 2013 status conference, the Secretary filed a report from Stephen J. McGeady.  Exhibit C.  Dr. McGeady questioned Dr. Steinman's assumption that Trystan suffered a seizure.  Dr. McGeady noted that none of Trystan's doctors had diagnosed him with a seizure disorder and none had prescribed anticonvulsant medications.  Exhibit C at 14.

diagnosis and continuing through each of the three prongs set forth in <u>Althen v. Sec'y of Health & Human Servs.</u>, 418 F.3d 1274, 1278 (Fed. Cir. 2005).  The undersigned expressed concern that the Sanchezes may lack a reasonable basis to proceed to hearing.  The undersigned encouraged the Sanchezes to file a supplemental report from Dr. Steinman before the entitlement hearing, which was scheduled for September 10-12, 2014.  Order, issued April 11, 2014, at 1.

The undersigned offered more guidance in an order for pre-trial briefs, issued May 13, 2014.  The undersigned reiterated the previous comment that "there may not be a reasonable basis to proceed to hearing."  Preh'g Order, filed May 13, 2014, at 11.  Based on the existing record, Trystan did not have a diagnosis, which could be an issue for petitioners under <u>Broekelschen v. Sec'y of Health & Human Servs.</u>, 618 F.3d 1339, 1346 (2010).  The undersigned noted that respondent's critiques on the <u>Althen</u> prongs appeared persuasive.  Preh'g Order, filed May 13, 2014, at 11.  Finally, the undersigned stated that "One purpose of this order was to identify the shortcomings in petitioners' case so that, if possible, they can address the deficiencies before the hearing."  <u>Id.</u>  If petitioners wanted, they could file another supplement expert report by Dr. Steinman.  <u>Id.</u> at 11-12.

Petitioners filed a fourth supplemental expert report by Dr. Steinman on May 29, 2014.  Exhibit 36.  In his fourth report, Dr. Steinman addressed issues and criticisms made in respondent's expert reports and outlined the potential conditions from which Trystan may be suffering.  These conditions include mitochondrial disorder, encephalopathy, and other neurologic conditions, all of which Dr. Steinman opined are the result of or were aggravated by the vaccinations.  <u>Id.</u> at 15-16.

Mr. and Mrs. Sanchez also filed a status report regarding genetic testing.  The Sanchezes stated that Trystan's treating doctor, Dr. Haas, ordered genetic testing for which their insurance would pay.  Exhibit 52.  The Sanchezes requested a continuance of the hearing, set for September 10-12, 2014, while the genetic tests were pending.  Pet'rs' Status Rep., filed June 23, 2014.  After a status conference, the undersigned canceled the September 2014 hearing and suspended the obligation to file briefs before the hearing.  Order, issued July 8, 2014.

**Petitioners' Request for Attorneys' Fees and Costs on an Interim Basis**

On September 18, 2014, petitioners filed a motion for an award of attorneys' fees and costs on an interim basis.  Petitioners requested $128,860.31 in attorneys' fees and miscellaneous costs.  Although the Sanchezes filed their motion in

September 2014, the attorneys' time sheets stop in December 2013.  The petitioners requested $15,000.00 for Dr. Steinman's work from April 2011 to September 2013.  Finally, the Sanchezes requested $2,350 for costs that they personally incurred.

The Secretary opposed the Sanchezes' application for attorneys' fees and costs on an interim basis.  The Secretary presented two arguments.  First, she contended that the Sanchezes' claim lacked reasonable basis entirely.  Second, even if the case were supported by reasonable basis, the Sanchezes were requesting an unreasonable amount.  Resp't's Resp., filed Nov. 24, 2014, at 10, 15.

The Sanchezes, in turn, filed a reply.  They maintained that reasonable basis supported their claim throughout its duration.  They also generally defended the amount requested in attorneys' fees and costs.  Pet'rs' Reply, filed Dec. 12, 2014.

### Events after the Submission of the Request for Attorneys' Fees and Costs

The genetic tests revealed that Trystan had a mutation in two genes.  The company that performed the tests characterized them as "disease-causing mutation[s]."  Exhibit 59.  In a February 3, 2015 status conference, the Secretary's attorney questioned why the case was continuing.  In her view, there was even less of a basis.  Nevertheless, the Sanchezes wanted to press forward.

