# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

* * * * * * * * * * * * * * * * * * * * *

TRYSTAN SANCHEZ, by and through   *
his parents, GERMAIN SANCHEZ and  *
JENNIFER SANCHEZ,                 *
                              *
                              * No. 11-685V
    Petitioners,  *
                              * Filed: December 8, 2021
v.                                *
                              *
SECRETARY OF HEALTH               * Attorneys' Fees and Costs on an
AND HUMAN SERVICES,               * Interim Basis; Reasonable Basis;
                              * Reasonable Number of Attorney
    Respondent.   * Hours.

* * * * * * * * * * * * * * * * * * * * *

Lisa A. Roquemore, Law Office of Lisa A. Roquemore, Rancho Santa Margarita, CA, for petitioners;
Jennifer L. Reynaud, United States Dep't of Justice, Washington, D.C., for respondent.

## PUBLISHED DECISION AWARDING ATTORNEYS' FEES AND COSTS ON AN INTERIM BASIS FOR A SECOND TIME[1]

The petitioners in this lengthy litigation, Mr. and Mrs. Sanchez, seek a second award of attorneys' fees and costs on an interim basis. They allege that a set of vaccines that their son, Trystan, received on February 5, 2009, caused him to suffer fever and subsequent seizure activity / disorder leading to his developmental issues. Pet., filed Oct. 17, 2011, at 12. They seek compensation pursuant to the National Childhood Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10 through 34 (2012).

---

[1] The E-Government Act, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services), requires that the Court post this decision on its website. Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website.

They filed a motion requesting a second award of attorneys' fees and costs on an interim basis.  Pet'rs' Fee Appl'n, filed Apr. 22, 2020.  The Secretary opposed this request, arguing that the Sanchezes did not possess a reasonable basis to prosecute the case during the time for which the Sanchezes seek attorneys' fees and costs.  Resp't's Resp., filed Sept. 11, 2020.

For the reasons explained below, the Secretary's position that the Sanchezes did not have reasonable basis is not persuasive.  Because the Sanchezes possessed a reasonable basis for prosecuting their claim through the time of the fee application, they are eligible for an award of attorneys' fees and costs on an interim basis.  As further outlined below, a reasonable amount of attorneys' fees and costs is **$581,933.38**.

## I.   Procedural History

The course of this case has been lengthy.  It has moved through several discrete phases, which are summarized below.

### A.   Events Before the Ruling Finding Facts

An abbreviated recitation of the procedural history begins with the filing of the petition, medical records (exhibit 1), expert report of Lawrence Steinman, M.D. (exhibit 2), and affidavits (exhibits 3-8) on October 21, 2011.  The medical records show that on February 5, 2009, Trystan received the diphtheria-tetanus-acellular pertussis ("DTaP"), hepatitis B, haemophilus influenzae type B, and pneumococcal conjugate vaccines.

In Mrs. Sanchez's affidavit, she asserted that Trystan was meeting all of his developmental milestones until he was six months old when he received vaccinations on February 5, 2009.  Exhibit 3 at ¶ 4.  Mrs. Sanchez asserted that on February 16, 2009, Trystan had a seizure.  Id. at ¶ 6.  She also maintained that between February 7, 2009 and April 29, 2009, Trystan's "developmental pace seemed to slow."  Id. at ¶ 8.

Unlike most petitioners, the Sanchezes included a report from their expert, Dr. Steinman, in the initial submissions.  Exhibit 2.  Dr. Steinman accepted the accuracy of Mrs. Sanchez's allegations.  Relying on Mrs. Sanchez's allegations, Dr. Steinman stated Trystan "may have had a seizure."  Id. at 1.  He proposed that the pertussis vaccine and the alum adjuvant in it can cause seizures.  Id. at 10.  Ultimately, Dr. Steinman opined that based upon the temporal relationship, his

medical expertise, and the medical literature, Trystan would not have suffered from seizures and developmental delay had he not received the vaccinations.  Id. at 14.

The Secretary indicated that petitioners were not entitled to compensation. The Secretary argued that although Dr. Steinman opined that Trystan had seizures beginning 11 days after receiving his six-month vaccinations, no contemporaneous medical records indicated Trystan in fact suffered these seizures.  Resp't's Rep., filed Feb. 28, 2012, at 12.[2]

The Sanchezes recognized that the recitation of events in the affidavits did not match the events in the contemporaneous medical records.  Pet'rs' Supp. to Pet., filed Mar. 6, 2012.  The affidavits asserted that shortly after Trystan received his vaccinations, he experienced seizures and developmental delay.  However, there are no medical records from around February 2009 that discuss either seizures or developmental delay.  Because of this discrepancy, a fact hearing was held on May 15, 2012.  Mr. and Mrs. Sanchez as well as Germain's mother and aunt, Lupe Sanchez and Bertha Sanchez, and Jennifer's mother, Emma Fernandez testified.

### B.    Ruling Finding Facts

On April 10, 2013, the undersigned issued a Ruling Finding Facts.  The Ruling Finding Facts generally accepted the accuracy of medical records created contemporaneously with events described in the records.  The ruling, therefore, generally did not credit testimony given much later in time.  For example, the Ruling Finding Facts expressly found that Trystan did not contort his arm in February 2009.  Ruling Finding Facts at 13, ¶ 11.  The Ruling Finding Facts also ordered the parties to provide the ruling to any expert they retained.

### C.    Events from the Ruling Finding Facts Through Anticipated Start of Hearing

On May 22, 2013, the Sanchezes filed an amended expert report by Dr. Steinman.  Exhibit 17.  Dr. Steinman repeatedly asserted that Trystan suffered from seizures.  Dr. Steinman stated that Trystan's arm contortions started as early as February 16, 2009.  Exhibit 17 at 2 n.1, 3.  However, these assertions did not

---

[2] With her report, the Secretary filed a report from Gerald Raymond, M.D.  Dr. Raymond disagreed with Dr. Steinman and concluded that although Trystan suffered from "developmental delay with associated imaging abnormalities," there was "no evidence that his condition resulted from or was exacerbated by any of the immunizations received."  Exhibit A at 7.

match the Ruling Finding Facts.  <u>See</u> order, issued June 14, 2013.  In addition, Dr. Steinman's May 17, 2013 report was not clear about the medically appropriate interval.  Thus, the Sanchezes were ordered to file another supplemental report from Dr. Steinman.

The Sanchezes filed a third report by Dr. Steinman on September 16, 2013.  Exhibit 28.  Dr. Steinman again asserted that Trystan had a seizure on February 16, 2009.  Exhibit 28 at 2.  The Secretary questioned the basis for this assertion and requested clarification as to whether Dr. Steinman believed that Trystan suffered other seizures.  The Sanchezes were ordered to file a status report addressing seizures.  Order, issued Dec. 11, 2013.[3]  In addition, the parties were ordered to plan for a hearing in July, August, or September 2014.

The Sanchezes filed the status report regarding seizure activity on December 18, 2013.  They maintained that Trystan suffered seizure activity, including arm contortions, in "March 2009, (April and May 2009 per Dr. Friedman medical record notes), August 2009, October/November 2009 after another set of vaccinations, December 2009, September and October 2010."  Pet'rs' Status Rep., filed Dec. 18, 2013, at 4.

In a January 28, 2014 status conference held to discuss the petitioners' status report about seizures, the Secretary's attorney characterized the Sanchezes' position as "logical insanity."  In the Secretary's view, the Sanchezes could not rely upon Dr. Friedman's August 3, 2010 record to deviate from the findings of fact.

On April 4, 2014, the Secretary filed supplemental reports from Drs. Raymond and McGeady.  Exhibits E-F.  The Secretary added a report from Edward Cetaruk, a toxicologist.  Exhibit G.  Respondent's experts criticized Dr. Steinman's reports, noting his reliance on allegations unsubstantiated by the medical record or medical literature.  Drs. Raymond and Cetaruk also indicated that Trystan had not been diagnosed with any particular condition, and a lack of diagnosis makes Dr. Steinman's attempt to link Trystan's condition to the vaccinations scientifically inappropriate.  Exhibit E at 2; exhibit G at 17.  Both

---

[3] After Dr. Steinman's September 13, 2013 report and before the December 6, 2013 status conference, the Secretary filed a report from Stephen J. McGeady, M.D.  Exhibit C.  Dr. McGeady questioned Dr. Steinman's assumption that Trystan suffered a seizure.  Dr. McGeady noted that none of Trystan's doctors had diagnosed him with a seizure disorder and none had prescribed anticonvulsant medications.  Exhibit C at 14.

doctors stated that additional testing would be necessary to diagnose Trystan definitively and accurately.

