# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| TRYSTAN SANCHEZ, by and through his parents, GERMAIN SANCHEZ and JENNIFER SANCHEZ, | \* \* \* \* | No. 11-685V Special Master Christian J. Moran |
| | \* | |
| Petitioners, | \* | Filed: August 14, 2024 |
| v. | \* | |
| | \* | |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | \* \* | |
| | \* | |
| Respondent. | \* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

<u>Lisa A. Roquemore</u>, Law Offices of Lisa A. Roquemore, Rancho Santa Margarita, CA, and <u>Richard Gage</u>, Richard Gage, P.C., Cheyenne, WY for petitioners; <u>Jennifer L. Reynaud</u>, United States Dep't of Justice, Washington, DC, for respondent.

## <u>PUBLISHED ORDER DENYING MOTION FOR PROTECTIVE ORDER[1]</u>

Based upon the evidence available to the Federal Circuit, the Federal Circuit found that Mr. and Ms. Sanchez, the petitioners, are entitled to compensation and remanded to determine the amount of damages to which they as guardians for their child, Trystan, are entitled. <u>Sanchez v. Sec'y of Health & Hum. Servs.</u>, 34 F.4th

---

[1] Because this order contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). This means the order will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), petitioners have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material before posting the decision.

1350 (Fed. Cir. 2022).  As the Sanchezes were documenting the scope of their compensation, they produced documents that should have been produced during entitlement.  The Secretary obtained full copies of records from four providers, and identified numerous other documents which should have been produced earlier. These include, in chronological order:

- Handwritten Subjective, Objective, Assessment and Plan (SOAP) notes taken by PA Luna during a February 17, 2009 urgent care visit reporting Trystan's cough symptoms but not mentioning arm contortions;
- A March 8, 2010 record from the Inland Counties Regional Center assessment noting Trystan had a seizure episode on August 8, 2009;
- A June 3, 2010 email from Ms. Sanchez to James. F. Gusella, Ph.D., providing a chronology suggesting that Trystan's arm contortions began after he recovered from an upper-respiratory illness;
- A record from a November 5, 2010 occupational therapy evaluation mentioning arm contortions beginning after Trystan's illness;
- A record of an August 6, 2011 visit to Dr. Valencia memorializing Ms. Sanchez's request to "change" a PA's notes regarding onset of Trystan's symptoms;
- A record from Dr. Brown dated August 19, 2011 stating that Ms. Sanchez asked him "to write a clarifying letter" about his appointment with Trystan in May 2009.  Dr. Brown stated that he did not believe Trystan had unusual arm movements in May 2009, as he would have documented such and ordered additional testing.  Dr. Brown stated that he faxed and mailed this record to Ms. Roquemore.

The Secretary is seeking a reopening of entitlement pursuant to an August 16, 2023 motion, which remains pending.  Mr. and Ms. Sanchez oppose reopening.

As part of the process regarding reopening, the Secretary is seeking oral testimony at a hearing to be held in California, the state where Mr. and Ms. Sanchez live.  A purpose of the hearing is to question the witnesses about why the identified documents were not produced during the entitlement phase of this case.[2] Mr. and Ms. Sanchez maintain that this testimony is not appropriate and are

---

[2] Another potential topic could be the meaning of the recently produced documents, providing an opportunity for direct testimony and cross-examination that could have been given during the original fact hearing if the relevant documents had been produced before then.

seeking a protective order.  Pet'rs' Mot., filed June 21, 2024.  The Secretary contends that the Sanchezes have not justified the entry of a protective order.

For the reasons explained below, the anticipated oral testimony is reasonable and necessary.  The Sanchezes have not established that a hearing is overly burdensome.  Thus, their motion for a protective order is denied.

## I.    <u>Factual Events in the Life of Trystan Sanchez</u>[3]

Mr. and Ms. Sanchez are the parents of Trystan Sanchez, who was born in 2008.  At age six months, on February 5, 2009, Trystan received a dose of the diphtheria-tetanus-acellular pertussis ("DTaP") vaccine.  Mr. and Ms. Sanchez alleged---and the Federal Circuit found---that the DTaP vaccination caused an aggravation of Trystan's previously unmanifested Leigh's syndrome.  "Leigh's syndrome is a severe neurological disorder that often presents in the first year of life, is characterized by progressive loss of mental and movement abilities, and typically results in death within 'a couple years.'"  <u>Sanchez</u>, 34 F.4th 1350, 1352 (Fed. Cir. 2022) (citing record).

Throughout this litigation, the parties have disputed when Trystan first began to manifest unusual movements.  Via written affidavits and oral testimony, Mr. Sanchez, Ms. Sanchez, and other family members averred that Trystan started having seizures by February 16, 2009, a date that is Ms. Sanchez's birthday.  Mr. and Ms. Sanchez maintain that Trystan continued to have seizures until he was seen by a physician's assistant, Micaela Marin-Tucker, who worked in the office of a pediatrician Rainilda Valencia.  During this appointment, which occurred on August 17, 2009, Ms. Marin-Tucker documented that Ms. Sanchez stated that Trystan began to lose skills "2-3 months ago."  Exhibit 1 at 54.

The Secretary did not agree with the testimonial assertions of Mr. Sanchez, Ms. Sanchez, and other family members.  The Secretary pointed out that during the time when Trystan was allegedly having abnormal movements, medical professionals saw Trystan and failed to document any complaint about abnormal

---

[3] The pending motion for a protective does not rely upon any particular event in Trystan's life.  Thus, Trystan's medical history is summarized to provide a context for the Secretary's motion to reopen, which underlies the motion for protective order.  For a more thorough description of Trystan's medical history, <u>see</u> <u>Decision on Remand</u>, 2020 WL 5641872 (Aug. 26, 2020), <u>mot. for rev. denied</u>, 142 Fed. Cl. 247 (2019), <u>rev'd</u>, 34 F.4th 1350 (Fed. Cir. 2022).

movements.  Examples of medical professionals who saw Trystan during the critical months of February to May included Jonathan Luna, a physician's assistant (February 17, 2009); Dr. Nabil Seleem, a pediatrician (April 29, 2009) ; and Dr. Philip Brown, a pediatrician (February 5, 2009 and May 13, 2009).  The Secretary reasoned that if Trystan were having seizures, Ms. Sanchez would have reported the seizures or abnormal movements to medical professionals and the medical professionals would have documented (and investigated) that complaint.  To the Secretary, the absence of a notation in the medical records of these providers during the relevant period of time within which the Sanchezes have maintained that Trystan was having abnormal arm movements suggestive of seizure activity indicates that Trystan was not have seizures.  The Sanchezes, in turn, maintain that they consistently informed medical professionals about Trystan's abnormal movements but these professionals did not document their concerns.

