# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

* * * * * * * * * * * * * * * * * * * * * * * *
| | |
|---|---|
| GERMAIN SANCHEZ and <br> JENNIFER SANCHEZ, <br> *parents of T.S.*, <br> <br>                 Petitioners, <br> v. <br> <br> SECRETARY OF HEALTH <br> AND HUMAN SERVICES, <br> <br>                 Respondent. | No. 11-685V <br> Special Master Christian J. Moran <br> <br> <br> Filed: October 1, 2025 |

* * * * * * * * * * * * * * * * * * * * * * * *

Lisa A. Roquemore, Law Offices of Lisa A. Roquemore, Rancho Santa Margarita, CA, and Richard Gage, Richard Gage, P.C., Cheyenne, WY for petitioners; Jennifer L. Reynaud, Zoe Wade, and Madylan Yarc, United States Dep't of Justice, Washington, DC, for respondent.

**FINDINGS REGARDING DR. VALENCIA'S**
**AND DR. BROWN'S MEDICAL RECORDS[1]**

     Mr. and Ms. Sanchez claim that vaccinations harmed their son, T.S., and the Federal Circuit determined they are entitled to compensation. The Secretary attempts to change that result via two procedural routes---a motion to reopen the entitlement phase of the case and a motion for sanctions. Both motions rest, in part, upon two medical records from doctors created in 2011 following visits from T.S. and Ms. Sanchez. A purpose for these visits was for Ms. Sanchez to request

---

[1] Because these Findings contain a reasoned explanation for the action in this case, the undersigned is required to post them on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). This means the Findings will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), petitioners have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material before posting the decision.

that the doctors "correct" earlier medical records that failed to mention T.S. was contorting his arm unusually. One is by Dr. Valencia and the other is by Dr. Brown. Both doctors declined to change their earlier medical records and memorialized the request in their records. These 2011 medical records were not produced until after the case entered the damages phase in 2023. Ms. Sanchez and an attorney representing her, Lisa Roquemore, testified about the production of these documents at a hearing held on June 2-3, 2025. The undersigned finds that the totality of the evidence and arguments clearly and convincingly establishes that Ms. Sanchez and Ms. Roquemore (a) possessed those documents before November 2011, (b) failed to submit the documents into the record when they were required to be submitted, and (c), therefore, purposely withheld the documents.

## BACKGROUND

### 2009

When T.S. was six months old, Ms. Sanchez brought him to Dr. Philip S. Brown on February 5, 2009. Exhibit 1 at 44. T.S. received a series of vaccinations.

Ms. Sanchez and other family members averred that within about two weeks, T.S. developed arm contortions. Exhibits 3-8 (affidavits). Ms. Sanchez further testified that these arm contortions happened multiple times per day.

Accompanied by her mother, Ms. Sanchez brought T.S. to Dr. Brown again on May 13, 2009. Exhibit 1 at 53.[2] On this date, in short, Dr. Brown memorialized that Ms. Sanchez was complaining that T.S. had congestion. Dr. Brown diagnosed T.S. as having a resolving upper respiratory infection. Notably, Dr. Brown did not memorialize any complaints about arm contortions. However, Ms. Sanchez maintains that she told Dr. Brown about abnormal arm movements.

About three months later, Ms. Sanchez brought T.S. to the office of a different pediatrician. This pediatrician is Dr. Rainilda P. Valencia. For T.S.'s first

---

[2] The May 13, 2009 appointment with Dr. Brown is the third time that a medical professional saw T.S. after the February 5, 2009 vaccination. These other two medical professionals did not memorialize any complaints about arm contortions in their records created during this time. See Exhibit 1 at 48-51 (Physician Assistant Jonathan Luna on Feb. 17, 2009), 50-52 (Dr. Seleem on Apr. 29, 2009). These records do not meaningfully affect issues for this Finding.

visit, which was on August 19, 2009, he was seen by Physician Assistant Micaela Marin-Tucker.  According to Ms. Marin-Tucker's record, Ms. Sanchez told her she "noticed a change in [T.S.'s] development about 2-3 months ago but since she had taken [T.S. to the pediatric clinic] with Dr. Brown she thought that everything was ok."  Exhibit 1 at 54.  If accurate, this history places the onset of T.S.'s developmental delay around May 19 to June 19.  Ms. Marin-Tucker's August 19, 2009 record does not memorialize any complaint about arm contortions.  However, Ms. Sanchez maintains that she told Ms. Marin-Tucker about arm contortions.  Tr. 4050.

Following the August 19, 2009 visit with Ms. Marin-Tucker, T.S. began to be treated by numerous doctors as his parents attempted to learn what was affecting him.  These efforts continued for years but they are generally not relevant to the production of records from Dr. Brown and Dr. Valencia

2011

In April 2011, Ms. Roquemore agreed to represent Mr. and Ms. Sanchez.  Timesheets at 7; Supp'l Decl. ¶ 10. [3]  Ms. Roquemore directed Ms. Sanchez to obtain all medical records.  Ms. Roquemore did not obtain medical records personally. Tr. 4266.