By March 2015, Dr. Haas diagnosed Trystan as suffering from Leigh's disease.  Exhibit 62.[4]  He also wrote a letter stating that Trystan had a genetic disease.

The undersigned provided an article on Leigh syndrome on May 8, 2015.  Exhibit 1001.  Leigh syndrome is a neurological disorder that usually manifests in the first year of life.  Id. at 1.  The condition involves progressive loss of mental and movement abilities and typically results in death within a couple of years.  Id.

In an ensuing status conference, the undersigned discussed the significance of the genetic testing and Dr. Haas's diagnosis.  Because the genetic mutation existed before vaccination, an important question was how would Trystan be but for the vaccinations?  The Secretary continued to question the viability of the case

---

[4] Dr. Haas had diagnosed Trystan with a mitochondrial disorder in June 2014.  Exhibit 52.

6

after the Ruling Finding Facts because the onset of neurologic problems seemed to be months after vaccination. The Sanchezes expressed an intent to pursue a claim that the vaccinations significantly aggravated Trystan's Leigh's disease. <u>See</u> order, issued Oct. 1, 2015.

In December 2015, the Sanchezes filed two additional expert reports. To discuss the anticipated course of Leigh's disease, the Sanchezes presented the opinion of a new expert, Dmitriy Niyazov. Dr. Niyazov asserted that the vaccinations caused Trystan's Leigh's disease. Dr. Niyazov reasoned that the genetic defect could have remained dormant but for the vaccinations. Exhibit 68 at 8.

The Sanchezes also filed another supplemental report from Dr. Steinman. Dr. Steinman largely reasserted the theories by which the vaccinations could have caused a neurologic problem but placed these theories in the context of Leigh's disease. Exhibit 95.

## II. <u>Analysis</u>

Broadly speaking, to resolve the pending motion for an award of attorneys' fees and costs on an interim basis, there are three issues. The first is whether petitioners are eligible for attorneys' fees and costs. The second is whether petitioners should receive any attorneys' fees and costs at this time. The third question is, assuming that some award is appropriate, what constitutes a reasonable amount in this case.

### Whether the Petitioners' Case Satisfies the Requirements for an Award of Attorneys' Fees and Costs

Petitioners who have not yet been awarded compensation may be entitled to an award of attorneys' fees and costs when "the petition was brought in good faith and there was a reasonable basis for the claim." 42 U.S.C. § 300aa—15(e)(1). Here, the petitioners presented multiple reports from Dr. Steinman in support of their claim.

The Secretary argues that petitioners' claim has lacked a reasonable basis from its inception. The Secretary asserts that Dr. Steinman's first report relied on facts in affidavits that are not found in medical records created contemporaneously. Resp't's Resp. at 12. Additionally, none of the treating physicians describe the

casual relationship between Trystan's vaccinations and the onset of significant aggravation of his condition.  Id. at 13.

The undersigned finds that petitioners had a reasonable basis for their claim through the Ruling Finding Facts.  When Dr. Steinman authored his first report, his reliance on the petitioners' affidavits was reasonable.  Dr. Steinman's choice to accept the accuracy of affidavits is consistent with long-standing practice in the Vaccine Program.  For cases alleging an injury listed in the Vaccine Table, the Vaccine Act explicitly authorizes a special master to determine if the onset of the injury differed from the onset listed in medical records.  42 U.S.C. § 300aa−13(b)(2); see also Potter v. Sec'y of Health & Human Servs., No. 90-2V, 1990 WL 293381 (Cl. Ct. Spec. Mstr. Dec. 18, 1990).  Special masters have engaged in the same reasoning for cases seeking compensation for non-Table injuries.  E.g. Mueller v. Sec'y of Health & Human Servs., No. 06-775, 2011 WL 1467938 (Fed. Cl. Spec. Mstr. Mar. 16, 2011).  The Secretary does not present any persuasive reason for finding that Dr. Steinman's reliance on affidavits was fanciful or frivolous.  Consequently, Dr. Steinman's initial report, which the Sanchezes filed with the petition, confers a reasonable basis for their claim.

The Secretary's argument that none of Trystan's treating physicians posited a causal relationship between the vaccinations and the onset of significant aggravation of his condition is misplaced.  A medical theory of causation between the vaccine and the alleged injury can be demonstrated using expert testimony.  Althen, 418 F.3d at 1278.  As the Secretary stated, "petitioners must show that they filed a claim that was supported by the medical records or by a medical opinion" to establish reasonable basis.  Resp't's Resp. at 13.  Thus, as previously stated, Dr. Steinman's initial report confers a reasonable basis for their claim.