In an April 10, 2014 status conference, the undersigned extensively reviewed the criticisms of Dr. Steinman's opinions, beginning with the lack of diagnosis and continuing through each of the three prongs set forth in Althen v. Secretary of Health & Human Services, 418 F.3d 1274, 1278 (Fed. Cir. 2005). The undersigned expressed concern that the Sanchezes may lack a reasonable basis to proceed to hearing. The undersigned encouraged the Sanchezes to file a supplemental report from Dr. Steinman before the entitlement hearing, which was scheduled for September 10-12, 2014. Order, issued Apr. 11, 2014, at 1.

The undersigned offered more guidance in an order for pre-trial briefs, issued May 13, 2014. The undersigned reiterated the previous comment that "there may not be a reasonable basis to proceed to hearing." Preh'g Order, issued May 13, 2014, at 11. Based on the existing record, Trystan did not have a diagnosis, which could be an issue for petitioners under Broekelschen v. Secretary of Health & Human Services, 618 F.3d 1339, 1346 (Fed. Cir. 2010). The undersigned noted that respondent's critiques on the Althen prongs appeared persuasive. Preh'g Order, issued May 13, 2014, at 11. Finally, the undersigned stated that "One purpose of this order was to identify the shortcomings in petitioners' case so that, if possible, they can address the deficiencies before the hearing." Id. If petitioners wanted, they could file another supplement expert report by Dr. Steinman. Id. at 11-12.

Petitioners filed a fourth supplemental expert report by Dr. Steinman on May 29, 2014. Exhibit 36. In his fourth report, Dr. Steinman addressed issues and criticisms made in respondent's expert reports and outlined the potential conditions from which Trystan may be suffering. These conditions include mitochondrial disorder, encephalopathy, and other neurologic conditions, all of which Dr. Steinman opined are the result of or were aggravated by the vaccinations. Id. at 15-16.

Mr. and Mrs. Sanchez also filed a status report regarding genetic testing. The Sanchezes stated that Trystan's treating doctor, Dr. Haas, ordered genetic testing for which their insurance would pay. Exhibit 52. The Sanchezes requested a continuance of the hearing, set for September 10-12, 2014, while the genetic tests were pending. Pet'rs' Status Rep., filed June 23, 2014. After a status conference, the undersigned canceled the September 2014 hearing and suspended the obligation to file briefs before the hearing. Order, issued July 8, 2014.

### D.     Petitioners' First Request for Attorneys' Fees and Costs on an Interim Basis

On September 18, 2014, petitioners filed a motion for an award of attorneys' fees and costs on an interim basis.  Petitioners requested $128,860.31 in attorneys' fees and miscellaneous costs.  Although the Sanchezes filed their motion in September 2014, the attorneys' timesheets stop in December 2013.  The petitioners requested $15,000.00 for Dr. Steinman's work from April 2011 to September 2013.  Finally, the Sanchezes requested $2,350.00 for costs that they personally incurred.

The Secretary opposed the Sanchezes' application for attorneys' fees and costs on an interim basis.  The Secretary presented two arguments.  First, he contended that the Sanchezes' claim lacked reasonable basis entirely.  Second, even if the case were supported by reasonable basis, the Sanchezes were requesting an unreasonable amount.  Resp't's Resp., filed Nov. 24, 2014, at 10, 15.

The Sanchezes, in turn, filed a reply.  They maintained that reasonable basis supported their claim throughout its duration.  They also generally defended the amount requested in attorneys' fees and costs.  Pet'rs' Reply, filed Dec. 12, 2014.

### E.     Events from the Submission of the Request for Attorneys' Fees and Costs Until the First Decision Awarding Attorneys' Fees and Costs

On January 23, 2015, the Sanchezes filed genetic tests that revealed that Trystan had a mutation in two genes.  Exhibit 59.  The company that performed the tests characterized them as "disease-causing mutation[s]."  Id.  In a February 3, 2015 status conference, the Secretary's attorney questioned why the case was continuing.  In her view, there was even less of a basis given Trystan's genetic mutations.  Nevertheless, the Sanchezes wanted to press forward.

By March 2015, Dr. Haas diagnosed Trystan as suffering from Leigh's disease.  Exhibit 62.[4]  He also wrote a letter stating that Trystan had a genetic disease.  Id.

The undersigned provided an article on Leigh syndrome on May 8, 2015. Exhibit 1001.  Leigh syndrome is a neurological disorder that usually manifests in

---

[4] Dr. Haas had diagnosed Trystan with a mitochondrial disorder in June 2014.  Exhibit 52.

the first year of life.  Id. at 1.  The condition involves progressive loss of mental and movement abilities and carries a poor prognosis.   Id.

In an ensuing status conference, the undersigned discussed the significance of the genetic testing and Dr. Haas's diagnosis.  Because the genetic mutation existed before vaccination, an important question was how would Trystan be but for the vaccinations?  The Secretary continued to question the viability of the case after the Ruling Finding Facts because the onset of neurologic problems seemed to be months after vaccination.  The Sanchezes expressed an intent to pursue a claim that the vaccinations significantly aggravated Trystan's Leigh's disease.  See order, issued Oct. 1, 2015.

In December 2015, the Sanchezes filed two additional expert reports.  To discuss the anticipated course of Leigh's disease, the Sanchezes presented the opinion of a new expert, Dmitriy Niyazov, M.D.  Dr. Niyazov asserted that the vaccinations caused Trystan's Leigh's disease.  Dr. Niyazov reasoned that the genetic defect could have remained dormant but for the vaccinations.  Exhibit 68 at 8.

The Sanchezes also filed another supplemental report from Dr. Steinman.  Dr. Steinman largely reasserted the theories by which the vaccinations could have caused a neurologic problem but placed these theories in the context of Leigh's disease.  Exhibit 95.

### F.   First Decision Awarding Attorneys' Fees and Costs

Although the Secretary had opposed any award of attorneys' fees and costs, see Resp't's Resp., filed Nov. 24, 2014, at 10, the undersigned found that Dr. Steinman's first report provided a reasonable basis for the claims set forth in the petition.  In short, the petition alleged that the vaccines caused Trystan to suffer seizures.  The assertion that Trystan suffered seizures primarily rested upon affidavits from Trystan's parents and other family members.  Dr. Steinman, in turn, provided a theory by which the vaccinations could have caused the seizures.

The undersigned's finding of reasonable basis extended only through the Ruling Finding Facts on April 10, 2013.  After the Secretary challenged the amount of time Ms. Roquemore spent on some activities, the undersigned reduced the amount of attorneys' fees awarded.  First Interim Fees Decision, 2016 WL 909186 (Fed. Cl. Spec. Mstr. Feb. 17, 2016).

### G.      Events from First Interim Fees Decision Until Hearing on December 4, 2017

Following the First Interim Fees Decision, the parties continued to develop evidence.  For the Secretary, Dr. Raymond wrote another report opining that Trystan's genetic mutation was the sole cause of his Leigh's syndrome and that the vaccinations did not cause or aggravate his illness.  Exhibit H at 8.

The Sanchezes responded by filing another report from Dr. Niyazov. Exhibit 102.  Dr. Niyazov questioned the interpretation of the genetic studies.  In response, the Secretary presented the ACMG Guidelines.  Exhibit J (filed June 10, 2016).  Dr. Niyazov addressed this material in another report.  Exhibit 132.  At this point, the presentation of reports from specially retained experts appeared largely complete.

Under the assumption that the parties had disclosed their experts' opinions and the bases for those opinions, the parties and the undersigned attempted to find mutually convenient dates for a multi-day hearing involving six experts.  Due to previous commitments, including the undersigned's commitments in other cases, an order issued on August 1, 2016 set the case for a hearing starting more than a year later, on December 4, 2017.  With a trial expected, the Sanchezes and Ms. Roquemore announced that another attorney, Sheila Bjorklund, was assisting them. Pet'rs' Notice, filed Mar. 23, 2017.

Thus, the next step was to direct the parties to file briefs.  Order, issued Mar. 21, 2017.  In compliance with the March 21, 2017 order, the Sanchezes submitted several items, including a brief and demonstrative exhibits.  The Secretary filed his brief on September 1, 2017.

Separately, the Secretary argued that the case should not proceed to a hearing.  Resp't's Mot. for Judgment on the Record, filed Oct. 18, 2017.  The next day, the Sanchezes opposed this motion and requested an exigent determination. Pet'rs' Resp., filed Oct. 19, 2017.  The Sanchezes later supplemented their opposition.  Pet'rs' Resp., filed Nov. 9, 2017.

The Secretary's motion was denied, mostly due to procedural reasons. Order, issued Nov. 14, 2017.  Due to commitments to conduct hearings in other cases, the undersigned ordered the hearing to proceed rather than rule on the Secretary's motion.  Id.  The undersigned denied the Secretary's motion without regard to the merit (or lack thereof) of the motion.  Id.  After this order, the parties

8

updated the curricula vitae for their experts and the Sanchezes filed 10 additional articles before the hearing started.