Presently, the parties agree that Trystan suffers from Leigh's syndrome.  Leigh's syndrome has had devastating consequences for Trystan.  Trystan's condition has caused Mr. and Ms. Sanchez to devote an extensive amount of energy and money to care for him.  Their dedication to their son is admirable.

## II.   **Procedural History**

The parties' dispute has been long running.  For purposes of the present order, the procedural history is divided into three phases.  The first period can be considered "broad background," running from when the petition was filed to when the Federal Circuit found that Mr. and Ms. Sanchez were entitled to compensation.  Two themes are involved: first, a determination about when Trystan experienced seizures / abnormal movements was a critical issue; and second, the parties consistently disputed when Trystan experienced seizures / abnormal movements.

The next period (Section II.B.) concerns the revelation that Mr. and Ms. Sanchez did not produce all required documents during the entitlement phase.  This lack of production of allegedly material documents is the basis for the pending motion to reopen.  As part of the motion to reopen, the Secretary has requested a hearing during which Ms. Roquemore and Ms. Sanchez would testify about the reasons why these documents were not produced during the entitlement phase.

The final period (Section II.C.) involves the pending motion for protective order.  Section II.C. recounts the parties' arguments in favor of and in opposition to developing evidence through oral testimony.

### A.     From Petition through Second Federal Circuit Opinion

Represented by Attorney Lisa Roquemore, Mr. and Ms. Sanchez filed their petition in October 2011.  They supported their petition with a collection of medical records from multiple providers, Exhibit 1.  They also presented affidavits.  Exhibits 3-7.  They certified that "After a good faith effort, Petitioner [sic] believes all available medical records have now been filed."  Pet'rs' Statement of Completion filed Oct. 27, 2011.  The Secretary, as previously noted, disputed the assertion that Trystan began to display seizures or abnormal movements around February 16, 2009.  See Resp't's Rep., filed Feb. 28, 2012.

As part of the process for determining how the evidence regarding the onset of Trystan's abnormal movements preponderated, a hearing was held on May 15, 2012, in San Diego, California.  During the hearing, Ms. Sanchez testified about her interactions with Mr. Luna, Dr. Seleem, and Dr. Brown.  Tr. 74-77 (direct examination about Mr. Luna), 79-83 (direct examination about Dr. Seleem), 85-87 (direct examination about Dr. Brown) 115 (cross-examination about Mr. Luna), 116 (cross-examination about Dr. Seleem), 116-17 (cross-examination about Dr. Brown), 125 (cross-examination about Dr. Seleem), 135 (special master's question about Mr. Luna).[4]  On May 15, 2012, Ms. Sanchez could not have been asked about certain documents associated with visits to Mr. Luna or Dr. Brown (specifically, Mr. Luna's notes from an urgent care visit on February 17, 2009 and a record from an August 19, 2011 appointment with Dr. Brown) because the petitioners had not filed those documents.

Findings of Fact were issued on April 10, 2013.  The undersigned found that Trystan did not exhibit arm contortions from the period beginning around February 16-17, 2009 to late April 2009.  Ruling Finding Facts, ¶¶ 8-11.

---

[4] During the May 15, 2012 fact hearing, Ms. Sanchez testified that after the May 2009 appointment with Dr. Brown, she decided she "was never going there again."  Tr. 87.  Based upon this testimony, Ms. Roquemore asked if Ms. Sanchez changed pediatricians, which Ms. Sanchez confirmed, explaining that she "didn't want to go to Dr. Brown anymore."  Tr. 88-89.  Ms. Roquemore then asked: "So you saw Dr. Brown in May, never to see him again, but your next medical appointment was not until August 2009 [with Dr. Valencia].  Why was that?"  Tr. 90.  These questions and answers indicated that Ms. Sanchez never brought Trystan back to Dr. Brown after the May 2009 appointment.  In fact, a later record revealed Ms. Sanchez saw Dr. Brown with Trystan on August 19, 2011, which was approximately nine months before the hearing.  Exhibit T at 17-18.

The parties obtained reports from experts about whether the DTaP vaccine harmed Trystan.  Around this time, Mr. and Ms. Sanchez requested an award of attorneys' fees and costs for work performed by their attorney, Ms. Roquemore. Pet'rs' Fee Appl'n, filed Sep. 16, 2014.  Ms. Roquemore submitted her Timesheets to support this application as exhibit 2 to the Fee Application.  Based upon Ms. Roquemore's time entries, the Secretary requested the production of four items:

**All photographs and videos reviewed by Ms. Roquemore depicting Trystan's condition "before and after."**  See Billing Entry dated 7/26/2011; see also Billing Entry, dated July 27, 2011 (0.3 billed to "Cross-reference L. Roquemore's photo observations to the timeline of events and prepare spreadsheet of findings.).

**Jennifer Sanchez's Journal for 2009**. See Billing Entries: 8/23/2011 (0.8 hours billed to "Review Jennifer's Journal for 2009"); 8/24/2011 (0.2 hours billed to "Electronically highlight relevant portions of the journal"); 8/29/2011 (0.5 hours billed to "Review 'original' of journal for half of 2008 and all of 2009."). See also, Transcript of May 15, 2012 Fact Hearing ("Transcript") at 113 (In response to, "When you were preparing your statement, did you look at any calendar or journal or anything where you would've kept this information," Ms. Sanchez answered, "No."); Transcript at 128 (In response to, "Were you keeping any sort of journal or diary or baby book during the spring of 2009?" Ms. Sanchez answered, "No. I had one and I never filled it out but, no, I didn't.").