By August 2011, Ms. Roquemore had received some medical records from Ms. Sanchez.  Ms. Roquemore was further developing the case.  On August 5, 2011, Ms. Roquemore spoke with Ms. Sanchez about "upcoming doctor appointments and clarifications of medical records.  Further discuss journal entries."  Timesheets at 15.  Because Ms. Sanchez had informed Ms. Roquemore that she (Ms. Sanchez) had told T.S.'s doctors that he was moving strangely, Ms. Roquemore suggested that Ms. Sanchez "attempt to obtain clarification by T.S.'s doctors to see what was recalled and if the doctor was willing to provide a clarification letter."  Supp'l Decl. ¶ 15; see also Exhibit 56 ¶ 6; Tr. 4068, 4300.

Ms. Sanchez brought T.S. to see Dr. Valencia on August 6, 2011.  One chief complaint was "WELL CHILD CHECK."  Exhibit 262 at 1.  T.S.'s medical history included that he was seeing specialists at Rady Children's Hospital in San Diego, such as neurologists, orthopedists, and specialists in metabolic disorders.  Dr.

---

[3] The Timesheets were attached to petitioners' first motion for an award of attorneys' fees and costs on an interim basis, filed Sep. 16, 2014, as Exhibit 2.
   Ms. Roquemore detailed her representation of the family in a Supplemental Declaration in support of the first motion for attorneys' fees and costs, filed on Dec. 12, 2014.

Valencia conducted a general pediatric examination. Her assessments included cerebral palsy, developmental delay not otherwise specified, and otitis media.

In the ensuing medial record dated August 6, 2011, Dr. Valencia discussed Ms. Sanchez's proposal to modify an earlier medical record:

> [Ms. Sanchez] wants her lawyer to talk to us as she is trying to get compensation from VAERS for his condition now. She needs letters to give them a strong case and she was asking me to change Micaela Marin-Tucker's (PA) notes on her first visit ESP the ROS and the onset of symptoms. Per Mom she believes our office did not "do anything wrong but instead is helping her son and that she is not going after us but she needs supplemental support from another agency". In conclusion I and my PA (Micaela Marin-Tucker) advised Mom that "we can not change or ALTER" any of our previous documents since they are considered PERMANENT RECORDS and that our note[] is based on the interview and assessments at the time of visit and that it will be hard to recall anything on those visits unless they were documented.

Exhibit 262 at 1. When this August 6, 2011 medical record was produced in 2023, it contained the following footer:

```
http://192.168.16.2:8080/mobiledoc/jsp/catalog/xml/printChartOptions.jsp?encounterID=...   10/21/2011
```

Within two weeks of the August 6, 2011 appointment at Dr. Valencia's office, Ms. Roquemore reviewed an "e-mail from J. Sanchez regarding meeting with Dr. Micaela."[4] Timesheets at 15 (Aug. 17, 2011). Ms. Roquemore conferred with Ms. Sanchez about "more details of meeting and items needing clarifying. Further discuss upcoming meeting with Dr. Brown. Further discuss status of journal, date of entries, and other witness statements." Id.

In the following week, Ms. Roquemore reviewed "medical records for office visit with Dr. Micaela" and she had a telephone conference with "Dr. Micaela's

---

[4] At this time, Ms. Sanchez and Ms. Roquemore believed that Micaela Marin-Tucker was a physician. However, they learned later that Ms. Marin-Tucker is a physician's assistant in Dr. Valencia's office.

4

office to discuss medical record." Timesheets at 16 (Aug. 22, 2011); accord Supp'l Decl. ¶ 17 (Ms. Roquemore "was even called upon to discuss the issues with Micaela's/Dr. Valencia's office"). The following day, Ms. Roquemore spoke with a malpractice attorney about a clarification letter. Timesheets at 16 (Aug. 23, 2011); Supp'l Decl. ¶ 17.[5] Ultimately, Ms. Marin-Tucker's August 17, 2009 medical record was not changed. See Supp'l Decl. ¶ 17 ("the attempt to obtain clarification of what was reported to them [Dr. Valencia and Ms. Marin-Tucker] by Jennifer turned out to be a dead end").

Ms. Sanchez brought T.S. to see Dr. Brown on August 19, 2011. Dr. Brown summarized that the purpose of the visit was to address Ms. Sanchez's request that Dr. Brown "write a clarifying letter concerning my last office visit (5/13/09)." Exhibit T at 17.[6] Dr. Brown then memorialized information from Ms. Sanchez: "The 5/13/11 [sic, should probably be 5/13/09] visit was for nasal congestion. His mother says that shortly after his first immunization she noticed he occasionally moved his arms in a strange way. She says she told every provider on his 3 subsequent visits in our office about these movements and no one was concerned. She was hoping I would remember her mentioning these movements and would clarify my notes." Id.