The analysis, however, changes once the Ruling Finding Facts was issued.  The special master's findings of fact bind the parties and their experts.  Dr. Steinman was not free to disregard any findings of fact in his subsequent reports.  See Burns v. Sec'y of Health & Human Servs., 3 F.3d 415, 417 (Fed. Cir. 1993).  His reports seem to indicate that he did.  Most notably, Dr. Steinman stated as early as February 2009, Trystan had suffered a seizure.  Exhibit 17 at 2, n.1, 3, exhibit 23 at 1.  Additionally, the Sanchezes stated facts that according to 2009 medical records Trystan suffered from seizure activity and arm contortions.  Pet'rs' Status Rep., filed Dec. 18, 2013 at 4.  However, the ruling states that Trystan did not have any arm contortions, rigidity, hypotonia, or twitches until he was around one year old.  Ruling ¶¶ 10-20.

In addition to questions about whether Dr. Steinman assumed facts inconsistent with the Ruling Finding Facts, Dr. Steinman's opinions in his May 17, 2013 and September 13, 2013 reports seem to be outside the bounds of opinions typically offered by experts for petitioners in the Vaccine Program.  See Hodges v. Sec'y of Health & Human Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that special masters may use their "accumulated expertise" in deciding cases).  Federal Circuit precedent indicates that a special master may find that a petitioner's case lacks reasonable basis even when the petitioner has an expert.  Perreira v. Sec'y of Health & Human Servs., 33 F.3d 1375 (Fed. Cir. 1994).  The discovery of genetic mutations and the diagnosis of Leigh's syndrome further complicate the assessment of the reasonable basis after the Ruling Finding Facts.

A finding that the Sanchezes' claim was supported by reasonable basis through the findings of fact opens a path to awarding the Sanchezes attorneys' fees and costs incurred through that date.  The decision to cut off the award of attorneys' fees and costs as of April 2013 does not mean that the Sanchezes' claim lacked a reasonable basis after that date.  That question remains open.

### Whether the Petitioners Should be Awarded Attorneys' Fees and Costs as a Matter of Discretion

The Federal Circuit identified some factors for a special master to consider before awarding attorneys' fees and costs on an interim basis.  These include: "protracted proceedings," "costly experts," and "undue hardship."  Avera v. Sec'y of Health & Human Servs., 515 F.3d 1343, 1352 (Fed. Cir. 2008).  This list is illustrative not exhaustive.

Except for the argument regarding reasonable basis, the Secretary does not object to the appropriateness of petitioners' interim fees at this time.  See Resp't's Resp. at 10 n.13, 15 (moving from an analysis of reasonable basis to an analysis of the amount sought without discussing Avera factors).  Factors weigh in favor of an award now.  First, this case has been pending for over four years.  Second, petitioners have retained an expert whose invoices, as of September 2013, are $15,000.00.  Third, petitioners have personally incurred costs.  Fourth, the amount of requested attorneys' fees is relatively large due, in part, to the fact hearing.  Therefore, Mr. and Mrs. Sanchez have established that an interim award is appropriate.  The remaining question is what is a reasonable amount for attorneys' fees and for attorneys' costs.

**What is a Reasonable Amount of Attorneys' Fees and Costs**

After a determination that Mr. and Mrs. Sanchez are entitled to an award of attorneys' fees and costs, the next question is to decide the reasonable amount. The Secretary disputes the amount requested in attorneys' fees and in expert fees. The Secretary has not objected to the amount requested for relatively routine costs, such as the costs associated with obtaining medical records.

A. Reasonable Amount of Attorneys' Fees

The Federal Circuit has approved the lodestar approach to determine "reasonable attorneys' fees." Avera, 515 F.3d at 1347. The lodestar approach involves a two-step process. First, a court determines an "initial estimate…by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" Id. at 1347-48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)). Secondly, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings. Id. at 1348.

Here, the Sanchezes are requesting $127,933.20 in attorneys' fees for Ms. Roquemore's work performed from July 29, 2010 to December 19, 2013.[5] This figure derives from an hourly rate of $345 or $355 per hour (depending on when the work was performed) and 343.5 hours.[6] The Secretary disputes the reasonableness of both proposed numbers. The request for attorneys' fees also includes $6,466 in compensation for paralegal work representing 53.0 hours billed at $125 per hour.