From the First Interim Fees Decision (February 17, 2016) through the completion of the hearing in December 2017, Ms. Roquemore's requested fees exceed $180,000.00. See Ms. Roquemore's Declaration, ¶¶ 22-23, found at Pet'rs' Mot., page 24-25.

### H.   Events from Hearing to Decision

The hearing was held on four days, December 4-7, 2017. Following the hearing, the undersigned did not order the parties to file briefs.

The undersigned found that the Sanchezes had not established that the vaccinations harmed Trystan. First Decision, 2018 WL 5856556, at *13 (Oct. 9, 2018). The undersigned found that the Sanchezes met their burden of showing that the vaccines can cause the initial manifestations of Leigh's syndrome. Id. However, the timing of Trystan's manifestation of Leigh's syndrome was inconsistent with the vaccinations being the cause of the illness. Id. The undersigned found that the evidence did not sufficiently establish that Trystan's neurological deterioration began on February 5, 2009. Id. at *14. Instead, the undersigned found that the medical records supported a finding that Trystan's deterioration did not begin until May 2009. Id. The three-month delay between Trystan's vaccinations and the onset of Leigh's syndrome is inconsistent with vaccine-causation. Id.

### I.   Appellate Activity

The Sanchezes challenged the October 9, 2018 decision. Pet'rs' Mot. for Rev., filed Nov. 8, 2018. The Sanchezes primarily argued that their affidavits and testimony regarding the onset of Trystan's illness in February 2009 should have been given more weight. Id. at 14-19. The Sanchezes further argued that even if Trystan's illness did not begin until May 2009, the timing is consistent with vaccine-causation. Id. at 20-24. The Sanchezes relied on medical literature Edmonds, Shoffner, and Naviaux and the expert testimony of Dr. Niyazov to support their theory that neurological degeneration can occur within weeks to months after vaccination. Id. at 22-24. Finally, the Sanchezes argued that the undersigned should have given more consideration to the rechallenge argument that the combined effect of Trystan's February and August vaccinations aggravated his illness. Id. at 34-37.

After the Secretary responded contesting the reliability of the Sanchez's affidavits and their theory of timing, the Sanchezes filed a reply reasserting their position. For the work at the Court of Federal Claims, Ms. Roquemore has requested fees slightly more than $60,000.00. See Ms. Roquemore's Declaration, ¶ 26, found at Pet'rs' Mot., page 26.

The Court denied the motion for review. Opinion, 142 Fed. Cl. 247 (2019). Accordingly, judgment was entered.

The Sanchezes appealed this judgment. They filed a primary brief and a reply brief at the Federal Circuit. Ms. Roquemore's request for the written submissions to the Federal Circuit is approximately $87,000.00. See Ms. Roquemore's Declaration, ¶ 27, found at Pet'rs' Mot., page 27.

Ms. Roquemore also appeared at an oral argument in Washington, DC. The charges associated with this work are approximately $60,000.00. See Ms. Roquemore's Declaration, ¶ 28, found at Pet'rs' Mot., page 27.

The Federal Circuit identified an error in the October 9, 2018 decision, vacated the February 11, 2019 judgment, and remanded for additional consideration. 809 F. App'x 843 (Fed. Cir. 2020).

## J.    Motion for a Second Award of Attorneys' Fees and Costs on an Interim Basis

Approximately two weeks after the Federal Circuit's Opinion, the Sanchezes requested another award of attorneys' fees and costs on an interim basis. This request begins with Ms. Roquemore's work in May 2013 and ends shortly after the Federal Circuit's remand. Fee exhibit 2 (timesheets). Ms. Roquemore's time entries are presented on 231 pages.

Ms. Roquemore courteously consented to a schedule in which the Secretary's response to the motion for attorneys' fees and costs was delayed until September 4, 2020, to allow the parties to focus on the proceedings on remand. Order, issued June 12, 2020. The Secretary opposed any award of attorneys' fees and costs. Resp't's Resp., filed Sept. 11, 2020. The Sanchezes replied on October 22, 2020.

### K.    Events After the Filing of the Motion for a Second Interim Award of Attorneys' Fees and Costs

As just noted, the pending motion for attorneys' fees and costs ends with Ms. Roquemore's work on April 22, 2020.  After that date, Ms. Roquemore has continued to represent the Sanchezes.  The Sanchezes filed additional reports from Dr. Steinman and Dr. Niyazov (exhibits 195-96), participated in a hearing on July 9, 2021, and submitted written arguments on July 29, 2021 and August 5, 2021.

After an August 26, 2021 decision found that they were not entitled to compensation, the Sanchezes filed a second motion for review.  They supported their motion with a reply brief, filed October 30, 2021.  The Court denied this motion for review.  Opinion, 152 Fed. Cl. 782 (2021).

The Sanchezes returned to the Federal Circuit.  Their appeal remains pending.  None of the activities after the Federal Circuit's remand are encompassed with the pending motion for attorneys' fees and costs.

## II.    Analysis

Broadly speaking, to resolve the pending motion for an award of attorneys' fees and costs on an interim basis, there are three issues.  The first is whether petitioners are eligible for attorneys' fees and costs.  The second is whether petitioners should receive any attorneys' fees and costs at this time as a matter of discretion.  The third question is, assuming that some award is appropriate, what constitutes a reasonable amount in this case.

### A.    Whether the Petitioners' Case Satisfies the Requirements for an Award of Attorneys' Fees and Costs

Petitioners who have not yet been awarded compensation may be entitled to an award of attorneys' fees and costs when "the petition was brought in good faith and there was a reasonable basis for the claim." 42 U.S.C. § 300aa-15(e)(1).  Here, the parties have disputed and are disputing the reasonable basis.

The controversy regarding reasonable basis started when the Sanchezes requested an award of attorneys' fees and costs on an interim basis on September 18, 2014.  In response, the Secretary challenged the reasonable basis because, in part, Dr. Steinman's first report relied on facts in affidavits that are not found in medical records created contemporaneously.  Resp't's Resp., filed Nov. 24, 2014, at 12; see also section I.D. above.

11

The First Interim Fees Decision found that Dr. Steinman's report justified a finding of reasonable basis through the Ruling Finding Facts. The case seemed to turn with the Ruling Finding Facts. The Ruling states that Trystan did not have any arm contortions, rigidity, hypotonia, or twitches until he was around one year old. Ruling ¶¶ 10-20. Because these conditions appeared to be predicates for Dr. Steinman's previously issued opinions, the continued reliability of Dr. Steinman's opinions seemed questionable. See Burns v. Sec'y of Health & Hum. Servs., 3 F.3d 415, 417 (Fed. Cir. 1993) (a special master may disregard an expert's report that assumes assertions not established by a preponderance of the evidence). Thus, the First Interim Fees Decision left open the question as to whether the Sanchezes had a reasonable basis to continue their case after the Ruling Finding Facts. See section I.F. above.

As noted in the procedural history, the Sanchezes did prosecute their case and are still appealing the judgment to the Federal Circuit. During this litigation, in advance of the two scheduled entitlement hearings, the undersigned expressed concerns about the reasonable basis to proceed. For example, the first order for submissions in advance of a hearing advised "on the existing record, there may not be a reasonable basis to proceed to a hearing." Order, issued May 13, 2014, at 11.

The May 13, 2014 order was based "on the existing record." At that time, doctors had not determined what condition was afflicting Trystan. Without a diagnosis, the Sanchezes' ability to define the injury for which they were seeking compensation was doubtful. See Broekelschen, 618 F.3d at 1346 (requiring petitioners to establish the condition a vaccine allegedly caused). In response, the Sanchezes requested a delay in the hearing and eventually Dr. Haas determined that Trystan suffered from Leigh's syndrome.

While the diagnosis of Leigh's syndrome eliminated any Broekelschen dispute, the genetic basis for Leigh's syndrome raised challenges for the Sanchezes in showing that a vaccination harmed Trystan. ("Harmed," here refers to either caused the Leigh's syndrome or significantly aggravated the Leigh's syndrome.) See Order, issued May 8, 2015.

To address Trystan's Leigh's syndrome, the Sanchezes obtained a report from Dr. Steinman, which tracked the Ruling Finding Facts. Exhibit 95 at 8. In addition, the Sanchezes brought in Dr. Niyazov, who has expertise in mitochondrial diseases.

After the Leigh's syndrome diagnosis and the detection of two mutations in Trystan's genes, the Secretary's expert, Dr. Raymond, maintained that the genetic mutations were the cause of the Leigh's syndrome.  Exhibit H.  The parties were expected to advocate for their positions in briefs filed in advance of the hearing.