**All audiotapes of doctor's appointments with Ms. Marin-Tucker and Dr. Davies**. See Billing Entries: 8/29/2011 (1.0 hour billed to "Listen to audio tape of doctor appointment with Dr. Micala [sic] [a.k.a. Micaela Marin-Tucker, P.A.] and another one with Dr. Davies regarding reporting of stiff arms and weird movements."); 3/1/2012 (0.5 billed to "Review Recording of appointment with Micaela and Dr. Valencia regarding they don't write everything down."); 3/2/12 billed to "Research regarding usage of recordings of conversations.").

**Day planner reviewed by Ms. Roquemore in March 2012**. See Billing Entries: 3/8/12 (1.1 hours billed to "Review day planner in day to day detail and draft memorandum regarding pros and cons of providing as evidence."); 3/8/12 (1.3 hours billed to telephone conference with Sanchezes, discussed inter alia the fact hearing, and "go over day planner in detail so that clients can decide whether it gets filed based on risks and benefits addressed. Go

over declarations compared to day planner and medical records."); 3/8/12.
(0.1 hours billed to "Review e-mail from Jennifer [Sanchez] requesting my
memorandum pertaining to day timer.").

Resp't's Resp. to Pet'rs' Appl'n for Interim Compensation, filed Nov. 24, 2014, at
2 n.1.[5]

Some of the time entries that the Secretary cited reflect Ms. Roquemore's
activities in July and August 2011, when Ms. Roquemore was developing the case
before drafting the petition.  The Secretary did not comment that around the same
time, Ms. Roquemore created another time entry on August 24, 2011.  In this entry,
Ms. Roquemore wrote that she spent 0.1 hours "Review[ing] letter from Dr.
Brown."

In an order memorializing an unrecorded status conference, the undersigned
expressed "concern[] about the completeness of petitioners' presentation of
evidence."  Order, issued Dec. 2, 2014, at 1.  The Sanchezes were ordered to file
four items:  (a) Trystan's baby journal, (b) the day planner, (c) the audio recording
of the visit with Ms. Marin-Tucker, and (d) a list of any other audio recordings
with doctors.  Id. at 3 ¶ 1.  In addition, if any items were not available, petitioners
were directed to explain why the items were not available in a statement made
under penalty of perjury.  Id. at 3 ¶ 2.

Ms. Sanchez provided her explanation about the baby journal, day planner,
and audio recording with Ms. Marin-Tucker.  Exhibit 56 (affidavit, signed Dec. 11,
2014).  In doing so, she submitted the baby journal and day planner.  Exhibits 57-
58.  Only the first few pages of the baby journal were filled out, containing
information on Mr. and Ms. Sanchez's family trees.  The day planner had many
entries between January 16, 2009 and October 13, 2009 for birthdays, family
members' appointments, payments due, and social events.  In the planner, Ms.
Sanchez wrote reminders for Trystan's appointments and often added a short note
memorializing what happened at the appointment.  At times, she also recorded
Trystan's moods and fever.  This production appeared to resolve the dispute about

---

[5] More substantively the Secretary opposed an award of attorneys' fees and costs on the
ground that the claim lacked a reasonable basis.  In the Secretary's view, the expert for Mr. and
Ms. Sanchez had disregarded facts about the onset of Trystan's seizures / abnormal movements.
Resp't's Resp., filed Nov. 24, 2014, at 10-15.  Mr. and Ms. Sanchez were awarded a portion of
the amount requested.  First Interim Fees Decision, 2016 WL 909186 (Feb. 17, 2016).

production of materials, although, as revealed later, Mr. and Ms. Sanchez had not filed all materials.

In the context of supporting the application for an award of attorneys' fees and costs on an interim basis, Ms. Roquemore submitted a "Supplemental Declaration." CM/ECF 108. Ms. Roquemore recounted her actions in representing Mr. and Ms. Sanchez. A particular point concerned activities in July and August 2011. Id. at ¶¶ 13-17. Ms. Roquemore acknowledged that Vaccine Rule 2 requires the production of medical records. Id. at ¶ 50. Ms. Roquemore, however, disputed whether the Sanchezes were obligated to produce "photos, calendars, journals, diaries, day timer, day planners and the like" because the Guidelines are not a "law." Id. She averred that she did not attempt "to thwart or not fulfill my legal obligations in the Vaccine Program." Id.

After the parties obtained reports from experts, the experts testified at an entitlement hearing. The First Entitlement Decision found that Mr. and Ms. Sanchez were not entitled to compensation. 2018 WL 5856556, issued Oct. 9, 2018. The First Entitlement Decision stated around February 15, 2009, Trystan's "arms contorted and he was jerking around. However, these movements were of the type typically displayed by an infant suffering from a cold." Id. at *4.

A motion for review was denied, 142 Fed. Cl. 247 (2019) and judgment was entered on February 11, 2019. Mr. and Ms. Sanchez appealed the judgment denying them compensation to the Federal Circuit. The Federal Circuit ruled that there was an error because of the discrepancy between the April 10, 2013 Findings of Fact and the [First] Entitlement Decision. Thus, the Federal Circuit vacated the judgment and remanded the case. 809 Fed. Appx. 843, 852-53 (Fed. Cir. 2020).[6]

Upon remand, the parties obtained additional reports from the key causation experts. A Second Entitlement Decision denied compensation. A primary reason was that Trystan's February 16, 2009 "arm contortions were not a manifestation of a neurologic injury." 2020 WL 5641872, at *40 (Aug. 26, 2020). Based upon the April 10, 2023 Findings of Fact, the Second Entitlement Decision also re-stated that Trystan did not make abnormal arm contortions from February through the end of April. Id. at *40-45. In this context, the Second Entitlement Decision

---

[6] The Federal Circuit also discussed a genetic issue. However, the Secretary's pending motion to reopen is not based upon newly discovered genetic information. Thus, this order does not describe the genetic issues.

found that the February 16, 2009 episode of arm contortions was "short-lived, singular, and did not signify a neurologic injury due to vaccination." Id. at *42.