Dr. Brown then elicited additional information from Ms. Sanchez: "When I asked her to demonstrate the movement she was seeing, she described and demonstrated a tonic extension and internal rotation or her arms. This can represent [decerebrate] posturing consistent with a seizure." Exhibit T at 17. Dr. Brown communicated his response to Ms. Sanchez: "Had I been told of that activity on any of T.S.'s visits, I would not only have documented that in the chart, but I would also had ordered an EEG (and MRI if the EEG were abnormal). Therefore, I do not believe that particular arm movement was brought to my attention on T.S.'s only visit with me after the immunizations."

Dr. Brown also conducted "a brief exam." He stated T.S. suffered from "some sort of degenerative neurologic process with an insidious onset that has left him significantly disabled. Based on the timing of the process and no conclusive diagnosis after 2 years of testing, an immunization reaction cannot be totally discounted." Exhibit T at 17-18.

---

[5] In her oral testimony, Ms. Roquemore clarified that the malpractice attorney represented Dr. Valencia's medical practice.

[6] Dr. Brown wrote his letter using ALL CAPITAL LETTERS. However, his letter is quoted above using more traditional capitalization.

Dr. Brown added that "a copy of this encounter has been faxed and mailed to mother's lawyer, Lisa Roquemore at 949-222-2022

18191 Von Karman Ave. Suite 470 Irvine, CA. 92612." Id. at 18.

While the issue of entitlement to compensation was being resolved, Mr. and Ms. Sanchez filed other medical records from Dr. Brown and Dr. Valencia. Two medical records from Dr. Brown were included in the initial packet. See Exhibit 1 at 44-47 (Feb. 5, 2009) and at 53 (May 13, 2009). One medical record from Dr. Valencia's office was filed within Exhibit 1 at pages 54-56 (Aug. 17, 2009). However, neither Dr. Valencia's August 6, 2011 medical record nor Dr. Brown's August 19, 2011 medical record were filed in the initial set of material.[7]

Within one month of the petition being filed, Ms. Roquemore directed Ms. Sanchez to obtain updated medical records. Timesheets at 22 (entry for Oct. 21, 2011: "Telephonic conference with [Ms. Sanchez] regarding setting up a meeting and regarding obtaining all 2011 medical records so we can file [a] Statement of Completeness"). On October 24, 2011, Ms. Sanchez emailed Ms. Roquemore medical records, Ms. Roquemore reviewed those records, and a paralegal filed them as the next set of exhibits. Id. at 23. The next day, Ms. Roquemore "Review[ed] several more emails from client with additional medical records (.1). [and] Review[ed] additional medical records of Dr. Valencia and UCSD biochemical genetics laboratory." Id. (entry for Oct. 25, 2011). On October 26, 2011, the paralegal filed additional records from Dr. Valencia's office as Exhibit 11. This set of records from Dr. Valencia contains the same footer as the footer that appears on Dr. Valencia's August 6, 2011 medical record filed as Exhibit 262:

> http://192.168.16.2:8080/mobiledoc/jsp/catalog/xml/printChartOptions.jsp?encounterID=...   10/21/2011

However, the August 6, 2011 medical record was not included within other records from Dr. Valencia's office filed as Exhibit 11. Nevertheless, Ms. Roquemore certified that the medical records filed into court were complete via the statement of completion.

---

[7] Arguably, the existence of these documents was disclosed via Ms. Roquemore's timesheets in 2014. However, the present Findings do not address the petitioners' argument that the Secretary waived a right to seek production of documents.

6

2023-25

The Federal Circuit found that Mr. and Ms. Sanchez were entitled to compensation. 34 F.4th 1350 (Fed. Cir. 2022). As part of the process for quantifying damages, Mr. and Ms. Sanchez requested reimbursement of out-of-pocket expenses for T.S.'s August 6, 2011 visit with Dr. Valencia. After the Secretary requested support for these expenses, Mr. and Ms. Sanchez filed the August 6, 2011 medical record from Dr. Valencia as Exhibit 262 on April 12, 2023.

The production in 2023 of a previously unproduced medical record created in 2011 prompted the Secretary to request authority to issue subpoenas for the 2011 records. Dr. Brown's responded to the subpoena by producing the August 19, 2011 medical record, which the Secretary filed as part of Exhibit T at pages 17-18. In response to other subpoenas and as part of the damages process, other medical records such as visits with physical therapists and occupational therapists were produced. However, these other records are also not important to determining issues around the production of Dr. Valencia's and Dr. Brown's records.

Dr. Valencia's 2011 record and Dr. Brown's 2011 record are at the foundation of the Secretary's motion to reopen. See Resp't's Mot. to Reopen, filed Aug. 16, 2023. The failure to produce these records is also a basis for the Secretary's pending motion for sanctions. Resp't's Mot. for Sanctions, filed Oct. 23, 2024.