1. Ms. Roquemore's Hourly Rate

A reasonable hourly rate is "the prevailing market rate defined as the rate prevailing in the community for similar services by lawyers of reasonable skill, experience, and reputation." Avera at 1347. In Avera, the Federal Circuit found that in Vaccine Act cases, a special master should use the forum rate, the Washington, DC rate, in determining an award of attorneys' fees. Id. at 1349. However, the court adopted the Davis County exception to prevent windfalls to attorneys who work in less expensive legal markets. Id. (citing Davis County

---

[5] The figure presented in the text ($127,933.20) deviates from the figure listed in the Sanchezes' motion ($127,934.50) by a de minimis amount.

[6] The Secretary maintained that Ms. Roquemore's timesheets showed 346.60 hours. Resp't's Resp. at 17. This difference is also de minimis.

Solid Waste Mgmt. & Energy Recovery Spec. Serv. Dist. v. U.S. Envtl. Prot. Agency, 169 F.3d 755 (D.C. Cir. 1999)).  In cases where the bulk of the work is done outside of the District of Columbia, and there is a "very significant difference" between the forum hourly rate and the local hourly rate, the court should calculate an award based on local hourly rates.  Id. (finding the market rate in Washington, DC to be significantly higher than the market rate in Cheyenne, WY).

Petitioners submit that their counsel should be compensated at an hourly rate of $345.00 for work performed from July 2010 through July 2011 and $355.00 to December 2013.  Pet'rs' Fee Appl'n at 5.  Respondent objects to petitioners' hourly rate of $345.00 per hour.  Resp't's Resp. at 16.  The Secretary argues that this is one of the highest rates in the program.  Id.  The Secretary acknowledges that other special masters have awarded Ms. Roquemore $345.00 per hour yet her billing practices in this case do not justify the rate.  Id.  The Secretary alternatively argues that if Ms. Roquemore's current rate is affirmed, the number of hours billed should be reduced.  Id.

Petitioners argue that Ms. Roquemore's hourly rate of $345.00 has been approved in prior decisions.  Petitioners state that her hourly rate of $355.00 was approved recently in Guerrero.  Pet'rs' Reply at 21.

Petitioners requested hourly rate is reasonable.  For work performed in 2010, petitioners' counsel was compensated at a rate of $340.00 per hour in Broekelschen v. Sec'y of Health & Human Servs., No. 07-137V, 2011 WL 2531199, at *3 (Fed. Cl. Spec. Mstr. June 3, 2011), mot. for rev. denied, 102 Fed. Cl. 719 (2011).  Furthermore, Ms. Roquemore's requested rate is within the range for experienced attorneys in the Vaccine Program.  Similarly, the paralegal rate of $125.00 has been approved in Broekelschen and is reasonable.  Id.  Thus, the undersigned compensates Ms. Roquemore at an hourly rate of $345 or $355 and her paralegal at an hourly rate of $125.

2.  Reasonable Hours Expended

The lodestar approach requires that the reasonable hourly rate be multiplied by the number of hours "reasonably expended on the litigation."  Avera, 515 F.3d. at 1347-48.  First, counsel must submit fee requests that include contemporaneous and specific billing entries, indicating the task performed, the number of hours expended on the task, and who performed the task.  See Savin ex rel. Savin v. Sec'y of Health & Human Servs., 85 Fed. Cl. 313, 315-18 (Fed. Cl. 2008).

11

Counsel must not include in their fee request hours that are "excessive, redundant, or otherwise unnecessary." Saxton, 3 F.3d at 1521 (quoting Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)). It is "well within the special master's discretion to reduce the hours to a number that, in his experience and judgment, [is] reasonable for the work done." Id. However, the time spent by an attorney performing the work that a paralegal can accomplish should be billed at a paralegal's hourly rate, not an attorney's. Riggins v. Sec'y of Health & Human Servs., No 99-382V, 2009 WL 3319818, at *25 (Fed. Cl. Spec. Mstr. June 15, 2009), mot. for rev. denied, (Dec. 10, 2009), aff'd, 406 Fed. Appx. 479 (Fed. Cir. 2011). Second, activities that are "purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them." Missouri v. Jenkins, 491 U.S. 274, 288 n.10 (1989). Attorneys may not separately charge for clerical or secretarial work because those changes are overhead for which the hourly rate accounts. See Bennett v. Dep't of Navy, 699 F.2d 1140, 1145 n.5 (Fed. Cir. 1983); Guy v. Sec'y of Health & Human Servs., 38 Fed. Cl. 403, 407-08 (1997).