Following a review of the evidence and the briefs, the undersigned advised he "continues to have concerns about the reasonable basis to proceed to a hearing." Order, issued Oct. 13, 2017, at 1.  Similarly, in response to the Secretary's motion for judgment without a hearing, the undersigned stated that the case would continue "despite the undersigned's expression about the reasonable basis to proceed to a hearing."  Order, issued Nov. 14, 2017.

In the hearing, the testimony from Dr. Niyavoz was much stronger than the undersigned expected.  Dr. Niyavoz's testimony provided a credible, but ultimately not persuasive, reason to find that the genetics did not explain everything.  See First Decision, 2018 WL 5856556, at *22-25.

In the Sanchezes' motion for review, they argued, among other points, that the First Decision was inconsistent with the Ruling Finding Facts.  The Court, however, disagreed.  142 Fed. Cl. at 258.

At the Federal Circuit, the Sanchezes again pressed an argument regarding the discrepancy.  The Federal Circuit agreed and stated that this issue should be considered again.  809 F. App'x at 852-53.

The Federal Circuit's opinion was the last significant action by a judicial officer before the Sanchezes filed their pending motion for attorneys' fees and costs.  They asserted that they possessed reasonable basis.  Pet'rs' Mot. at 5.

In a status conference to discuss proceedings on remand, the undersigned directed the Secretary to address reasonable basis particularly in regard to the Sanchezes' success at the Federal Circuit.  Order, issued June 12, 2020 and clarified on June 15, 2020.  These orders, as noted previously, delayed the Secretary's response to the motion until September 4, 2020, which was later extended to September 11, 2020.

The Secretary argued "this claim lost reasonable basis in April 2013." Resp't's Resp., filed Sept. 11, 2020, at 6.  The primary reason is that "none of the contemporaneous, objective medical records suggest that Trystan's progressive neurological decline began with or soon after his February 5, 2009 vaccinations, as

13

would be required for petitioners to demonstrate a causal relationship between Trystan's vaccinations and his Leigh's syndrome." Id. at 6 (citing Remand Decision, 2020 WL 5641872, at *8-14, *38-67 (Fed. Cl. Spec. Mstr. Aug. 26, 2020).

The Sanchezes' reply presents arguments in two themes.  First, the Sanchezes respond directly to the Secretary's argument regarding the onset of Trystan's neurologic decline.  Referring to the First Decision's finding that Trystan's arm contorted 10 days after vaccination, the Sanchezes maintain "this *old* concern regarding Dr. Steinman's alleged disregard of the Findings of Facts should be, by now, laid to rest given the Decision and given that Dr. Steinman, a highly qualified neurologist, interpreted the medical records and doctor notes differently from the Court." Pet'rs' Reply at 4.  They continue: "However, such alleged concerns keep cropping up in Respondent's briefings in regard to the reasonable basis issue without recognizing and squaring up how the fact findings had changed and the fluidity of this case." Id.

The second theme concerns the issue that the Secretary did not address—the rulings by the Court of Federal Claims and the Federal Circuit.  "[A]t no point in time did either Judge Campbell-Smith or the Federal Circuit state that Petitioner[s'] Motions for Review or the Federal Circuit appeal were without reasonable basis." Id. at 6.

The undersigned finds that the Sanchezes' arguments regarding their reasonable basis to continue the case persuasive.  While the undersigned cautioned the Sanchezes that their case may lack a reasonable basis, the warning to be cautious is just that, a warning.  In other cases, petitioners have not heeded these warnings and then have not been awarded the attorneys' fees and costs.  See, e.g., Frantz v. Sec'y of Health & Hum. Servs., 146 Fed. Cl. 137, 144 (2019) (ruling that the special master was not arbitrary in finding reasonable basis ceased after the Secretary presented expert reports refuting petitioner's evidence); Rehn v. Sec'y of Health & Hum. Servs., No. 14-1012V, 2017 WL 1011487, at *6 (Fed. Cl. Mar. 2, 2017) (after first counsel withdrew, second counsel was on notice that case might lack a reasonable basis).  But a warning is not a ruling.

Here, after the undersigned's warnings, the Sanchezes strengthened their case.  With assistance from Dr. Haas, the Sanchezes put forward a diagnosis for Trystan.  Then, with their retained expert Dr. Niyavoz, the Sanchezes presented oral testimony regarding genetics that was credible, although not persuasive.

Moreover, the Sanchezes persuaded the Federal Circuit to vacate the October 9, 2018 Decision, and ensuing judgment of February 11, 2019. Their success would seem to indicate that the outcome of the appeal is consistent with a finding of reasonable basis.[5] While the question of reasonable basis was not before the Federal Circuit, the Federal Circuit did not suggest that the appeal bordered on frivolous such that an award of attorneys' fees would not be appropriate. Accordingly, the Sanchezes are eligible for an award of attorneys' fees and costs on an interim basis.

## B. Whether the Petitioners Should Be Awarded Attorneys' Fees and Costs as a Matter of Discretion

Before awarding attorneys' fees and costs on an interim basis, a special master must consider various factors. These include: "protracted proceedings," "costly experts," and "undue hardship." Avera v. Sec'y of Health & Hum. Servs., 515 F.3d 1343, 1352 (Fed. Cir. 2008). This list is illustrative, not exhaustive.

The Secretary did not present any argument regarding the Avera factors and any argument would appear difficult to justify as the circumstances support a second interim award. First, Ms. Roquemore has worked on this case for many years after the First Interim Fees Decision. Second, petitioners have retained two experts whose invoices exceed $15,000.00. Third, petitioners have personally incurred costs. Therefore, Mr. and Mrs. Sanchez have established that an interim award is appropriate. The remaining question is what is a reasonable amount for attorneys' fees and for attorneys' costs.

## C. What Is a Reasonable Amount of Attorneys' Fees and Costs

With respect to the process for determining the reasonableness of the amount requested in attorneys' fees and costs, the pending motion for a second interim award contrasts with the first motion for an interim award. To review, after the Sanchezes sought an interim award of attorneys' fees, totaling $128,860.31, Pet'rs' Mot., filed Sept. 18, 2014, the Secretary objected to the amount requested. The Secretary pointed out aspects of the case in which the billing was excessive. Resp't's Resp., filed Nov. 24, 2014, at 10, 15. The undersigned resolved those

---

[5] By way of contrast, unsuccessful appellate review often still is found to be reasonable. See, e.g., Hirmiz v. Sec'y of Health & Hum. Servs., 135 Fed. Cl. 260 (2017). If *unsuccessful* appeals merit awards of reasonable attorneys' fees and costs, then the Secretary would have been well served to advance some argument why the Sanchezes lacked a reasonable basis to appeal to the Federal Circuit.

disputes and found that a reasonable amount of attorneys' fees was $94,885.35. First Interim Fees Decision, 2016 WL 909186, at *1.[6]

Adjudication of the present motion is following a different process. After the Sanchezes requested this second award, the undersigned "invited" the Secretary to provide his "views regarding the amount requested." Order, issued June 15, 2020 (citing D.G. v. Sec'y of Health & Hum. Servs., No. 11-577V, 2020 WL 3265015, at *5 n.8 (Fed. Cl. Spec. Mstr. May 22, 2020)). However, the Secretary did not address the reasonableness of the amount requested, other than to present the entirely unpersuasive argument that the case lacked reasonable basis. Resp't's Resp., filed Sept. 11, 2020. This omission led the Sanchezes to reinforce their request for attorneys' fees and costs, arguing "Respondent did not accept the Special Master's invitation to address its views on the amount requested. Thus, Petitioners respectfully request all fees and costs be approved as reasonable." Pet'rs' Reply, filed Oct. 8, 2020, at 7.

While the Sanchezes' proposal has some appeal, see Dorego v. Secretary of Health & Human Services, No. 14-337V, 2016 WL 1635826, at *4-5 (Fed. Cl. Spec. Mstr. Apr. 4, 2016), the Court of Federal Claims requires that special masters evaluate the reasonableness of the amount requested independently. McIntosh v. Sec'y of Health & Hum. Servs., 139 Fed. Cl. 238 (2018). In other words, the undersigned cannot simply approve the Sanchezes' request because the Secretary did not raise any objections. Instead, the undersigned is obligated to review the motion.

The review of the request was hampered by the way Ms. Roquemore presented her invoices, which exceed 200 pages. The undersigned requested that Ms. Roquemore present an electronic version of her invoices in an excel spreadsheet "if it would be relatively easy for petitioners' counsel to do so." Order, issued June 12, 2020; accord Order, issued July 1, 2020, ¶ 6. Ms. Roquemore represented that as her paralegal and she understood how the Timeslips program functioned, she could not. Pet'rs' Status Rep., filed Jan. 14, 2021. However, according to information available on the internet about Timeslips, Timeslips can present individualized reports for each client and reports in excel format. Order, issued Jan. 29, 2021, and attachment (Professional Billing that

---

[6] The amount requested does not exactly correspond to the amount awarded because the motion requested attorneys' fees for work performed through December 2013, but the First Interim Fees Decision found that the Sanchezes were eligible for attorneys' fees through April 2013.