A motion for review was denied, 152 Fed. Cl. 782 (2021), and judgment was entered again on February 16, 2021. Mr. and Ms. Sanchez appealed a second time. A majority of judges from the Federal Circuit panel again vacated the judgment. The Federal Circuit panel majority found an error in that the Second Entitlement Decision did not explain why Trystan did not have seizures / abnormal movements between February and May. 34 F.4th 1350 at 1354-56. The Federal Circuit panel majority determined that it could find that the evidence before it preponderated in favor of finding that Trystan's seizures / abnormal movements started in February and continued through May. The Federal Circuit panel majority, thus, concluded that that Mr. and Ms. Sanchez were entitled to compensation. The case was remanded for purposes of determining the amount of damages.

## B.   Activities on Second Remand, Including Discovery of Missing Documents and Motion to Reopen

Upon receipt of the Federal Circuit's mandate, the undersigned began to schedule deadlines to resolve compensation quickly.[7] This case warranted prioritization because (a) the Sanchezes were entitled to compensation, and (b) at the time of remand, this case had been pending the second longest amount of time at the Office of Special Masters. See Order, issued Mar. 17, 2023 (denying the Secretary's motion for enlargement of time); Order, issued Nov. 9, 2022 (maintaining deadlines for life care plans in advance of damages hearing).

To document an unreimbursed expense for which they sought compensation, Mr. and Ms. Sanchez produced, on April 12, 2023, an office note from Dr. Valencia, dated August 6, 2011. Exhibit 262. On this date, Dr. Valencia documented Trystan's developmental delay and cerebral palsy. Id. at 2. She also prescribed a medication for otitis media (an ear infection). Id.

More importantly for the pending motion to reopen and pending motion for protective order, Dr. Valencia wrote about Ms. Sanchez's request to change Ms. Marin-Tucker's medical record:

---

[7] After the remand, the parties continued to develop their positions regarding damages. Those events are not recounted in this order.

See Chief complaints; per Mom she wants her lawyer to talk to us as she is trying to get compensation from VAERS for his condition now. She needs letters to give them a strong case and she was asking me to change Micaela Marin-Tucker's (PA) notes on her first visit ESP [especially] the ROS [review of symptoms] and the onset of symptoms. Per Mom she believes our office did not "do anything wrong but instead is helping her son and that she is not going after us but she needs supplemental support from another agency". In conclusion I and my PA (Micaela Marin-Tucker) advised Mom that "we can not change or ALTER" any of our previous documents since they are considered PERMANENT RECORDS and that our notes is based on the interview and assessments at the time of visit and that it will be hard to recall anything on those visits unless they were documented.

Id. at 1 (some spacing adjusted without notation). Ms. Sanchez's request appeared to be directed at the August 17, 2009 record from Ms. Marin-Tucker that reported that Ms. Sanchez "noticed a change in [Trystan's] development about 2-3 months ago," i.e., around May 17, 2009, or June 17, 2009. See Exhibit 1 at 54-56.

The Secretary noted this newly produced record in support of a motion to extend the deadline for his filing a life care plan. See Resp't's Reply, filed May 1, 2023, at 5. The Secretary asserted that based upon Ms. Roquemore's time entries shortly before and shortly after August 6, 2011, "Ms. Roquemore was plainly aware of the existence of Dr. Valencia's August 6, 2011 record." Id. at 6. In addition, the Secretary also noted that Mr. Sanchez and Ms. Sanchez produced, for the first time, records from Inland Regional Center ("IRC") on March 22, 2023 as Exhibit 243. These records, too, contain a statement from Ms. Sanchez about when Trystan started to develop problems. Id. at 3-6.

Soon after the Secretary discovered the incompleteness in the production of medical records from Dr. Valencia, a status conference was held, which was recorded. During this status conference, Ms. Roquemore did not state whether she possessed Dr. Valencia's August 6, 2011 medical record but failed to produce it. Tr. May 24, 2023 at 8.

The Sanchezes did not produce other medical records as well. The Secretary sought to confirm that the production of other medical records was complete. So, in a recorded status conference and later by motion, the Secretary requested

authority to issue subpoenas.  During the status conference, Ms. Roquemore stated that she would have to speak with the Sanchezes about it, but that she did not think they would object.  Tr. May 24, 2023 at 20-21.  The Sanchezes ultimately did not file any opposition to the request.  The Secretary subpoenaed medical records from four providers.  Resp't's Mot's., filed May 25, 2023.  The Secretary obtained these records.  Exhibits S-V.

Of this group of records, the Secretary initially identified two more documents that should have been produced during the entitlement phase.  These documents are at the foundation for the motion to reopen, which the Secretary filed on August 16, 2023.[8]  These are:

- An August 19, 2011 report from Dr. Brown.  Exhibit T at 17-18.
- A June 3, 2010 email to James. F. Gusella, Ph.D.  Exhibit U at 771-72.

In Dr. Brown's August 19, 2011 letter, he documents that he briefly examined Trystan, who was "generally hypotonic."  Exhibit T at 17.[9]  Dr. Brown stated that Trystan "showed no significant signs of neurologic disability before his immunizations [on February 5, 2009] or 3 months later.  This is apparently some sort of degenerative neurologic process with an insidious onset that has left him significantly disabled.  Based upon the timing of the process and no conclusive diagnosis after 2 years of testing, an immunization reaction cannot be totally discounted."  Id. at 17-18.

The basis of Dr. Brown's statement that Trystan "showed no significant signs of neurologic disability" within three months of his vaccination apparently was based upon his office notes from May 13, 2009.  See Exhibit 1 at 53 (Dr. Brown's May 13, 2009 record noting a nasal congestion and a resolving viral infection with no mention of arm movements).  In his August 19, 2011 letter, Dr. Brown wrote that Ms. Sanchez brought Trystan to him with a request to change his previous record with respect to the onset of Trystan's problems.  Dr. Brown wrote:

---

[8] Copies of the three medical records are also found as the appendix to Resp't's Mot. to Reopen.

[9] Dr. Brown wrote in all capital letters.  However, this order quotes Dr. Brown with more traditional capitalization.  Dr. Brown also mistakenly refers to the February 5, 2009 and May 13, 2009 appointments as "2/5/11" and "5/13/11".