A hearing was held in Riverside, California. On June 2, 2025, Ms. Sanchez testified. Ms. Roquemore testified on June 3, 2025.

During the hearing, the Secretary requested the production of emails between Ms. Sanchez and Ms. Roquemore. Tr. 4264. Speaking on behalf of Mr. and Ms. Sanchez, Mr. Gage objected on the ground of attorney-client privilege and attorney work product. Id. The issue was not resolved during the hearing.

After the hearing, the undersigned advised that the evidence supported five findings. Of these five findings, four are relevant here.[8] These are:

> 2. Ms. Sanchez possessed Dr. Valencia's record before the October 27, 2011 statement of completion was filed;

---

[8] The first tentative finding, omitted here, concerned Ms. Sanchez's 2008-2009 day planner.

7

> 3. Ms. Roquemore possessed Dr. Valencia's record before the October 27, 2011 statement of completion was filed;
>
> 4. Ms. Sanchez possessed Dr. Brown's letter before the October 27, 2011 statement of completion was filed; and
>
> 5. Ms. Roquemore possessed Dr. Brown's letter before the October 27, 2011 statement of completion was filed."

Order, issued June 23, 2025. This order permitted Mr. and Ms. Sanchez to submit additional evidence, including emails. The order reminded Mr. and Ms. Sanchez to consider the attorney-client privilege and work product doctrine if they choose to submit the emails.

Mr. and Ms. Sanchez addressed the tentative findings. Of the four points listed above, Mr. and Ms. Sanchez challenged only point 3, which is "Ms. Roquemore possessed Dr. Valencia's record before the October 27, 2011 statement of completion was filed." Pet'r's Status Rep., filed July 23, 2025. In other words, Mr. and Ms. Sanchez did not challenge the other three points, which were that, before the statement of completion was filed, (2) Ms. Sanchez possessed Dr. Valencia's record, (4) Ms. Sanchez possessed Dr. Brown's record, and (5) Ms. Roquemore possessed Dr. Brown's record. With respect to the issue of whether Ms. Roquemore possessed Dr. Valencia's record, Mr. and Ms. Sanchez stated "Ms. Roquemore provided Mr. Gage with an email from Mrs. Sanchez to Ms. Roquemore dated October 25, 2011 with Dr. Valencia records attached. Upon inspection by Mr. Gage, the documents were attached to the October 25, 2011 email were the 2010 records filed as Exhibit 11. No 2011 records were attached." Pet'rs' Status Report, filed July 23, 2025, at 2. They requested a status conference to discuss how they might maintain the attorney-client privilege. Id.

Before the status conference was held, the Secretary presented his views. The Secretary requested the production of "all relevant emails, collected in such a way to preserve the original file type and metadata, filed on either a USB drive or CD." Resp't's Status Rep't, filed Aug. 8, 2025, at 2. The Secretary also argued that Mr. and Ms. Sanchez have waived attorney-client privilege.

A status conference was held. A primary point of discussion was whether a different special master could adjudicate any assertion of attorney-client privilege. The answer was no. Order, issued Aug. 13, 2025, citing <u>Estes v. United States</u>, 128 Fed. Cl. 285, 288 (2016); <u>Weston/Bean Joint Venture v. United States</u>, 128 Fed. Cl. 1 (2014); Vaccine Rule 3(a). The August 13, 2025 order allowed Mr. and Ms. Sanchez an opportunity to submit either the emails or a privilege log asserting a

8

privilege with an in camera inspection of documents. The August 13, 2025 order also explained that if Mr. and Ms. Sanchez were submitting the emails, they would be required to authenticate the emails. Mr. and Ms. Sanchez moved for an additional thirty days to submit any of these additional materials. The motion was granted. Order, issued Aug. 22, 2025. Mr. and Ms. Sanchez did not submit anything further. Therefore, the matter is ready for adjudication.

## ASSESSMENT

The purpose of this Finding is to determine, based upon the documents referenced above and the testimony from Ms. Sanchez and Ms. Roquemore, whether Ms. Sanchez and Ms. Roquemore were aware of the medical records from Dr. Valencia and Dr. Brown during the entitlement phase of the case and whether they should have been produced as exhibits. The significance of these findings is deferred until a complete resolution of the motion to reopen and motion for sanctions.