The Sanchezes request compensation for approximately 340 attorney hours and 50 paralegal hours. The Secretary objects to the number of hours, maintaining that the request is excessive. Resp't's Resp. at 16-19. Petitioners argue that this was a very complex case and it required substantial due diligence. Pet'rs' Reply at 22.

To support her argument that the amount of time requested was excessive, the Secretary divided the case into phases and attached a multi-page appendix listing activities that allegedly took an unreasonable amount of time. This method is quite helpful because it draws the attention of the petitioners' attorney and the undersigned to specific challenges.

a.   Activities from Inception to Filing the Petition

From July 29, 2010 through October 2014, Ms. Roquemore and her paralegal took steps to prepare a petition for filing. Among attorneys who regularly represent petitioners in the Vaccine Program, Ms. Roquemore stands out for regularly filing petitions that include medical records, affidavits, and reports from experts. Ms. Roquemore's observance of the Vaccine Act's requirements (see 42 U.S.C. § 300aa−11(c)) should be applauded.

Ms. Roquemore's diligence in attempting to submit fully developed petitions necessarily involves more time and effort than petitions that are filed without medical records. In this case, Ms. Roquemore and her paralegal gathered medical

records, prepared affidavits from percipient witnesses, conducted legal research, obtained a report from Dr. Steinman, and drafted the petition.  All this work, which was done before Ms. Roquemore mailed the petition to the Clerk's Office for filing, took slightly more than 100 hours for Ms. Roquemore and more than 20 hours for her paralegal.  The asserted value for this work is $39,155.70.

The Secretary argues that spending 125 hours (totaling more than $39,000.00) is excessive before the first pleading is even filed.  Resp't's Resp. at 18.  Within the pre-petition stage, the Secretary identifies five discrete topics for which Ms. Roquemore spent an unreasonable amount of time:  drafting affidavits, conducting legal research, facilitating an expert report, preparing attorneys' fees, and drafting the petition.  The Secretary has not interposed any objection to the time spent obtaining, reviewing, and summarizing Trystan's medical records.

Trystan's medical records are the backbone on which the remainder of the case is based.  As discussed above in the context of explaining why the Sanchezes had a reasonable basis for filing their petition, the contemporaneously created medical records suggest that Trystan started having some problems in development in June 2009.  See exhibit 1 at 54 (record from Aug. 17, 2009).  This date is relatively distant from the date Trystan was vaccinated, February 5, 2009.

The Sanchezes apparently informed Ms. Roquemore that they believed that Trystan was having problems much sooner than June.  In their account, Trystan started having seizures in February, although the Sanchezes did not recognize the movements as seizures.  Ms. Roquemore drafted affidavits from the Sanchezes, which were filed as exhibits 3 and 4.  Ms. Roquemore also prepared affidavits for three other percipient witnesses, Trystan's two grandmothers and a great aunt.  Exhibits 5-7.  For these five affidavits, Ms. Roqumore spent 7.4 hours and her paralegal spent 0.3 hours.  The Secretary objects to this time.

Ms. Roquemore's time was entirely reasonable.  The affidavits change the temporal relationship between the vaccination and the onset of problems dramatically.  If the Sanchezes account were credited, then their case would have been much stronger.  Thus, Ms. Roquemore's investment of a relatively large amount of time was reasonable.  In addition, one of the witnesses spoke Spanish primarily and the language barriers contributed to some extra time.

In conjunction with preparing the affidavits, Ms. Roquemore also conducted more than 30 hours of legal research.  It appears that Ms. Roquemore read multiple

cases in which a vaccine was alleged to have caused a seizure, either with or without a fever.