<u>Simply Works</u>, Sage Timeslips, https://timeslipssage.com/ (last visited Dec. 8, 2021); <u>Sage Timeslips Features: Export to Excel or Word</u>, Sage City, https://www.sagecity.com/us/sage_timeslips/f/sage-timeslips-features/126199/export-to-excel-or-word (last visited Dec. 8, 2021)).

The lack of an electronic record has increased the amount of time the undersigned has spent reviewing the application, increasing the delay to the Sanchezes, their attorney, and the experts whom they retained.  The undersigned's attention to this fee application has, consequently, delayed the processing of cases involving other petitioners and other attorneys.  This situation can be remedied.  Just as attorneys were directed to refrain from submitting handwritten invoices, <u>see</u> <u>Schueman v. Secretary of Health & Human Services</u>, No. 04-693V, 2010 WL 3421956, at *2 (Fed. Cl. Spec. Mstr. Aug. 11, 2010), so, too, Ms. Roquemore may be ordered to submit electronic versions of her invoices.  <u>See</u> <u>Robinson v. City of Edmund</u>, 160 F.3d 1275, 1285 n.11 (10th Cir. 1998) (a trial court "may quite properly impose on the claimant the burden or organizing or summarizing the billing records in such a manner to facilitate judicial review of the reasonableness of the claim for attorneys' fees"); Rule 1.1(a) of the California Rules of Professional Conduct, comment [1] ("The duties set forth in this rule include the duty to keep abreast of changes in the law and its practice, including the benefits and risks associated with relevant technology.").[7]

First, the undersigned considers the Sanchezes' request for attorneys' fees.  To determine the reasonable amount of attorneys' fees, the court uses the lodestar approach.  Using the lodestar approach, the undersigned addresses the reasonable amount of attorneys' fees for Ms. Roquemore.  Then, the reasonable amount of attorneys' fees for Ms. Bjorklund's work is considered.  Second, the undersigned addresses the request for costs, including requests for the costs Ms. Roquemore's law firm incurred, Ms. Bjorklund's travel expenses, Dr. Steinman's expenses, Dr. Niyavoz's expenses, and the costs the Sanchezes personally incurred.

    1.   <u>Reasonable Amount of Attorneys' Fees</u>

The Federal Circuit has approved the lodestar approach to determine "reasonable attorneys' fees."  <u>Avera</u>, 515 F.3d at 1347.  The lodestar approach involves a two-step process.  First, a court determines an "initial estimate . . . by 'multiplying the number of hours reasonably expended on the litigation times a

---

[7] The undersigned requested, but did not order Ms. Roquemore to submit electronic versions of her invoices.  Order, issued Jan. 29, 2021.

reasonable hourly rate.'" Id. at 1347-48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)).  Secondly, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings.  Id. at 1348.

A reasonable hourly rate is "the prevailing market rate defined as the rate prevailing in the community for similar services by lawyers of reasonable skill, experience, and reputation." Avera, 515 F.3d at 1347.  In Avera, the Federal Circuit found that in Vaccine Act cases, a special master should use the forum rate, the Washington, DC rate, in determining an award of attorneys' fees.  Id. at 1349.  However, the court adopted the Davis County exception to prevent windfalls to attorneys who work in less expensive legal markets.  Id. (citing Davis Cty. Solid Waste Mgmt. & Energy Recovery Spec. Serv. Dist. v. U.S. Env't Prot. Agency, 169 F.3d 755 (D.C. Cir. 1999)).  In cases where the bulk of the work is done outside of the District of Columbia, and there is a "very significant difference" between the forum hourly rate and the local hourly rate, the court should calculate an award based on local hourly rates.  Id. (finding the market rate in Washington, DC to be significantly higher than the market rate in Cheyenne, WY).

The lodestar approach requires that the reasonable hourly rate be multiplied by the number of hours "reasonably expended on the litigation." Avera, 515 F.3d at 1347-48.  First, counsel must submit fee requests that include contemporaneous and specific billing entries, indicating the task performed, the number of hours expended on the task, and who performed the task.  See Savin ex rel. Savin v. Sec'y of Health & Hum. Servs., 85 Fed. Cl. 313, 315-18 (2008).  Counsel must not include in their fee request hours that are "excessive, redundant, or otherwise unnecessary." Saxton v. Sec'y of Health & Hum. Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)).  It is "well within the special master's discretion to reduce the hours to a number that, in his experience and judgment, [is] reasonable for the work done." Id.  However, the time spent by an attorney performing the work that a paralegal can accomplish should be billed at a paralegal's hourly rate, not an attorney's. Riggins v. Sec'y of Health & Hum. Servs., No. 99-382V, 2009 WL 3319818, at *25 (Fed. Cl. Spec. Mstr. June 15, 2009), mot. for rev. denied, (Dec. 10, 2009), aff'd, 406 F. App'x 479 (Fed. Cir. 2011).  Second, activities that are "purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them." Missouri v. Jenkins, 491 U.S. 274, 288 n.10 (1989).  Attorneys may not separately charge for clerical or secretarial work because those changes are overhead for which the hourly rate accounts.  See Bennett v. Dep't of the Navy, 699 F.2d 1140, 1145 n.5 (Fed. Cir. 1983); Guy v. Sec'y of Health & Hum. Servs., 38 Fed. Cl. 403, 407-08 (1997).

Here, the Sanchezes are requesting $520,798.80 in attorneys' fees for Ms. Roquemore's work performed from May 2013 to April 22, 2020, and $72,405.00 in attorneys' fees for Ms. Bjorklund's work.  Pet'rs' Mot., filed Apr. 22, 2020, at 3-4, ¶¶ 1, 4.  They are addressed separately.

>    a)    *Reasonable Fees for Ms. Roquemore*

Preliminarily, the Sanchezes request that Ms. Roquemore be compensated at rates ranging from $355.00 per hour in 2013 to $410.00 per hour for work in 2019.  Pet'rs' Mot. at 7-9 (citing McCulloch v. Sec'y of Health & Hum. Servs., No. 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015); Raicevic v. Sec'y of Health & Hum. Servs., No. 14-554V, 2016 WL 5362695 (Fed. Cl. Spec. Mstr. Aug. 31, 2016); Taylor v. Sec'y of Health & Hum. Servs., No. 14-861V, 2016 WL 5390169 (Fed. Cl. Spec. Mstr. Sept. 2, 2016); Davis v. Sec'y of Health & Hum. Servs., No. 14-978V, 2017 WL 656304 (Fed. Cl. Spec. Mstr. Jan. 23, 2017); Amani v. Sec'y of Health & Hum. Servs., No. 14-150V, 2017 WL 772536 (Fed. Cl. Spec. Mstr. Jan. 31, 2017); Guerrero v. Sec'y of Health & Hum. Servs., 120 Fed. Cl. 474 (2015); J.T. v. Sec'y of Health & Hum. Servs., No. 12-618V, 2018 WL 4623163 (Fed. Cl. Spec. Mstr. Apr. 20, 2018); Chinea v. Sec'y of Health & Hum. Servs., No. 15-95V, 2019 WL 3206829 (Fed. Cl. Spec. Mstr. June 11, 2019)).  These hourly rates are appropriate when Ms. Roquemore was performing sophisticated legal work commensurate with the skills of an attorney who has practiced in the Vaccine Program for more than 20 years.  The vast majority of Ms. Roquemore's entries are appropriate.  However, for a minority of entries, as explained below, Ms. Roquemore was performing either tasks appropriate for a more junior attorney or a paralegal to perform.  Another problem is that Ms. Roquemore spent an excessive amount of time on some tasks.

Similarly, the request for a paralegal in Ms. Roquemore's firm appears to span from $135.00 per hour to $139.00 per hour.  Id.  These rates are appropriate for paralegal tasks.  But, Ms. Roquemore's paralegal consistently performed clerical tasks for which an award of attorneys' fees is not permitted.