3 year-old boy here with his mother with request for me to
write a clarifying letter concerning my last office visit
(5/13/09). I had seen him on one other occasion on 2/5/11 at 5
months-old when he received his first set of immunizations.
The 5/13/11 visit was for nasal congestion. His mother says that
shortly after his first immunizations she noticed he occasionally
moved his arms in a strange way. She says she told every
provider on his 3 subsequent visits in our office about these
movements and no one was concerned. She was hoping I would
remember her mentioning these movements and would clarify
my notes.

When I asked her to demonstrate the movement she was seeing,
she described and demonstrated a tonic extension and internal
rotation of her arms. This can represent decerebrate posturing
consistent with a seizure. Had I been told of that activity on any
of Trystan's visits, I would not only have documented that in
the chart, but I would also had ordered an EEG (and MRI if the
EEG were abnormal). Therefore, I do not believe that particular
arm movement was brought to my attention on Trystan's only
visit with me after the immunizations.

Exhibit T at 17.  Dr. Brown finished his letter with an addendum:  "A copy of this
encounter has been faxed and mailed to mother's lawyer, Lisa Roquemore at 949-
222-2022.  18191 Von Karman Ave. Suite 470 Irvine, CA. 92612." Id. at 18.  (The
fax number on Dr. Brown's letter matches the fax number listed on CM/ECF for
Ms. Roquemore's office).  In the context of seeking a reopening of entitlement, the
Secretary contended that based upon Dr. Brown's addendum, "petitioners' counsel
knew of this record."  Resp't's Mot. to Reopen at 8.

After the Secretary filed the motion to reopen entitlement, a recorded status
conference was held on August 31, 2023.  In this context, Ms. Roquemore stated
that to the extent the opposition to the forthcoming motion to reopen relied upon
factual allegations, they would be supported with affidavits.  Tr. Aug. 31, 2023 at
19.

The Sanchezes opposed the motion to reopen.  Pet'rs' Resp., filed Sep. 6,
2023.  The Secretary maintained his position.  Resp't's Reply, filed Sep. 18, 2023.
As part of his reply, the Secretary identified another document, which arguably
supported reopening entitlement: handwritten notes from Trystan's February 17,

2009 visit to Urgent Care.  Exhibit T at 50.  These notes appear to list Ms. Sanchez's concerns about Trystan and do not include a worry about a seizure or abnormal movement.  The reply appeared to complete the briefing for the motion to reopen.[10]

Mr. and Ms. Sanchez added a Sur-Reply on October 6, 2023.  They expressed an interest in presenting affidavits.  The Sur-Reply stated:

> Further, the silence [in their Response] is a mere unwillingness to be baited into Respondent's quagmire of rabid and highly speculative accusations which are veiled as facts or close to fact, especially in light of the Vaccine Program's philosophy that it is supposed to be, among other things, non-adversarial. Although Petitioners do not believe that further explanation regarding the medical records are relevant to the Motion to Reopen, they have an understanding that it may be relevant for this Court's future and other determinations. As such, separate declarations will be filed shortly as to what happened over 10 years ago.

Pet'r's Sur-Reply, filed Oct. 6, 2023, at 2.

In a status conference, the parties discussed a schedule.  Ms. Roquemore stated that the petitioners were planning to file an affidavit from Mr. Sanchez. When asked whether she would be filing an affidavit herself, Ms. Roquemore stated that it was undetermined.  The Secretary did not oppose the submission of affidavits.  However, the Secretary inquired about a fact hearing in which any affiants might testify.  Tr. Oct. 31, 2023 at 25.

The petitioners were permitted to file an affidavit from Mr. Sanchez. However, the testimony of Ms. Sanchez appeared more significant as she possessed more direct knowledge.  Order, issued Nov. 2, 2023, at 2 (citing evidence).  Thus, regardless of whether Mr. Sanchez testified via an affidavit, the Secretary could seek oral testimony from either Mr. Sanchez, Ms. Sanchez, or both Mr. Sanchez and Ms. Sanchez.  Id.

---

[10] Because the present ruling resolves only the motion for protective order, this ruling does not set forth all the details of the arguments for and against reopening entitlement.

The petitioners filed an affidavit from Mr. Sanchez.  Exhibit 295.  They also filed a status report regarding the motion to reopen on November 29, 2023.  The petitioners did not file an affidavit from Ms. Roquemore.

The Secretary requested oral testimony regarding the motion to reopen from Ms. Sanchez and Ms. Roquemore.  Resp't's Status Rep., filed Dec. 8, 2023.  The Secretary further developed arguments in support of reopening.

The parties discussed the possibility that Ms. Roquemore might be called upon to explain the failure to produce documents, including the Dr. Brown letter, in other status conferences.  In light of these discussions, Mr. and Ms. Sanchez retained a separate attorney with experience in the Vaccine Program, Richard Gage.  See Notice, filed Jan. 17, 2024.

At the request of Mr. and Ms. Sanchez, the Secretary reinforced his motion to reopen via a Comprehensive Brief, filed on Jan. 11, 2024.  The Secretary argued that a "'substantial change in the evidence'" may justify a departure from an appellate court's mandate.  Resp't's Comp. Br. at 15, quoting Retractable Tech. v. Becton Dickinson, 756 F.3d 1366, 1372 (Fed. Cir. 2014).  Along the same line, the Secretary contended that special masters may reopen entitlement based upon an assessment of four factors: "'(1) the nature of the proffered new evidence; (2) the prejudice to the parties; (3) the length of the delay; and (4) the reason for the delay.'"  Resp't's Comp. Br. at 26, quoting Vant Erve v. Sec'y of Health & Hum. Servs., 39 Fed. Cl. 607, 612 (1997), aff'd, 232 F.3d 914 (Fed. Cir. 2000).

The Secretary sought to establish that the newly discovered evidence supported both a departure from the Federal Circuit's mandate and a reopening of entitlement.  Included with the brief was an appendix listing 92 items which, the Secretary contended, should have been produced during the entitlement phase.  Of these documents, the Secretary highlighted another potentially relevant record: notes from a March 8, 2010 visit to Inland Counties Regional Center, during which Ms. Sanchez reported that Trystan had a seizure episode on August 8, 2009.  Resp't's Comp. Br. at 13-14.  The Secretary asserted that this was evidence that the arm contortions began months, not days, post-vaccination.  The Secretary also again argued for the testimony of Ms. Sanchez and Ms. Roquemore.  Id. at 29-30.  In doing so, the Secretary explained why, in his view, testimony from Ms. Roquemore would not invade the attorney-client privilege or the attorney work product doctrine.  Id. at 30.  The Secretary also requested five additional sets of documents.  Id. at 28-29.  One of these items was the presentation of the Dr. Brown letter that Ms. Roquemore had reviewed on August 24, 2011.