In evaluating the evidence regarding Ms. Sanchez's and Ms. Roquemore's awareness of and possession of the medical records from Dr. Valencia and Dr. Brown, the undersigned is looking for clear and convincing evidence. Although "the normal standard in civil suits is the 'preponderance' standard," Thomas v. Nicholson, 453 F.3d 1279, 1283 (Fed. Cir. 2005), an elevated burden is appropriate here. In the potentially analogous circumstance in which a party alleged to have infringed a patent seeks a finding that the patent was procured due to inequitable conduct based upon a failure to present information to the Patent and Trademark Office, the burden of proof is clear and convincing. Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276, 1291 (Fed. Cir. 2011) (en banc); Ohio Willow Wood Co. v. Alps South, LLC, 813 F.3d 1350, 1357 (Fed. Cir. 2016).[9] "Clear and

---

[9] In Therasense, the en banc Federal Circuit reviewed the evidentiary burdens for establishing inequitable conduct and determined that a higher burden was appropriate because, in part, the "inequitable conduct regarding any single claim renders the entire parent unenforceable," making it the "'atomic bomb' of patent law." 649 F.3d at 1288. The differences between patent litigation and litigation in the Vaccine Program may make an analogy inapt. For example, although the en banc Federal Circuit was concerned that the doctrine of inequitable conduct was being raised too frequently in district courts ("the inequitable conduct doctrine has plagued not only the courts but also the entire patent system"), the Vaccine Program has, fortunately, had relatively few cases when petitioners did not file all the medical records.

In any event, if the clear and convincing burden is excessively high, any error would appear harmless in the sense that findings supported by clear and convincing evidence would also be supported by preponderant evidence.

convincing evidence," in turn, means "evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.'"  Miller v. Department of Justice, 842 F.3d 1252, 1257-58 (Fed. Cir. 2016).

### Dr. Valencia

The evidence clearly and convincingly establishes that both Ms. Sanchez and Ms. Roquemore possessed Dr. Valencia's August 6, 2011 medical record by October 27, 2011.  This date is the date on which Ms. Roquemore filed a statement of completion.

The documentary evidence makes these findings almost inescapable.  In the Secretary's May 9, 2024 motion, the Secretary pointed out that the date-stamped footer on the August 6, 2011 record matched the footer on the remainder of Dr. Valencia's records produced as Exhibit 11.  The Secretary, therefore, argued that the August 6, 2011 record should have been produced in 2011.  Resp't's Comp. Br., filed Jan. 11, 2024, at 5-9.  The Secretary made essentially the same argument in support of his contentions regarding litigation misconduct.  Resp't's Mot. for Sanctions, filed Oct. 23, 2024, at 7-9.

A close read of the petitioners' response to the pending motions suggests these points are not disputed.  With respect to Dr. Valencia's August 6, 2011 medical record, the thrust of the Sanchezes' argument is that the information contained in the August 6, 2011 medical record does not change the findings of fact about T.S.'s health in 2009.  Pet'rs' Comp. Resp., filed May 9, 2024, at 26-28.  Notably, Mr. and Ms. Sanchez did not argue that Ms. Sanchez did not possess this document in October 2011.  See id.  When given a chance in 2024 to explain with evidence the discrepancy in Dr. Valencia's records, Mr. and Ms. Sanchez did not present any evidence.  This lack of response is surprising because when people are accused of litigation misconduct, one response might be some like "the accusation is based upon a misunderstanding of the facts.  Here's what actually happened . . ."  It was only after a hearing was commenced that any evidence was introduced that could explain why Dr. Valencia's August 6, 2011 medical record was not filed until years later.

The evidence further clearly and convincingly supports a finding that Ms. Roquemore possessed Dr. Valencia's August 6, 2011 medical record by October 27, 2011.  As documented in Ms. Roquemore's timesheets, Ms. Roquemore directed Ms. Sanchez to obtain updated medical records on October 21, 2009.  Dr. Valencia's office printed the records on October 21, 2011.  Ms. Roquemore's timesheets also show that Ms. Sanchez sent an email with medical records on

October 25, 2011. Ms. Roquemore reviewed records from Dr. Valencia on that day. Ms. Roquemore's paralegal filed the medical records of Dr. Valencia on October 26, 2011. A statement of completion was filed on October 27, 2011.

From the assertions made during the hearing, Ms. Sanchez and Ms. Roquemore appear to have two points in rebuttal. (Again, neither point was raised in the May 9, 2024 Comprehensive Response to the Motion to Reopen.) First, Ms. Sanchez suggested in her oral testimony that the August 6, 2011 medical record may have somehow gotten separated from the other records such that when Ms. Sanchez emailed records to Ms. Roquemore, the August 6, 2011 record was missing. Tr. 4117-18, 4202. But, this argument is not credible. Ms. Sanchez testified that she sent original records (not copies) to Ms. Roquemore, that she did not "do anything with the records" before sending them to Ms. Roquemore, and that she did not reorganize them. Tr. 4032. This process leaves little chance for medical records to get misplaced accidentally. Ms. Sanchez also stated that she found the August 6, 2011 record in a box of records, but it was not with the other records from Dr. Valencia's office. Tr. 4117-18. However, even if the August 6, 2011 medical record got separated from other documents, the August 6, 2011 medical record would still have been possessed by Ms. Sanchez, albeit in a different place. Ms. Sanchez testified that she did not return to Dr. Valencia's office in 2023 to receive a new set of records; rather, she located them again in her house during the damages phase, meaning this record was not acquired between October 2011 and April 2023. Tr. 4224. In short, Ms. Sanchez did not offer any plausible denial regarding her receipt of Dr. Valencia's August 6, 2011 medical record in October 2011, and agreed that it was a fair assumption that she had the record in her possession since October of 2011. Tr. 4225. The evidence clearly and convincingly supports a finding that Ms. Sanchez possessed Dr. Valencia's August 6, 2011 medical record in October 2011. Although given the opportunity to comment upon a tentative finding that Ms. Sanchez possessed Dr. Valencia's record before the October 27, 2011 statement of completion was filed, Mr. and Ms. Sanchez did not make any argument about this tentative finding. Petr's Status Rep., filed July 23, 2025.