An attempt to charge the Sanchezes for this much legal research at this stage of the case is unreasonable for several reasons.  First, as an attorney experienced in the Vaccine Program, Ms. Roquemore already commands relatively high hourly rates.  See Broekelschen, 102 Fed. Cl. 719, 730-31 (2011) (suggesting Ms. Roquemore may have been awarded fewer hours because her hourly rate is higher).  The flip side of this coin is that Ms. Roquemore should know enough about the Vaccine Program that she does not require extensive legal research.  See Rasmussen v. Sec'y of Health & Human Servs., No. 91-1566V, 1996 WL 752289, at *2 (Fed. Cl. Spec. Mstr. Dec. 20, 1996) (approving relatively high number of hours for an inexperienced attorney).  Second, to the extent that Ms. Roquemore was compiling an extensive and organized chart of seizure cases, this activity is a facet of learning about the law.  As such, this is part of an attorney's general obligation and should not be billed to one client discretely.  See Brown v. Sec'y of Health & Human Servs., No. 09-426V, 2012 WL 952268, at *6 (Fed. Cl. Spec. Mstr. Feb. 29, 2012) (eliminating all time Ms. Roquemore spent on research that duplicated work performed in other cases).  Instead, the attorney is indirectly compensated by working more efficiently and, thereby, charging a higher hourly rate.

Third, Ms. Roquemore conducted at least some of the legal research prematurely.  Ms. Roquemore knew or should have known that Trystan was not a typical seizure case.  The medical records showed that the doctors who treated Trystan did not diagnose Trystan as suffering from a seizure disorder.  The only mention of seizures is contained in a record from Dr. Friedman, who memorialized that the parents told her Trystan had a seizure.  Dr. Friedman diagnosed biotin-responsive basal ganglia disease.  Other disorders included mitochondria disease.  See exhibit 1 at 194-99.  In short, Ms. Roquemore was on notice that the Sanchezes' claim that the vaccinations caused Trystan to suffer seizures was problematic at the start.  These problems should have caused Ms. Roquemore to pause before spending days and days researching a condition that Trystan may not have had.  After a more definitive indication that Trystan suffered from seizures, Ms. Roquemore could have spent additional time researching cases from the Vaccine Program.

Nevertheless, these criticisms / comments about the extent to which Ms. Roquemore researched a seizure disorder in this case are not intended to suggest that attorneys should never conduct legal research.  Such a bright line rule would

14

be absurd.  Instead, the question is one of reasonableness.  Given Ms. Roquemore's experience in the Vaccine Program and the tentative nature of the claim that Trystan suffered from a seizure disorder, appropriate legal research could have been conducted relatively quickly.  In the undersigned's experience, five hours would give Ms. Roquemore ample time to reacquaint herself with seizure cases and to consider how Trystan's case compares and contrasts with them.  Consequently, the undersigned deducts 28.8 hours (at an average of $350 per hour) from Ms. Roquemore's time.

Ms. Roquemore provided the medical records and affidavits to Dr. Steinman and interacted with him while he produced the first report.  She has charged 7.2 hours for this work to which the Secretary objected.  In general, Ms. Roquemore's efforts were reasonable given the complexities of Trystan's case.  However, Ms. Roquemore sometimes charged excessively.  See Guerrero v. Sec'y of Health & Human Servs., 124 Fed. Cl. 153 (2015) (finding special master was not arbitrary in reducing Ms. Roquemore's hours in part).  The undersigned will deduct 1.0 hours (at an average of $350 per hour) from Ms. Roquemore's time.

While preparing the petition, Ms. Roquemore and her paralegal spent time relating to attorneys' fees.  Ms. Roquemore's efforts relate to attorneys' fees in general, not anything to do with the Sanchezes' case.  Thus, Ms. Roquemore should not have billed the Sanchez case.  The paralegal's time also was not reasonable.  See Guerrero v. Sec'y of Health & Human Servs., No. 12-689, 2015 WL 3745354, at *5 (Fed. Cl. Spec. Mstr. May 22, 2015) (deducting time Ms. Roquemore's paralegal spent on creating fee reports), mot. for rev. denied in relevant part, 124 Fed. Cl. 153 (2015).  The Secretary's objection is sustained in full and the undersigned deducts $604.40.

The remaining aspect of the pre-filing work to which the Secretary interposed an objection is the time spent drafting the petition.  The petition largely tracks verbatim the affidavit that Ms. Roquemore drafted for Mrs. Sanchez.  The petition incorporates events from Trystan's medical records and cites to them.  Ms. Roquemore's petition drafting activities include conferring with her clients.  She has charged 16.7 hours of time plus 3.2 hours of paralegal time.