Untangling the appropriately charged tasks from the unreasonably charged activities is not practicable when the invoice runs more than 200 pages.[8]  Thus, under these circumstances, the undersigned will determine a reasonable amount of attorneys' fees for Ms. Roquemore by reducing the request by a percentage.  See,

---

[8] An electronic spreadsheet might have allowed more precision.

e.g., Town of Grantwood Vill. v. United States, 55 Fed. Cl. 481, 489 (2003) (reduction of 30% for supplemental fee petition); Presault v. United States, 52 Fed. Cl. 667, 681 (2002) (reduction of 20% of the total requested fee); cf. FastShip, LLC v. United States, 143 Fed. Cl. 700, 733 (2019) (reducing a damages expert's fees by 85%), vacated on other grounds, 968 F.3d 1335 (Fed. Cir. 2020), reinstated after remand, 153 Fed. Cl. 215, 232-33 (2021), app. dismissed, No. 2021-2031, 2021 WL 2413188 (Fed. Cir. June 10, 2021).  While the reduction is not expressed on a line-by-line basis, the undersigned has reviewed each page and each line on each page in the fee request multiple times.  The combination of this line-by-line review and the undersigned's experience in presiding over the case allows for the following comments.

The evaluation of a reasonable amount of attorney's fees for Ms. Roquemore considers multiple factors.  These include the factual complications, the legal complications, the amount of time spent on activities, the choice to engage on the activity, the charge for the activity, and the sufficiency of the billing records.

This case was complicated factually.  Early in the litigation, an onset hearing was held to determine when Trystan began experiencing certain symptoms.  As the litigation continued, the Sanchezes learned more about Trystan's health.  With respect to the discovery of genetic mutations, it appears that the litigation may have contributed to the Sanchezes' pursuit of genetic testing.  Once the results of the genetic testing became available, the Sanchezes provided this information to their attorney and their expert, Dr. Steinman.  Dr. Steinman wrote seven reports before the December 4, 2017 entitlement hearing.  Exhibits 2, 17, 28, 36, 55, 95, 157.  The genetic testing also prompted the Sanchezes to retain reports from a second expert, Dr. Niyazov.  As the attorney proffering reports from two experts, Ms. Roquemore would reasonably spend more time than an attorney who has presented reports from only one expert.

The factual complications in turn made the case more complicated legally. Although the Sanchezes consistently compared their case to a case in which the petitioners received compensation, Paluck v. Secretary of Health & Human Services, 786 F.3d 1373 (Fed. Cir. 2015), petitioners in other cases involving genetic mutations have not succeeded.  See, e.g., Stone v. Sec'y of Health & Hum. Servs., 676 F.3d 1373 (Fed. Cir. 2012).  Thus, the path leading to a favorable outcome for the Sanchezes was not well established.

The legal complications also prolonged the litigation.  The Sanchezes filed a motion for review, which was not successful.  The Sanchezes also filed an appeal to the Federal Circuit, which succeeded at least in part.

Throughout all stages of the case, assessing the reasonableness of Ms. Roquemore's activities is not always easy.  A reasonable amount of time for a particular task depends, in part, on the experience of the person performing the task.  An attorney with years of experience litigating cases can charge more per hour because the attorney accomplishes more in that hour than a less experienced attorney.  Broekelschen v. Sec'y of Health & Hum. Servs., 102 Fed. Cl. 719, 723, 730 (2011) ("[J]ust because one attorney was awarded compensation based upon a specific number of hours worked does not mean that the special master must make an award based upon the same number of hours worked in an entirely different case at a higher hourly rate."); see also Garrison v. Sec'y of Health & Hum. Servs., 128 Fed. Cl. 99, 107 (2016).  For example, a routine motion for enlargement of time for an expert might take an experienced attorney 0.2 hours.  And, perhaps, a newer attorney might take 0.3 hours or 0.4 hours to draft the same motion.  But, for any routine motion for enlargement of time, approximately 1.0 hour is not reasonable.  Cf. fee exhibit 2 at 7 (entry for July 29, 2013).

The question of the reasonable amount of time for a task presupposes that the task itself is reasonable to perform.  However, Ms. Roquemore performed activities that appear to be excessive.  For example, Ms. Roquemore investigated Dr. Niyazov before retaining him.  Ms. Roquemore watched a presentation Dr. Niyazov made.  See fee exhibit 2 at 84 (entry for November 11, 2015).  She also reviewed transcripts in which he testified.  Id. (entry for November 12, 2015).  Probably one activity or the other is enough.  Spending time on both seems excessive.

Another example of an activity that might start as reasonable but then slip into unnecessary concerns consulting colleagues.  Over the course of the litigation, Ms. Roquemore's billing records include more than 20 entries in which she consulted another attorney.  The undersigned does not recall seeing any billing for discussions with an outside attorney.[9]  Some of Ms. Roquemore's consultation may stem from the complexity of the case and some of the consultations may be due to Ms. Roquemore's work as a solo practitioner.  Yet, the Sanchezes hired Ms. Roquemore and Ms. Roquemore is being compensated at a high hourly rate due to her expertise.  At some point, excessive consultation with other attorneys is not something for which attorneys should bill their clients.  See Carter v. Sec'y of Health & Hum. Servs., No. 04-1500V, 2007 WL 2241877 (Fed. Cl. Spec. Mstr.

---

[9] Counsel of record may consult with outside attorneys but not necessarily bill the Vaccine Program for those consultations.

July 13, 2007) (indicating attorneys may not bill for learning about an area of the law about which they are not familiar).

The structure of a solo practice and how Ms. Roquemore delegates (or does not delegate) work contributes to the relatively high fee request.  See Barclay v. Sec'y of Health & Hum. Servs., No. 07-605V, 2014 WL 2925245 (Fed. Cl. Spec. Mstr. Feb. 7, 2014).  Of course, Ms. Roquemore is free to practice as she wants. But, the question arises as to whether the Trust Fund should pay for her operations. Without an associate attorney, Ms. Roquemore spent relatively large amounts of time on activities like research.  (Again "relatively large" places Ms. Roquemore in the context other experienced and high-charging attorneys, who, often, are supported by lower-charging associate attorneys.)  See, e.g., fee exhibit 2 at 12 (entry for October 18, 2013) (researching Daubert and Restatement of Torts); id. at 53 (entry for December 17, 2014) (researching motions for review of non-entitlement orders); id. at 66 (entry for April 2, 2015) (reviewing opinions from the Court of Federal Claims and Federal Circuit in the same case for more than one hour); id. at 144 (entry for October 5, 2017) (researching ADP ribosylation); id. at 196 (entries for April 11-12, 2019) (spending more than two hours on the Federal Circuit rules).

Ms. Roquemore also performed duties that a paralegal could perform.  For example, she frequently communicated with clients to request medical records. Ms. Roquemore may favor direct contact with her clients.  However, Ms. Roquemore has billed at a high hourly rate for communications that paralegals at other firms routinely do.

The paralegal at Ms. Roquemore's law firm, in turn, routinely charged for performing clerical tasks such as filing documents.[10]  This consistent invoicing reflects a lack of billing judgment as Ms. Roquemore litigated this issue.  On a motion for review, the Court ruled deductions were not arbitrary, capricious, or an abuse of discretion.  Guerrero v. Sec'y of Health & Hum. Servs., 124 Fed. Cl. 153, 158-59 (2015), app. dismissed, No. 2016-1753 (Fed. Cir. Apr. 22, 2016).

While Guerrero does not constitute binding precedent in Sanchez, Ms. Roquemore could have appealed to the Federal Circuit for a precedential opinion.[11]

---

[10] In future submissions, Ms. Roquemore should identify the paralegal.  Floyd v. Sec'y of Health & Hum. Servs., No. 13-556V, 2017 WL 1344623, at *3-4 (Fed. Cl. Spec. Mstr. Mar. 2, 2017).

[11] The respondent, not the petitioner, filed the notice of appeal that was subsequently withdrawn.

But, the prospects of the Federal Circuit determining that filing a document is not a clerical activity seems doubtful because of existing precedent. See Bennett v. Dep't of the Navy, 699 F.2d 1140, 1145 n.5 (Fed. Cir. 1983). Accordingly, on the undersigned's line-by-line review, the undersigned found most of the paralegal's activities to be non-compensable clerical work.[12]

Ms. Roquemore also created time entries that lacked sufficient detail to assess their reasonableness. Examples of overly general descriptions tended to occur in preparing for the hearing, writing briefs, and preparing for oral argument at the Federal Circuit. See fee exhibit 2 at 129 (entry for June 12, 2017) (more than 5 hours revising Dr. Niyazov's rebuttal report); id. at 145 (entry for October 10, 2017) (12 hours preparing Dr. Steinman's direct testimony over multiple days); id. at 146 (entry for October 20, 2017) (more than 34 hours reviewing Dr. Steinman's literature over multiple days); id. at 149 (entry for November 1, 2017) (27 hours preparing Dr. Niyazov's testimony over multiple days). Ms. Roquemore's time in preparing for oral argument at the Federal Circuit particularly illustrates how her billing entries make crediting all her time challenging. To start, there is no question that before appearing at a Circuit Court of Appeals, an attorney should review the written briefs, plan and practice an oral statement, and anticipate questions from the bench. But, the question is how much time is reasonable? Here, after the Federal Circuit scheduled the argument, Ms. Roquemore spent more than 80 hours in preparation. See id. at 219 (entries starting December 27, 2019). Some amount of this time is reasonable. For example, Ms. Roquemore took part in a moot court. But, 80 hours is essentially two normal 40-hour work weeks devoted to an argument scheduled to last 30 minutes. Thus, it seems that some amount of time is redundant and, therefore, excessive. Broekelschen, 102 Fed. Cl. at 731 (ruling that the special master did not abuse his discretion in reducing number of hours for Federal Circuit appeal); cf. Biery v. United States, 2014 WL 12540517, at *3 (finding only 25% of 168 hours preparing for oral argument before the Supreme Court of Kansas reasonable); Infiniti Info. Solutions, LLC. v. United States, 94 Fed. Cl. 740, 752 (2010) (reducing time preparing for oral argument because the arguing attorney was previously unfamiliar with the case).