14

The formal request for Ms. Roquemore's testimony raised to the forefront a question as to whether the rules of ethics allowed Ms. Roquemore to remain as counsel of record in a case in which she was likely to testify. <u>See</u> Order to Show Cause, filed March 26, 2024.[11]  After the parties submitted briefs as well as the Sanchezes averring that they wanted Ms. Roquemore to continue to represent them (Exhibit 325), the undersigned took Mr. and Ms. Sanchez at their word.  Ms. Roquemore was permitted to continue to represent Mr. and Ms. Sanchez.  Order, issued Apr. 10, 2024.

In addition to allowing Ms. Roquemore to remain as counsel of record for Mr. and Ms. Sanchez, the April 10, 2024 order attempted to schedule a few steps. The sequence involved resolving the Secretary's pending request for documents, receiving a comprehensive brief from the petitioners regarding the motion to reopen, and conducting a hearing on the motion to reopen.  The plan was to hold the hearing in San Diego, California, in the latter part of the summer.

Mr. and Ms. Sanchez opposed the Secretary's request for documents. Pet'rs' Resp., filed Apr. 25, 2024.  However, the arguments were presented far too vaguely to be persuasive, and their objections were overruled.  Order, issued Apr. 29, 2024.  This order encouraged the parties to begin conferring about potential dates for the hearing on the motion to reopen.  <u>Id.</u> at 2 ¶ 4.  The April 29, 2024 order did not reference the production of the Dr. Brown letter Ms. Roquemore had reviewed.

Mr. and Ms. Sanchez maintained that entitlement should not be reopened. Pet'rs' Comp. Opp'n, filed May 9, 2024.  First, they argued that the evidence was cumulative in nature and/or not relevant.  Additionally, they contended that the mandate and the law of the case doctrine precluded re-litigation of entitlement, and the circumstances did not justify a deviation from the mandate.  The Sanchezes also argued that, as the Secretary "knew or should have known" in 2014 that the record was incomplete, he had waived the ability to raise the issue and should not be allowed to benefit from his lack of due diligence.  Pet'rs' Comp. Opp'n at 23.

---

[11] Around this time, Mr. and Ms. Sanchez attempted to prevent the undersigned from ruling upon the pending motion to reopen via two different procedural paths.  These efforts resulted in further delays.  <u>See</u> Opinion and Order, issued Mar. 22, 2024, 2024 WL 1637913.

Mr. and Ms. Sanchez were directed to produce the Dr. Brown letter that Ms. Roquemore had reviewed.  Order, issued May 16, 2024.  The date of production was set for May 31, 2024.

On May 31, 2024, Mr. and Ms. Sanchez did not comply with the May 16, 2024 order by submitting the Dr. Brown letter.  They did not file anything.  As such, Mr. and Ms. Sanchez were directed to file this letter as a separate exhibit for a second time.  Order, issued June 5, 2024.  Mr. and Ms. Sanchez requested additional time to respond because Ms. Roquemore was out of the country when the May 16, 2024 order was issued.  Pet'rs' Mot., filed June 11, 2024.  Although the motion made no representation about Mr. Gage's status on May 16, 2024, when the original deadline was set, the deadline was extended until June 21, 2024.  The deadline for Mr. and Ms. Sanchez to propose potential dates for the hearing on the motion to reopen was also extended until June 21, 2024.

### C.    Pending Motion for Protective Order

Mr. and Ms. Sanchez opposed the order for a hearing.  Pet'rs' Mot. for Protective Order, filed June 21, 2024.  The motion is slightly longer than four pages of which approximately half sets forth background material, leaving approximately two pages of analysis.  Mr. and Ms. Sanchez cited no cases.  Although the Sanchezes stated that "no further discovery or hearing are reasonable and necessary," they did not expand on this point or cite to any authority.  They argued that the Secretary was not entitled to be heard on a motion to reopen due to waiver and lack of due diligence.  They further argued that an in-person hearing would be overly burdensome and might violate attorney-client privilege and work product privilege.

The Secretary contended in a seven-page response that the hearing should proceed.  Resp't's Resp., filed July 26, 2024.[12]  The Secretary essentially argued, for various reasons, that Mr. and Ms. Sanchez had not established the high standards for a protective order.

Mr. and Ms. Sanchez submitted a reply, approximately three pages in length.  The Sanchezes cited 42 U.S.C. 300aa-12(d)(3)(B) and argued that any proceedings in the Vaccine Program must be "reasonable" and "necessary."  They repeated

---

[12] The time was extended for the Secretary to file this response due to unexpected health problems of his counsel.

their argument that there was waiver and a lack of due diligence by the Secretary, and also argued that the documents were cumulative and would not change their entitlement to compensation.

## III.   <u>Analysis</u>

In the Vaccine Program, special masters govern the production of evidence. 42 U.S.C. § 300aa–12(d)(3)(B).  The Federal Circuit has recognized that "the permissible scope of the special master's inquiry is virtually unlimited.  Congress desired the special masters to have very wide discretion with respect to the evidence they would consider and the weight to be assigned that evidence." <u>Whitecotton v. Sec'y of Health & Hum. Servs.</u>, 81 F.3d 1099, 1108 (Fed. Cir. 1996).

Although special masters have latitude about the production of evidence, this "very wide discretion" has some bounds.  For example, parties in the Vaccine Program may invoke privileges as they would in other courts, such as the Court of Federal Claims.  <u>E.g.</u> <u>Wittner v. Sec'y of Health & Hum. Servs.</u>, 43 Fed. Cl. 199, 206 (1999) (ruling that special master did not err in allowing respondent to call a doctor whom the petitioner's attorney had consulted despite the argument of attorney work product); <u>C.f.</u> <u>Royal Bush Manufacturing, Inc. v. United States</u>, 75 F.4th 1250, 1260 (Fed. Cir. 2023) (stating, in the context of a dispute over antidumping duties, that Customs and Border Patrol has an "inherent authority to issue protective orders").  In opposing Mr. and Ms. Sanchez's motion for protective order, the Secretary has not argued that special masters lack the authority to issue protective orders.