Second, there is an argument that *Ms. Roquemore* did not receive the August 6, 2011 medical record in 2011 because Ms. Roquemore's timesheets present information in two separate sentences. "Review several more emails from client with additional medical records. (.1) Review additional medical records from Dr. Valencia and UCSD biochemical genetics laboratory. (.4)." Timesheets at 23 (entry for Oct. 25, 2011). To the extent Ms. Sanchez or Ms. Roquemore is offering an argument that the emails Ms. Roquemore received did not include the medical records from Dr. Valencia, this argument splits hairs too finely.

11

A natural reading of Ms. Roquemore's timesheets is that Ms. Sanchez sent emails containing the medical records that Ms. Roquemore devoted more time to reviewing later than day.  In Ms. Roquemore's testimony, she did not deny that she received Dr. Valencia's records by email.  At best, Ms. Roquemore testified that she did not know in 2025 what she read in 2011.  Tr. 4883-84, 4287.  But, Ms. Roquemore did not identify any different records she received by email.  In any event, Ms. Roquemore indisputably received <u>some</u> of Dr. Valencia's records because they were filed as Exhibit 11.  And, to repeat, the pages in Exhibit 11 contain the footer showing they were printed on 10/21/2011.  That same footer appears on the August 6, 2011 record filed as Exhibit 262.  This consistency is a clear and convincing basis for finding that Ms. Sanchez and Ms. Roquemore possessed Dr. Valencia's record by October 27, 2011.

The circumstances under which Dr. Valencia came to write the August 6, 2011 medical record further supports a finding that clear and convincing evidence shows that Ms. Roquemore, at a minimum, should have known that Dr. Valencia created some document in August 2011.  In August 2011, Ms. Sanchez and Ms. Roquemore planned for Ms. Sanchez to seek a clarification of Ms. Marin-Tucker's August 19, 2009 medical record.  (To repeat, the August 19, 2009 medical record placed the onset of T.S.'s developmental delay no earlier than May 19, 2009.)  Ms. Sanchez and Ms. Roquemore communicated before and after the August 6, 2011 visit.  Timesheets at 15 (entries for Aug. 5, 2011 and Aug. 17, 2011).  Ms. Roquemore even listened to an audio recording of the visit.  Timesheets at 16 (entry for Aug. 29, 2011).  Ms. Roquemore spoke to someone in Dr. Valencia's office and a malpractice attorney, who represented Dr. Valencia's medical practice.  Timesheets at 16 (entry for Aug. 23, 2011).  (In her oral testimony, Ms. Roquemore did not remember the names of the people with whom she spoke.)  Thus, it is highly probable that Ms. Roquemore knew in August 2011 that Dr. Valencia had written a letter regarding a request for clarification or that Ms. Roquemore should have known in August 2011 that Dr. Valencia had written a letter regarding a request for clarification.

Although Mr. and Ms. Sanchez contested a tentative finding that *Ms. Roquemore* possessed Dr. Valencia's August 6, 2011 before the statement of completion was filed (Pet'rs' Status Rep., filed July 23, 2025), their belatedly asserted arguments are not persuasive.  Their argument is based upon emails that have not been produced.  Further, Ms. Roquemore has not explained how she supposedly retrieved the emails from October 2011.  This absence of explanation is significant because Mr. Gage, as an officer of the court, can vouch only for what Ms. Roquemore gives to him.

12

Whether Ms. Sanchez or Ms. Roquemore possessed Dr. Valencia's August 6, 2011 letter before the petition was filed on October 11, 2011 does not affect the outcome of either the motion to reopen or the motion for sanctions. As explained above, the evidence clearly and convincingly weighs in favor of finding that both Ms. Sanchez and Ms. Roquemore possessed the record when Ms. Roquemore certified the completeness of medical records. If the August 6, 2011 medical record had been filed on October 26, 2011 with the remainder of Dr. Valencia's medical records, the various findings of fact made during entitlement could have taken into consideration this medical record. The fact that Ms. Sanchez and Ms. Roquemore had, but did not produce, Dr. Valencia's August 6, 2011 medical record makes the previous findings of fact vulnerable to revision. This Finding will also be considered in adjudication of the Secretary's motion for sanctions.