Under the circumstances of this case, Ms. Roquemore has charged an excessive amount of time.  Before drafting the petition, she summarized medical records and she is being fully compensated for her review.  Ms. Roquemore also drafted affidavits and, despite an objection from the Secretary, she is being fully compensated for the affidavits.  Together, Ms. Roquemore's summary of medical

records and the affidavits constitute the vast majority of the petition.  The process of copying paragraphs from one document and pasting into another document could not have taken much time.  Attorneys should not charge the amount of time it takes to produce a new document when the document is actually based upon pre-existing material.  <u>Broekelschen</u>, 102 Fed. Cl. at 730-31; <u>Guerrero</u>, 2015 WL 3745354, at *6.  Because the petition largely duplicates work for which Ms. Roquemore is receiving compensation, the undersigned will allow 4 hours of attorney time and 3.2 hours of paralegal time.  This is a deduction of 13.7 hours of attorney time at $355 per hour.

For work performed before filing the petition, $23,257.80 is reasonable.

b.  Fact Hearing Preparation

After the Sanchezes filed their petition and associated evidence, the Secretary reviewed this material in her report.  The Secretary identified the discrepancy in Trystan's health in spring and summer 2009 as a significant issue.  Thus, the parties agreed to have a hearing to obtain testimony as part of the process leading to findings of fact.

The hearing was held on May 15, 2012.  Five people, including one person who required the assistance of an interpreter, testified.  The duration of the hearing was approximately 8 hours.

Beginning approximately one month before the hearing, Ms. Roquemore began preparing for the fact hearing.  In total, Ms. Roquemore spent 26.8 hours preparing.  The Secretary objects to the number of hours billed for preparing for the fact hearing.  Resp't's Resp. at 18.

The issue in the hearing was limited:  determining Trystan's health from February 2009 to October 2009.  For these eight months, Trystan saw health care providers approximately five times.  These contemporaneously created medical records provide some information.  The witnesses' affidavits, which Ms. Roquemore had already prepared, provided additional perspectives.

A reasonable, if generous, amount of time to prepare for a fact hearing involving five witnesses is 16 hours, the equivalent of two workdays.  On the first day, Ms. Roquemore can review the relevant medical records, the witnesses'

affidavits, and draft a set of questions for each witness.[7]  In my experience, an
entire workday is a generous amount of time to prepare questions to ask at the
hearing in this case.  On the second day, Ms. Roquemore can meet with the
witnesses to prepare for testifying in a courtroom and revise her set of questions.

Although there is no hard and fast rule about the reasonableness of time to
prepare for a hearing, the finding that 16 hours of time to prepare for a one-day
hearing is consistent with outcomes in other cases.  For an experienced attorney,
another special master commented that 14 hours in preparing for an entitlement
hearing "appears reasonable, if a bit lengthy."  Rodriguez v. Sec'y of Health &
Human Servs., No. 06-559V, 2009 WL 2568468, at *20 (Fed. Cl. Spec. Mstr. July
27, 2009), mot. for rev. denied, 91 Fed. Cl. 453 (2010), aff'd, 632 F.3d 1381 (Fed.
Cir. 2011).  Another special master found that the hours Ms. Roquemore spent in
preparing for a hearing were "excessive."  Brown v. Sec'y of Health & Human
Servs., No. 09-426V, 2012 WL 952268, at *5 (Fed. Cl. Spec. Mstr. Feb. 29, 2012)
(awarding, among other items, four hours to prepare one fact witness).

For these reasons, the undersigned eliminates 10.8 hours from Ms.
Roquemore's work in preparing for the fact hearing.

c.  Clerical Tasks and de Minimis Activities

With respect to Ms. Roquemore's time, the Secretary's final argument
concerns multiple small tasks for which Ms. Roquemore or her paralegal have
charged 0.1 hours.  Activities include filing through the CM/ECF system,
downloading from the CM/ECF system, and reviewing orders.  The total value of
the tasks for which the Secretary has interposed an objection is $3,667.00.

After the parties submitted briefs in the present case, the Court of Federal
Claims considered Ms. Roquemore's billing practices and found that the
undersigned special master was not arbitrary in finding that Ms. Roquemore or her
paralegal inappropriately charged for clerical tasks.  Guerrero, 124 Fed. Cl. at 160.
Although Guerrero does not constitute formally binding precedent, the reasoning in
Guerrero regarding clerical tasks is persuasive.