Continuing to list further examples of excessive hours seems unnecessary. In many respects, the time Ms. Roquemore spent on this case produced a better product. For example, she engaged with the experts as they wrote their reports. See fee exhibit 2 at 81 (entry for October 2, 2015) (email to Dr. Steinman explaining what his opinion needs to cover). In short, her lawyering was good.

---

[12] Due to the way Ms. Roquemore presented her invoices, precisely quantifying the value of the clerical work is practically impossible.

But, in some respects, her billing judgment was not as good.  Other special masters have critiqued Ms. Roquemore similarly.  See, e.g., D.G., 2020 WL 3265015 (reducing Ms. Roquemore's fees by 20%); J.T., 2018 WL 4623163 (effectively reducing Ms. Roquemore's fees by 18%); D.S. v. Sec'y of Health & Hum. Servs., No. 10-77V, 2017 WL 6397826 (Fed. Cl. Spec. Mstr. Nov. 20, 2017); Torday v. Sec'y of Health & Hum. Servs., No. 07-372V, 2011 WL 2680687 (Fed. Cl. Spec. Mstr. Apr. 7, 2011).

Although those cases provide a tiny measure of support to the outcome here, the analysis in this case depends upon a detailed assessment of the timesheets Ms. Roquemore submitted as well as the undersigned's firsthand observations in overseeing this litigation from its inception in 2011.  The conclusion does not follow a simple logic of finding that the amount requested in attorney's fees is "large and therefore too much."  Instead, as McIntosh requires, the undersigned evaluated the reasonableness of the proposal.

The undersigned finds that to accomplish "rough justice," see Fox v. Vice, 563 U.S. 826, 837 (2011), an appropriate reduction to Ms. Roquemore's fee request is 20 percent.

### b)    Reasonable Fees for Ms. Bjorklund

In addition to seeking attorneys' fees for work Ms. Roquemore and her paralegal performed, the Sanchezes request attorneys' fees for work of a second attorney, Sheila Bjorklund.  Ms. Bjorklund's invoice totals $72,405.00 in fees.

Initially, the retention of a second attorney was reasonable due to the case's complexity.  The Sanchezes retained two experts and the Secretary retained four experts.  The hearing lasted four days.  Ms. Roquemore and Ms. Bjorklund mostly divided tasks so that they did not duplicate efforts unreasonably.  The Secretary also planned to use two attorneys at the hearing.[13]  Accordingly, the circumstances of this case made two attorneys at trial appropriate.

The next issue is the lodestar value of Ms. Bjorklund's work.  For the first factor in the lodestar equation, a reasonable hourly rate, Ms. Bjorklund proposes $450.00 per hour.  This amount is reasonable.

The second factor is a reasonable number of hours.  In general, Ms. Bjorklund's invoices contain an acceptable amount of detail to assess the

---

[13] Actually, one attorney from the Department of Justice conducted almost all of the hearing because one attorney became ill.

reasonableness of the activity.[14]  At the beginning of her involvement, Ms. Bjorklund repeated some tasks that Ms. Roquemore had already performed.  For example, Ms. Bjorklund reviewed the pretrial order, the reports from the Secretary's experts, and leading cases.  Fee exhibit 19 at 2 (entry for June 20, 2017).  However, this repetition is not excessive because the attorney joining the case in anticipation of a trial must learn where the case stands.  Similarly, Ms. Bjorklund reviewed the outlines of the direct examinations for Dr. Steinman and Dr. Niyazov, which Ms. Roquemore had prepared.  Id. at 4 (entries from November 7, 2017 to November 15, 2017).  While the amount of time Ms. Bjorklund spent might be near the upper bound of reasonableness, the undersigned sees little basis to quibble, especially because the Secretary did not interpose any objection to the amount of time requested.

Ms. Bjorklund spent most of her time in preparing to cross-examine the Secretary's four experts.  This time was productive.  Ms. Bjorklund's cross-examinations were effective.   Ms. Bjorklund pointed out the limits to the expertise of the Secretary's experts.  She spontaneously dispensed with lines of questioning that were not advancing the Sanchezes' case to pursue other avenues.  And yet, at the same time, Ms. Bjorklund maintained a professional tone.[15]

In short, the time Ms. Bjorklund has requested is reasonable.  The Sanchezes are awarded $72,405.00 for Ms. Bjorklund's work.

## 2.   Costs

The request for costs contains several categories.  The law firm's costs include relatively mundane items, such as postage and copies.[16]  The law firm also requests costs for mileage and travel expenses Ms. Roquemore incurred.  Fee exhibit 4 at 2.  In general, these costs are reasonable.  The only exceptions are

---

[14] A small number of entries from Ms. Bjorklund might have contained more detail or have been divided into component tasks.  For example, on April 16, 2017, Ms. Bjorklund spent 1.0 hour on "review expert reports" and on the next day she spent 2.5 hours "on review expert reports."  Fee exhibit 19 at 2.  Given the extent of litigation, reading the expert reports over the course of 3.5 hours was reasonable.  But, the entries could have specified which reports were read on which days.

[15] This praise for Ms. Bjorklund's effectiveness in cross-examination may seem incongruent with the outcome in which the Sanchezes were not entitled to compensation.  However, cross-examination of the Secretary's witnesses would not change the fact that Trystan did not display any significant and lasting changes to his development in the months immediately following his February vaccination.  See Remand Decision, 2020 WL 5641872, at *44.

[16] Given the availability of scanning and emailing documents, continuing to incur expenses for copying and mailing documents may be questionable in the future.

certain costs that appear more for Ms. Roquemore's convenience, such as in-room dining and valet parking at the hotel. A reasonable reduction for these unnecessary expenditures is $200.00. In addition, for the oral argument at the Federal Circuit on *Friday*, February 7, 2020, Ms. Roquemore flew to Washington, DC on *Wednesday,* February 5, 2020.[17] Fee exhibit 4 at 23. Ms. Roquemore has not demonstrated that an additional day's lodging and food is justified. See Broekelschen, 102 Fed. Cl. at 733 (denying motion for review of fees decision). Therefore, $470.77 is reduced. Accordingly, the Sanchezes are awarded $4,498.71 in costs Ms. Roquemore's law firm incurred.

Ms. Bjorklund, separately, requested an award of her costs for traveling to the hearing. The Sanchezes documented Ms. Bjorklund's costs in a supplemental response, filed November 3, 2021. Accordingly, the Sanchezes are awarded $2,063.13 for Ms. Bjorklund's costs.

Dr. Steinman seeks reimbursement of his costs, totaling $1,147.63. See fee exhibit 9. While most of these costs are reasonable, Dr. Steinman flew to the hearing in first class. See id. at 8. When directed to explain Dr. Steinman's costs, the Sanchezes represented that Dr. Steinman inadvertently failed to reduce his claim for reimbursement to the amount of a coach-class ticket. Thus, they propose that his costs be reduced by $164.37 because a reduction would approximate the cost of Dr. Steinman's return trip, which was in coach. Pet'rs' Resp., filed Oct. 21, 2021, at 5. Dr. Steinman, in fact, has requested reimbursement of his return trip at a coach-class rate corroborating that any overbilling was inadvert. Thus, the Sanchezes are awarded $983.26 for Dr. Steinman's travel costs.

Dr. Niyazov proposes that he be awarded $2,377.98. See fee exhibit 16 at 5. A portion of those costs derives from renting a car and parking the car. However, after arriving in the hotel, a car was not reasonable or necessary. Thus, $600.00 is deducted. A reasonable amount of costs for Dr. Niyazov is $1,777.98.