In support of the request for a protective order, Mr. and Ms. Sanchez's motion cites only a single authority.[13]  Rule 26(c) of the Rules of the Court of Federal Claims ("R.C.F.C.").  Pet'rs' Mot. at 3.  As discussed in the previous paragraph, incorporating R.C.F.C. 26(c) into the Vaccine Program via Vaccine Rule 1 appears both uncontroversial and appropriate.

This provision, in relevant part, states: "A party or any person from whom discovery is sought may move for a protective order. . . . The court may, for good

---

[13] The Sanchezes cite to 42 U.S.C. 300aa-12(d)(3)(B) in their reply.  However, arguments not presented in an opening brief are waived.  <u>SmithKline Beecham, Corp. v. Apotex Corp.</u>, 439 F.3d 1312, 1320 (Fed. Cir. 2006); <u>Braseth Trucking, LLC v. United States</u>, 126 Fed. Cl. 608, 615 (2016).

cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."[14]  A key provision is the "good cause" standard.  "Good cause requires a showing that the discovery request is considered likely to oppress an adversary or might otherwise impose an undue burden." Forest Products Northwest, Inc. v. United States, 453 F.3d 1355, 1361 (Fed. Cir. 2006) (affirming denial of a motion for protective order because, in part, the moving party did not provide sufficient detail).  "For good cause to exist, the party seeking to limit the disclosure of discovery materials must show that specific prejudice or harm will result if no protective order is granted."  In re Violation of Rule 28(D), 635 F.3d 1352, 1357–58 (Fed. Cir. 2011).

By these measures, the motion for protective order falls well short.  Mr. and Ms. Sanchez have not detailed why testimony is not appropriate.  This lack of specificity, by itself, justifies the denial of the motion for protective order.  This is not the first time that Mr. and Ms. Sanchez have been found to present arguments against discovery too vaguely.  Order, issued Apr. 29, 2024.

The Secretary has sufficiently explained why Ms. Roquemore's testimony is necessary, as it will help "fill [the] evidentiary gap" regarding the letter from Dr. Brown which was reportedly sent to her office via fax and mail, and Ms. Roquemore's timesheet entry for reviewing a letter from Dr. Brown.  Resp't's Comp. Br. at 29-30 (discussing the Vant Erve "reason for delay" factor).

Although Mr. and Ms. Sanchez propose that they might provide information via written interrogatories, such a proposal is not an adequate substitute for in-person testimony for several reasons.  To the extent that Mr. Sanchez, Ms. Sanchez, and/or Ms. Roquemore wished to explain in writing the circumstances of how and why multiple medical records were not produced during entitlement, they separately or collectively could have produced affidavits or declarations made under penalty of perjury months ago.  Overall, Mr. Sanchez, Ms. Sanchez, and Ms. Roquemore have seemed to be attempting to avoid discussing their failure to produce documents.  Their willingness to provide information voluntarily on their terms seems to have expanded after they were ordered to produce the information.

---

[14] Another portion of R.C.F.C. 26(c)(1), which was deleted from the material quoted in the text as marked by the ellipses, requires a moving party to confer.  Mr. and Ms. Sanchez have stated that they conferred with the Secretary via correspondence dated June 18, 2024.  Pet'rs' Mot. for Prot. Order at 3.

Next, regardless of the motivations of Mr. Sanchez, Ms. Sanchez, and Ms. Roquemore, the Secretary has a good faith basis to explore the circumstances of a failure to produce many documents. The Secretary possesses a right to choose the method of investigation. De Graffenreid v. United States, 2 Cl. Ct. 640, 644 (1983) ("a party cannot evade oral depositions merely by soliciting written interrogatories"). Writing answers to written interrogatories would not allow the Secretary to press follow up questions and could, simply, delay adjudication as the parties almost inevitably would dispute whether the Secretary could ask questions at another hearing to a witness that answered interrogatories.

The Secretary's preference for in-person oral testimony is sensible. Famously, Professor Wigmore declared that cross-examination is "beyond any doubt the greatest legal engine invented for the discovery of truth." 5 J. Wigmore, Evidence § 1367, p. 32 (J. Chadbourn rev. 1974), quoted in United States v. Salerno, 505 U.S. 317, 328 (1992) (Stevens, J., dissenting).[15] Written interrogatories are less likely to lead to the discovery of truth. Furthermore, without live testimony, the undersigned cannot assess the witness's demeanor in spontaneously answering questions under oath. This assessment may be critical because Ms. Sanchez and Ms. Roquemore will be testifying as fact witnesses. See Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009) stating a "trial court makes a credibility determination in order to assess the candor of a fact witness"); Herrman v. United States, 129 Fed. Cl. 780, 784 (2017) (denying a request from non-party witnesses to appear by videoconferencing because, in part, the "court values the ability to evaluate the witnesses' credibility and demeanor in person"). Trial courts "enjoy wide latitude to determine admissibility and the mode and order of evidentiary presentations." SEB S.A. v. Montgomery Ward & Co. Inc., 594 F.3d 1360, 1373 (Fed. Cir. 2010) (internal quotation marks omitted), aff'd on non-relevant point, Global-Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754 (2011).

A lively and free-flowing exchange of questions and answers during oral testimony is much more likely to produce the truth, either because of what the witness says, what the witness does not say, or how the witnesses say what they say. In the course of any testimony, the questions posed to Ms. Sanchez and/or Ms. Roquemore may (or may not) come close to information protected by either the attorney-client privilege and/or the attorney work product doctrine. But, this

---

[15] The Federal Circuit quoted an earlier edition of the same treatise in SynQor, Inc. v. Vicor Corp., 988 F.3d 1341, 1352 n.5 (Fed. Cir. 2021).

possibility does not mean that all questions will. The questions can be evaluated on a question-by-question basis.[16] See In re Unilin Décor N.V., 153 Fed. App'x 726, 727 (Fed. Cir. 2005) (stating in a non-binding order denying a petition for mandamus that the "determination of what is a legal strategy and what is a discoverable fact is undoubtedly a tough line to draw and, in the absence of a showing of clear abuse of discretion, is best left to the supervision of the trial judge on a case-by-case basis").