Dr. Brown

The evidence clearly and convincingly favors a finding that Ms. Roquemore possessed Dr. Brown's August 19, 2011 letter on August 24, 2011. This finding is primarily based upon two sources of information: Dr. Brown's letter and Ms. Roquemore's timesheets.

Dr. Brown's letter begins with a statement that Ms. Sanchez came "with a request for me to write a clarifying letter." Exhibit T at 17. The day Ms. Sanchez brought T.S. to see Dr. Brown, August 19, 2011, was a Friday. Dr. Brown's letter ends with an addendum: "a copy of this encounter has been faxed and mailed to mother's lawyer, Lisa Roquemore at 949-222-2022

18191 Von Karman Ave. Suite 470 Irvine, CA. 92612." Exhibit T at 18.

Normally, a stamped document placed in the mail is presumed to reach its destination. See Charlson Realty Co. v. United States, 384 F.2d 434, 274 (Ct. Cl. 1967); Policy Analysis Co. Inc., v. United States, 50 Fed. Cl. 626, 632 (2001). This presumption also extends to materials that are faxed. See Morgan Tire of Sacramento, Inc. v. Goodyear Tire & Rubber Co., 60 F.Supp.3d 1109, 1117 (E.D. Ca. 2014).

Here, a resort to a presumption regarding mailing or faxing is not required. On Wednesday, August 24, 2011, Ms. Roquemore "[r]eviewed letter from Dr.

13

Brown." Timesheet at 16.[10]  She also emailed Ms. Sanchez regarding Dr. Brown and petition.

When combined, Dr. Brown's statement that he is mailing and faxing a letter to Ms. Roquemore plus Ms. Roquemore's statement that she reviewed a letter from Dr. Brown a few days later are sufficient to conclude that the evidence clearly and convincingly favors a finding that Ms. Roquemore reviewed Dr. Brown's August 19, 2011 letter.  Any arguments to the contrary are rejected.

One possible contrary argument is that Ms. Roquemore did not receive Dr. Brown's August 19, 2011 letter and, instead, reviewed some other letter from Dr. Brown on August 24, 2011.  To ascertain whether this was likely, Ms. Roquemore was ordered to produce the Dr. Brown letter she reviewed.  See Order, issued May 16, 2024; see also Resp't's Comp. Br., filed Jan. 11, 2024, at 28.  After a "thorough" search, Ms. Roquemore averred that she could not find this document.  Pet'rs' Notice, filed Aug. 21, 2024.  Thus, when Ms. Roquemore testified on June 3, 2025, she maintained that she did not "know" whether she had reviewed the August 19, 2011 letter on August 24, 2011.  Tr. 4253-54.  But, Ms. Roquemore's credibility was significantly reduced by her demeanor in testifying and by her failure to identify an alternative letter.

A second possible contrary argument is that Dr. Brown's August 19, 2011 letter is not a "medical record."  In Ms. Roquemore's June 3, 2025 testimony, Ms. Roquemore seemed to be suggesting that she did not know in 2011 that Dr. Brown's August 19, 2011 letter constituted a medical record that the Vaccine Act required to be filed.  Any such suggestion borders on frivolous.  First, to the extent that Ms. Roquemore is testifying that she did not review the August 19, 2011 letter in August 2011, this testimony is rejected as false and inconsistent with the clear, convincing, and contemporaneous evidence showing she did.  Next, if Ms. Roquemore is maintaining that the Vaccine Act requires petitioners to file treatment records (as opposed to records seeking clarification), that argument is contradicted by the words of the statute.  The Vaccine Act does not distinguish between medical records created for the purpose of treatment and records created for the purpose of accuracy.  The Vaccine Act simply requires production of "all provider notes."  42 U.S.C. § 300aa–11(c)(2).[11]  Finally, Ms. Roquemore

---

[10] Ms. Roquemore's receipt of Dr. Brown's letter negates any argument regarding the lack of a HIPPA authorization.  See Pet'rs' Comp. Resp., filed May 9, 2024, at 34.

[11] The Vaccine Act provides:

14

recognized during her June 3, 2025 testimony that Dr. Brown's August 19, 2011 letter is a medical record. Tr. 4342. Indications that Dr. Brown's August 19, 2011 letter is a medical record includes the notation that Dr. Brown conducted a "brief exam." Exhibit T at 17. Although Ms. Roquemore's agreement that Dr. Brown's letter constituted a medical record came in the context of a question about her knowledge in 2025, the same information about Dr. Brown's letter was available in 2011.

In short, the clear and convincing evidence contained in the present record establishes that Ms. Roquemore possessed and had actual knowledge of Dr. Brown's August 19, 2011 medical record before Ms. Roquemore filed the petition and submitted a statement of completion. Again, although Mr. and Ms. Sanchez could have challenged the tentative finding that Ms. Roquemore possessed Dr. Brown's letter, they did not. See Pet'rs' Status Rep., filed July 23, 2025. From Ms. Roquemore's possession and knowledge of Dr. Brown's letter, Mr. and Ms. Sanchez's knowledge can be inferred via either of two methods.