The undersigned has reviewed the items to which the Secretary interposed
an objection.  The undersigned finds that some activities are reasonable for either

---

[7] At the hearing, Ms. Roquemore asked relatively similar questions to Trystan's mother
and father.  She also asked relatively similar questions to Trystan's grandmothers and great aunt.

Ms. Roquemore or a paralegal to perform.  For this work, the Sanchezes are awarded $500.

### d.  Other Activities

Besides the general activities described above, Ms. Roquemore performed other work before the Ruling Finding Facts.  For example, before the fact hearing, she assessed the case after the Secretary's Rule 4 report and after the fact hearing, she proposed findings of fact.  For these phases, the Secretary has interposed objections only to clerical tasks as discussed above.  Ms. Roquemore's activities are reasonable here.

It bears repeating that the Sanchezes have not established reasonable basis for the continuation of their claim after the Ruling Finding Facts.  Thus this decision's analysis of Ms. Roquemore's time stops as of April 30, 2013.  The motion for attorneys' fees included Ms. Roquemore's time through December 19, 2013.  But whether her activities from April 30, 2013 through December 19, 2013, were reasonable remains unadjudicated.

### e.  Summary for Attorneys' Fees

From the beginning of Ms. Roquemore's representation of the Sanchezes through the end of April 2013, the month in which the Ruling Finding Facts was issued, the Sanchezes are awarded $85,291.80 in attorneys' fees.

## B.  Dr. Steinman's Expert Fees

The Sanchezes also request reimbursement for work Dr. Steinman has performed.  Dr. Steinman has charged $500 per hour.  Dr. Steinman has invoiced for 30 hours of work, 17 hours for his initial report and 13 hours for the reports that followed the Ruling Finding Facts.

The Secretary objects to Dr. Steinman's hourly rate.  Resp't's Resp. at 19. However, the undersigned finds that Dr. Steinman's hourly rate of $500.00 is reasonable.

As discussed above, the Sanchezes had a reasonable basis for their claim through the time of the Ruling Finding Facts, which was issued on April 10, 2013. Dr. Steinman's work performed before this date was reasonable.  Thus, the undersigned will compensate the Sanchezes for the 17 hours that Dr. Steinman

spent preparing his initial report.  The value is $8,500.  Of this amount, the Sanchezes paid a retainer of $2,000.  Pet'rs' Fee Appl'n, exhibit 7 (Dr. Steinman invoice).  Thus, Ms. Roquemore can be awarded the balance ($6,500).

However, whether the Sanchezes had a reasonable basis to continue their claim after the Ruling Finding Facts is much less clear.  No decision has been reached on this issue.  Therefore, the undersigned reserves evaluation of Dr. Steinman's supplemental reports until a later date.

## C. Other Costs

After the Sanchezes filed their initial submission, the Secretary interposed some objections.  The Sanchezes accepted the Secretary's modifications.  Pet'rs' Reply at 35.  The Sanchezes are awarded $743.55, representing travel, postage and copying costs.

The Sanchezes personally incurred costs for a $350.00 filing fee and a $2,000.00 retainer paid to Dr. Steinman.  The Secretary does not object to a reimbursement of these costs.  The Sanchezes are personally awarded $2,350.00.

## III.    Conclusion

There is no just reason to delay the entry of judgment on interim attorneys' fees and costs.  Therefore, in the absence of a motion for review filed under RCFC Appendix B, the clerk of court shall enter judgment in petitioners' favor.  Those fees and costs are awarded as follows:

**a.  For the attorneys' fees and costs, the Sanchezes are awarded $92,535.35.  This amount shall be paid in the form of a check payable to petitioners and petitioners' attorney, Lisa A. Roquemore, of Law Office of Lisa A. Roquemore.**

**b.  For the costs personally borne, the Sanchezes are awarded $2,350.00. This amount shall be paid in a check issued to the Sanchezes.**

The Clerk shall enter judgment accordingly.[8]

---

[8] Pursuant to Vaccine Rule 11(a), the parties can expedite entry of judgment by each party filing a notice renouncing the right to seek review by a United States Court of Federal Claims judge.

**IT IS SO ORDERED.**

s/ Christian J. Moran
Christian J. Moran
Special Master