### a)    Dr. Steinman

The Sanchezes' primary expert has been Lawrence Steinman, who has assisted petitioners in the Vaccine Program in numerous cases. As such, Dr. Steinman is well known to special masters. Dr. Steinman's invoice requests compensation in the amount of $46,375.00 for his work after 2013. Fee exhibit

---

[17] Although Ms. Roquemore paid for a ticket in first class, she sought reimbursement only for a coach-class ticket and documented the cost of the coach-class ticket. See fee exhibit 4 at 24-33. This method comports with the expectation that the Vaccine Injury Compensation Trust Fund will pay for only reasonable expenses.

9.[18]  This reflects $48,375.00 for Dr. Steinman's work performed after April 2013 minus the $2,000.00 retainer paid by the Sanchezes.  Id.

With respect to Dr. Steinman's hourly rate, Dr. Steinman's invoices are based upon a charge of $500.00 per hour.  See fee exhibit 9.  However, in Dr. Steinman's accompanying affidavit, he suggests that an appropriate rate is $550.00 per hour.  Fee exhibit 7.  Dr. Steinman's suggestion that his hourly rate increase if only to account for inflation certainly merits consideration.  After all, since 2016, the Office of Special Masters has adjusted hourly rates for attorneys based upon inflation.  U.S. Ct. of Fed. Cl., OSM Attorneys' Forum Hourly Rate Fee Schedules, https://www.uscfc.uscourts.gov/node/2914 (last visited Dec. 8, 2021).

Any adjustment to Dr. Steinman's hourly rate is better left for another day and another case.  In this case, the hourly rate that Dr. Steinman has proposed is $500.00 per hour and that rate is reasonable.  Accordingly, Dr. Steinman will be compensated at a rate of $500.00 per hour.

For work performed after April 2013, Dr. Steinman's invoice lists tasks totaling 96.75 hours.  A significant portion of this total was spent in preparing for and attending the four-day hearing.  Given that the Secretary did not interpose any objection to the number of hours Dr. Steinman spent, the undersigned finds that the number of hours is reasonable.  Accordingly, the Sanchezes are awarded $46,375.00 for Dr. Steinman's professional services.

### b)    Dr. Niyavoz

The Sanchezes' second expert is Dmitriy Niyazov.  Dr. Niyazov's invoice requests compensation in the amount of $28,880.00 for his work from November 2015 through December 2017.  Fee exhibit 16.  This accounts for $32,880.00 for Dr. Niyazov's work minus $4,000.00 in retainer fees paid by the Sanchezes.  Id.

With respect to Dr. Niyazov's hourly rate, Dr. Niyazov's invoices request $400.00 per hour.  Fee exhibit 14 at ¶ 7.  Dr. Niyazov graduated from medical school in 2001 and has been a diplomate of the American Board of Medical Genetics since 2009.  His current primary position is the section head for medical genetics in the department of pediatrics for Ochsner Health System in New Orleans.  Fee exhibit 15 (curriculum vitae).  The proposed hourly rate ($400.00 per hour) is reasonable for Dr. Niyazov.

---

[18] The First Interim Fees Decision compensated the Sanchezes for Dr. Steinman's work through April 2013.

For his work, Dr. Niyazov's invoice lists tasks totaling 82.2 hours.  Like Dr. Steinman, Dr. Niyazov spent a significant amount of time preparing for and attending the four-day hearing.  Given that the Secretary did not interpose any objection to the number of hours Dr. Niyazov spent, the undersigned finds that the number of hours is reasonable.  Accordingly, the Sanchezes are awarded $28,880.00 for Dr. Niyazov's professional services.

c)      *Mr. and Mrs. Sanchez*

The Sanchezes request reimbursement for costs that they incurred personally in the amount of $9,170.26.  See fee exhibits 5-6.  The Sanchezes seek reimbursement for the following costs: $4,000.00 for Dr. Niyazov's retainer; $4,714.70 for Federal Circuit Appeal costs; $377.73 for accommodations during the December 2017 hearing; $48.28 for travel expenses; $29.55 for out-of-pocket litigation expenses, and $500.00 for the filing the Federal Circuit appeal.  Fee exhibit 5 at 2; fee exhibit 6; Pet'rs' Resp., filed Oct. 21, 2021, at 4.  Some items are relatively routine, such as the cost of lodging to attend the hearing, mailing costs, and retainers for Dr. Niyazov.  These items are awarded.

The costs associated with the Federal Circuit appeal fall into a different category, partially.  Ms. Roquemore contracted with a vendor, Counsel Press, Inc., to assist with the Federal Circuit appeal.  Counsel Press, in turn, presented two invoices with charges for items such as preparing the brief, "docket tracking," "electronic file production and review," "electronic filing," "filing of documents," "shipping & handling," "Federal Express to client," "shipping and handling," and "preparation of motion."  How Counsel Press determined its charges is not explained.  However, to extend to Ms. Roquemore and the Sanchezes the benefit of the doubt, the undersigned will accept, as reasonable, the charges associated with preparing the brief ($1,395.00) and preparing the reply brief ($525.00).  So, too, the undersigned will accept the fee for preparing a motion ($450.00), despite the fact that the motion appears predicated on Ms. Roquemore's error in calendaring.  The remaining list of charges have not been justified.  For example, Counsel Press has invoice for both "electronic filing" and "filing of documents."  Counsel Press also did not demonstrate the costs of shipping materials.  Accordingly, $859.00 is removed from the list of charges from Counsel Press as unreasonable.  The reasonable costs paid by the Sanchezes totals $8,311.26 ($9,170.26 - $859.00).

The Sanchezes cannot pay a price because their attorney engaged a third-party vendor whose costs were excessive.  "No attorney may charge any fee for services in connection with a petition [in the Vaccine Program] which is in addition to any amount awarded as compensation by the special master."  42

U.S.C. § 300aa-15(e)(3).  The provision prevents attorneys from shifting unawarded costs to their clients.  <u>Beck v. Sec'y of Health & Hum. Servs.</u>, 924 F.2d 1029 (Fed. Cir. 1991).  Accordingly, the undersigned will deduct the $859.00 from costs awarded to Ms. Roquemore, leaving the Sanchezes costs intact.

3.   <u>Summary Regarding the Reasonable Amount of Attorneys' Fees and Costs.</u>

For the reasons explained above, a reasonable amount of attorneys' fees and costs from May 2013 to April 2020 is as follows:

**Attorneys' Fees**

Ms. Roquemore's Fees

| | |
|---|---|
| Requested | $520,798.80 |
| Reduction (20%) | $104,159.76 |
| Awarded | **$416,639.04** |

Ms. Bjorklund's Fees

| | |
|---|---|
| Requested and Awarded | **$72,405.00** |

**Costs**

Ms. Roquemore's Law Firm

| | |
|---|---|
| Requested | $5,169.48 |
| Reduction | $670.77 |
| Awarded | $4,498.71 |
| Further reduction for costs the Sanchezes incurred: | $859.00 |
| Final award | **$3,639.71** |

Ms. Bjorklund's Travel Costs

| | |
|---|---|
| Requested and Awarded | **$2,063.13** |

Dr. Steinman's Professional Fees

| | |
|---|---|
| Requested and Awarded | **$46,375.00** |

Dr. Niyavoz's Professional Fees

| | |
|---|---|
| Requested and Awarded | **$28,880.00** |

Dr. Steinman's Expenses
   Requested                          $1,147.63
   Reduction                           $164.37
   Awarded                           **$983.26**

Dr. Niyazov's Expenses
   Requested                          $2,377.98
   Reduction                           $600.00
   Awarded                          **$1,777.98**

Mr. and Mrs. Sanchez's Expenses
   Requested                          $9,170.26
   Reduction                           $859.00
   Awarded                          $8,311.26
   Restored amount                    $859.00
   Final Award                        **$9,170.26**

## III.  <u>Conclusion</u>

The Sanchezes have prosecuted their action with a reasonable basis.  The duration and fees incurred since the previous decision awarding attorneys' fees and costs on an interim basis justifies a second award on an interim basis.

A reasonable amount of attorneys' fees and costs totals $581,933.38.  This amount shall be paid as follows:

The amount of $498,294.99 in a check made payable to petitioners and Ms. Roquemore.  This amount represents fees and costs associated with Ms. Roquemore, Dr. Steinman, and Dr. Niyazov.

The amount of $74,468.13 in a check made payable to petitioners and Ms. Bjorklund.  This amount represents fees and costs associated with Ms. Bjorklund.

The amount of $9,170.26 in a check made payable to petitioners alone.

There is no just reason to delay the entry of judgment on interim attorneys' fees and costs.  Therefore, in the absence of a motion for review filed under RCFC Appendix B, the clerk of court shall enter judgment in petitioners' favor.[19]

**IT IS SO ORDERED.**

s/ Christian J. Moran
Christian J. Moran
Special Master

---

[19] Pursuant to Vaccine Rule 11(a), the parties can expedite entry of judgment by each party filing a notice renouncing the right to seek review by a United States Court of Federal Claims judge.

31