This ruling should not be construed as a ruling that Mr. and Ms. Sanchez have failed to interpose an objection to any question based upon the attorney-client privilege or the attorney work product doctrine. As just stated, questions will be considered one at a time. Whether Mr. and Ms. Sanchez choose to assert any privileges available to them is for them to decide. In this regard, Mr. and Ms. Sanchez may wish to consider that at least in some cases, when the actions of a represented party are called into question, attorneys sometimes testify. See, e.g., Backertop Licensing LLC v. Canary Connect, Inc., 107 F.4th 1335, 1344 (Fed. Cir. 2024) (holding that District Court was "reasonable . . . to require in-person testimony in furtherance of its authority to investigate attorney and party misconduct"); Luv n' Care, Ltd. v. Laurain, 98 F.4th 1081, 1095 (Fed. Cir. 2024) (noting that party's former counsel gave testimony in proceeding before unclean hands). Certainly, these examples do not require Mr. and Ms. Sanchez to waive any privileges, but these examples do indicate that attorneys have testified. Mr. and Ms. Sanchez may, arguably, have already waived the attorney-client privilege by submitting a declaration from Ms. Roquemore on December 12, 2014. CM/ECF 108.

Mr. and Ms. Sanchez argued in a few sentences that oral testimony should not be conducted until the undersigned has declared what the law is and resolve their contention that the Secretary waived his opportunity to seek the production of the newly revealed documents. See Pet'rs' Mot. at 4. However, Mr. and Ms. Sanchez have not cited any authority for this rationale for a protective order.

---

[16] In anticipation of the hearing, the undersigned invites Mr. and Ms. Sanchez to discuss the metes and bounds of the attorney-client privilege and the work product doctrine in a memorandum. Any discussion would be more informative if Mr. and Ms. Sanchez presented authorities that analyzed the attorney-client privilege and the work product doctrine in the context of a party's failure to disclose evidence.

Trial courts "are afforded broad discretion to control and manage their dockets, including the authority to decide the order in which they hear and decide issues pending before them." Amado v. Microsoft Corp., 517 F.3d 1353, 1358 (Fed. Cir. 2008). In the undersigned's assessment, the better practice is first to obtain all relevant and non-privileged evidence and then to resolve the motion to reopen.[17]

Finally, the May 16, 2024 order required Mr. and Ms. Sanchez to submit as a separately numbered exhibit the Dr. Brown letter that Ms. Roquemore reviewed on August 24, 2011. Mr. and Ms. Sanchez have not complied with this order. The pending motion for protective order emphasizes the alleged burdensomeness of a hearing. Very little, if any, of the motion for protective order concerns the production of a single document. To the extent that the motion for protective order could be construed as seeking relief from the obligation to produce Dr. Brown's letter, that aspect of the motion for protective order is denied as well.

Mr. and Ms. Sanchez are being given a final opportunity to cure their lack of compliance with respect to the production of the Dr. Brown letter as a separately filed exhibit. If Mr. and Ms. Sanchez do not comply with this order to file the Dr. Brown letter as a separately filed exhibit, the Secretary may seek sanctions as provided in Rule 37(b) of the Rules of the Court of Federal Claims.

## IV.    Conclusion and Schedule

The petitioners' June 21, 2024 motion for protective order is DENIED. The proposed testimony is reasonable and necessary to adjudicate the motion to reopen. To advance the resolution of this case, the following schedule is established:

1.  Mr. and Ms. Sanchez are directed to file the Dr. Brown letter that Ms. Roquemore reviewed on August 24, 2011 as a separately filed exhibit by **Wednesday, August 21, 2024**.

2.  Mr. and Ms. Sanchez are directed to file a status report regarding their availability for a two-day hearing to be held in San Diego, California.[18] Mr. and Ms. Sanchez should propose dates that are

---

[17] In between the completion of oral testimony and the resolution of the motion to reopen, an in-person oral argument may be scheduled.

[18] For a range of dates that were once convenient, see Resp't's Status Rep., filed May 22, 2024 and Order, issued June 5, 2024. The week of September 16 is no longer available.

convenient for Ms. Roquemore because Ms. Roquemore will be called to testify as a witness.  The deadline for this status report is **Wednesday, August 28, 2024**.

3. If Mr. and Ms. Sanchez fail to comply with the order to submit the Dr. Brown letter that Ms. Roquemore reviewed on August 24, 2011 as a separately filed exhibit by Wednesday, August 21, 2024, the Secretary may file a motion for sanctions.  Any such motion shall be filed by **Wednesday, September 25, 2024**.  If the Secretary seeks sanctions, Mr. and Ms. Sanchez may respond within the time permitted by the Vaccine Rules.

4. Mr. and Ms. Sanchez may file a memorandum regarding the attorney-client privilege and the attorney work product doctrine.  The purpose of this memorandum would be to inform the adjudication of any objections to questions posed during the forthcoming hearing.  As such, the memorandum is likely to be more helpful if it discusses the attorney-client privilege or the attorney work product doctrine in the context of a party's failure to produce documents.  The memorandum is also likely to be more helpful if it discusses the waiver of attorney-client privilege or the attorney work product doctrine in the context of attorneys describing their activities.  The deadline for any such memorandum from Mr. and Ms. Sanchez is **Wednesday, September 25, 2024**.  If Mr. and Ms. Sanchez file a memorandum, the Secretary may respond with a memorandum **within 21 days**.

5. Finally, although not related to the motion for protective order or the motion to reopen, Mr. and Ms. Sanchez shall file any updated records for Trystan.  The updated records should be certified by a custodian of documents.  Mr. and Ms. Sanchez shall file any updated records by **Wednesday, September 25, 2024**.  If there are no updated records, Mr. and Ms. Sanchez should file a status report on the same date.


**IT IS SO ORDERED.**

<u>s/ Christian J. Moran</u>
Christian J. Moran
Special Master

22