First, on the date Ms. Roquemore received Dr. Brown's August 19, 2011 medical record, Ms. Roquemore emailed Ms. Sanchez about "Dr. Brown and Petition." Timesheets at 16 (entry for Aug. 24, 2011). It is highly probable that Ms. Roquemore informed her client that Dr. Brown was disagreeing with Ms. Sanchez's assertion that she (Ms. Sanchez) told Dr. Brown in May 2009 that T.S. was having unusual arm movements. It seems likely, although perhaps not convincingly established, that Ms. Roquemore actually delivered Dr. Brown's August 19, 2011 medical record to Ms. Sanchez via email. But, it is not necessary to penetrate what is potentially protected by the attorney-client privilege or the work product doctrine. Ms. Roquemore's email about Dr. Brown is a sufficient basis to conclude the evidence clearly and convincingly favors a finding that Ms. Sanchez knew about Dr. Brown's August 19, 2011 medical record.

Even if there were some doubt in the evidence---and there is no doubt that Ms. Roquemore received Dr. Brown's August 19, 2011 medical letter and communicated with Ms. Sanchez about it on August 24, 2011, then the law provides a different method: the knowledge of an attorney is imputed to the client. The Federal Circuit recognizes this principle. See Immunocept, LLC v. Fulbright

---

"A petition for compensation under the Program for a vaccine-related injury or death shall contain . . .

(2) . . . post-injury inpatient and outpatient records (including all provider notes)."

42 U.S.C. § 300aa–11(c).

15

& Jaworski, LLP, 504 F.3d 1281, 1287 (Fed. Cir. 2007) ("the imputation analysis involves determining whether an attorney was acting within the scope of his authority or employment when he discovered or reasonably should have discovered the critical information. Noticeably absent from the imputation rule is a requirement that the attorney have a duty to disclose information to the client"); Florida Dehydration Co. v. United States, 101 F.Supp. 361, 363 (Ct. Cl. 1951) ("notice to an attorney is notice to the client"). In California, the imputation principle is especially strong. One California case states:

> Under general agency principles, an attorney is his client's agent, and ... the agent's knowledge is imputed to the principal even where ... the agent does not actually communicate with the principal, who thus lacks actual knowledge of the imputed fact. . . . This rule of imputed notice is irrebuttable. . . . And it includes things the agent not only knows with regard to the subject matter of his agency, but by inquiry notice should know.

Roche v. Hyde, 51 Cal. App. 5th 757, 265 Cal. Rptr. 301, 332 (2020) (citations and quotation marks omitted).[12]

Although either of these two points are a sufficient basis for finding that the evidence clearly and convincingly supports a finding that "Ms. Sanchez possessed Dr. Brown's letter before the October 27, 2011 statement of completion was filed," Mr. and Ms. Sanchez were given an opportunity to rebut this tentative finding. See Order, issued June 23, 2025 (point 4). However, they raised no argument against this finding. See Pet'rs' Status Rep., filed July 23, 2025.

After Ms. Roquemore came into possession of Dr. Brown's August 19, 2011 medical records, it was incumbent upon Ms. Roquemore to file the document and to maintain it. The Vaccine Act requires petitioners to file all provider notes with the petition. 42 U.S.C. § 300aa–11(c)(2). This Finding means that Mr. and Ms. Sanchez and Ms. Roquemore did not comply with the statute. This lack of compliance will be considered in evaluating the pending motion for sanctions. The failure of Mr. and Ms. Sanchez and Ms. Roquemore to disclose Dr. Brown's August 19, 2011 letter may justify the reopening of entitlement.

---

[12] Immunocept and Roche mention what the attorney "should have discovered" or "should know." However, here, what Ms. Roquemore "should" have discovered or "should" have known does not play a role because Ms. Roquemore actually knew about the Dr. Brown medical record.

16

## CONCLUSION

The Secretary's August 16, 2023 motion to reopen and October 23, 2024 motion for sanctions involved the lack of production of Dr. Valencia's August 6, 2011 medical record and Dr. Brown's August 19, 2011 medical record. A hearing was held on this topic during which the two people who knew about the events in 2011, Ms. Sanchez and Ms. Roquemore, testified. The evidence clearly and convincingly favors finding that both Ms. Sanchez and Ms. Roquemore knew about and/or possessed both Dr. Valencia's August 6, 2011 medical record and Dr. Brown's August 19, 2011 medical record by October 27, 2011. These findings will be considered upon adjudication of the August 16, 2023 motion to reopen and the October 23, 2024 motion for sanctions.

**IT IS SO ORDERED.**

s/ Christian J. Moran
Christian J. Moran
Special Master
