# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * * * * * * * *
GERMAIN SANCHEZ and            *
JENNIFER SANCHEZ,              *
parents of T.S.,              *
                              *    No. 11-685V
            Petitioners,      *    Special Master Christian J. Moran
v.                            *
                              *
SECRETARY OF HEALTH           *    Filed: February 17, 2026
AND HUMAN SERVICES,           *
                              *
            Respondent.       *
* * * * * * * * * * * * * * * * * * * * * * * * *
```

Lisa A. Roquemore, Law Offices of Lisa A. Roquemore, Rancho Santa Margarita, CA, and
Richard Gage, Richard Gage, P.C., Cheyenne, WY, for petitioners;
Jennifer L. Reynaud, Zoey Wade, and Madylan Yarc, United States Dep't of Justice, Washington,
DC, for respondent.

### ORDER REGARDING RESPONDENT'S
### MOTION TO REOPEN AND MOTION FOR SANCTIONS[1]

Germain and Jennifer Sanchez filed this case in 2011, claiming that various childhood vaccinations given to their son, T.S., on February 5, 2009, harmed him by causing a neurologic problem. Pet., filed Oct. 17, 2011. A critical issue was when T.S. first displayed any symptoms of a neurologic problem.

After litigation lasting more than a decade, the Federal Circuit found, as a fact, that T.S. started having neurologic problems, specifically abnormal arm movements, close in time to the vaccinations. The Federal Circuit primarily relied upon testimony from Mr. and Ms. Sanchez,

---

[1] Because this order contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). This means the order will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material before posting the decision.

given first by affidavit in 2011 and later by oral testimony in 2012 (fact hearing). Based upon this finding, the Federal Circuit found that Mr. and Ms. Sanchez were entitled to compensation. 34 F.4th 1350 (Fed. Cir. 2022).

In 2023, while investigating the amount of compensation to which Mr. and Ms. Sanchez were entitled, the Secretary received medical records that Mr. and Ms. Sanchez should have produced years and years earlier. The Secretary grounds the pending motion to reopen the issue of entitlement upon his recent discovery of previously available evidence, arguing that this evidence is sufficient to undermine the previous finding of fact. The Sanchezes maintain that the newly produced evidence is cumulative with previous evidence. The Sanchezes also argue that their failure to produce documents is excused because the Secretary should have requested the missing documents earlier in the litigation

The Secretary also moved for an imposition of sanctions on the Sanchezes due to their and their attorney's alleged misconduct with respect to the preservation and production of evidence. The Secretary moved for dismissal or, in the alternative, an order granting an adverse inference. Mr. and Ms. Sanchez opposed the motion for sanctions.

The Secretary has satisfied the standards for reopening entitlement because the medical records produced in 2023 constitute newly discovered evidence that warrant a departure from the Federal Circuit's mandate. Mr. and Ms. Sanchez and their attorney, Lisa Roquemore, were responsible for the failure to file crucial medical records in 2011. Thus, the argument that the Secretary is responsible for the absence of missing records is not persuasive. Further, upon a reopening of entitlement, preponderant evidence supports finding that T.S.'s initial abnormal arm movements occurred months later than previously found. Whether this change in fact-finding results in a change in outcome will be determined later.

As discussed below, the Secretary has deferred any request for sanctions until Mr. and Ms. Sanchez seek additional attorneys' fees and costs. The Secretary's motion for sanctions is therefore denied as moot.

The outline of this lengthy opinion is as follows:

I. The Process by Which Medical Records are Submitted ........................................... 3

II. Procedural History ............................................................................................. 5

III. Analysis Part One: Motion to Reopen ................................................................ 19

IV. Analysis Part Two: Findings of Facts .................................................................. 35

V. Analysis Part Three: Motion for Sanctions ........................................................... 66

VI. Conclusion ........................................................................................................ 66

## I.    The Process by Which Medical Records are Submitted

For the motion to reopen and the motion for sanctions, the key issue concerns the production of medical records. Thus, the law regarding the duties for submitting medical records is explained as a foundation for the analysis that follows. By way of background, the Vaccine Program is intended to be "less adversarial." Vaccine Rule 3(b)(2). Congress's plan to create a less adversarial process for resolving claims that a vaccine injured someone is reflected in several aspects of the Vaccine Act.

Congress directed that when a petition is filed, the petition "shall contain … (2) pre- and post-injury physician or clinic records (including all relevant growth charts and test results), all post-injury inpatient and outpatient records (including all provider notes, tests results, and medication records)." 42 U.S.C. § 300aa–11(c). This statutory requirement is at center of the parties' dispute regarding whether entitlement should be reopened.

As to the scope of material to be filed with a petition, judicial officers offered some instructions. First, the judges of the Court of Federal Claims promulgated the Vaccine Rules. Citing 42 U.S.C. § 300aa–11(c), the Vaccine Rules require petitioners to present medical records relating to "any post-vaccination treatment of the injured person, including all in-patient and out-patient records." Vaccine Rule 2(c)(2)(A)(iii).

Second, special masters authored a set of Guidelines, which detail the types of medical records expected to be filed. In the 2004 version, which was in place at the time the Sanchezes filed their petition, the Guidelines provided:

> The statute at § 11(c) explicitly sets forth the required documents, as does Vaccine Rule 2(c). The scope of the requirements is, intentionally, very broad. Counsel should include all medically-related records that might possibly shed light on the question of causation. Indeed, in the typical case where the vaccine recipient was an infant when vaccinated, the petition should include all medical records relating to the pregnancy and resulting delivery, as well as records pertaining to the infant's entire lifetime prior to the vaccination, including those of "well baby" visits. In addition, the petition **must** contain in every case **all** records pertaining to the vaccination itself and all post-vaccination medical examination and treatment records of the individual.
>
> In short, if there is any doubt whether a record falls within the above description, it should be included.

Section II.B.1.[2]  Through the Guidelines, the special masters also added: "If petitioner has doubts about the relevance of requested records, petitioner should keep in mind that the standard used for determining relevance will ordinarily be a quite liberal one, i.e., whether the requested records might shed light upon any issues relating to petitioner's claim."  Section III.[3]

In 2011, when Mr. and Ms. Sanchez were submitting medical records about T.S., the informal spirit of the Vaccine Program was reflected in how petitioners submitted medical records.  To a large degree, respondent and special masters tended to trust that petitioners were presenting accurate and complete sets of medical records.  The Secretary, to the undersigned's knowledge, rarely, if ever, attempted to verify the accuracy and completeness of medical records submitted by a petitioner's attorney by obtaining medical records directly from the medical provider.  Without this investigatory oversight, the submission of medical records largely, if not entirely, depended upon the good faith and professionalism of the petitioners and the attorneys representing them.[4]

The Secretary, too, has a responsibility to present accurate information.  In the context of a case in which a doctor retained by the Secretary did not disclose that his medical license was suspended, a judge of the Court of Federal Claims stated: "The court believes that a party in a vaccine injury case has a duty to update or supplement inaccurate information in the record before the special master."  Contreras v. Sec'y of Health & Hum. Servs., 116 Fed. Cl. 472, 477 (2014), judgment vacated on other grounds after intervening proceedings, 844 F.3d 1363 (Fed. Cir. 2017).

Outside of the Vaccine Program, the obligation to supplement disclosures is codified in paragraph (e) of Rule 26 of the Rules of Civil Procedure.  See Ideal Innovations, Inc. v. United States, 167 Fed. Cl. 314, 341-43 (2023) (noting that plaintiff was responsible for changing its responses to interrogatories when its position changed).  Although the Federal Rules of Civil Procedure do not govern how cases are processed in the Vaccine Program, see 42 U.S.C. § 300aa–12(d)(2); see also Cedillo v. Sec'y of Health & Hum. Servs., 617 F.3d 1328, 1342 (Fed. Cir. 2010) (noting that the discovery rules of the Federal Rules of Civil Procedure "do not apply

---

[2] This comment in the Guidelines---to err on the side of producing all information---is consistent with the legislative history associated with the Vaccine Act.  Congress "intend[ed] for the parties and the court to construe this provision broadly so as to require the submission of a meaningful file of information."  H.R. CONF. REP. No. 101-386, at 514-15 (1989), as reprinted in 1989 U.S.C.C.A.N. 3018, 3117-18.

[3] The current Guidelines are similar.  See Guidelines Section II, Chapter 3.

[4] After questions arose about how petitioners and their attorneys were gathering medical records, special masters began to require that petitioners and their attorneys submit certifications from custodians of medical records about the number of pages being provided.  When the Sanchezes were submitting T.S.'s medical records in 2011, they were not required to submit certifications.

to proceedings under the Vaccine Act.  Rather, such proceedings are governed by [the Vaccine Rules]"); portions of the Rules of the Court of Federal Claims ("RCFC") have been followed in Vaccine Program cases.  See, e.g., Snyder v. Sec'y of Health & Hum. Servs., 69 Fed. Cl. 390, 392 (2006) (following Rule 25 regarding substitution of parties), aff'd on non-related ground sub nom., Zatuchni v. Sec'y of Health & Hum. Servs., 516 F.3d 1312 (Fed. Cir. 2008); Seacor v. Sec'y of Health & Hum. Servs., 34 Fed. Cl. 141, 143-44 (1995) (using Rule 6(a) to determine how a state holiday affected the deadline for filing a motion for review).

## II.   Procedural History

When adjudicating a motion to open a judgment due to the discovery of previously available evidence pursuant to Rule 60(b)(2) of the Rules of Civil Procedure, an "[a]nalysis of the record is necessary."  Venture Industries Corp. v. Autoliv ASP, Inc., 457 F.3d 1322, 1329 (Fed. Cir. 2006).  Thus, the procedural history of the case, including the creation of the evidentiary record, is provided.  A list of all the published opinions and published orders can be found in Appendix A.

### A.   Consultation and Retention of Attorney Roquemore

To pursue a potential claim in the Vaccine Program, Ms. Sanchez consulted with the attorney who eventually filed the petition, Lisa Roquemore, on July 29, 2010.  Timesheets at 6.[5] It appears that Ms. Roquemore reviewed medical records that Mr. and Ms. Sanchez provided to her.  Over the next few months, Ms. Roquemore continued to review information, to conduct legal research, and to confer with a potential expert, Lawrence Steinman.

Ms. Roquemore agreed to represent Mr. and Ms. Sanchez on April 19, 2011.  Timesheets at 7; Supp'l Decl. at ¶ 10.[6]  The Sanchezes collected T.S.'s medical records.[7]  Eventually, the

---

[5] "Timesheets" refer to Ms. Roquemore's invoices.  Mr. and Ms. Sanchez submitted Ms. Roquemore's invoices as "Fee Exhibit 2" in support of a first motion for an award of attorneys' fees and costs on an interim basis, filed on September 16, 2014.  The citation to specific pages refers to the pagination appearing in the bottom right corner.

[6] After the Sanchezes filed their first motion for an award of attorneys' fees on an interim basis, the Secretary identified potential omissions of materials, argued that there was no reasonable basis for filing the petition, and argued that the amount of fees and costs was unreasonable.  See Order, issued Dec. 2, 2014.  On December 12, 2014, the Sanchezes filed a reply addressing these points, accompanied by a supplemental declaration from Ms. Roquemore explaining some of the entries on her timesheets and discussing some materials that were not submitted.

[7] In a recorded status conference on May 24, 2023, Ms. Roquemore stated that, in 2011, she "always had the clients collect the medical records."  May 24, 2023 Tr. at 9.  Her office's "current practice" is to have the client obtain certified records "in conjunction with the office." Id.

petition presented information about medical records created by, among others, Dr. Brown on August 19, 2009, and Ms. Marin-Tucker on August 17, 2009. As discussed below, the medical professionals creating these medical records did not memorialize any complaint that T.S. was moving his arms abnormally.

Around this time, Ms. Sanchez provided Ms. Roquemore with a day planner, reflecting some activities in 2009. Supp'l Decl. ¶ 16. As discussed below, Mr. and Ms. Sanchez did not produce this day planner until December 2014, when it was filed as Exhibit 58. Ms. Roquemore maintained that because the day planner is not a medical record, she did not have an obligation to produce the day planner. Supp'l Decl. ¶¶ 16, 52.

### B. Medical Records Created in August 2011 and Ms. Roquemore's Comments on Them

On August 5, 2011, Ms. Roquemore spoke with Ms. Sanchez about "upcoming doctor appointments and clarifications of medical records. Further discuss journal entries." Timesheets at 15. Because Ms. Sanchez had informed Ms. Roquemore that she (Ms. Sanchez) had told T.S.'s doctors that he was moving strangely, Ms. Roquemore suggested that Ms. Sanchez "attempt to obtain clarification by T.S.'s doctors to see what was recalled and if the doctor was willing to provide a clarification letter." Supp'l Decl. ¶ 15. The doctors from whom Ms. Sanchez sought clarification were Dr. Valencia and Dr. Brown.[8] The materials associated with Dr. Valencia and Dr. Brown are critical to the pending motion to reopen.

#### 1. Dr. Valencia

Ms. Sanchez brought T.S. to see Dr. Valencia on August 6, 2011. Exhibit 262 at 1. The Secretary has identified this record as a record that should have been provided much earlier. Resp't's Reply regarding Mot. to Reopen, filed Sept. 18, 2023, at 5-7. Dr. Valencia has documented:

> [Ms. Sanchez] wants her lawyer to talk to us as she is trying to get compensation from VAERS for his condition now. She needs letters to give them a strong case and she was asking me to change Micaela Marin-Tucker's (PA) notes on her first visit ESP the ROS and the onset of symptoms. Per Mom she believes our office did not "do anything wrong but instead is helping her son and that she is not going after us but she needs supplemental support from another agency". In conclusion I and my PA (Micaela Marin-Tucker) advised Mom that "we can not change or ALTER" any of our previous documents since they are considered PERMANENT

---

[8] The author of the August 19, 2009 medical record (Exhibit 1 at 54-56) is Ms. Micaela Marin-Tucker, who is a physician's assistant in Dr. Valencia's office. For a time, Ms. Sanchez believed that Ms. Marin-Tucker was a doctor.

> RECORDS and that our notes [are] based on the interview and assessments at the time of visit and that it will be hard to recall anything on those visits unless they were documented.

Exhibit 262 at 1.

Ms. Sanchez made an audio recording of this appointment at Dr. Valencia's office, using her phone. Exhibit 56 ¶ 6. Ms. Sanchez provided a compact disc with the recording to Ms. Roquemore. Exhibit 56 ¶ 7; Supp'l Decl. ¶¶ 17, 55. This audio recording was not filed as an exhibit and in her December 11, 2014 affidavit, Ms. Sanchez stated that she had no idea where the recording is. Exhibit 56 ¶ 7.

Within two weeks of the August 6, 2011 appointment at Dr. Valencia's office, Ms. Roquemore reviewed an "e-mail from J. Sanchez regarding meeting with Dr. Micaela." Timesheets at 15 (Aug. 17, 2011). Ms. Roquemore conferred with Ms. Sanchez about "more details of meeting and items needing clarifying. Further discuss upcoming meeting with Dr. Brown. Further discuss status of journal, date of entries, and other witness statements." Id.

In the following week, Ms. Roquemore reviewed "medical records for office visit with Dr. Micaela" and she had a telephone conference with "Dr. Micaela's office to discuss medical record." Timesheets (Aug. 22, 2011); accord Supp'l Decl. ¶ 17 ("Ms. Roquemore 'was even called upon to discuss the issues with Micaela's/Dr. Valencia's office'"). The following day, Ms. Roquemore spoke with a malpractice attorney about a clarification letter. Timesheets (Aug. 22, 2011); Supp'l Decl. ¶ 17. Ultimately, Ms. Marin-Tucker's August 17, 2009 record was not clarified. See Supp'l Decl. ¶ 17 ("the attempt to obtain clarification of what was reported to them [Dr. Valencia and Ms. Marin-Tucker] by [Ms. Sanchez] turned out to be a dead end.")

### 2. Dr. Brown

Ms. Sanchez brought T.S. to see Dr. Brown on August 19, 2011. Dr. Brown summarized that the purpose of the visit was to address Ms. Sanchez's request that Dr. Brown "write a clarifying letter concerning my last office visit (5/13/09)." Exhibit T at 17.[9] Dr. Brown then memorialized information from Ms. Sanchez: "The 5/13/11 [sic, should probably be 5/13/09] visit was for nasal congestion. His mother says that shortly after his first immunization she noticed he occasionally moved his arms in a strange way. She says she told every provider on his 3 subsequent visits in our office about these movements and no one was concerned. She was hoping I would remember her mentioning these movements and would clarify my notes." Id.

Dr. Brown then elicited additional information from Ms. Sanchez: "When I asked her to demonstrate the movement she was seeing, she described and demonstrated a tonic extension and internal rotation or [sic, presumably "of"] her arms. This can represent decerbrate posturing

---

[9] Dr. Brown wrote his letter using ALL CAPITAL LETTERS. However, his letter is quoted above using more traditional capitalization.

consistent with a seizure." Exhibit T at 17. Dr. Brown communicated his response to Ms. Sanchez: "Had I been told of that activity on any of [T.S.]'s visits, I would not only have documented that in the chart, but I would also had ordered an EEG (and MRI if the EEG were abnormal). Therefore, I do not believe that particular arm movement was brought to my attention on [T.S.]'s only visit with me after the immunizations."

Dr. Brown also conducted "a brief exam." He stated T.S. suffered from "some sort of degenerative neurologic process with an insidious onset that has left him significantly disabled. Based on the timing of the process and no conclusive diagnosis after 2 years of testing, an immunization reaction cannot be totally discounted." Exhibit T at 17-18. This "brief exam" means that Dr. Brown created a "medical record." See 42 U.S.C. § 300aa-11(c) (requiring the production of "all post-injury . . . outpatient records (including all provider notes. . .)." When testifying about this record in 2025, Ms. Roquemore agreed that Dr. Brown's August 19, 2011 document was a "medical record." Tr. 4342.

Dr. Brown added that "a copy of this encounter has been faxed and mailed to mother's lawyer, Lisa Roquemore at 949-222-2022

18191 Von Karman Ave. Suite 470 Irvine, CA. 92612." Id. at 18.

At the fact hearing in 2025, Ms. Sanchez testified that she did make a recording of an appointment with Dr. Brown, but she could not recall if it was the May 2009 or August 2011 appointment. Tr. 4062-66. However, earlier statements indicate that Ms. Sanchez recorded this August 2011 appointment with Dr. Brown. Ms. Sanchez averred in 2014:

> Ms. Roquemore said it couldn't hurt to see if [the medical providers] recalled that which I recalled and if so if they would be willing to write a letter to that effect or some sort of correction to the medical records . . . I believe I made a recording of a meeting with Dr. Brown as well. But, I don't remember much about it other than I felt he was one of the most uncaring doctors ever.

Exhibit 56 ¶ 6. Additionally, in opposition to the Secretary's motion to reopen, Mr. and Ms. Sanchez stated, "Mrs. Sanchez met with Ms. Michaela, P.A. and Dr. Brown to obtain clarifications of the medical records and had recorded the meetings." Pet'r's Opp'n, filed Sep. 6, 2023, at 19. However, regardless of which appointment was recorded, the status of an audio recording with Dr. Brown is unknown.

Within one week of the August 19, 2011 appointment with Dr. Brown, Ms. Roquemore spent 0.1 hours reviewing a "letter from Dr. Brown." Timesheets at 16 (Aug. 24, 2011). She also emailed Ms. Sanchez "regarding Dr. Brown and Petition." Id.

### C.    Submission of Petition and Initial Sets of Medical Records, October 2011

Represented by Attorney Roquemore, Mr. and Ms. Sanchez filed their petition on October 17, 2011. They alleged that various childhood vaccinations, given to T.S. on February 5, 2009, harmed him. Pet., filed Oct. 17, 2011. The petition referred to an appointment with a physician's assistant, Micaela Marin-Tucker, on August 17, 2009, during which Ms. Sanchez

8

reported that she noticed a change in T.S.'s development about two to three months earlier.  Id. at 5, citing Exhibit 1 at 54-56.[10]  Ms. Roquemore represented that after the case was converted to electronic filing, the petition would be accompanied by "Medical Records, pre- and post February 05, 2009 vaccinations from all hospitals and medical treatments within the United States."  Id. at 13.

Within approximately two weeks of the petition's submission and the conversion to electronic filing, Ms. Roquemore stated that "After a good faith effort, Petitioner believes all available medical records have now been filed."  Pet'rs' Statement of Completion, dated Oct. 27, 2011.  Mr. and Ms. Sanchez did not submit the August 6, 2011 medical record from Dr. Valencia or the August 19, 2011 medical record from Dr. Brown.  They also did not submit records from some places where T.S. had received therapy, such as the Inland Regional Center, at this time.

D.    **Affidavit Testimony regarding T.S.'s Health from February 5, 2009 through August 17, 2009**

Mr. and Ms. Sanchez submitted five affidavits with their petition.  The most significant comes from Ms. Sanchez because she was the one who took T.S. to see various doctors.

1.    Jennifer Sanchez's Affidavit, Exhibit 3

Ms. Sanchez averred as follows:  After the February 5, 2009 vaccination, T.S. was very upset and cried.  His temperature was 102.2 degrees.  He had a lump on his thigh.  Exhibit 3 ¶ 5. The fever lasted about two days.  She considered this reaction to be typical as Dr. Brown had informed her that "fever and fussiness were normal side effects of the immunization."  Id.

On Ms. Sanchez's birthday, February 15, T.S. began to run a fever again.  On the evening of February 16, 2009, T.S. was very hot and crying inconsolably.  Exhibit 3 ¶ 6.  Mr. Sanchez was caring for T.S. because Ms. Sanchez, who was pregnant, had nausea, vomiting, and fatigue. Late in the evening, Mr. Sanchez brought T.S. upstairs and showed her that T.S. was stiffening his arm.  Id.

On February 17, 2009, Ms. Sanchez brought T.S. to Urgent Care, where he was seen by a Physician Assistant, Jonathan P. Luna.  Exhibit 3 ¶ 7.  Ms. Sanchez inquired about "all the fussiness and strange stiffness."  Id.  Ms. Sanchez told Mr. Luna "about the weird movements and [T.S.] being stiff in addition to his other symptoms."  Id.  Mr. Luna did not conduct any tests and "he failed to document everything that was said in the medical records."  Id.  He advised Ms. Sanchez to continue medicine to reduce T.S.'s fever.

Between the February 17, 2009 visit with Mr. Luna and the April 29, 2009 visit with Dr. Seleem, Ms. Sanchez and Mr. Sanchez were anxious about T.S.  Exhibit 3 ¶ 8.  They observed that T.S.'s behavior changed in that he was not as active.  His development slowed.  T.S. was

---

[10] The notice of filing for Exhibit 1 identifies this material as T.S.'s medical records without identifying the source of those records.  Notice of Filing, filed Oct. 21, 2011.

"lethargic, tired, weak and just appeared to be in a daze." Id. The family did not take T.S. for medical attention because his symptoms were not of serious concern according to his doctor.[11]

Ms. Sanchez brought T.S. to the pediatrician's office where Dr. Seleem saw him. Exhibit 3 ¶ 9. Dr. Seleem diagnosed T.S. as suffering from an ear infection and bronchitis. Ms. Sanchez told Dr. Seleem about "the strange behavior," but the "doctor completely ignored this fact and did not report everything in the medical record that [he was] told." Id.

Ms. Sanchez brought T.S. to see Dr. Brown on May 13, 2009, with her mother. Exhibit 3 ¶ 10. T.S. was still congested. Ms. Sanchez "expressed her concerns to the doctor and explained the strange body and arm stiffness, fevers, congestion, and lethargy. . . . The doctor appeared to not care at all." Id. "The doctors tried to make us believe that the progression of [T.S.]'s illness was 'normal,' that the duration of his congestion, other cold symptoms and the odd movements/stiffness were not suspicious, and that there was no need to be overly concerned." Id.

Mr. and Ms. Sanchez decided to change T.S.'s pediatrician for his one-year well-baby appointment, which they scheduled with Ms. Marin-Tucker. Exhibit 3 ¶ 11. Ms. Sanchez informed Ms. Marin-Tucker that she had noticed a change in T.S.'s development. She also reported that after the first set of shots, T.S. got really sick and that he had made these strange movements with his body and arm.

Ms. Sanchez signed her affidavit on October 5, 2011. She did not discuss any visits she had with Dr. Brown or another pediatrician, Dr. Rainilda Valencia, in August 2011.

### 2.  Germain Sanchez's Affidavit, Exhibit 4

Mr. Sanchez's affidavit largely tracks the affidavit from his wife. Mr. Sanchez added more information about the evening of February 16, 2009, when he was caring for T.S. while his wife was sick and exhausted. Mr. Sanchez stated that T.S. "felt very stiff and uncomfortable." Exhibit 4 ¶ 6. "[T.S.] began to hold his arm behind his back with a lot of tension and jerk his head back. . . . This lasted for only a few minutes." Id.

### 3.  Affidavits from Other Family Members: Lupe Sanchez, Emma Fernandez, and Bertha Sanchez, Exhibits 5-7

These family members, who are T.S.'s grandmothers and paternal great-aunt, recounted their recollections. Emma Fernandez averred that she was present when her daughter (Ms.

---

[11] Although Ms. Sanchez's affidavit uses the word "doctor," the only medical professional who had seen T.S. after the February 5, 2009 vaccination was Mr. Luna, a physician's assistant. Exhibit 3 at 3-4. Ms. Sanchez later testified that she did not learn that Mr. Luna was not a doctor until much later.

Sanchez) asked Dr. Brown about T.S.'s "'weird movements.'"  Dr. Brown appeared "hurried" and gave "short answers."  Exhibit 6 ¶ 4.

### E.   Resolution of Factual Issues about T.S.'s Health and Abilities

From the beginning of the case, the parties disagreed about T.S.'s health in the six months after the February 5, 2009 vaccinations.  Ms. Sanchez averred that T.S. began having unusual movements within approximately two weeks.  See Exhibit 3 (affidavit).  The Secretary, however, disputed the accuracy of this recollection in part because of the medical record Ms. Marin-Tucker created.  Resp't's Rep., filed Feb. 28, 2012, at 12-13.

Due to the parties' dispute over T.S.'s health, a hearing was held on May 15, 2012.  Mr. Sanchez, Ms. Sanchez, and other family members testified about their recollections of T.S.  Ms. Sanchez testified she had a baby journal but "never filled it out."  Tr. 128; see also Tr. 113.  She further testified that after she saw Dr. Brown in May 2009, she decided she "was never going there again."  Tr. 87.  When Ms. Roquemore stated that Ms. Sanchez "saw Dr. Brown in May, never to see him again," Ms. Sanchez did not correct this statement.  Tr. 90.

Because Mr. and Ms. Sanchez had not filed some records, such as Dr. Valencia's August 6, 2011 record and Dr. Brown's August 19, 2011 record, they were not asked any questions about these records during the May 15, 2012 hearing.  Likewise, Mr. and Ms. Sanchez were not asked any questions about recordings of conversations with medical personnel because the recordings had not been disclosed before the hearing.

Ms. Marin-Tucker's August 17, 2009 record stated that Ms. Sanchez noticed that her son was having developmental issues two to three months ago.  Exhibit 1 at 54-56.  This recollection was generally credited as accurate and has not been challenged.  Instead, the parties dispute when T.S. moved his arm abnormally.

The findings regarding abnormal arm movements have varied.  A Ruling Finding Facts found (a) that T.S. did not have abnormal arm movements in February around the time of his mother's birthday and (b) that T.S. did not have abnormal movements in March through May 2009.  A primary reason was that the medical records created by Mr. Luna, Dr. Seleem, and Dr. Brown did not memorialize any complaint from Ms. Sanchez about abnormal movements.  Ruling Finding Facts, 2013 WL 1880825, issued April 10, 2013.

The First Entitlement Decision was consistent with the Ruling Finding Facts, in part, and inconsistent in part.  The First Entitlement Decision was consistent in the sense that the First Entitlement Decision found that T.S. did not have abnormal arm movements in March through May 2009.  The First Entitlement Decision was inconsistent with the Ruling Finding Facts in the sense that the First Entitlement Decision found that T.S. had one episode of abnormal arm movements around Ms. Sanchez's birthday but this episode was due to a cold.  2018 WL 5856556, issued October 9, 2018.

11

The First Federal Circuit Opinion ruled that the First Entitlement Decision contained an error.[12]  The error was that the First Entitlement Decision found that the isolated abnormal arm movement was due to a cold, a proposition for which there was inadequate expert support.  Thus, the Federal Circuit remanded the case to address this issue.  The First Federal Circuit Opinion did not change any findings that T.S. did not move his arm abnormally in March through May 2009.  809 Fed. App'x 843, 850 (Fed. Cir. Apr. 7, 2020)

The Second Entitlement Decision attempted to address the remanded issue.  Based upon new expert reports and testimony, the Second Entitlement Decision found that the isolated abnormal arm movement in February 2009 was due to a cold.  Because this sequence was incompatible with the theory of vaccine-causation proposed by the experts retained by the Sanchezes, they were denied compensation.  2020 WL 5641872, issued August 26, 2020.

The Second Federal Circuit Opinion reversed the judgment denying Mr. and Ms. Sanchez compensation in a split opinion.[13]  The panel majority found that T.S. had abnormal arm movements in March through May.  Thus, in the majority's view, T.S. responded to the vaccinations in a way consistent with the theory of causation, entitling Mr. and Ms. Sanchez to compensation.  The Federal Circuit, therefore, remanded for a determination of damages.  34 F.4th 1350 (Fed. Cir. 2022).

As discussed below, the discovery of information during the damages phase is the basis for the pending motion to reopen.  However, part of the Sanchezes' response to the pending motion to reopen is based upon other events occurring earlier in the litigation.  Thus, those events are briefly recounted.

### F.    Submission of Timesheets with Disclosure of Unproduced Material, September to December 2014

 Mr. and Ms. Sanchez submitted a first motion for an award of attorneys' fees and costs on an interim basis on September 16, 2014.  This fee motion contained Ms. Roquemore's Timesheets, which are cited above.  The Timesheets arguably revealed the existence of two types of unproduced material---material the Secretary requested explicitly and material the Secretary

---

[12] Before the case reached the Federal Circuit, the Court of Federal Claims denied a motion for review.  142 Fed. Cl. 247.  However, this opinion is generally superseded by the opinion from the Federal Circuit.

[13] Again, there was an intervening opinion from the Court of Federal Claims.  152 Fed. Cl. 782 (2021).

did not request explicitly.  The items discussed in this section bear upon the pending motion to reopen.[14]

### 1.    Material the Secretary Requested Explicitly

The Timesheets revealed that Ms. Sanchez had created a baby journal and day planner, which had not been submitted.  See Resp't's Resp., filed Nov. 24, 2014, at 2 n.1 (identifying newly identified material).  The Timesheets also revealed the creation of an audio file regarding Ms. Marin-Tucker.

These missing items were discussed in a November 25, 2014 status conference.  Mr. and Ms. Sanchez were generally obligated to file these items.  Order, issued Dec. 2, 2014.[15]

Ms. Sanchez explained her account of what happened in an affidavit, signed on December 11, 2014.  Exhibit 56.  Ms. Sanchez stated that she began, but did not finish, T.S.'s baby book.  Id. at 2.  Ms. Sanchez averred "I never gave it [the baby book] to Ms. Roquemore as it didn't really have anything in it."  Mr. Sanchez and Ms. Sanchez filed the baby book as Exhibit 57.

For the day planner, Ms. Sanchez recognized that she "made a few notes regarding [T.S.]."  Exhibit 56 at 2.  This document was filed in black and white as Exhibit 58.

As to the audio recordings with Ms. Marin-Tucker, Ms. Sanchez averred she provided a version on compact disc to Ms. Roquemore, but it was difficult to hear.  Ms. Sanchez reported that Ms. Roquemore returned the CD to her, but she did not know where it was.  Exhibit 56 at 3-4.

After this evidence was filed, neither party sought an opportunity to seek additional oral testimony from Ms. Sanchez.  Neither party sought a revision of the April 10, 2013 Ruling Finding Facts.  See Opinion and Order, 142 Fed. Cl. 247, 250-51 (2019) (ruling that the special master did not err in not discussing information from the day planner in denying entitlement

---

[14] These items also contributed to the Secretary's motion for sanctions.  However, the Secretary appears to have withdrawn the motion for sanctions for the time being, while keeping open the possibility of revisiting the issue in the context of attorneys fees.  Tr. 4627.

[15] The Secretary also requested before and after photos of T.S. that Ms. Roquemore reviewed.  Resp. to Mot. for Interim Fees, filed Nov. 24, 2014 at 2 n.1.  The special master denied this request, explaining:

A family possessing pictures of their young child ishardly surprising. If the Secretary anticipated that photographs would be useful, the Secretary easily could have requested them. Thus, the petitioners' failure to disclose photographs is not prejudicial.

Order, issued Dec. 2, 2014.

when the petitioners did not raise the day planner in their briefs and the experts did not discuss it), vacated on other grounds, 809 F. App'x 843 (Fed. Cir. 2020).

### 2. Material that the Secretary Did Not Request Explicitly

In 2014, the Secretary did not seek the production of material created by Dr. Valencia, her assistant Ms. Marin-Tucker, or Dr. Brown. According to the position taken in opposition to the Secretary's 2023 motion to reopen, the submission of Ms. Roquemore's Timesheets in August 2014 as part of the Interim Fee application alerted the Secretary that "Mrs. Sanchez met with Ms. Michaela, P.A. and Dr. Brown to obtain clarifications of the medical records and had recorded both meetings." Pet'r's Opp'n, filed Sep. 6, 2023, at 19. According to Mr. and Ms. Sanchez, the Secretary's failure to seek the documents in 2014 constitutes a waiver of the right to obtain documents from Dr. Valencia, Ms. Marin-Tucker, and Dr. Brown. Id. at 19-20; see also id. at 12.

### 3. Assessment of Compliance

Following a status conference on November 25, 2014, the special master commented that the Sanchezes "appear[ed] to have complied" with their obligation to produce all medical records. Order, issued Dec. 2, 2014. However, "whether petitioners [had] complied with their secondary obligation to present non-medical records [was] questionable." Id. As noted, the Secretary requested the production of certain items, such as the day planner and the baby book. Mr. and Ms. Sanchez produced them as well as an affidavit from Ms. Sanchez. Exhibits 56-58. Mr. and Ms. Sanchez also presented a declaration from their attorney, Ms. Roquemore, explaining certain entries in her timesheets and discussing some of the non-medical record materials that had not been submitted. Neither the affidavits nor the declaration corrected the special master's impression that the Sanchezes had submitted all medical records.

### G. Submission of Additional Materials during Damages Phase

At the start of the process for determining the amount of compensation, Mr. and Ms. Sanchez were directed to file additional documents, including updated medical records. Order, issued Aug. 30, 2022, at 6. After many months, Mr. and Ms. Sanchez submitted a set of records from Inland Regional Center as Exhibit 243 and the August 6, 2011 record from Dr. Valencia as Exhibit 262. As noted above, in the August 6, 2011 record, Dr. Valencia memorialized a request from Ms. Sanchez to change Ms. Marin-Tucker's record with respect to T.S.'s "onset of symptoms." Exhibit 262 at 1. The Secretary identified these old, yet newly filed, documents as supporting a request for additional time to respond to petitioners' life care plan. Resp't's Reply, filed May 1, 2023, at 5-7.

An extensive status conference was held on May 24, 2023, which was recorded.[16] During the status conference, Ms. Roquemore stated that she did not know why the documents

---

[16] The Secretary filed the transcript as part of the motion to reopen entitlement on August 16, 2023, which is docket number 386.

were not filed earlier.  May 24, 2023 Tr. at 6-7.  As to the Inland Regional Center, Ms. Roquemore's response was two-fold.  Ms. Roquemore maintained that she was not aware that petitioners were supposed to file treatment records and Ms. Roquemore also stated that she was not aware that T.S. was being treated at the Inland Regional Center.  Id. at 4-6, 13.  When the Secretary's attorney pressed the issue of Dr. Valencia's August 6, 2011 record, Ms. Roquemore stated that it was not an established fact that her office possessed the pediatrician's record.  Upon discovery of some records that the Sanchezes arguably should have submitted during the entitlement stage, the Secretary requested authority to subpoena medical records from four providers of medical services.  Id. at 19-20.  The purpose was to confirm the completeness of the medical records that were already on file.  See Resp't's Motions for Subpoena, filed May 25, 2023.  The Secretary submitted the responses to those subpoenas as Exhibits S to U on July 26 and 28, 2023.

### H.    Motion to Reopen, filed Aug. 16, 2023[17]

The Secretary argued that the belated discovery of medical records supported reopening the entitlement stage of the case.  Resp't's Mot. to Reopen, filed Aug. 16, 2023.  In this context, the Secretary asserted that new evidence can justify a departure from an appellate court's mandate.  Id. at 11-12.  Pursuant to an August 18, 2023 order, the Secretary supplemented his initial motion on August 25, 2023.  The Secretary argued that Vant Erve v. Sec'y of Health & Hum. Servs., 39 Fed. Cl. 607, 612 (1997), aff'd after remand in non-precedential op., 232 F.3d 914 (Fed. Cir. 2000), sets forth the controlling test to assess whether entitlement should be reopened.

Mr. and Ms. Sanchez opposed reopening entitlement.  They recognized that "some medical records that were not originally received and/or inadvertently not filed, came to light in the Summer 2023."  Pet'rs' Resp., filed Sep. 6, 2023, at 10.  The main thrust of their opposition was two-fold.  First, any material that was produced late is cumulative with previous evidence such that the newly discovered evidence does not justify reopening.  Second, the Secretary waived any argument about the newly discovered evidence by not requesting it sooner.

The Secretary addressed the Sanchezes' arguments via a Reply, filed Sep. 18, 2023.  The Secretary emphasized that Mr. and Ms. Sanchez did not deny that they knew the belatedly produced records existed and they did not deny that they had an obligation to produce them during the entitlement phase.  In the Secretary's view, the newly produced documents are

---

[17] The motion to reopen has affected the resolution of damages.  Initially, the proceedings regarding compensation were not delayed, and the case proceeded on a parallel track, simultaneously but separately addressing the issues of damages and the motion to reopen.  Order, issued Sep. 22, 2023 (denying the Secretary's motion to stay).  A hearing on damages was held on September 26-27, 2023.  However, the witnesses did not complete their oral testimony.  Damages issues remain pending.  See Order, issued Dec. 20, 2024.

informative, not cumulative.  The Secretary also responded to the argument that he had waived his right to ask for documents by not asking earlier.

Mr. and Ms. Sanchez filed a Sur-Reply on October 6, 2023 without seeking leave.  They stated that preparing for and participating in the damages hearing, which had been held on September 26-27, 2023, prevented them from filing declarations regarding the production of records.  However, they planned to file declaration(s) soon.

Mr. Sanchez, alone, discussed the production of documents.  Exhibit 295, filed Nov. 29, 2023.  Although Mr. Sanchez was speaking for the family, he lacked direct knowledge of what happened at various medical appointments as Ms. Sanchez primarily took T.S. to see doctors without her husband.  Mr. Sanchez also recounted disruptions in Ms. Roquemore's practice of law in 2011.

In response to Mr. Sanchez's declaration, the Secretary sought oral testimony from Ms. Sanchez and Ms. Roquemore.  Resp't's Status Rep., filed Dec. 8, 2023.  The Secretary maintained that their testimony would be relevant to assessing the fourth Vant Erve factor, the reason for the delay in production of documents.

The Secretary's request for testimony from Ms. Roquemore raised a question as to whether Ms. Roquemore could remain counsel of record because, generally, an attorney should not both represent a party and testify about a disputed matter.  Because Ms. Roquemore's status was unsettled, a second session of a damages hearing was cancelled.  See Order, issued Dec. 14, 2023.  Mr. and Ms. Sanchez ameliorated this issue, to a degree, by retaining Attorney Richard Gage as an associate attorney.  See Pet'rs' Notice, filed Jan. 17, 2024.

At the request of Mr. and Ms. Sanchez, the Secretary consolidated his arguments regarding reopening in a Comprehensive Motion, filed Jan. 11, 2024.  In this motion, the Secretary requested that Mr. and Ms. Sanchez produce certified copies of various items.  Although delayed by intervening events discussed below, Mr. and Ms. Sanchez opposed the request to reopen via a Comprehensive Response, filed May 9, 2024.  The Secretary did not file a separate reply.

### I.    Miscellaneous Procedural Steps

Mr. and Ms. Sanchez interposed various obstacles to the undersigned's resolution of the motion to reopen.  Although these actions delayed adjudication, the outcomes do not meaningfully affect resolution of the motion to reopen.  Details about the outcomes of the various motions can be found in the published opinions.  Examples include four motions for protective orders.  These were denied.  Order, issued Aug. 14, 2024, 2024 WL 4564656 (finding Ms. Sanchez's and Ms. Roquemore's testimony about the failure to produce documents was reasonable and necessary); Order, issued Oct. 28, 2024, 2024 WL 5467401 (finding that Ms. Sanchez was required to produce her mental health records because she had placed her mental health status in issue); Opinion, filed Dec. 2, 2024, 2024 WL 2024 WL 5414170 (ruling that the Court of Federal Claims lacked jurisdiction to review the denial of protective orders); Order, issued Feb. 13, 2025, 2025 WL 2783118 (finding Ms. Sanchez remained obligated to testify).

16

Mr. and Ms. Sanchez sought a mandamus from the Federal Circuit and this petition was denied as well.  No. 2025-114, 2025 WL 670189 (Fed. Cir. Mar. 3, 2025).

### J.   Pending Motion for Sanctions, October 2024 to November 2024

Based upon Ms. Roquemore's statement that she could not locate the Dr. Brown letter that she had reviewed on August 24, 2011, the Secretary requested sanctions.  Resp't's Mot., filed Oct. 23, 2024.  The Secretary argued that Ms. Roquemore's failure to preserve this evidence was a form of spoliation and that Ms. Roquemore and Ms. Sanchez had engaged in a pattern of misconduct.  The Secretary argued that the drastic remedy of dismissal was appropriate.  In the alternative, the Secretary argued that an adverse inference should be drawn.

Mr. and Ms. Sanchez contested the motions for sanctions.  Pet'r's Resp., filed Nov. 6, 2024.  The Secretary kept his position.  Resp't's Reply, filed Nov. 13, 2024.

A hearing regarding the motion to reopen and motion for sanctions was held in June 2025.  Ms. Sanchez testified first, with both attorneys (Ms. Roquemore and Mr. Gage) present.  Ms. Roquemore testified next.  The hearing concluded on June 3, 2025.[18]

### K.   Finding of Fact Regarding Day Planner

After the parties completed submitting evidence, which mainly consisted of reviews of day planners, a finding of fact was made.  Clear and convincing evidence supported a finding that Ms. Sanchez altered her day planner before she submitted it into evidence.  2025 WL 2988894.

### L.   Findings of Fact Regarding Dr. Valencia's and Dr. Brown's Records

Regarding Dr. Valencia and Dr. Brown's medical records, tentative findings were announced in a June 23, 2025 order: that Ms. Sanchez possessed Dr. Valencia's August 6, 2011 medical record and Dr. Brown's August 19, 2011 medical report before the statement of completion was filed; and that Ms. Roquemore possessed Dr. Brown's August 19, 2011 medical report before the statement of completion was filed.  Mr. and Ms. Sanchez did not contest these findings.  Pet'rs' Status Rep., filed July 23, 2025.

As to the remaining tentative finding, which concerns Ms. Roquemore's possession of Dr. Valencia's August 6, 2011 medical record, Mr. and Ms. Sanchez contested this one.  See Pet'rs' Status Rep., filed July 23, 2025.  They argued that the email from Ms. Sanchez to Ms. Roquemore in 2011 did not contain the August 6, 2011 medical record.  However, Ms. Roquemore did not explain how she retrieved the email from August 2011.  Thus, there was a question about the authenticity.  Moreover, when the Secretary requested a production of all the relevant emails, Mr. and Ms. Sanchez did not verify their account by producing them.

---

[18] The transcripts for the June 2025 start with a "4" in the thousand place, i.e., 4xxx.  Similarly, pagination from the oral argument in December 2025 continues this pagination.

Accordingly, Ms. Roquemore was also found to have possessed Dr. Valencia's August 6, 2011 medical record before Ms. Roquemore certified the medical records as complete.  Findings regarding Dr. Valencia's and Dr. Brown's Medical Records, issued Oct. 1, 2025, 2025 WL 3004761.

### M.    Additional Briefing and Oral Argument

Following the findings of fact regarding the day planner and the August 2011 medical records created by Dr. Valencia and Dr. Brown, an oral argument was tentatively announced. Order, issued Oct. 16, 2025.  Part of this order requested clarification as to the basis for the Secretary's pending motion for sanctions.  The order noted:

> The Secretary argued that sanctions are appropriate primarily (maybe exclusively) because of Ms. Roquemore's alleged failure to preserve a letter from Dr. Brown, leading to an allegation of spoliation.  However, the October 1, 2025 findings of fact found that Ms. Roquemore possessed and reviewed Dr. Brown's August 19, 2011 letter, which is in evidence as Exhibit T pages 17-18. Thus, it is not clear whether sanctions are appropriate as the allegedly missing document actually is in evidence.

Id.  The order further questioned whether a sanction of dismissal would be appropriate for an alleged failure to preserve a single document, and asked whether and what other, less drastic sanctions might be available.  Id.

In response, the Secretary stated that the finding that Ms. Roquemore had reviewed Dr. Brown's August 19, 2011 medical record did not moot the motion for sanctions.  Resp't's Supp'l Br., filed Nov. 6, 2025.  The Secretary contended that his motion for sanctions "was based on malfeasance that was both pervasive and egregious."  Id. at 5.  The Secretary further argued that a sanction less than dismissal would not be appropriate.

In response to a request from Mr. and Ms. Sanchez, the undersigned provided some guidance about the anticipated scope of oral argument.  Order, issued Nov. 12, 2025.  This order permitted the parties to cite additional cases in support of their respective positions by a deadline shortly before Thanksgiving.  The parties each submitted short status reports citing a few additional cases.

Oral argument was held on December 3, 2025.[19]  On the topic of the motion to reopen, the parties maintained the positions expressed in their briefs.  As to the motion for sanctions, the Secretary revised his petition regarding sanctions for the time being, stating:

---

[19] A more thorough discussion of the parties' arguments is recounted in the analysis section of this Order.

> while we believe the dismissal would be an appropriate sanction for the misconduct that Petitioners and Ms. Roquemore committed in this case, but given that now about 14 years later we appear to have a complete record of the events that occurred in the days and weeks following [T.S.]'s vaccinations, we believe that the most prudent approach would be to reopen the record on entitlement and to decide the case on the merits. But then the question of sanctions could be revisited in the context of attorneys' fees.

Tr. 4627.

This oral argument makes the motion to reopen and the motion for sanctions ready for adjudication. The first part of the analysis is to determine whether the entitlement should be reopened. Because the Secretary has demonstrated extraordinary circumstances that justify a departure from the mandate rule, entitlement is reopened. In the second part of the analysis, the relevant evidence regarding the onset of T.S.'s abnormal arm movements is reviewed and a new finding of fact is made. Finally, in the third part of the analysis, there is a short discussion of the Secretary's motion for sanctions.

### III.    **Analysis Part One: Motion to Reopen**

#### A.    **Introduction**

To review, during the process of determining the amount of compensation, Mr. and Ms. Sanchez produced Dr. Valencia's August 6, 2011 medical record for the first time in 2023 as Exhibit 262. This belated production prompted the Secretary to subpoena other medical records directly from the providers and the Secretary found that other records, such as Dr. Brown's August 19, 2011 medical record, had not been produced.

Based upon this newly discovered evidence,[20] the Secretary sought to reopen entitlement. Resp't's Mot. to Reopen, filed Aug. 16, 2023. A Comprehensive Motion, filed Jan. 11, 2024, elaborated upon the Secretary's arguments. Mr. and Ms. Sanchez's most extensive arguments against reopening are found in their Comprehensive Resp., filed May 9, 2024.

The analysis of the motion to reopen is contained in the following parts. First, the factors to be considered in determining whether the entitlement phase of the case can be reopened are set

---

[20] Cases differentiate newly discovered evidence from newly created evidence. E.g., Magnesystems, Inc. v. Nikken, Inc., 933 F.Supp. 944, 951 (C.D. Ca. 1996) (ruling that two patents, which were more than 15 years old, could have been discovered with due diligence before the trial court ruled upon a motion for summary judgment). The rationale is that the newly discovered evidence must have existed before the initial resolution. Sigmatech, Inc. v. United States, 144 Fed. Cl. 159, 175-76 (2019). In the present case, all of the evidence on which the Secretary relies to reopen entitlement is newly discovered.

forth.  Before these factors are analyzed, the issue of the Secretary's opportunity to discover the evidence at issue years earlier is next addressed.  An analysis of the relevant factors follows.

### B.    Standards for Reopening Entitlement

In proposing that entitlement be reopened, the Secretary advanced a four-factor test announced in Vant Erve v. Sec'y of Health & Hum. Servs., 39 Fed. Cl. 607, 612 (1997), aff'd after intervening proceedings, 232 F.3d 914 (Fed. Cir. 2000).  Resp't's Mot. to Reopen, filed Aug. 16, 2023, at 10; Resp't's Comp. Mot. at 16.  Mr. and Ms. Sanchez appear to agree.  Pet'rs' Comp. Resp. at 12 (citing a case that relied upon Vant Erve).

A review of the Vant Erve litigation is illuminating.  Mr. and Ms. Vant Erve alleged that a diphtheria-pertussis-tetanus vaccine caused their son, Christian, to suffer a residual seizure disorder and/or an encephalopathy, two injuries then listed on the Vaccine Table.  Vant Erve, 39 Fed. Cl. at 608.  Mr. and Ms. Vant Erve supported their claim with an affidavit from Christian's treating pediatric neurologist, Dr. Mathisen.  Dr. Mathisen disclosed his opinions via an affidavit in which he described MRIs performed in December 1991 and August 1992.  Id. at 609.  The December 1991 MRI was discussed during an entitlement hearing held on May 26, 1994, but the August 1992 MRI had not been produced then.  Id. at 610 n.10.  After a hearing, the special master found in favor of Mr. and Ms. Vant Erve.  More specifically, the special master found that they had established that Christian suffered from a residual seizure disorder and an encephalopathy and that the Secretary had failed to rebut the presumption of causation by establishing a factor unrelated.  Id. at 609.  The case proceeded to damages.

During damages, the Secretary obtained information about the August 1992 MRI, and a third MRI from April 1993.  Vant Erve, 39 Fed. Cl. at 610 n.10.  These MRIs existed before the evidentiary hearing in May 1994.  The Secretary also obtained information about an MRI from January 1997.  Based in part upon these studies, the Secretary sought to reopen entitlement.  The Secretary supported this motion with a statement from a neurologist, who opined that the series of MRIs supported a diagnosis that Christian suffered from a "genetic inborn error of metabolism."  Id. at 610.

The special master denied the motion to reopen entitlement.  Although the lately produced evidence could have been important to resolving the case, the special master reasoned that the failure to produce the evidence was "the direct result of respondent's negligence" because "she could have asked for the documentation earlier."  Id. at 611.  The special master then determined the amount of compensation to which the Vant Erves were entitled.

The Secretary challenged the entitlement ruling by filing a motion for review.  A primary argument was that the special master had "placed an improper burden on respondent to request documents that petitioner should have furnished without a special request."  Vant Erve, 39 Fed. Cl. at 611. The Court of Federal Claims ultimately granted the motion for review.

In this process, the Court adopted the four-factor test, which the special master had used.  These four factors are: "(1) the nature of the proffered new evidence; (2) the prejudice to the

parties; (3) the length of the delay; and (4) the reason for the delay." Id. at 612. In addition, the Court commented upon those four factors.

1. Nature of Proffered New Evidence. This part of the test is "paramount." Id. In the Vant Erve case, the Secretary's new evidence---that Christian suffered from a genetic disease of metabolism---would, if credited, demonstrate that the entitlement decision was "simply wrong." Id. at 613.

2. Prejudice to the Parties. The Court defined prejudice to the parties in terms of the non-moving party's inability to re-establish its case, perhaps because a witness became unavailable. The Court rejected attempts to define "prejudice" in terms of emotional toil. Id. at 613.

3. Length and 4. Reason for the Delay. When the case went to an entitlement hearing, the Secretary did not have access to much information created about Christian. "The Special Master place[d] the responsibility for that circumstance on the respondent. In the court's view, this was erroneous." Vant Erve, 39 Fed. Cl. at 614. The Court eventually determined that the Vant Erves shared responsibility for the failure to produce some evidence, including MRI data, because their expert seemed to mislead the Secretary into thinking there was only one MRI, which was from January 1991 and which the Secretary possessed.

In discussing the burden of production, the Court commented about the expectations in the Vaccine Program:

> It would turn the informal vaccine process on its head if —in circumstances such as those here, where information fundamental to the correct diagnosis came into existence, petitioners should have known that respondent was interested in the data, and the absence of those new materials was not known to respondent—the respondent had to specifically ask for supplementation of the petitioner's medical history or be barred from relying on it later.

Id. at 616. Thus, the Court ruled that the special master abused his discretion in denying the motion to reopen, granted the motion for review, and remanded for further considerations.

On remand, Mr. and Ms. Vant Erve were denied compensation. Vant Erve v. Sec'y of Health & Hum. Servs., No. 92-341V, 1998 WL 887126 (Fed. Cl. Spec. Mstr. Dec. 3, 1998). The special master found that "Christian's neurologic condition is, more probably than not, the result of a progressive, dysmyelinating metabolic disorder." Id. at *3. One reason was that the special master "based upon the overall history of the case," came "to question the candor of Dr. Mathisen's testimony." Id. at *5.

This decision did not end the litigation. Mr. and Ms. Vant Erve filed a motion for review, which the Court of Federal Claims denied. Vant Erve v. Sec'y of Health & Hum. Servs., 43 Fed. Cl. 338 (1999) (ruling that the special master's factual findings were not arbitrary or capricious).

Mr. and Ms. Vant Erve appealed the judgment denying them compensation to the Federal Circuit. In an unpublished and nonprecedential opinion, the Federal Circuit ruled that the Court

of Federal Claims "did not err in concluding that the special master abused his discretion in denying the government's motion to reopen." Vant Erve v. Sec'y of Health & Hum. Servs., 232 F.3d 914, 2000 WL 425005, at *1 (Fed. Cir. 2000).  The Federal Circuit also ruled that the special master's later findings were not arbitrary and capricious.  Thus, the Federal Circuit affirmed the judgment denying compensation.

The Vant Erve case has some procedural resemblances to the present case.  For example, in both cases, a judgment awarding compensation has not been entered.

On the other hand, there is a prominent procedural difference between Vant Erve and T.S.'s case.  In T.S.'s case, the Federal Circuit has determined, based upon the record that was before it at the time, that Mr. and Ms. Sanchez were entitled to compensation.  34 F.4th 1350; see also Tr. 4511, 4529.  Normally, the mandate rule would prevent a lower tribunal from changing what an appellate authority has determined.  See Northern Helex Co. v. United States, 225 Ct. Cl. 194, 634 F.2d 557, 560 (Ct. Cl. 1980).  However, the mandate rule has some exceptions, including an exception for newly discovered evidence.  Rembrandt Vision Technologies, L.P. v. Johnson & Johnson Vision Care, Inc., 818 F.3d 1320, 1329 (Fed. Cir. 2016) (ruling a district court abused its discretion in denying a motion for a new trial and noting that the mandate rule did not preclude the granting of a motion for a new trial); Tronzo v. Biomet, Inc., 236 F.3d 1342, 1349 (Fed. Cir. 2001) (recognizing that trial courts "have considered revisiting issues otherwise foreclosed where there has been a substantial change in the evidence"); Cf., Packet Intelligence LLC v. NetScout Systems, Inc., 100 F.4th 1378, 1384 (Fed. Cir. 2024) (stating that "our precedents hold that remanded patent cases remain vulnerable to post-mandate developments concerning patentability, even if liability – including patent validity – has already been conclusively resolved by appellate review").  Thus, the Secretary's motion is at least procedurally proper in the sense that newly discovered evidence can justify a trial court's reconsideration of an issue that an appellate court already addressed.  Tr. 4619-20.  In this regard, the Federal Circuit's resolution of Mr. and Ms. Sanchez's petition for a writ of mandamus did not suggest that the pending motion to reopen was frivolous.  In re T.S., by and through Sanchez, No. 2025-114, 2025 WL 670189 (Fed. Cir. Mar. 3, 2025).

## C.   Opportunity to Discover Information Earlier

It seems that a preliminary issue to be decided is Mr. and Ms. Sanchez's argument that it is not their fault the documents were not produced earlier in the litigation because the Secretary should have asked for them.  Pet'rs' Comp. Resp. at 24, 44.  This issue is preliminary in the sense that the set of relevant documents to be analyzed in terms of whether they support reopening entitlement should be limited to those documents that (a) Mr. and Ms. Sanchez did not produce in the entitlement phase and (b) there was no waiver of the production of those documents.

The parties primarily rely upon Vant Erve (respondent) and Stone v. Sec'y of Health & Hum. Servs., 676 F.3d 1373 (Fed. Cir. 2012) (petitioners).  Vant Erve was summarized above.  Thus, the relevant procedural history from Stone, which is an opinion in a consolidated case, is taken up next.

22

Scott Hammitt asserted that a diphtheria-tetanus-acellular pertussis vaccine caused his daughter, Rachel, to suffer a neurologic problem known as severe myoclonic epilepsy of infancy ("SMEI"). Hammitt v. Sec'y of Health & Hum. Servs., No. 07-170V, 2010 WL 3735705, at *1 (Fed. Cl. Spec. Mstr. Aug. 31, 2010). Mr. Hammitt relied upon opinions from the neurologist whom he retained, Marcel Kinsbourne. Dr. Kinsbourne and the Secretary's expert testified at a hearing on May 14-15, 2009. Id. at *2. Based upon this record, the special master found that the Secretary demonstrated that a genetic mutation caused the SMEI. Id. at *1. Mr. Hammitt filed a motion for review. The Court held that the special master applied an incorrect legal standard and remanded. See Hammitt v. Sec'y of Health & Hum. Servs., No. 07-170V, 2011 WL 1135878, at *1 (Fed. Cl. Mar. 4, 2011) (discussing opinion remanding the case).

After remand, Mr. Hammitt sought to submit additional evidence. However, the special master denied that request. Hammitt, 2011 WL 1135878, at *1 n.4. Although the special master's decision does not detail the reason for denying the motion to supplement, the opinion on the motion for review states that the motion to submit additional information was denied for three reasons: (1) because the Remand Order required a re-evaluation of the existing evidence, not further development of the record, (2) because Mr. Hammitt knew about the article proposed to be submitted and could have submitted the article into evidence earlier, and (3) because the proposed additional evidence does not appear to support Mr. Hammitt's claim. Hammitt v. Sec'y of Health & Hum. Servs., 98 Fed. Cl. 719, 723 (2011). As to the merit of Mr. Hammitt's claim, the special master denied entitlement on the ground that "the SCN1A gene mutation was the sole, substantial cause of Rachel's SMEI." 2011 WL 1135878 at *3.

Mr. Hammitt challenged the outcome by filing a second motion for review. Most of the Court's opinion explained that the special master's conclusion complied with the legal standards and was not arbitrary and capricious. However, as relevant to the arguments of Mr. and Ms. Sanchez, the Court also agreed with the denial of the request to file additional evidence. Hammitt, 98 Fed. Cl. at 729. Thus, judgment was entered against Mr. Hammitt.

Mr. Hammitt appealed to the Federal Circuit, which resolved his case in conjunction with an appeal brought by another set of parents, Jennifer and Gary Stone. Mr. Hammitt contested the special master's denial of his motion to submit additional evidence. Stone, 676 F.3d at 1385. The Federal Circuit stated the grounds on which the special master had relied. These were (1) the remand order did not call for development of additional evidence, (2) Dr. Kinsbourne knew about the article before the initial opinion, and (3) the article did not support Mr. Hammitt's claims. The Federal Circuit ruled that the special master did not abuse his discretion in declining to allow Mr. Hammitt to submit additional evidence. Id. at 1386.

Based upon these events in Stone / Hammitt, Mr. and Ms. Sanchez argue that the situation in their case resembles Hammitt in that the newly discovered evidence "was, in fact, known and available to Respondent prior to any Decision by the Special Master. . . . Hence, Respondent failed to act diligently in 2014 to submit the evidence in a timely fashion." Pet'rs' Comp. Resp. at 14. During the December 2025 oral argument, Mr. and Ms. Sanchez likewise argued that Stone was their strongest case. Tr. 4511.

23

Stone / Hammitt does not bear the load that Mr. and Ms. Sanchez place upon it.  First, the Federal Circuit's holding was that the special master did not abuse his discretion in declining to accept more evidence.  Under the abuse of discretion standard, it seems that, arguably, a special master could also exercise appropriate discretion in allowing more evidence.  See Hanlon v. Sec'y of Health & Hum. Servs., 191 F.3d 1344, 1350 (Fed. Cir. 1999) (noting that special master did not abuse her discretion in considering medical evidence that was not available earlier); Veryzer v. Sec'y of Health & Hum. Servs., 100 Fed. Cl. 344, 348 (2011) (noting that a special master reopened the record for additional evidence on remand).  The practice of allowing additional evidence on remand was followed in Mr. and Ms. Sanchez's case.  Opinion and Order, 152 Fed. Cl. 782, 787 (2021) (noting the special master permitted the parties to file additional expert reports and held an additional hearing), rev'd on non-related grounds, 34 F.4th 1350 (Fed. Cir. 2022).  Thus, the Federal Circuit in Stone / Hammitt did not establish an absolute rule prohibiting the consideration of additional material on remand.

Second, and relatedly, an interpretation of Stone / Hammitt as always forbidding consideration of additional material would conflict with other Federal Circuit cases.  In other situations, the Federal Circuit has recognized its mandate may not need to be followed when, upon remand, there is newly discovered evidence.  Tronzo, 262 F.3d at 1349; see also Retractable Technologies v. Becton Dickinson, 757 F.3d 1366, 1372 (Fed. Cir. 2014) (finding no actual change in the evidence).  The exception to the mandate rule for newly discovered evidence would be pointless if the trial forum could not consider the newly discovered evidence.

Third, in Hammitt, the special master's third reason for denying Mr. Hammitt's motion to submit additional evidence was that the special master reasoned that the evidence did not support petitioner's claim.  (This determination implies that the special master at least looked at the potential evidence.)  But, in the present case, the evidence that forms the basis for the Secretary's motion to reopen, especially Dr. Brown's August 19, 2011 medical record, does help the Secretary's argument.  The helpfulness of Dr. Brown's medical record is further discussed below.

Fourth, and perhaps most importantly, in Hammitt, the special master found that Mr. Hammitt was "knowing" about the medical article's "existence 'well in advance of' the Special Master's initial decision.  Hammitt, 98 Fed. Cl. at 723.  In the Federal Circuit's recounting, "Dr. Kinsbourne was 'aware of the article and its significance' well before the special master issued his initial opinion."  Stone, 676 F.3d at 1385.  Regardless of whether the relevant person is Mr. Hammitt (through his attorney) or Dr. Kinsbourne, an important aspect is that the person possessed *actual* knowledge or awareness.

This focus on actual knowledge serves to distinguish the facts in Hammitt from the situation for Mr. and Ms. Sanchez.  Here, there is no basis to find that the Secretary, including his attorney Ms. Reynaud, knew about Dr. Brown's August 16, 2011 letter in 2014 or earlier.  To the extent that Mr. and Ms. Sanchez argue that Dr. Brown's letter "was, in fact, known . . . to Respondent" (Pet'rs' Comp. Resp. at 14), Mr. and Ms. Sanchez use language imprecisely.  As discussed below, Mr. and Ms. Sanchez have a basis to argue that the Secretary *could* have known about Dr. Brown's August 19, 2011 letter.  Although an argument about what the Secretary

should have known has some legitimacy, it ultimately fails in persuasiveness for several reasons, including Vant Erve.

To return to Vant Erve briefly, in that case, the petitioners' expert and treating doctor (Dr. Mathisen) based his opinion upon an MRI from December 1991, which the petitioners presented with their petition. Vant Erve, 39 Fed. Cl. at 615. Via an affidavit from June 11, 1993, Dr. Mathisen cited an MRI from August 1992. Id. at 616. Although this affidavit disclosed the August 1992 MRI, the Secretary did not request it. To add to the complexity, Dr. Mathisen's June 11, 1993 affidavit did not disclose that he had also reviewed an MRI from April 30, 1993. Then, Dr. Mathisen testified during a hearing in May 1994. Id. at 615. In this testimony, he referred to the original December 1991 MRI. The Court stated that Dr. Mathisen's testimony "creates the impression, albeit no doubt unintentionally, that he was speaking from materials already presented." Id. at 616. Based upon this sequence, the Court ruled the special master committed a legal error in determining that the Secretary was "negligent" in not obtaining the evidence before the hearing. Id. at 614.

In overturning the special master's finding that the Secretary was negligent in Vant Erve, the Court stated: "There is no support in the vaccine rules, in other words, for the observation below that 'the primary reason for the delay in this case plainly seems to have been respondent's *own negligence* in failing to timely seek obvious relevant records.'" 39 Fed. Cl. at 616 (quoting decision by the special master). Although not spelled out in Vant Erve, the following Vaccine Rules appear relevant.

A basic Vaccine Rule is the rule requiring the production of medical records. Vaccine Rule 2(c)(1) incorporates provisions of the Vaccine Act and also mandates the submission of medical records.[21] Congress has already imposed an obligation on petitioners: the petition "shall contain … (2) . . . all post-injury . . . outpatient records (including all provider notes, tests results, and medication records)." 42 U.S.C. § 300aa–11(c). From the starting point that petitioners are required to disclose information, other consequences follow. For example, "There is no discovery as a matter of right." Vaccine Rule 7(a). This rule is consistent with Congress's intention that litigation in the Vaccine Program be "less adversarial." 42 U.S.C. § 300aa–12(d)(2)(A).

---

[21] The relevant portion of this rule includes: As required by 42 U.S.C. § 300aa-11(c), the petition must be accompanied by the following documents:

> (A) Medical Records. Petitioner must include a certified copy of all available medical records supporting the allegations in the petition, . . .
>
> (iii) any post-vaccination treatment of the injured person, including all in-patient and out-patient records, provider notes, test results, and medication records.

The culture of litigation in the Vaccine Program also reflects the spirit of being "less adversarial."[22]  Special masters, attorneys for the petitioners, and attorneys from the Department of Justice cooperate to attempt to make proceedings fair and expeditious.  This cooperation, in turn, is based upon the trust among attorneys as officers of the court.

Unfortunately, the trust extended to Ms. Roquemore in this case was misplaced.  On at least two occasions, Ms. Roquemore made statements about the completeness of medical records that were not accurate.  The first occurred on October 27, 2011 when Ms. Roquemore certified that the case's record included all medical records.  This certificate of completeness was not accurate because Mr. and Ms. Sanchez had not produced records from California's Inland Regional Center and Loma Linda.  See Exhibits 243, 326; see also Tr. 4391 (Ms. Roquemore's under-oath acknowledgement that with the benefit of hindsight the statement of completion was not accurate).  The 2011 certificate of completeness was not accurate also because, as determined in the October 1, 2025 Finding regarding Dr. Valencia's and Dr. Brown's medical records, clear and convincing evidence shows that Ms. Roquemore possessed both Dr. Valencia's August 6, 2011 medical record and Dr. Brown's August 19, 2011 medical record.  See section II.L, above.  Yet, despite her possession of these two medical records, Ms. Roquemore did not file them into evidence.  Her certification of completeness was, therefore, at minimum, in error.

During the December 2025 oral argument, the attorneys for Mr. and Ms. Sanchez explained that in some instances, an attorney for petitioners will certify the record as containing all medical records, but then officials within the Government identify and request missing medical records.  Tr. 4512 (Ms. Roquemore), 4518-19 (Ms. Roquemore), 4524 (Ms. Roquemore), 4526 (Mr. Gage), 4528 (Ms. Roquemore).  This description is accurate, as the Secretary recognized.  Tr. 4536 (Ms. Reynaud).  This practice in which the Secretary has asked for medical records is the foundation for the petitioners' argument that the respondent has missed his opportunity to request medical records.

Petitioners' argument has at least some plausibility with respect to the group of medical records from T.S.'s treatment at places such as California Inland Regional Center and Loma Linda.  Exhibits 243, 326.  Although *Ms. Sanchez* was aware that T.S. received treatment at these places before the petition was filed in 2011 and, therefore, Ms. Sanchez should have filed these medical records when the petition was filed in 2011, there is not any reliable basis for finding that *Ms. Roquemore* knew about California Inland Regional Center records or Loma Linda records when Ms. Roquemore certified the medical records as complete in 2011.  A finding that an attorney did not knowingly withhold some documents does not exonerate a party as, according to the Federal Circuit, "even an accidental omission qualifies as misconduct under [Fed. Rule of Civil Proc.] 60(b)(3)."  Rembrandt Vision Technologies, L.P. v. Johnson &

---

[22] On numerous occasions, attorneys who are coming to the Vaccine Program for the first time have told the undersigned that they have found working with their counterpart at the Department of Justice to be a refreshing change from traditional litigation.

<u>Johnson Vision Care, Inc.</u>, 818 F.3d 1320, 1328 (Fed. Cir. 2016) (ruling that a district court abused its discretion in denying a motion for a new trial).

However, with respect to Dr. Valencia's August 6, 2011 medical record and Dr. Brown's August 19, 2011 medical record, the analysis changes. Based upon the October 1, 2025 Findings of Fact, both Ms. Sanchez and Ms. Roquemore knew about and possessed both medical records before Ms. Roquemore certified the medical records as complete. Although Mr. Gage contended that "We are all doing the best we can," (Tr. 4532) that description does not explain why Ms. Roquemore failed to file in 2011 two medical records that she possessed.[23]

The second instance in which trust in Ms. Roquemore was misplaced occurred in the context of the first motion for an award of attorneys' fees and costs on an interim basis on September 16, 2014. <u>See</u> section II.F, above. In support of this motion, Mr. and Ms. Sanchez presented Ms. Roquemore's timesheets. The detailed time entries from August 2011 revealed that Ms. Roquemore had considered material such as the day planner, T.S.'s baby book, and audio recordings. The Secretary requested production of this material. <u>See</u> Resp't's Resp., filed Nov. 24, 2014, at 2 n.1 (identifying newly identified material).

The timesheets also showed that on August 22, 2011, Ms. Roquemore called "Dr. Micaela's office to discuss medical record"[24] and on August 24, 2011, Ms. Roquemore "[r]eviewed letter from Dr. Brown." These entries are the crux of Mr. and Ms. Sanchez's argument regarding the Secretary's lack of diligence. <u>See</u> Pet'rs' Comp. Resp. at 20. In their view, the Secretary had sufficient information "right there and then in 2014 to subpoena the records." <u>Id.</u> at 20-21. In other words, the Secretary should have known something was missing.

The completeness of the disclosure of information by Mr. and Ms. Sanchez was discussed in an unrecorded status conference on November 25, 2014. <u>See</u> Order, issued December 2, 2014. Mr. and Ms. Sanchez maintained that they were not obligated to file items like the day planner because they were obligated to file only "medical records," and the day planner is not a medical record. In resolving this dispute, the undersigned made a preliminary point---that "Petitioners appear to have complied with this obligation [to produce all medical records]." Order, issued Dec. 2, 2014, at 1; <u>see also</u> Tr. 4517. Ms. Roquemore subsequently affirmed her understanding was that petitioners are required to present medical records. Ms.

---

[23] Two things merit noting. First, Mr. Gage joined the case in 2024, well after medical records were (and were not) filed in 2011. Second, Ms. Roquemore appears to contest the Findings of Fact regarding her possession of Dr. Valencia's and Dr. Brown's 2011 medical records. <u>See</u> Tr. 4527. While Mr. and Ms. Sanchez, of course, possess a right to seek appellate review, the tenor in the December 3, 2025 oral argument that Ms. Roquemore did nothing wrong is inconsistent with the current findings of fact.

[24] Again, in 2011, Ms. Sanchez and Ms. Roquemore believed Ms. Marin-Tucker was a doctor, not a physician's assistant in Dr. Valenica's office.

Roquemore's Supp'l Dec. in support of Pet'rs' Reply regarding Mot. for Interim Fees, filed Dec. 12, 2014, at 15; see also Tr. 4515.

However, Ms. Roquemore did not correct the undersigned's belief that Mr. and Ms. Sanchez had complied with their obligation to produce all medical records. In fact, as was later revealed, Mr. and Ms. Sanchez had not presented many medical records about T.S. To the extent that discussions at the end of 2014 revealed to Ms. Roquemore and the Sanchezes that they should have produced more of T.S.'s medical records earlier in the case, then the Sanchezes should have made that production voluntarily without any additional request from the Secretary. See 42 U.S.C. § 300aa–11(c)(2) (requiring the submission of "all post-injury . . . records"); see also Ideal Innovations, Inc. v. United States, 167 Fed. Cl. 314, 341-44 (2023) (discussing parties' obligation to supplement their discovery responses and imposing sanctions preventing the plaintiff from relying upon documents produced late); Contreras v. Sec'y of Health & Hum. Servs., 116 Fed. Cl. 472, 477 (2014) (noting that the Secretary had an independent obligation to update the curriculum vitae of an expert whose medical license became suspended), vacated on unrelated grounds, 844 F.3d 1363 (Fed. Cir. 2017).

As to the accusation that the Secretary and his attorney did not act with due diligence, the Secretary's response is short, but true: "For respondent to have sought further discovery after 2014, he would have had to disbelieve the representations of petitioner and Ms. Roquemore that all such records had been filed." Resp't's Comp. Mot., filed Jan. 11, 2024, at 27. Although Mr. and Ms. Sanchez responded, they did not explicitly contend that the Secretary should not have believed their representations in 2011 and 2014 concerning the production of medical records.

How the Secretary responded in 2024, after Mr. and Ms. Sanchez produced Dr. Valencia's August 6, 2011 medical record, is not the question. The pertinent time is 2014, when arguably Ms. Roquemore's timesheets suggested that the petitioners and she were not fulfilling their obligations to present medical records. Again, this affirmative duty to produce medical records comes from Congress and is found in the Vaccine Act.

The perspective from 2024 wrongly brings in information not available in 2014. The Federal Circuit has warned that hindsight should not affect an assessment of whether a discovery (invention) was obvious. See Orexo AB v. Actavis Elizabeth LLC, 903 F.3d 1265, 1271 (Fed. Cir. 2018) ("Judicial hindsight must be avoided"); Outside the Box Innovations, LLC v. Travel Caddy Inc., 695 F.3d 1285, 1297 (Fed. Cir. 2012) ("courts have recognized that, although advances in technology may in retrospect appear obvious to a judge, stimulated by advocacy, it is relevant that the advance eluded persons in the field. The distortions flowing from judicial hindsight have often been remarked"); Mintz v. Dietz & Watson, Inc., 679 F.3d 1372, 1378 (Fed. Cir. 2012). Likewise, the Supreme Court has reasoned "[a] factfinder should be aware, of course, of the distortion caused by hindsight bias and must be cautious of arguments reliant upon ex post reasoning." KSR Internat'l Co. v. Teleflex, Inc., 550 U.S. 398, 421 (2007).

From the information available in 2014, the Secretary cannot have been expected to sniff out potential litigation misconduct by seeking the authority to issue subpoenas. To start, Ms. Roquemore certified the medical records as complete on October 27, 2011. Then, in 2014, a gist

of the argument regarding the failure to produce the day planner was "we complied with our obligations because we produced [all] the medical records." This appeared credible at the time.

When viewed from a trusting perspective in 2014, Ms. Roquemore's time records did not set off any alarms. For example, Ms. Roquemore spent some time in early August 2011 checking with people in Dr. Valencia's office about whether a medical record could be corrected. These efforts do not necessarily inform either the Secretary or the undersigned that Ms. Roquemore possessed a medical record that she did not file. Similarly, Ms. Roquemore's August 24, 2011 time entry about reviewing a letter from Dr. Brown does not signal that Ms. Roquemore is reviewing information that was not filed into evidence. Before this date, Dr. Brown had created two other documents, which were filed with the petition as Exhibit 1 pages 44 (Feb. 5, 2009), and 53 (May 13, 2009). Thus, a natural interpretation of Ms. Roquemore's August 24, 2011 time entry is compatible with an assumption that Mr. Sanchez, Ms. Sanchez, and Ms. Roquemore are playing by the rules. See Resp't's Reply, filed Sep. 18, 2023, at 6 (arguing that the Secretary had no reason to disbelieve the representations from Ms. Roquemore); Tr. 4538.

To the extent that information from 2024 or 2025 could influence the evaluation, this information seems to support the view that the Secretary did not have a substantial basis to request discovery. For example, in the context of discussing the (lack of) production of Dr. Valencia's August 6, 2011 medical record, Ms. Roquemore maintained that she did not know in 2011 that the visit was going to be memorialized in a medical record. May 24, 2023 Tr. at 10. Ms. Roquemore maintained this account when she testified in 2025. Tr. 4387. And Ms. Roquemore further testified that she did not know Dr. Valencia created a medical record. Tr. 4304. Ms. Roquemore professed ignorance on these topics even though she was communicating with Ms. Sanchez. Similarly, Ms. Roquemore did not know when she testified in 2025 what letter from Dr. Brown she reviewed on August 24, 2011. Tr. 4251. Nevertheless, the gravamen of the argument from petitioners is that counsel for the Secretary should have had greater knowledge about what was going on in August and October 2011 than Ms. Roquemore. This argument is not persuasive.

To the extent that Mr. and Ms. Sanchez are arguing that the information presented in Ms. Roquemore's timesheets was a basis for the Secretary to glean various clues to reach the conclusion that medical records from 2011 were missing, Mr. and Ms. Sanchez appear to overlook that the same information presented in Ms. Roquemore's timesheets would be a basis for Ms. Roquemore also to conclude that medical records from 2011 were missing. As Ms. Roquemore contended, "maybe both parties are at fault." Tr. 4528.

Overall, the misconduct in failing to present Dr. Valenica's August 6, 2011 medical record and in failing to present Dr. Brown's August 19, 2011 medical record taints the position of Mr. and Ms. Sanchez.[25] This misconduct amounts to an affirmative choice to hide evidence.

_____

[25] "Misconduct" is used in the sense of its meaning in Fed. R. Civ. Proc. 60(b)(3). Cases interpreting the meaning of misconduct as used in Fed. R. Civ. Proc. 60 are helpful to define "misconduct." See Rembrandt Vision Technologies, L.P. v. Johnson & Johnson Vision Care,

Additional misconduct occurred with respect to other medical records, such as the records from Inland Regional Center where T.S. received treatment, although the failure to obtain these treatment records appears to have been based upon Ms. Roquemore's lack of awareness. Tr. 4156 (Ms. Sanchez's testimony that she does not recall whether Ms. Roquemore asked whether T.S. was receiving any therapy).[26] In any event, the misconduct by Ms. Sanchez and Ms. Roquemore taints their position such that they cannot persuasively argue that the Secretary alone was to blame. See 4DD Holdings, LLC v. United States, 169 Fed. Cl. 164, 179 (2023) (ruling that the United States could not assert the defense of equitable estoppel because "[t]he government comes before the court with unclean hands. It has intentionally destroyed evidence and lied to 4DD about its actions"), mot. for reconsideration denied, No. 15-945C, 2024 WL 2240359 (Fed. Cl. Apr. 26, 2024), appeal docketed, No. 24-1996 (Fed. Cir. June 25, 2024); Cf. Oak Grove Technologies, LLC, v. United States, 116 F.4th 1364, 1383-85 (Fed. Cir. 2024) (finding that the Court of Federal Claims did not abuse its discretion in imposing a sanction – a financial penalty – against the government when it failed to include documents in the administrative record of a bid protest).

At the end of the day, the Sanchez case resembles Vant Erve. In both situations, petitioners were at least aware of information relevant to entitlement but did not file the information. In both cases, petitioners have attempted to shift responsibility from themselves to the Secretary, arguing that the Secretary was not diligent. This argument lacked persuasiveness

---

Inc., 818 F.3d 1320, 1328 (Fed. Cir. 2016) (differentiating "misconduct" from "fraud" and "misrepresentation" and citing Anderson v. Cryovac, Inc., 862 F.2d 910, 923 (1st Cir. 1988)). However, Rule 60 does not govern the Secretary's motion to reopen entitlement. Rule 60 comes into play when there is a judgment. Vant Erve, 39 Fed. Cl. at 612. Here, there is no judgment. See Pet'rs' Comp. Resp. at 41, 46.

[26] As part of the briefing, Mr. and Ms. Sanchez located a passage in one of Dr. Dipple's medical records that noted that T.S. was being seen at Inland Regional Center. Pet'rs' Comp. Resp. filed May 9, 2024, at 7 and 23, citing Exhibit 1 at 131. In an ideal world, the Secretary could have noted this mention and requested the production of these medical records. See Vaccine Rule 4(a)(2) (explaining that "If respondent concludes that relevant documents are missing, respondent must immediately notify petitioner regarding the perceived omission"). But, the same can be said for Mr. and Ms. Sanchez---in an ideal world, either Ms. Roquemore or they also would have seen the phrase in Dr. Dipple's records and sought out the records from Inland Regional Center as the Vaccine Act requires them to do. Thus, the records from Inland Regional Center are comparable to the MRIs in Vant Erve for which the Court found that both parties shared the responsibility for the lack of earlier production. Vant Erve, 39 Fed. Cl. at 614. Notably, although the respondent was partially responsible for the delay in the production of a critical medical record, the Court still granted the Secretary's motion to reopen entitlement. Id. at 615 (noting that, "At a minimum, the onus of the delay in production can be shared equally between the parties").

in <u>Vant Erve</u> and in this case because the duty to produce medical records then and now was with the petitioners.

### D.    Newly Discovered Medical Records

The set of newly discovered medical records is considerable.  For example, the materials from Inland Regional Center, where T.S. received therapy, exceeds 1700 pages.  Exhibit 243.  For purposes of analysis, the set of newly discovered medical records can be divided into two categories: (1) Dr. Valencia's and Dr. Brown's August 2011 medical records and (2) other medical records in which Ms. Sanchez (and sometimes Mr. Sanchez) told medical personnel T.S.'s history.

### 1.    Dr. Valencia's and Dr. Brown's August 2011 Medical Records

The background for the creation of these medical records provides a context to understanding why they are important for the litigation.  After T.S. received the vaccines in February 2009, according to the family's affidavits, he started to experience abnormal movements that he displayed for multiple months.  <u>See</u>, <u>e.g.</u>, Exhibit 3 ¶¶ 6-11 (Ms. Sanchez's aff., dated Oct. 5, 2011).  During the time when T.S. was assertedly moving abnormally, Ms. Sanchez brought him to Dr. Brown for an ear infection.  Exhibit 1 at 53.  Dr. Brown's record from this visit fails to memorialize any complaints about abnormal movements.  The first medical record to document an abnormality in T.S.'s development was the August 19, 2009 record that Ms. Marin-Tucker, a physician's assistant in Dr. Valencia's office, created.  Exhibit 1 at 54-56.  According to this history, Ms. Sanchez noticed a delay in Tristan's development two to three months ago, making the potential onset around May or June 2009.

These medical records posed a challenge for the Sanchezes's claim that the February 5, 2009 vaccination harmed T.S in several respects.  First, the absence of a documented complaint supports an inference that T.S. was not having abnormal movements at the time Dr. Brown saw him.  If T.S. had been experiencing abnormal movements in May 2009 when Ms. Sanchez brought him to see Dr. Brown, then Ms. Sanchez would have told Dr. Brown about those abnormal movements and Dr. Brown, at a minimum, would have documented the complaint.  Without documentation, the special master could find that Ms. Sanchez's testimonial account was unpersuasive.  This reasoning has been found not arbitrary.  <u>See</u> <u>Bradley v. Sec'y of Health and Hum. Servs.</u>, 991 F.2d 1570, 1574 (Fed. Cir. 1993).  Second, Ms. Marin-Tucker's August 19, 2009 medical record tends to corroborate the analysis of Dr. Brown's May 13, 2009 medical record.  As just stated, one interpretation of Dr. Brown's May 13, 2009 is that T.S. was not, in fact, having abnormal movements May 13, 2009.  Then, the history that Ms. Marin-Tucker obtained from Ms. Sanchez places the onset of T.S.'s abnormal movements around the end of May 2009, which is after the visit with Dr. Brown.  Third, if the combined effect of Dr. Brown's May 13, 2009 medical record and Ms. Marin-Tucker's August 19, 2009 medical record persuasively established that T.S. started abnormal movements at the end of May 2009, then it was unlikely that the February 5, 2009 vaccination caused the problem.  <u>See</u> <u>Pafford v. Sec'y of Health & Human Servs.</u>, 451 F.3d 1352, 1358 (Fed. Cir. 2006) ("If, for example, symptoms normally first occur ten days after inoculation but petitioner's symptoms first occur several weeks after inoculation, then it is doubtful the vaccination is to blame.").

From this starting point, Ms. Roquemore suggested that Ms. Sanchez inquire whether the doctors might correct their medical records. The basis for this suggestion was Ms. Sanchez's recollection that she had consistently reported that T.S.'s abnormal movements started in February 2009, right after the vaccination. Exhibit 3 (Ms. Sanchez's affidavit) ¶¶ 7-10; Ms. Roquemore's Supp'l Decl. ¶ 15. Thus, Ms. Roquemore and Ms. Sanchez planned that Ms. Sanchez would see if the doctors were "willing to provide a clarification letter." Ms. Roquemore's Supp'l Decl. at ¶ 15.

Dr. Valencia's August 6, 2011 medical record and Dr. Brown's August 19, 2011 medical record are the result of this plan. Both Dr. Valencia and Dr. Brown document that Ms. Sanchez was asking for a change to the medical records. Exhibit 262 (filed Apr. 12, 2023) and Exhibit T at 17-18 (filed July 26, 2023). Both Dr. Valencia and Dr. Brown declined to change their underlying records. Dr. Valencia stated that Ms. Marin-Tucker and she "can not change or ALTER any of our previous documents since they are considered PERMANENT RECORDS and that our notes [are] based on the interview and assessment at the time of [the] visit and that it will be hard to recall anything on those visits unless they were documented." Exhibit 262 at 1.

The parties differed in their interpretation of Dr. Valencia's August 6, 2011 medical record. The Secretary maintained that Dr. Valencia is saying in 2011 that "there was nothing omitted from the original records." Tr. 4589. Mr. and Ms. Sanchez contended that the August 6, 2011 medical record "only says that it would be hard to recall anything on those visits unless it was documented. It doesn't mean everything was documented." Id.

Although Dr. Valenica's August 6, 2011 record could be viewed as neutral, not adding or subtracting information about when T.S. started to move his arm abnormally, this medical record revealed that Ms. Sanchez sought correction of T.S.'s medical records from at least one doctor. Tr. 4590. If Mr. Sanchez and Ms. Sanchez had filed Dr. Valenica's August 6, 2011 medical record with the other medical records from Dr. Valencia that they filed on October 26, 2011 as Exhibit 11, then almost certainly there would have been questions asked about whether Ms. Sanchez had sought correction of records from other doctors. For example, the undersigned almost certainly would have inquired about this topic during the May 15, 2012 fact hearing. In this scenario, a truthful response to this question would have required Ms. Sanchez to disclose she also sought a correction of Dr. Brown's records.

From the information discovered in response to the Secretary's 2023 subpoena, Dr. Brown's response to Ms. Sanchez's 2011 attempt to change T.S.'s medical record is now known. Dr. Brown went a step farther than Dr. Valencia. Dr. Brown disagreed with Ms. Sanchez's statement in 2011 that she in 2009 told him that T.S. was having abnormal movements. Dr. Brown stated that if she had told him about those abnormal movements, then Dr. Brown would have acted upon them. In particular, Dr. Brown would have ordered an EEG. Exhibit T at 17. Mr. and Ms. Sanchez acknowledge that a physician's ordering an EEG in response to a complaint that an infant was moving abnormally was not something out of left field. Tr. 4596.

32

2.       Other Medical Records Created in 2009-10

Although potential litigation sparked Ms. Sanchez to seek corrections to Dr. Valencia's and Dr. Brown's medical record, other newly discovered medical records show how Ms. Sanchez reported T.S.'s medical history before she consulted an attorney.  These include reports to a physical therapist and occupational therapist in October 2009.  Exhibit 326 at 13, 43.  Another example is the report to Inland Regional Center in March 2010.  Exhibit 243 at 4, 604.  A third example is the parents' email to Dr. Gusella in June 2010.  Exhibit U at 771.  These are discussed in more detail in section IV.C.

**E.       Assessment of Newly Discovered Medical Records**

The parties differ in how they value the newly discovered medical records.  The Secretary maintains that "these newly discovered medical records, individually and collectively, represent a substantial change in the evidence that requires this special master to set aside the Circuit's mandate and reopen the record on entitlement."  Resp't's Comp. Mot. at 21.  In contrast, Mr. and Ms. Sanchez generally argue across multiple pages that the newly discovered evidence either is cumulative or supports their account.  See Pet'r's Comp. Resp. at 24-40.

The newly discovered medical records are not cumulative with previously produced evidence.  Dr. Brown's letter, in particular, contradicts Ms. Sanchez's account that she told Dr. Brown (and other medical professionals treating T.S.) that T.S. was moving his arm abnormally.  This is especially significant when considering the lack of evidence negating Ms. Sanchez's account in the previous (incomplete) record.  See Second Federal Circuit Opinion, 34 F.4th at 1355 n.5.  Taken together, the newly produced evidence constitutes an extraordinary circumstance that justifies revisiting the entitlement finding that the Federal Circuit made without the benefit of all the evidence.  See Vant Erve, 39 Fed. Cl. at 612 (stating that whether to consider reopening entitlement, the "paramount test is the nature of the proffered new evidence").  While the newly discovered evidence is "highly relevant," 39 Fed. Cl. at 612, the four-factor Vant Erve test has other components as well.

**F.       Other Vant Erve Factors**

Although Vant Erve emphasizes that the factor weighing the most heavily is the nature of the newly discovered evidence, there are additional factors.

1.       Prejudice to the Parties

Vant Erve defined prejudice to the parties in terms of the non-moving party's inability to re-establish its case, perhaps because a witness became unavailable.  The Court rejected attempts to define "prejudice" in terms of emotional toil.  39 Fed. Cl. at 613.

The Secretary contended that allowing reopening would not prejudice Mr. and Ms. Sanchez.  Resp't's Mot. to Reopen, filed Aug. 16, 2023, at 12-13.  He points out that after he subpoenaed documents, the records have been preserved.

Mr. and Ms. Sanchez provide relatively little comment about a potential prejudice to them.  Much of their argument regarding prejudice is tangled with arguments that the Secretary should have sought production of documents earlier.  See Pet'r's Resp. to Motion to Reopen, filed Sep. 6, 2023, at 12-13.  As found earlier in this order, an attempt to shift blame for the lack of production of records onto the Secretary is not persuasive.  Otherwise, Mr. and Ms. Sanchez note that the case has been pending for more than a decade and has been to the Federal Circuit twice.  Id. at 12.

The record supports a finding that Mr. and Ms. Sanchez would not be prejudiced in the sense that they can continue litigating the case.[27]  Mr. and Ms. Sanchez have not identified any witnesses who have become unavailable.  See Pet'rs' Opp'n to Mot. to Reopen, filed Sept. 6, 2023 at 13; see also Resp't's Reply, filed Sep. 18, 2023, at 2 n.1.[28]

### 2.      Length of Delay and Reason for the Delay

In Vant Erve, these two factors were treated together.  39 Fed. Cl. at 614-15.

A predominant question is who is responsible for the delay in producing the newly discovered evidence, starting with Dr. Valencia's August 6, 2011 medical record and Dr. Brown's August 19, 2011 medical record.  As discussed in the October 1, 2025 Finding of Fact, Ms. Sanchez and Ms. Roquemore possessed both documents before Ms. Roquemore certified the records as complete on October 27, 2011.  2025 WL 3004761.  Their failure to comply with their obligations caused the delay.  This litigation misconduct weighs in favor of the Secretary's argument for reopening and weighs against the Sanchezes' argument opposing reopening.  See Luv n' Care, Ltd. v. Laurain, 98 F.4th 1081, 1094-96 (Fed. Cir. 2024) (ruling that trial court did not abuse its discretion in finding that a litigant's "unclean hands" barred it from seeking relief for alleged infringement of patents).

---

[27] Although reopening entitlement is "prejudicial" in the sense that reopening might lead to a finding that Mr. and Ms. Sanchez are not entitled to compensation, this risk is inherent in any motion to reopen.  Thus, the potential change in outcome is not a basis for denying a motion to reopen.  See Vant Erve, 39 Fed. Cl. 613-14.

[28]  The Sanchezes also contend that, "From the Sanchezes' perspective, more delay in this case is seen as an attempt to 'run the clock' on [T.S.]'s life. That, in and of itself, and the time it will take to go through a reopening of entitlement, is most definitely prejudicial to this child and his family."  Pet'rs' Sur-Reply, filed Oct. 6, 2023, at 3; see also Pet'rs' Comp. Opp'n, filed May 9, 2024, at 52.  This comment is regrettable and inconsistent with how the Government acts.  Routinely, after there has been a finding of entitlement (regardless of whether the Secretary contested entitlement), the Secretary cooperates in the process of resolving damages.  What distinguishes the T.S.'s case from other cases is the discovery of medical records that should have been produced years earlier.  Moreover, as stated, Vant Erve rejected attempts to factor emotional toil into a determination of prejudice.  39 Fed. Cl. at 613.

The length of the delay is, unfortunately, long, as the case was filed in 2011, and the Secretary filed the motion to reopen entitlement in 2023. However, as the Secretary contends, "Years of litigation could have been avoided if petitioners had disclosed these records." Resp't's Mot. to Reopen, filed Aug. 16, 2023, at 13.

G.    **Summary regarding Motion to Reopen**

The obligation to produce medical records rests with Mr. and Ms. Sanchez, according to both the Vaccine Act and Vaccine Rule 2. At the beginning of the case in 2011, they did not file all of T.S.'s medical records. Some of the missing records included medical records that Ms. Sanchez and Ms. Roquemore possessed and knew about before Ms. Roquemore certified the record as complete.

Mr. and Ms. Sanchez have not persuasively transformed their burden to produce all medical records into a burden for the Secretary to request records such that the Secretary can be found to have waived the right to request medical records. The information contained in Ms. Roquemore's timesheets submitted in 2014 did not alert the Secretary that Ms. Roquemore and Ms. Sanchez possessed a medical record from Dr. Valencia and a medical record from Dr. Brown that they had not produced. Moreover, even if both parties were somehow responsible for the lack of production of these records, Vant Erve demonstrates that reopening entitlement is proper when the character of the newly discovered evidence is highly relevant to entitlement.

As set out above in section III.E., the newly discovered medical records are highly relevant to entitlement. The newly discovered medical records contain information about how a doctor who treated T.S. in 2009 would have acted if Ms. Sanchez told him about abnormal arm movements. This evidence is new and undermines Ms. Sanchez's account. Multiple newly discovered medical records also present an account in which T.S. developed an illness, which lasted for weeks or a month, and then around the time he was recovering from the the illness, started to move his arms abnormally. Moreover, the other Vant Erve factors are either neutral or weigh in favor of reopening entitlement. See section III.F above.

Accordingly, the Secretary has met his burden of establishing the extraordinary circumstances warranting revisiting the entitlement finding made by the Federal Circuit.

IV.    **Analysis Part Two: Findings of Facts**

A.    **Introduction**

Before the analysis of these arguments proceeds, one preliminary point should be acknowledged. The question of when T.S. started to display abnormal movements is not a new issue. Therefore, the ensuing weighing of the evidence does not start on a fresh page as many pages have already been written on this topic.[29]

---

[29] For a summary of rulings on this topic, see Appendix B.

This history of litigation does not preclude a reassessment of the evidence by the undersigned.  Because special masters (not juries) resolve claims in the Vaccine Program in the first instance, a motion to reopen is necessarily directed to the same finder of fact.  See, e.g., Hanlon v. Sec'y of Health & Hum. Servs., 40 Fed. Cl. 625, 629 (1998) (ruling a special master reasonably reopened entitlement to receive evidence from an expert), aff'd, 191 F.3d 1344 (Fed. Cir. 1999); Vant Erve, 40 Fed. Cl. at 616 (remanding the case to the same special master).  The previous findings of fact do not require disqualification of the undersigned.  See In re T.S. by and through Sanchez, No. 2025-114, 2025 WL 670189, at *3 (Fed. Cir. 2025) (denying petitioners' motion for reassignment due to alleged bias); Opinion and Order Denying Petitioners' Mot. for Protective Order, No. 11-685V, 2024 WL 5414170, at *4 (directing petitioners to file any motion for reassignment of the case to the chief special master); see also Order, issued Apr. 10, 2024 (considering sua sponte whether the undersigned's concerns about the credibility of Ms. Roquemore required recusal).

These prior adjudications, especially the resolutions by the Federal Circuit, certainly merit considerable respect.  But, they do not control the outcome because the evidence has changed.  See Deribeaux v. Sec'y of Health & Hum. Servs., 717 F.3d 1363, 1365-66 (Fed. Cir. 2013) (describing a procedural history in which information produced during damages led a special master to find the petitioners were not entitled to compensation).

## B.      Standards for Adjudication

The undersigned's obligation is to make findings of fact and conclusions of law.  Munn v. Sec'y of Health & Hum. Servs., 970 F.2d 863, 869 (Fed. Cir. 1992); 42 U.S.C. § 300aa–12(d)(3)(A)(i).  In finding facts, the question is how does the evidence preponderate?  Petitioners are required to establish their case by a preponderance of the evidence.  42 U.S.C. § 300aa–13(1)(a).  The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence."  Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).  Proof of medical certainty is not required.  Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991).

Distinguishing between "preponderant evidence" and "medical certainty" is important because a special master should not impose an evidentiary burden that is too high.  Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379-80 (Fed. Cir. 2009) (reversing special master's decision that petitioners were not entitled to compensation); see also Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d 1357 (Fed. Cir. 2000); Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (disagreeing with dissenting judge's contention that the special master confused preponderance of the evidence with medical certainty).

## C.      Summary of Evidence

In all cases, special masters are required to consider the record as a whole.  42 U.S.C. § 300aa-13(a)(1).  Consideration of the entire record is even more important in the context of reopening entitlement because any evaluation of whether the newly discovered evidence is

different from previously produced evidence or is cumulative with previously produced evidence inherently requires a review of the previously produced evidence.

The evidence concerning T.S.'s health from February to August 2009 is divided into three categories.

**1.      Medical Records Created from February 5, 2009 through August 2009**

T.S. was born in August 2008.  T.S. was taken to his six-month well-baby checkup with Dr. Philip Brown on February 5, 2009.  Exhibit 1 at 44.  Dr. Brown found his growth and development to be normal.  Id. at 46.  On this day, T.S. received the diphtheria-tetanus-acellular pertussis, hepatitis B, Haemophilus influenzae type B, inactivated polio, and pneumococcal conjugate vaccines.  Id.  Dr. Brown recommended that T.S. return in two months to receive further vaccinations.  Id.; see also Ruling Finding Facts, 2013 WL 1880825 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) at ¶ 6.

On the morning of February 17, 2009, Ms. Sanchez brought T.S. to an Urgent Care, where he was examined and treated by certified Physician Assistant Jonathan P. Luna.[30]  Ms. Sanchez told Mr. Luna that T.S. had been coughing and congested, and had a fever.  Exhibit 1 at 49.  The medical record did not mention anything about T.S. exhibiting unusual arm movements.  See id. at 48-51.  T.S.'s temperature was 98.9 degrees and "fever" was noted.  Exhibit 1 at 49; Tr. at 74, 115.  Mr. Luna diagnosed T.S. with a "[c]ommon cold" and "[v]iral syndrome." Exhibit 1 at 48, Tr. at 74, 115.

A later discovered medical record adds some additional information.  When the Secretary subpoenaed records from Mr. Luna's office, the office produced one page which was previously not produced.  Exhibit T at 50.  The parties typically refer to this page as the "SOAP" (Subjective, Objective, Assessment, and Plan) notes.  The SOAP notes contain a typed portion that describes the nature of the illness or injury as a "bad cough."  The nurse who filled out the SOAP notes wrote that the chief complaint was a "cough & congestion."  The SOAP note contains no notation of abnormal arm movements.  Ms. Sanchez signed the document twice, reflecting that she consented to treatment and certifying that the follow-up instructions were explained to her and that she understood them.  Id. at 49-51.

On April 29, 2009, when pediatrician Dr. Nabil R. Seleem saw T.S., then eight and a half months old, he noted that T.S. had suffered cough and congestion for two weeks.  No unusual

---

[30] Documents about this Urgent Care visit are found in two places, produced at different decades in the litigation.  The initial document about the February 17, 2009 Urgent Care visit was filed in conjunction with the petition in October 2011 and is found at page 48-49 of Exhibit 1.  The complete document about the February 17, 2009 Urgent Care visit was filed with other documents produced in response to the Secretary's subpoena on July 26, 2023.  Exhibit T at 50-51.

arm movements or developmental issues were reported.  In his neurological review, Dr. Seleem noted "[n]o neurological symptoms."  Ultimately, he diagnosed T.S. with an ear infection and bronchitis and prescribed amoxicillin.  Exhibit 1 at 50-52.

Ms. Sanchez and T.S.'s grandmother (likely Emma Fernandez, see Exhibit 6 ¶ 4) returned with T.S. to St. Mary High Desert Medical Group on May 13, 2009, when he again saw Dr. Brown.  Dr. Brown's May 13, 2009 medical record is one the more critical medical records.  The history of present illness states: "8 month-old boy here with his mother and gm [grandmother] with c/o [complaints of] still congested since 4/29/09 visit with Dr. Seleem who tx [treated] him with amoxicillin for otitis. Mother says the congestion sx [symptoms] are worse during the daytime. No known exposures, but sibs attend school."  Exhibit 1 at 53.[31]  Dr. Brown's May 13, 2009 medical record memorializes that Dr. Brown conducted a physical examination of three aspects: "Gen," "HEENT," and "Chest."  Based upon this information, Dr. Brown reached three impressions: "Nasal congestion and some rhonchi," "Resolving URI/Viral LRI infection," and "Resolved otitis."  Id.  Dr. Brown's plan was to use a humidifier, elevate the head of T.S.'s bed, and to follow up "PRN increased S/SX."  Exhibit 1 at 53.

In August 2009, Ms. Sanchez was pregnant with her daughter.  A baby shower was held on August 8, 2009.  Exhibit 58 (day planner) at 31.  Family members attended this baby shower.

At about one year old, T.S. was seen by Physician Assistant Micaela Marin-Tucker for a well-child exam.  Exhibit 1 at 54-56 (Aug. 17, 2009); Tr. 89-90.  Ms. Sanchez informed Ms. Marin-Tucker that she "noticed a change in [T.S.'s] development about 2-3 months ago[32] but since she had taken [T.S. to the pediatric clinic] with Dr. Brown she thought that everything was ok."  Exhibit 1 at 54.  Upon a review of systems, Ms. Marin-Tucker found that T.S. did not walk, stand, crawl, and hold his head up while sitting, or make any attempt to move his lower extremities.  She also noted in her examination that his extremities seemed soft, yet rigid at times.  As the result of her examination, Ms. Marin-Tucker ordered a battery of lab tests.  Exhibit 1 at 54-55.  She also referred T.S. to a neurologist, physical therapist, and occupational therapist.  Id. at 55; Exhibit OO at 150; Tr. at 90.  Additionally, T.S. received his third hepatitis B vaccine, as well as his second doses of the pneumococcal conjugate, diphtheria-tetanus-acellular pertussis, and Hib vaccines.  Exhibit 1 at 55; Tr. at 92.  T.S. was to return to the nurse the next week to receive the remaining vaccinations that were due, including the measles, mumps, and rubella, varicella, and hepatitis A vaccines.  Exhibit 1 at 55.

Dr. Valencia ordered some genetic tests.  These turned out negative.  Exhibit NN at 106 (date reported: Oct. 5, 2009).

---

[31] Dr. Brown's May 13, 2009 record uses all capital letters.  This opinion reformats Dr. Brown's medical record using more traditional capitalization.

[32] According to this report, T.S.'s developmental changes began between May 17, 2009 and June 17, 2009.

2.    Medical Records from October 2009 to August 2012

For purposes of resolving the motion to reopen, the changes in T.S.'s state of health beyond October 2009 are not relevant. Thus, this order tends not to restate the results of most tests performed on T.S. during this time. The presentation of information about T.S.'s health from October 2009 forward draws mainly from the medical records. The Sanchezes generally do not dispute the accuracy of the medical records created after October 2009. See, e.g., Exhibit 3 ¶¶ 13-17 (discussing additional appointments with medical personnel, including Ms. Marin-Tucker on Oct. 7, 2009; Dr. Michelson on Nov. 12, 2009; Dr. Michelson on December 15, 2009 to discuss the results of the MRI; and Dr. Valencia on Dec. 24, 2009). Although the summary of T.S.'s medical records is relatively sparse, all medical records have been reviewed. By way of contrast, information about T.S.'s past medical history is relevant to the pending motion to reopen. Thus, the following sections tend to put forward the information that Mr. and Ms. Sanchez told medical personnel about how T.S.'s disorder began.

In the August 19, 2009 visit, Ms. Marin-Tucker had referred T.S. to a neurologist, physical therapist, and occupational therapist. Exhibit 1 at 55; Tr. at 90. Although Mr. and Ms. Sanchez produced records from a neurologist at the beginning of the case (and this record is discussed below), the records from the physical therapist and occupational therapist were not produced until May 1, 2024. These records are contained in records from Loma Linda University Health, which was filed as Exhibit 326.

About six weeks after the first appointment with Ms. Marin-Tucker, both Mr. and Ms. Sanchez went to see Ms. Marin-Tucker for a follow-up. In a review of T.S.'s systems, Ms. Marin-Tucker noted no seizures, weakness, or tics. She made no notation of tremors or twitching. Upon neurologic examination, she found T.S. to be unable to grasp, sit, crawl, or make much eye contact. Mr. Sanchez reported that there was "another child in the family with the same symptoms and doctors [could] find nothing wrong." Ms. Marin-Tucker emphasized the importance of making the appointment with a neurologist as soon as possible. Exhibit 1 at 57-58 (Oct. 7, 2009).

Between the occupational therapist and the physical therapist, the occupational therapist saw T.S. first. On October 8, 2009, the occupational therapist, who appears to be Stacey Cunningham, recorded that T.S. had been diagnosed with developmental delay. Exhibit 326 at 13; Exhibit OO at 196 (duplicate). Ms. Cunningham further reported that T.S.'s "M [mom] stated he decreased [functioning] after 6 mos. shots. In Aug., pt's pediatrician recommended neurology eval per M. No other PMH [past medical history] per M." Id. Ms. Sanchez's goal for T.S. was "'Being where he is supposed to be at.'" Id. at 14. Ms. Cunningham evaluated T.S.'s functioning, noted deficits in several areas, and recommended occupational therapy, which T.S. attended.

The physical therapy evaluation was relatively similar. The diagnosis is again developmental delay. The history recounts: "14 month-old male, referred @ 12mo well child-visit for Delay. Mom states pt was developing normally until immunizations @ 6 mo; got infection & was not the same since." Exhibit 326 at 43; Exhibit OO at 193 (duplicate). Unlike the occupational therapy form, the form for the physical therapy evaluation prompts information

about onset date.  The answer is "Feb. 5, 2009."  Id.  Another note on this form states: "Baby was normal according to mom, but @ 6 mo visit to MD, got immunization shots, got sick & was not the same since.  Pt did not have another MD visit until 12 months when MD referred."  Id. at 44.[33]  The physical therapist, who appears to be Lisa Hwang, also evaluated T.S.'s functioning, found problems, and recommended more therapy.

On November 12, 2009, T.S. was taken to see Dr. David J. Michelson, the neurologist to whom he was referred.  Dr. Michelson's summary of the history of present illness begins: "The parents are good historians and there are some prior clinic notes and laboratory test results available for my review."  Exhibit 1 at 140.  The HPI section also memorializes that T.S. "previously held his right arm stiffly behind him episodically, he does not do this lately."  Id.  Dr. Michelson's account of T.S.'s past medical history includes that he suffered no chronic illnesses.

Otherwise, much of Dr. Michelson's November 12, 2009 note documented T.S.'s current condition.  Dr. Michelson recorded that T.S. was unable to sit independently, his hands stayed closed, and his feet went forward when at rest.  He noted that, T.S. "holds his mouth open tightly and drools at times, but at other times he chews and swallows well."  Dr. Michelson's review of systems was positive for muscle spasms, global developmental delay, weakness, walking problems, constipation, and birthmarks.  Dr. Michelson noted that T.S. suffered from "global developmental delay of unclear etiology, though a genetic predisposition is suspected based on the family history and a [central nervous system] cause is suggested by the physical exam findings."  Exhibit 1 at 140-41.

An MRI / MRA that Dr. Michelson had ordered suggested that T.S. suffered from abnormalities in a part of his brain known as the basal ganglia.  Exhibit 1 at 142.  Dr. Valencia referred to this notation in a note following a December 24, 2009 medical appointment.  Exhibit 1 at 64-65.  The doctors suspected that this problem in the basal ganglia might respond to treatment with biotin.

At the end of 2009, T.S. was treated for a rash.  See, e.g., Exhibit OO (Loma Linda records) at 127, 132, 304 (history and physical).

The physical therapist, Ms. Hwang, reported on T.S.'s progress on February 10, 2010.  Exhibit 326 at 49.  In Ms. Hwang's account, T.S.'s medical history includes: "Mother states pt was developing normally until immunizations at 6 months of age.  Pt. had infection after immunizations and once resolved, began demonstrating difficulty with gross motor skills.  Pt. has been declining since."  Id.

---

[33] Between the immunizations, which were on February 5, 2009, and the one-year check-up, which was on August 17, 2009, Ms. Sanchez brought T.S. to see three medical providers: Mr. Luna, Dr. Seleem, and Dr. Brown.

A chief complaint of "possible Biotin-responsive basal ganglia disease" and developmental delay was the basis of an appointment with a geneticist at UCLA, Katrina Dipple, on February 22, 2010.[34]  Exhibit 16.  Mr. and Ms. Sanchez informed Dr. Dipple that T.S.

> has head control since he was born and then at 5 to 6 months of age, he lost his head control. Around 6 months of age, he was congested for about 4 weeks. Parents noted around this time, he started having contortions of his arms which included twisting and turning backwards, the arms were very stiff, this would come and go and last minutes to hours. He then began having the same [problem] with his feet.  This progressed to be his whole body becoming stiffer and tighter.

Id. at 2.  This history does not mention the vaccinations.  However, a later portion of this same record states that T.S. was behind schedule on his immunizations "per parent's preferences."  Id. at 3.

Based upon the results of various tests, Dr. Dipple stated that the differential included a "metabolic abnormality [such] as mitochondrial disease including Leigh's disease."  Id. at 3.  Dr. Dipple was uncertain about a biotin-responsive basal ganglia disease because T.S.'s improvement when taking biotin "has been mild."  Id. at 4.  Dr. Dipple ordered additional tests, but they were not enlightening.

By March 8, 2010, T.S. was being evaluated for services through California's Inland Regional Center.  Exhibit 243 at 571 (Individual Family Services Plan, dated March 8, 2010), at 1448 (assessment, dated April 1, 2010).  He was found eligible for services.  See id. at 222 (Early Start Report, dated April 8, 2010).  Through the Inland Regional Center, T.S. received extensive services.  Much of the work of Inland Regional Center is captured in Individualized Program Plans (IPPs) over the years.  But, these IPPs are not relevant to the motion to reopen.

The Inland Regional Center documents were not produced until March 22, 2023.[35]  Arguably, the only records from Inland Regional Center relevant to the Secretary's pending motion to reopen are from his initial evaluation.  See Resp't's Comp. Mot., filed Jan. 11, 2024, at 13-14.  As part of the family's application for benefits, Ms. Sanchez was asked whether T.S. had

---

[34] Before seeing Dr. Dipple, the Sanchezes had seen a different pediatric geneticist, James Bartley.  Exhibit NN at 24-25 (Feb. 4, 2010).  However, Dr. Bartley's record does not present any information about T.S.'s medical condition in 2009.

[35] The original version was missing pages labelled 237-239.  After the Secretary noted the omission of these pages, Mr. and Ms. Sanchez filed an amended version of the Inland Regional Center on January 14, 2024 and explained that the omission was likely due to an error in scanning.  Pet'rs' Comp. Resp., filed May 9, 2024, at 39.  The initially missing pages consisted of an immunization record and a third-party billing inquiry.

ever had a seizure.  Ms. Sanchez wrote: "don't know / has put his arms back and shook."  Exhibit 243 at 604.  The staff member at Inland Regional Center added a note "8-8-09 had an episode – arm back straight all body shaking lasted for a few seconds to a minute."  Id.  This exchange of information is repeated in the typed assessment, which adds "There have been no further episodes of this behavior."  Id. at 4.

T.S. returned to UCLA's pediatric geneticist, Dr. Dipple, on May 10, 2010.  Exhibit 1 at 82-84.  In updating T.S.'s progress since Dr. Dipple last saw him on February 22, 2010, Dr. Dipple noted that T.S. "has made some developmental progress.  He is making raspberries.  He started services from the Regional Center and currently gets OT and PT."  Id. at 82.  Based upon information available to her, Dr. Dipple assessed T.S. with "biotin-responsive basal ganglia disease (BBGD), which is a disorder due to mutations in the thiamine transporter to SLC19A3 gene on 2q36. . . [M]itochondrial disease is unlikely."  Id. at 84.

It appears that Ms. Sanchez searched the internet for information about biotin-responsive disorders of the basal ganglia.  See Exhibit 1 at 196 ("Mom was doing online research on biotinidase").  Ms. Sanchez's investigation led her to email a researcher, Dr. James Gusella, whom she believed "could shed some light" on T.S.'s situation, on June 3, 2010.[36]  As part of Ms. Sanchez's plea for help for T.S., she supplied Dr. Gusella with the following chronology, which presents information about the start of abnormal arm movements after the recovery from illness:

> We first noticed something was [amiss] when he missed some important developmental milestones like sitting up and crawling. Then at around six months old he got sick with a cold followed by an ear infection and congestion that lasted about a month. When we took him to the doctor they told us he was normal but we suspected something was wrong. When he finally did get better he wasn't quite the same. He began to clinch his hands and hold his arms in strange positions behind his back. He also started to have little fits of seizures. Little twitches of his body that I could tell he wasn't controlling.

Exhibit U at 771.[37]  A senior genetic counselor forwarded this email to Dr. Jennifer Friedman, a neurologist, on June 22, 2010.

---

[36] A website from 2023 identifies Dr. Gusella as the "Bullard Professor of Neurogenetics in the Department of Genetics at Harvard University." https://bmiphd.hms.harvard.edu//people/james-francis-gusella.

[37] The Secretary obtained this 2010 document via a subpoena issued in 2023.  This document was not included in the material the Sanchezes produced.

Mr. and Ms. Sanchez brought T.S. to see neurologist Dr. Jennifer Friedman, the same doctor to whom Ms. Sanchez's email to Dr. Gusella was forwarded.[38]  The appointment took place on August 2, 2010.  Exhibit 1 at 194-99.[39]  Dr. Friedman obtained a history about the onset of T.S.'s problems:

> [T.S.] was perfectly normal until 6 month vaccines. Parent report he was saying mama, dada and supporting weight on his legs at that time. Parents didn't do 2 month or 4 month shots, then showed up for 6 month vaccines at 5 mo of age. (at this visit noted to have normal development, rolling back to front and standing when placed, passing objects hand to hand and rake sand grasping small objects, sitting with support, no head leg with pull to sit) Got his shots, then shortly developed fever and cranky. Then developed congestion (1-2 weeks after). Were giving him Tylenol. Saw PMD, Dx otitis media, gave Amox. ("It was horrible he was really sick, he couldn't eat). There was one particularly bad night where he started: he started making weird movements. At night he would stiffen his arms behind his back, he would jerk his arms and his neck, sometimes at same time, sometimes one after another. Arms much more prominent than the head. Would do this minutes at a time. Dad would try to straighten his arms but they would snap back. He would do this when awake and asleep. No post-ictal.

Exhibit 1 at 194.  Evidently, Dr. Friedman reviewed some medical records because Dr. Friedman stated the first document showing abnormal neurologic symptoms is from August 2009, when Ms. Sanchez described a "2-3 month changes in development."  Id. at 194-95.  Dr. Friedman assessed T.S. as suffering from "global developmental delay and dystonia secondary to a presumptive diagnosis of biotin responsive basal ganglia disease."  Id. at 197.

Dr. Friedman ordered additional tests, including an EEG.  The EEG suggested seizures, but she did not recommend any treatment.  See Exhibit 1 at 182-82.

Dr. Friedman referred the family to a specialist in metabolic diseases, Fred Levine.  Exhibit 1 at 201-02 (Sep. 21, 2010).  The history of present illness that Dr. Levine obtained includes: "entirely normal until 6 months of age when had febrile illness associated with significant lethargy. Dating from that point, parents noted abrupt loss of developmental

---

[38] Both Ms. Sanchez and Ms. Roquemore persuasively deny that Ms. Roquemore facilitated the appointment with Dr. Friedman.  See Exhibit 56 ¶ 2; Supp'l Decl. at 2 n.2.

[39] A portion of the August 2, 2010 report was written by Jeffrey Gold.  However, the parties tend to refer to this medical record as written by Dr. Friedman.

milestones. They have considered vaccine reaction as a possibility but they recall also mentioning to their physician the possibility of West Nile virus infection." Id. at 201.

On November 5, 2010, an occupational therapist, Kenneth Latner, memorialized that T.S. "stopped progressing with gross motor skills after this illness and *began* shaking in bilateral extremities." Exhibit 246 at 1877 (emphasis added).

On December 7, 2010, T.S. was seen by pediatrician Valerie Wong. Dr. Wong obtained a history from Ms. Sanchez:

> [T.S.] received his vaccinations at 6 months of age. Prior to this, he had only received the hepatitis B vaccine. Mother believes the vaccines caused the patient's present state. At the same time, mother relates that the patient had a very high fever, greater than 103° F, for at least 4-5 days, during which he was miserable with coughing and a runny nose. At approximately 6 months of age, soon after the illness and the vaccinations, mother noted that the patient was no longer advancing in his milestones.

Exhibit 246 at 1873.

T.S. continued to see various doctors and receive medical treatments. On August 7, 2012, T.S. saw another doctor for the first time. Dr. Haas recorded:

> [T.S.] was perfectly normal until 6 month vaccines. Parents report he was saying mama, dada and supporting weight on his legs at that time. Parents didn't do 2 month or 4 month shots, then showed up for 6 month vaccines at 5 mo of age. (at this visit noted to have normal development, rolling back to front and standing when placed, passing objects hand to hand and rake sand grasping small objects, sitting with support, no head leg with pull to sit) Got his shots, then shortly developed fever and cranky. Then developed congestion (1-2 weeks after). Were giving him Tylenol. Saw PMD, Dx otitis media, gave Amox. The fever persisted and he had inconsolable crying. 11 days after the vaccination, he had an episode of 'contortion' in the upper limbs. He would stiffen his arms behind his back, he would jerk his arms and his neck, sometimes at same time, sometimes one after another.
>
> …
>
> After that time (about 7 months) he lost his head control for about 1-2 moonths, but then started getting it back. Arm stiffening continued high frequency for about 1 month. They tried Sinemet, which gave him dyskinesias. After 1.5 years, these dystonic episodes stopped.

44

> First note of abnormal development is in 8/09 at 12 months of age. Mother at this point notes a 2-3 month concern with changes in development.

Exhibit 26 at 1. Dr. Haas stated that "currently" T.S. was "making slow developmental progress." Id. at 2. His impression was that T.S. had "acute onset regression and dystonia at 6 months of age, following vaccination, which repeated with the next set of vaccines at 12 months." Id. at 3. "The next step would be for his muscle to be sent for mtDNA sequencing." Id.

Dr. Haas continued to see T.S. periodically. In due course, Dr. Haas ordered genetic tests. The results showed that T.S. has two genetic mutations. However, the Federal Circuit has already found that there is "no evidence [that T.S.'s] mutations would have resulted in the same progression and severity of his Leigh's syndrome absent the vaccine," and that "the government did not meet its burden to establish [T.S.]'s Leigh's syndrome was the result of factors unrelated to the vaccine." Sanchez v. Sec'y of Health & Hum. Servs., 34 F.4th 1350, 1356 (Fed. Cir. 2022). Furthermore, the production of the results of the genetic tests is not a basis for the Secretary's motion to reopen. Thus, the genetic issue plays no role in the outcome of the motion to reopen.

### 3.    Testimonial Assertions

As noted in section II.D above, Ms. Sanchez, Mr. Sanchez, and other family members testified about T.S.'s health during the critical time in the months after the February 2009 vaccination.

## D.    Assessment of All Evidence

Some evidence is reliable and entitled to a great deal of weight. Examples of evidence that is strong includes (1) the set of medical records created from February 2009 through May 2009 and (2) the set of medical records created from October 2009 and later in which a history was created. A chart summarizing key medical records from February 17, 2009 through August 7, 2012 is located in Appendix C. By way of contrast, the evidence in the form of testimonial assertions is not reliable and given much less weight.

### 1.    Medical Records Created within about Four Months of Vaccination

Medical records created contemporaneously with the events being described are often credited as accurate. Cucuras v. Sec'y of Health & Hum. Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, they are not presumptively complete. Despite their training, doctors may sometimes fail to record something. La Londe v. Sec'y of Health & Hum. Servs., 110 Fed. Cl. 184, 203 (2013), aff'd 746 F.3d 1334 (Fed. Cir. 2014). A medical record can also be incomplete because a patient does not communicate all information to the doctor. Kirby v. Sec'y of Health & Hum. Servs., 997 F.3d 1378, 1383 (Fed. Cir. 2021); La Londe, 110 Fed. Cl. at 203 (listing four explanations for inconsistencies between medical records and testimony).

Kirby presented a much different factual situation from the case at hand.  Christie Kirby alleged that an October 8, 2013 flu vaccine injured her shoulder or arm.  Kirby v. Sec'y of Health & Hum. Servs., No. 16-185V, 2019 WL 6336026 (Fed. Cl. Spec. Mstr. Nov. 1, 2019).  Ms. Kirby reported a problem within one week of the vaccination and, therefore, sought treatment for pain from October through November, including multiple sessions of physical therapy.  Id. at *4-6.  In December 2013, a doctor told her she had reached maximum medical improvement.  In January 2014, she told a doctor that she was "feeling fine."  Id. at *6, *19.  Ms. Kirby next told a doctor about shoulder pain in October 2015.  Id. at *6.

As part of her claim for compensation, Ms. Kirby was required to establish that her injury lasted more than 6 months.  42 U.S.C. § 300aa–11(c)(1)(D).  The special master found that her injury lasted more than 6 months based, in part, upon medical records that suggested that small problems persisted and, in part, upon Ms. Kirby's testimony.  Id. at *19-20.

The Secretary challenged this determination, and the Court granted the motion for review.  Kirby v. Sec'y of Health & Hum. Servs., 148 Fed. Cl. 530 (2020).  Relying, in part, upon Cucuras, the Court determined that the special master's finding that the injury persisted for more than six months was arbitrary and capricious primarily because of the January 2014 medical record in which Ms. Kirby said she was feeling fine.  Id. at 539-40.

Ms. Kirby appealed to the Federal Circuit.  The Federal Circuit reversed the opinion from the Court of Federal Claims and reinstated the special master's ruling finding entitlement.  Kirby v. Sec'y of Health & Hum. Servs., 997 F.3d 1378 (Fed. Cir. 2021).  The Federal Circuit reviewed Cucuras and stated that Cucuras does not stand for the proposition that "medical records are accurate and complete as to all the patient's physical conditions."  Id. at 1382.  Instead, there can be occasions when a medical record is incomplete.  The Federal Circuit provided an example: "A patient having a heart attack is not likely to mention his runny nose, nor is his physician likely to record it."  Id. at 1383.  The Federal Circuit, therefore, did not see much significance to the absence of complaints in the medical records from January 2014 to July 2015.

> Although these medical records are silent about the existence of any lingering symptoms, they are also silent about the nonexistence of such symptoms. . . . The silence can, moreover, be explained by the fact that Ms. Kirby had reached maximum medical improvement and thus exhausted all available treatment, . . . or that she was visiting the doctor for reasons unrelated to her vaccine injury.

Id. at 1383.

Based upon this analysis, the Federal Circuit ruled that a reasonable fact finder could credit Ms. Kirby's testimony that her injury lasted for longer than six months.  The Federal Circuit, therefore, reversed the Court of Federal Claims.  Id. at 1384.  After Kirby, the Court of Federal Claims has recognized that special masters may reject testimonial assertions as long as

the special master considers all evidence. Trinnaman v. Sec'y of Health and Hum. Servs., 171 Fed. Cl. 317, 325-26 (2024).

However, in some circumstances, a special master may weigh the absence of complaints in medical records differently. A prominent example is Bradley v. Sec'y of Health and Hum. Servs., in which Mrs. Bradley testified at a hearing before a special master that within days of vaccination, her daughter Rachel had a high temperature, lost her appetite and muscle tone, and had episodes of vacant staring and unresponsiveness. 24 Cl. Ct. 641, 642 (1991). Mrs. Bradley further testified that "she telephoned her doctor at least once to express her concern over Rachel's temperature and disposition. However, no visit was made to the doctor's office and no records substantiate[d] the events Mrs. Bradley described as having occurred in the three-day period immediately following" vaccination. Id. at 643.

In a bench ruling, the special master determined "that the absence of any contemporaneous recordation in Rachel's medical records of the events immediately following the January inoculation rendered suspect the accuracy of Mrs. Bradley's testimony concerning those events and impaired its believability." 24 Cl. Ct. at 644. The special master reasoned that the behaviors Mrs. Bradley recalled were too significant to go unrecorded. The special master stated:

> [I]f Ms. Bradley had ever given doctors the same description of Rachel's behavior in the three-day period that she now has given to me, a note of that description would be somewhere in the medical records here.
>
> I think that if in fact Rachel's behavior during the crucial three days had been as dramatic as Ms. Bradley testifies, that she had not been able to get the child's attention whatsoever, for a period of a minute or so a number of repeated times, that the child would have ended up at a doctor's [office].

Id. at 645. The special master found that the Bradleys had not established that Rachel suffered a Table injury. Id.

The Bradleys filed a motion for review, arguing in part that the special master's rejection of Mrs. Bradley's testimony ran counter to legislative intent that the Vaccine Program be a non-adversarial forum that administered awards quickly and easily. 24 Cl. Ct. at 644. The Court of Federal Claims rejected this argument and denied the motion, explaining that Congress's intent

> does not mean, however, that the special master must accept, without question, the testimony of a witness simply because that testimony stands unrebutted. The search for truth goes on whether the hearings are formal or not. Thus, the proper discharge of the fact-finding function requires that the truth of the testimony offered be evaluated not only in terms of a witness' demeanor but also by the probative force of attendant circumstances.

Id.  The Court stated that "the special master act[ed] within permissible bounds in rejecting Mrs. Bradley's testimony," as the decision was based on reasonable inferences.  Id.  "The special master's conclusion that the absence of any medical recordation of Rachel's post-inoculation symptoms was more telling than Mrs. Bradley's testimony was clearly reasonable given the dramatic nature of the symptoms claimed, the close medical attention that had been focused on Rachel since the time of her birth . . . and Mrs. Bradley's self-described preoccupation with her daughter's state of health . . . The rejection of Mrs. Bradley's testimony was a legitimate exercise of the special master's fact-finding function."  Id.

The case was then appealed to the Federal Circuit.  991 F.2d 1570 (Fed. Cir. 1993).  The Bradleys argued that the special master was arbitrary and capricious in relying on the absence of medical records, and also in rejecting Mrs. Bradley's testimony.  Id. at 1574-75.  The Federal Circuit affirmed, explaining that although a special master "may find the first symptom of an injury occurred within the applicable time frame, even if the occurrence of the symptom was not recorded," such a finding may not be made "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion."  Id. at 1574 (quoting 42 U.S.C. § 300aa–13(a)(1)).  The Federal Circuit determined that the special master "did consider the facts and circumstances involved in Mrs. Bradley's testimony, and his rejection of that testimony, in light of all its evidence, was not arbitrary and capricious."  Id. at 1575.

In the Sanchezes' case, from the date after the vaccination until the date of the first appointment with Ms. Marin-Tucker, T.S. saw three medical providers: Mr. Luna (Feb. 17, 2009), Dr. Seleem (Apr. 29, 2009), and Dr. Brown (May 13, 2009).  Exhibit 1 at 48-53.  None of these people documented a complaint about abnormal arm movements.  Thus, the April 10, 2013 Ruling Finding Facts found that T.S. was not experiencing arm contortions on February 17, 2009 when Mr. Luna saw him.  2013 WL 1880825, at *8 (findings 10-11).  The April 10, 2013 Ruling further found that between February and the April 29, 2009 appointment with Dr. Seleem, T.S. did not exhibit arm contortions.  Id. (finding 13).

The basic rationale was that if T.S. were contorting his arms as frequently as Ms. Sanchez was asserting in her written and oral testimony, then Ms. Sanchez would have told T.S.'s doctors and a doctor would have memorialized this complaint.  Id. at *5-6.  The Ruling Finding Facts noted that while a failure of *one* medical professional to memorialize a complaint could be reasonable, it is much less likely that three medical professionals did not document a complaint from Ms. Sanchez.  The undersigned further rejected the testimonial assertions of Ms. Sanchez and other family members because their memories dimmed with the passage of time.  Id. at *6.

The Federal Circuit in 2022 viewed the evidence differently, stating, "On the record before us, the only reasonable conclusion is that [T.S.]'s arm contortions continued after February 16 and were a symptom of a neurologic injury."  34 F.4th at 1353.  In reaching this conclusion, the Federal Circuit specifically noted that "the absence of a reference to a condition or circumstance is much less significant than a reference which negates the existence of the condition or circumstance."  Id. at 1355 n.5 (quoting Kirby v. Sec'y of Health and Hum. Servs., 997 F.3d 1378, 1383 (Fed. Cir. 2021) (internal quotation marks omitted)).

48

We now know that Ms. Sanchez and Ms. Roquemore violated the Vaccine Act's mandate to produce all post-injury medical records by failing to produce Dr. Brown's August 19, 2011 medical record. Dr. Brown's recollection entered into evidence in July 2023. Thus, until now, the record before all judicial officers, including the Federal Circuit in 2022, lacked this critical evidence. The newly discovered evidence from Dr. Brown answers the Federal Circuit's reasoning in that he contradicts Ms. Sanchez's account that she told him about T.S.'s abnormal arm movement. Dr. Brown described what he would have done if Ms. Sanchez had told him her son was posturing his arms. Dr. Brown would have "documented that in the chart." Exhibit T at 17. Dr. Brown would have also ordered an EEG. Id. Thus, Dr. Brown did "not believe that particular arm movement was brought to [his] attention." Id. Here, Dr. Brown's August 19, 2011 medical record effectively "negates" the testimony that Ms. Sanchez told Dr. Brown about abnormal arm movements.

Dr. Brown's August 19, 2011 medical record bears indicia of reliability. First, he memorialized Ms. Sanchez's complaint. Doctors and medical professionals are recognized to be trained to obtain accurate histories. See Cucuras v. Sec'y of Health & Hum. Servs., 26 Cl. Ct. 537, 543 (1992) ("It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred"), aff'd, 993 F.2d 1525, 1528 (Fed. Cir. 1993); Caron v. Sec'y of Health & Hum. Servs., 136 Fed. Cl. 360, 384 (2018) (denying motion for review and finding special master was not arbitrary in refraining from crediting testimonial assertions about problems not memorialized in medical records created contemporaneously); Candell v. Sec'y of Health & Hum. Servs., No. 11-729V, 2014 WL 341449, at *7 (Spec. Mstr. Fed. Cl. Jan. 6, 2014); Ruling Finding Facts, 2013 WL 1880825, at *6.

Second, Dr. Brown explained how he would have responded if Ms. Sanchez had told him about and shown him abnormal arm movements. In the undersigned's experience, Dr. Brown's plan is consistent with how doctors typically respond. Pediatricians are sensitive to infants possibly having seizures. Thus, EEGs are routinely ordered in this situation. During the December 3, 2025 oral argument, Attorney Roquemore acknowledged that Dr. Brown's proposed plan was "not out of left field." Tr. 4596. As the Secretary argued, Ms. Marin-Tucker's August 17, 2009 medical record is further evidence of how medical professionals respond when presented with accounts of infants moving unusually. See Resp't's Comp. Mot. at 20-21. After Ms. Sanchez told Ms. Marin-Tucker about T.S.'s delayed development, Ms. Marin-Tucker acted. Exhibit 1 at 54. Ms. Marin-Tucker did not ignore a mother's worry. Ms. Marin-Tucker referred the family to a neurologist. Exhibit 1 at 54; Tr. 92.

The evidence in the Sanchez case is very different from the facts in Kirby. A prominent distinguishing feature is that within a week of the start of the injury, Ms. Kirby promptly told a doctor about the onset of the pain and received treatment. This treatment continued until she reached maximum medical improvement. Thus, the special master could conclude that "feeling fine" reflected her usual state of health, which by January 2014, included nerve pain. In contrast, T.S.'s abnormal arm movements were (allegedly) new. When T.S. saw Dr. Seleem in April 2009 and Dr. Brown in May 2009, T.S. had not received any treatment for abnormal movements. It cannot have been a situation in which T.S. had reached maximum improvement and Ms.

49

Sanchez had adjusted to a different normal.  In Kirby, the Federal Circuit reasoned that a patient having a serious medical condition (a heart attack) is unlikely to tell a doctor about a trivial medical condition (a runny nose).  However, the scenario for T.S. seems to be the opposite.  The medical records from Dr. Seleem and Dr. Brown show that Ms. Sanchez brought her son to the doctor's office for relatively routine problems, such as congestion and an ear infection.  But, Ms. Sanchez is maintaining that she actually told the doctors about a potentially more serious condition---abnormal arm movements.  While it seems true that doctors and patients dealing with a heart attack are likely to overlook a runny nose, would people with a runny nose or their physicians overlook a heart attack?

The original determination in this case emphasized that if T.S. were having abnormal movements and if Ms. Sanchez told the doctors about them, the doctors would have written down her complaints.  See Ruling Finding Facts, 2013 WL 1880825, at *6 (Apr. 10, 2013).  Although that determination was based upon an inference (or assumption) that doctors memorialize significant reports of problems, such an inference (or assumption) is no longer necessary now (at least for Dr. Brown) because Dr. Brown has stated what he would do.  Exhibit T at 17.

Additionally, although the First Entitlement Decision credited the testimonial assertions that T.S. experienced one series of abnormal movements around the time of Ms. Sanchez's birthday, that finding was restricted to a single day.  At the time of the First Entitlement Decision, it appeared that Ms. Sanchez may not have communicated an abnormal arm movement to Mr. Luna because Ms. Sanchez did not appreciate the significance of the abnormal arm movement.  This lack of appreciation, in turn, explains why Mr. Luna's medical record does not memorialize any complaints about abnormal arm movements.

The change in one fact (T.S. had an isolated set of abnormal arm movements) in the First Entitlement Decision did not create a wave of other new findings.  The First Entitlement Decision was consistent with the April 20, 2013 Ruling Finding Facts in finding that T.S. did not have abnormal arm movements in April when he saw Dr. Seleem or in May when he saw Dr. Brown.  At the time of the First Entitlement Decision, Ms. Sanchez's testimonial assertions that (a) T.S. was having 5-10 abnormal arm movements per day for multiple weeks, (b) she told Dr. Brown and Dr. Seleem about the arm movements, and (c) the doctors neglected to write down the complaints and failed to respond to complaints about abnormal arm movements seemed unlikely.  Now, with a complete record, Dr. Brown's August 19, 2011 medical record further substantiates the consistent finding that T.S. had not been experiencing abnormal arm movements in March, April, or early May 2009.

In attempting to minimize the evidentiary value of Dr. Brown's August 19, 2011 record, Mr. and Ms. Sanchez offer various criticisms, but these criticisms are not persuasive.  Initially, Mr. and Ms. Sanchez contended that Dr. Brown's statement in August 2011 about what he would have done (order an EEG) had he been told in May 2009 that T.S. was moving his arm abnormally was speculative.  Pet'rs' Comp. Resp., filed May 9, 2024, at 30-31.  But, during oral argument, this point was largely withdrawn.  Tr. 4596.  Dr. Brown's statement about what he would have done is not speculative in the sense that Dr. Brown is talking about his own activities.  By way of contrast, Dr. Brown might be speculative if he stated what other

50

pediatricians would have done.  Dr. Brown is qualified to write about how he practices medicine and is knowledgeable about how he responds to complaints about an infant's unusual movements.  Thus, during the oral argument, Mr. and Ms. Sanchez moved away from describing Dr. Brown's August 19, 2011 medical record as speculative and rather characterized it as "self-serving."  Tr. 4596.  This critique is based, in part, on Ms. Sanchez's opinion that Dr. Brown was an uncaring doctor, which is based upon her interactions with Dr. Brown on either two or three occasions.  Regardless of how Ms. Sanchez perceived Dr. Brown, there is little persuasive evidence to find that his treatment of T.S. was inappropriate in any way.  As mentioned, Dr. Brown's hypothetical plan to order an EEG was reasonable.  See Tr. 4596 (Ms. Roquemore: "not out of left field").  The reasonableness of Dr. Brown's plan for an EEG reinforces Dr. Brown's reliability because it shows a basic competence in how to respond to (alleged) complaints about abnormal movements in infants.

Accordingly, Dr. Brown's August 19, 2011 letter is strong, direct, and probative evidence that Ms. Sanchez did not tell him in May 2009 that T.S. was moving his arms abnormally.  From this finding, it is a relatively short step to infer that the reason Ms. Sanchez did not tell Dr. Brown that her son was having abnormal arm movements in May 2009 is because T.S., in fact, was not moving his arm movements abnormally.  This reasoning has been accepted as not arbitrary numerous times, including by the Federal Circuit in Bradley.  See also Britt v. Sec'y of Health and Hum. Servs., No. 17-1352V, 2021 WL 4282596, at *2 (Fed. Cl. Spec. Mstr. Aug. 27, 2021) (citing cases).

### 2.    Medical Records Containing Histories

After the appointment with Ms. Marin-Tucker on October 7, 2009, T.S. saw other medical professionals and several (but not all) of these records are new.  Despite some minor inconsistencies, one story repeats.  Ms. Sanchez told multiple medical providers that T.S. got his vaccinations, got sick for weeks, and then started having problems.  For example, in a newly produced document, a physical therapist (Lisa Hwang) memorialized that "Mom states [patient] was developing normally until immunizations @ 6 mo; got infection & was not the same since."  Exhibit 326 at 43 (Oct. 27, 2009).  Ms. Hwang repeats this account in her February 11, 2010 record.  Id. at 49.  During the December 3, 2025 oral argument, the Secretary's attorney, Ms. Reynaud, highlighted that Ms. Hwang did not mention any unusual arm movements in her chronology.  Tr. 4556.  Ms. Roquemore characterized the record as "cumulative," and argued that a provider like Ms. Hwang who "is not highly trained like the specialists is . . . kind of writing stuff down and . . . it's not necessarily a chronology, but just kind of a set of what's being reported."  Tr. 4556-57.  She stated that the record was "not precise" and further questioned whether the "since" referred to the time since T.S. received the vaccines or since T.S. had a cold.  Tr. 4557-59.

This account recorded by Ms. Hwang also appears in an email that Mr. Sanchez and Ms. Sanchez composed to Dr. Gusella on June 3, 2010.  Exhibit U at 771.  This document is also new.  The purpose of this email was to request that Dr. Gusella, who has expertise in treating biotin deficiencies, provide a second opinion.  Tr. 4078.  In introducing themselves, Mr. and Ms. Sanchez described what happened to T.S.:

> We first noticed something was [amiss] when he missed some important developmental milestones like sitting up and crawling. Then at around six months old he got sick with a cold followed by an ear infection and congestion that lasted about a month. When we took him to the doctor they told us he was normal but we suspected something was wrong. When he finally did get better he wasn't quite the same. He began to clinch his hands and hold his arms in strange positions behind his back. He also started to have little fits of seizures. Little twitches of his body that I could tell he wasn't controlling.

Exhibit U at 771. An important aspect to this chronology is that after recovering from the infection, T.S. "wasn't quite the same. He began to . . . hold his arms in strange positions behind his back." Id.

When asked about this document in 2025, Ms. Sanchez averred that some portions of the story were told out of order. Tr. 4170. This June 2, 2025 testimony is consistent with how Mr. and Ms. Sanchez responded to the Secretary's motion to reopen. See Pet'rs' Resp. to Mot. to Reopen, filed Sep. 6, 2023, at 30-32. But, when asked to explain the correct sequence of events, Ms. Sanchez testified that T.S. "got his six-month shots and then he got sick and then he started losing milestones." Tr. 4171. She also confirmed that the strange arm movements followed getting sick. Tr. 4172. This testimony is, more or less, consistent with the chronology presented in the Sanchezes' email to Dr. Gusella.[40]

Another account, albeit from a document that has been included in the record since May 7, 2012, is similar. On February 22, 2010, because Mr. and Ms. Sanchez thought T.S. might possibly have a biotin-responsive basal ganglia disease, they consulted a pediatric geneticist, Katrina Dipple. Exhibit 16; see also Tr. 4038. As part of a lengthy "history of present illness," Dr. Dipple memorialized that

---

[40] The discrepancy between petitioners' arguments and Ms. Sanchez's testimony demonstrates the value in receiving oral testimony. See Anaheim Gardens v. United States, No. 93-655C, 178 Fed. Cl. 155, 2025 WL 3687946, at *3-4 (Dec. 19, 2025) (denying a motion for summary judgment when the credibility of affiants was challenged). As part of the briefing process, the Secretary noted that petitioners' argument that the Gusella email presented a series of events that were out of order was not supported by an affidavit. Resp't's Reply, filed Sep. 18, 2023, at 5. Then, when Ms. Sanchez was questioned about the Gusella email, her testimony confirmed the facially apparent chronology in the email: T.S. got vaccinated, got sick, and then started making abnormal arm movements and losing milestones. Tr. 4171-72. During the December 3, 2025 oral argument, Ms. Roquemore was not able to address Ms. Sanchez's testimony. Tr. 4578.

> Around 6 months of age, [T.S.] was congested for about 4 weeks.[41] Parents noted around this time, he started having contortions of his arms which included twisting and turning backwards, the arms were very stiff, this would come and go and last minutes to hours.

Exhibit 16 at 2. Although questioned about this document, Ms. Sanchez's testimony did not add much. See Tr. 4041. At best, Ms. Sanchez testified that she did not recall telling Dr. Dipple that the arm contortions occurred in conjunction with the congestion. Tr. 4166.

Another newly produced medical record also reflects this same story. On November 5, 2010, an occupational therapist, Kenneth Latner, memorialized that T.S. "stopped progressing with gross motor skills after this illness and *began* shaking in bilateral extremities." Exhibit 246 at 1877 (emphasis added). When asked about Mr. Latner's medical record during the oral argument, Ms. Roquemore did not have "any additional thoughts." Tr. 4588.

Thus, at least three people memorialized accounts from Ms. Sanchez that T.S. was sick for weeks and then declined. These are Physical Therapist Hwang, Dr. Dipple, and Occupational Therapist Latner. It seems unlikely that all three medical professionals would have written down a history inaccurately. The likelihood of multiple errors is decreased by the Gusella email that Mr. Sanchez and Ms. Sanchez wrote. Their account, too, was that T.S. became sick and then developed problems. Notably three of these four sources were filed into evidence in 2023 or later. The consistency in the reports given to Physical Therapist Hwang, in the report given to Occupational Therapist Latner, and in the Gusella email reinforces the history given to Dr. Dipple. The same history given to four people is stronger evidence than evidence given in a single history.

To counter these newly produced medical records, Mr. Sanchez and Ms. Sanchez rely upon records that were produced in 2011 and 2012. See Pet'rs' Comp. Resp, at 22-27. The most important sources are Dr. Michelson, Dr. Dipple, Dr. Friedman, and Dr. Haas. During the December 3, 2025 oral argument, Ms. Roquemore stated that these medical records associated the onset of T.S.'s abnormal movements with his mother's birthday, which is in February. Tr. 4547. The four medical records on which Mr. and Ms. Sanchez rely are taken up in chronological order, starting with the earliest:

Dr. Michelson. The family saw Dr. Michelson on November 12, 2009, upon the referral from Ms. Micaela-Tucker. Exhibit 1 at 140. In terms of T.S.'s medical history, Dr. Michelson memorialized a report that he "previously held his right arm stiffly behind him episodically, he does not do this lately." Id.

---

[41] The illness with congestion that lasted for about four weeks actually was from April 2009 to May 2009, when Dr. Seleem and Dr. Brown saw T.S.

This information from Dr. Michelson confirms that T.S. had, at some time before November 12, 2009, moved his arm abnormally.  In this sense, Dr. Michelson's medical record is important.  However, on the question as to when did T.S. *begin* to move his arm abnormally, Dr. Michelson's report provides no information.

During oral argument, Ms. Roquemore acknowledged that Dr. Michelson's report does not refer to abnormal movements starting around Ms. Sanchez's birthday.  Tr. 4560-61.  Thus, the first medical record Ms. Roquemore identified does not stand for the proposition for which the medical record was cited.

Dr. Dipple.  Dr. Dipple, who is a geneticist, created two medical records: the first on February 22, 2010 and the second on May 10, 2010.  Exhibit 16, Exhibit 1 at 82-84.  In the earlier medical record, Dr. Dipple documented a report from T.S.'s parents that "Around 6 months of age, [T.S.] was congested for about 4 weeks. Parents noted around this time, he started having contortions of his arms which included twisting and turning backwards, the arms were very stiff."  Exhibit 16 at 2.  The latter medical record discusses T.S.'s progress after the earlier visit.

Dr. Dipple's February 22, 2010 medical record is consistent with a chronology in which T.S.'s abnormal arm movements started around the time of the infection lasting four weeks.  The medical records from Dr. Seleem and Dr. Brown show that the infection was in April-early May 2009.  Admittedly, the history that Dr. Dipple memorialized on February 22, 2010 is not perfectly consistent with the Dr. Seleem and Dr. Brown records in that Dr. Dipple's history says that T.S. was congested at "[a]round 6 months of age."  Actually, T.S. was approximately eight to nine months old when he was sick for about four weeks.  But the more important piece of information is that Mr. and Ms. Sanchez told Dr. Dipple that the arm movements occurred in the context of congestion, and not in the context of his vaccination.

In oral argument, Ms. Roquemore focused on the portion of Dr. Dipple's medical record that refers to a problem when T.S. was about six months old.  Tr. 4565.  Ms. Roquemore acknowledged that Dr. Dipple's records do not mention Ms. Sanchez's birthday, but expected more precision in the record from Dr. Friedman, which is discussed next.  Id.

Dr. Friedman.  It appears that Mr. and Ms. Sanchez may have located Dr. Friedman, a neurologist, from their email to Dr. Gusella.  Regardless of how they found Dr. Friedman, Mr. and Ms. Sanchez took T.S. to see her on August 2, 2010.  Exhibit 1 at 194-99.

Relevant portions of the sequence of events in the history that Dr. Friedman obtained include:

> [T.S.] was perfectly normal until 6 month vaccines.  Parent[s] report he was saying mama, dada and supporting weight on his legs at that time.  Parents didn't do 2 month or 4 month shots, then showed up for 6 month vaccines at 5 mo of age. (at this visit noted to have normal development, rolling back to front and standing when placed, passing objects hand to hand and rake sand grasping

54

> small objects, sitting with support, no head leg with pull to sit) Got
> his shots, then shortly developed fever and cranky. Then developed
> congestion (1-2 weeks after). Were giving him Tylenol. Saw PMD,
> Dx otitis media, gave Amox. ("It was horrible he was really sick,
> he couldn't eat["]). There was one particularly bad night where he
> started: he started making weird movements.

Exhibit 1 at 194.  The key events are: T.S. "[g]ot his shots, then shortly developed fever and [was] cranky.  Then developed congestion.  Saw [primary medical doctor] [diagnosed with] otitis media."  Then, T.S. made abnormal movements.

The story reflected in Dr. Friedman's August 2, 2010 medical record resembles the story presented in Dr. Dipple's February 22, 2010 medical record.  In both accounts, the information about the arm movements follows information about congestion.  Dr. Friedman's August 2, 2010 medical record is also similar to Dr. Dipple's medical record in the sense that the onset of the infection is reported slightly mistakenly.  Although Dr. Friedman memorialized a statement that the congestion started "1-2 weeks after" his vaccination, Dr. Seleem's April 29, 2009 medical record says that T.S. had suffered a cough and congestion for two weeks.  Exhibit 1 at 50-52.

Dr. Friedman's August 2, 2010 medical record does not suggest that T.S.'s abnormal arm movements started in February 2009.  In oral argument, Ms. Roquemore acknowledged that Dr. Friedman's medical record does not mention Ms. Sanchez's birthday.  Tr. 4582-83.  This is the third example in which Ms. Roquemore asserted a medical record links the onset of T.S.'s arm movements to Ms. Sanchez's birthday but the medical record does not support this assertion.

Dr. Haas.  The final medical record that was produced during the entitlement phase of the litigation and on which Mr. and Ms. Sanchez rely to counter the Secretary's argument that the recently produced medical records contain new information is from Dr. Haas.  See Pet'rs' Comp. Resp, at 22-27.  The first visit with Dr. Haas occurred on August 7, 2012.  Exhibit 26 at 1.  Thus, this medical record differs from the records created by Dr. Michelson, Dr. Dipple, and Dr. Friedman in the sense that Mr. and Ms. Sanchez had sought compensation from the Vaccine Program before they saw Dr. Haas in 2012.

Dr. Haas recorded a history that states in part:

> [T.S.] was perfectly normal until 6 month vaccines.  Parents report
> he was saying mama, dada and supporting weight on his legs at
> that time.  Parents didn't do 2 month or 4 month shots, then showed
> up for 6 month vaccines at 5 mo of age. (at this visit noted to have
> normal development, rolling back to front and standing when
> placed, passing objects hand to hand and rake sand grasping small
> objects, sitting with support, no head leg with pull to sit) Got his
> shots, then shortly developed fever and cranky. Then developed
> congestion (1-2 weeks after). Were giving him Tylenol. Saw PMD,
> Dx otitis media, gave Amox. The fever persisted and he had
> inconsolable crying.  11 days after the vaccination, he had an

> episode of 'contortion' in the upper limbs.  He would stiffen his arms behind his back, he would jerk his arms and his neck, sometimes at same time, sometimes one after another.

Exhibit 26 at 1.

Of all the medical records, Dr. Haas's August 7, 2012 medical record is probably the most consistent with the account that Mr. and Ms. Sanchez assert through their affidavits.  For example, Dr. Haas memorialized that "11 days after the vaccination, [T.S.] had an episode of 'contortion' in the upper limbs."  Exhibit 26 at 1.  Given that Dr. Brown's record documented T.S.'s receipt of vaccinations on February 5, 2009 (Exhibit 1 at 44), Dr. Haas's medical record means that T.S. started having arm contortions on February 16, 2009.

The historical information presented in Dr. Haas's August 7, 2012 medical record merits little weight for several reasons.  First, Mr. and Ms. Sanchez told Dr. Haas in August 2012 about events that (supposedly) happened in February 2009, which is a difference of more than two years.  Thus, Dr. Haas's August 7, 2012 medical record is not a contemporaneous account about what happened in February 2009.  See Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 532, 539-40 (2011) (defining contemporaneous and stating a medical record created about a year later is not contemporaneous with the events it described), recons. denied after remand on other grounds, 105 Fed. Cl. 353 (2012), aff'd without op., 503 F. App'x 952 (Fed. Cir. 2013).

Second, the history that Dr. Haas obtained (T.S. started having arm contortions around February 16, 2009) is inconsistent with the medical records created by Mr. Luna, Dr. Seleem, and Dr. Brown.  These medical records do not memorialize complaints about arm contortions.  As a matter of logic, it is conceivable that either (a) Ms. Sanchez did not tell three medical professionals that her son was making abnormal arm movements or (b) Ms. Sanchez told a medical professional about the abnormal arm movements and the medical professional declined to write down the complaint and further declined to respond to this complaint.  However, the likelihood of scenario (a) or (b) being accurate is remote, especially because three different medical professionals were involved.  The possibility is even more unlikely because Dr. Brown described how he would have reacted to learning that T.S. was making abnormal movements.  See Exhibit T at 17.

Third, the history that T.S. began having arm contortions "11 days after the vaccination," (Exhibit 26 at 1) is oddly specific.  The specificity differs from the information presented in Dr. Dipple's February 22, 2010 medical record and Dr. Friedman's August 2, 2010 medical record.  See Exhibit 1 at 82-84, 194-99.  Neither of those two accounts suggest that T.S. started having abnormal movements in February 2009, let alone exactly "11 days" after the vaccination.  In this respect, the possibility that litigation influenced how Ms. Sanchez remembered events cannot be discounted.  See Martin v. Sec'y of Health & Hum. Servs., No. 22-109V, 2025 WL 1456807, at *8 (Fed. Cl. Spec. Mstr. Apr. 21, 2025) (stating "Judicial officers have long recognized that participation in litigation may impair the accuracy of a person's memory" and citing cases); McCabe v. Sec'y of Health and Hum. Servs., No. 13-570V, 2018 WL 3029175, at *45-46 (Fed. Cl. Spec. Mstr. May 17, 2018) (refraining from crediting testimony from petitioner about unrefreshing sleep that was presented after petitioner filed a report from an expert asserting

petitioner suffered from chronic fatigue syndrome); Doe/05 v. of Health & Hum. Servs., No. redacted, 2007 WL 5187610, at *28 (Fed. Cl. Spec. Mstr. July 30, 2007) (crediting medical records created contemporaneously over testimony given "when memories have faded and the impetus to succeed in litigation may cloud memories or conflate events").

Moreover, the history that Dr. Haas obtained on August 7, 2012 is remarkably similar, nearly word-for-word, to the history that Dr. Friedman obtained on August 2, 2010. Compare Exhibit 26 at 1 with Exhibit 1 at 194. However, it is not exactly the same, and is therefore not the result of some sort of copying / pasting or sharing between the two offices. The primary difference is that the history given to Dr. Hass approximately two years after the history to Dr. Friedman contains the detail that the arm contortions started "11 days" after the vaccination. How these two doctors created histories with almost exactly the same wording is not readily apparent. See Tr. 4605 (special master discussing cross-examination during the trial for the Triangle Shirtwaist Fire Disaster).

Accordingly, although Dr. Haas's memorialization of a history in which T.S.'s arm movements began 11 days after vaccination provides a modicum of support to the claims of Mr. and Ms. Sanchez, the value of Dr. Haas's history is outweighed by other evidence. This other evidence includes, but is not necessarily limited to, Dr. Brown's May 13, 2009 medical record; the records of Physical Therapist Hwang; Dr. Dipple's February 22, 2010 medical record; Dr. Friedman's August 2, 20210 medical record; Occupational Therapist Latner's November 6, 2011 medical record; and the June 3, 2010 email to Dr. Gusella.

### 3. Family Members' Testimony

A final category of evidence is the testimonial assertions of T.S.'s family members. Testimony from people with direct knowledge of events constitutes a form of evidence. James-Cornelius v. Sec'y of Health & Hum. Servs., 984 F.3d 1374, 1380 (Fed. Cir. 2021). Special masters are expected to consider testimony in finding facts. See, e.g., Kirby, 997 F.3d at 1384; Cucuras, 993 F.2d at 1528 (noting "the special master heard and considered petitioner's testimony"); Bradley, 991 F.2d at 1575 (stating "the special master did consider the facts and circumstances involved in Mrs. Bradley's testimony, and his rejection of that testimony, in light of all of the evidence, was not arbitrary and capricious").

This group of family members includes T.S.'s father; his paternal grandmother, Lupe Sanchez; his paternal great-aunt, Bertha Sanchez; and his maternal grandmother, Emma Fernandez. But, the most knowledgeable person is his mother, Jennifer Sanchez. Ms. Sanchez's testimony that T.S. began having arm movements in February 2009 is not persuasive for two reasons.

> a) *Ms. Sanchez's Testimonial Account about the Onset of Arm Movements is Inconsistent with Other Evidence*

On the critical issue of when T.S. began persistent abnormal arm movements, Ms. Sanchez's testimony is not persuasive because her words are inconsistent with her actions. Ms. Sanchez showed concern, devotion, and love for T.S. when she brought him to both Dr. Seleem

and Dr. Brown for an ear infection that did not resolve within about two weeks.  See Exhibit 1 at 50-52 (April 29, 2009) and at 53 (May 13, 2009).  Ms. Sanchez testified that starting in mid-February and continuing for several months, T.S. was moving his arm abnormally 5-10 times per day.  Tr. 77; see also Tr. 89 (Ms. Sanchez: between the visit with Dr. Brown and the baby shower, T.S. had abnormal arm movements every day).  If this were accurate and assuming, for sake of simplicity, that the number is 7 times per day, then by time Ms. Sanchez brought T.S. to Dr. Brown on May 13, 2009, he would have experienced approximately 600 episodes of arm contortion for which he had received no medical treatment.[42]  Would a concerned, devoted, and loving mother fail to tell a doctor?  And if the first doctor ignored her complaints, would she not then seek the help of a different provider?

In the May 15, 2012 fact hearing, Ms. Sanchez testified that she discussed T.S.'s arm movements with three people.  Tr. 75, 116 (both discussing Mr. Luna), 80, 117 (both discussing Dr. Seleem), Tr. 86, 118 (both discussing Dr. Brown); see also Tr. 125 (Ms. Sanchez's testimony that by August 2009, she had told 3-4 doctors about arm movements, but they had done nothing).  In June 2025, her testimony was similar.  She testified that she told everyone that T.S.'s arm movements started in February.  Tr. 4168-69; see also Tr. 4052 ("There's multiple records that . . . don't memorialize a lot of things").  In this context, Ms. Sanchez repeatedly stated that she did not tell just some medical providers about T.S.'s arm movements, but that she told "everybody."  For Ms. Sanchez's testimony that T.S. started having arm contortions in February and that she told all of his medical provides about the arm contortions to be accurate, then multiple medical professionals failed to memorialize a complaint about arm contortions.  The list includes:

Mr. Luna and nurses at this practice,

Dr. Seleem,

Dr. Brown,

Ms. Marin-Tucker (twice),

Ms. Cunningham, the occupational therapist, and

Ms. Hwang, the physical therapist.

The absence of notation about arm movements in medical records created by six medical professionals seems to have two possibilities.  Which is more likely --- either (1) Ms. Sanchez did not tell the medical professionals about abnormal arm movements or (2) six medical professionals did not memorialize a complaint?

In oral argument, Ms. Roquemore argued that more weight should be given to records created by doctors, as opposed to medical professionals who are not doctors such as physician's

---

[42] From February 16, 2009 to May 13, 2009 is 86 days.  86 days times 7 abnormal arm movements per day = 602 abnormal arm movements.

assistants or therapists. Tr. 4547. In this context, Ms. Roquemore was contending that the medical records created by the medical doctors, Dr. Michelson, Dr. Dipple, Dr. Friedman, and Dr. Haas, were reliable in that they connected T.S.'s arm movements with Ms. Sanchez's birthday. Tr. 4547. In point of fact, as demonstrated above, none of these medical records use the term "birthday." The only medical record that is consistent with an onset of abnormal movements in February 2009 is Dr. Haas's August 7, 2012 medical record. Exhibit 26 at 1. But, the history given to Dr. Haas seems influenced by the pending litigation. Moreover, in the undersigned's experience, medical professionals other than doctors (like a physical therapist) sometimes record more information about a patient's history, perhaps because a physical therapist has more time to spend with the patient. Thus, there is not a persuasive reason for discounting records created by Mr. Luna, Ms. Marin-Tucker, Ms. Cunningham, and Ms. Hwang simply because they are not medical doctors.

### b)      Ms. Sanchez's Credibility Has Been Impeached

A basic function of finders of fact, such as special masters, is to consider the credibility of witnesses. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379 (Fed. Cir. 2009) (stating a "trial court makes a credibility determination in order to assess the candor of a fact witness"); see also Erb v. Dep't of the Treasury, No. 2021-1756, 2024 WL 1110340 at (Fed. Cir. Jan. 24, 2024) (holding that Merit System Protection Board's credibility determinations were not arbitrary where Board "provided sufficient reasoning for generally giving little weight to Mr. Erb's testimony by referring to his demeanor during the hearing, citing discrepancies in his testimony, and explaining why his testimony 'contained improbabilities'"); MobileMedia Ideas LLC v. Apple Inc., 780 F.3d 1159, 1168 (Fed. Cir. 2015) (stating that a "jury is permitted to make credibility determinations and believe the witness it considers more trustworthy"). Here, events after the Federal Circuit's second remand in 2022 have undermined Ms. Sanchez's credibility. See Tr. 4615.

Discovery of Failure to Produce Dr. Valencia's Record, see 2025 WL 3004761;

Discovery of Failure to Produce Dr. Brown's Record, see 2025 WL 3004761;

Discovery of Error in Earlier Testimony

At the earliest stages of this litigation, Ms. Roquemore and Ms. Sanchez planned to attempt to neutralize some of the most important evidence weighing against the claim that the February 2009 vaccinations harmed T.S. --- Dr. Brown's May 2009 medical record, which did not memorialize arm contortions, and Ms. Marin-Tucker's August 2009 medical record, which placed the onset of developmental delay at least three months after the vaccination. Their plan was to seek clarification (or revision) of these medical records.

Seeking a revision is not necessarily wrong. Patients are permitted to seek amendment to their medical records. 45 C.F.R. § 164.526.

However, Ms. Sanchez erred when she failed to produce the fruits of her efforts---Dr. Valencia's August 6, 2011 medical record and Dr. Brown's August 19, 2011 medical record. As

discussed extensively above, (1) petitioners in the Vaccine Program are required to produce all medical records and (2) Dr. Valencia and Dr. Brown created medical records in 2011.  Thus, (3) Ms. Sanchez should have produced them.

Ms. Sanchez's and Ms. Roquemore's determination to cover up these medical records appears to have contributed to inaccurate testimony during the May 12, 2012 fact hearing.  Ms. Sanchez testified that she brought T.S. to see Dr. Brown on May 13, 2009, and during this appointment, she told Dr. Brown "about the weird movement, the contortion of the arm."  Tr. 85.  But, Dr. Brown allegedly frustrated Ms. Sanchez because he did not act on her complaint.  In this context, Ms. Sanchez testified that she "was never going there again."  Tr. 86.  Ms. Roquemore reinforced this testimony by stating that Ms. Sanchez "saw Dr. Brown in May, never to see him again."  Tr. 90.

Due to the Secretary's subpoena in 2023, the record now contains evidence that shows Ms. Sanchez and her son saw Dr. Brown after May 13, 2009.  More specifically, Ms. Sanchez sought assistance from Dr. Brown in changing his medical record on August 19, 2011.  Exhibit T at 17-18.  The inconsistency between what Ms. Sanchez said (never seeing Dr. Brown after May 2009) and what Ms. Sanchez did (seeing Dr. Brown on August 24, 2011) diminishes her credibility as a witness.

Mr. and Ms. Sanchez's attempts to smooth out this inconsistency were ineffective.  They contend that in her oral testimony on May 13, 2009, "Mrs. Sanchez was speaking about not seeing Dr. Brown for further treatment of her son."  Pet'rs' Resp. to Mot. for Sanctions, filed Nov. 6, 2024, at 9.  To Mr. and Ms. Sanchez, there is a difference between seeing a doctor for medical treatment and seeing a doctor for correction of a medical record.

This differentiation is unpersuasive for two reasons.  First, the asserted specificity regarding medical treatment is not found in the relevant passages from the May 13, 2009 hearing.  Ms. Sanchez did not testify: "I planned never to see Dr. Brown for medical treatment." Instead, she said she "was never going there again."  Tr. 86.  Likewise, Ms. Roquemore did not say that Ms. Sanchez "never returned to Dr. Brown for medical treatment."  In effect, the argument in opposition to the motion to sanctions adds words to the transcript.

Second, on August 11, 2011, Dr. Brown *did* provide medical treatment to T.S.  Exhibit T at 17-18.  Admittedly, the primary purpose of this visit was not for medical treatment and the medical treatment was not extensive.  However, Dr. Brown obtained a history, examined T.S., and commented on his condition.  Id.  Thus, even if purported distinction between records memorializing medical treatment and records documenting requests to revise medical records were valid--which is a questionable proposition--Dr. Brown's August 11, 2011 record is a medical record.

Under these circumstances, Ms. Sanchez's written testimony (affidavits) and oral testimony that T.S. began to develop abnormal arm movements in February 2009 is not credible. On this topic, her honesty has been so undermined that she is not a reliable witness.[43]

In this regard, Ms. Sanchez resembles a key witness from <u>Vant Erve</u>, the neurologist who treated the child-vaccinee, Dr. Mathisen. In the order denying the Secretary's motion to reopen entitlement, the special master found "no evidence of bad faith on the part of petitioners or Dr. Mathisen." <u>Vant Erve v. Sec'y of Health & Hum. Servs.</u>, No. 92-341V, 1997 WL 383144, at *13 (Fed. Cl. Spec. Mstr. June 26, 1997). But, as noted above, the choice not to reopen entitlement was reversed and the case was remanded. <u>Vant Erve</u>, 39 Fed. Cl. 607. Upon remand, the special master found that Dr. Mathisen's credibility was reduced. One reason was that "some of the statements made by Dr. Mathisen in the first evidentiary hearing . . . seem suspect in light of other statements that he had made in medical records that actually were already in existence prior to that hearing, but had not at that time found their way into the evidentiary record." <u>Vant Erve v. Sec'y of Health & Hum. Servs.</u>, No. 92-341V, 1998 WL 887126, at *6 (Fed. Cl. Spec. Mstr. Dec. 3, 1998). The decision denying compensation was sustained. <u>Vant Erve v. Sec'y of Health and Hum. Servs.</u>, 43 Fed. Cl. 338, 344 (1999) (noting special master's "misgivings" about Dr. Mathisen's testimony), <u>aff'd in non-precedential opinion</u>, 232 F.3d 914 (table), 2000 WL 425005 (Fed. Cir. 2000).

Thus, although the undersigned was reluctant to find---and did not find---that Ms. Sanchez testified untruthfully in the May 15, 2012 fact hearing, the situation has now changed. Much like the discovery of new evidence prompted the special master to reassess Dr. Mathisen's credibility in <u>Vant Erve</u>, so, too, the discovery of litigation misconduct influences the weight to be given to Ms. Sanchez's testimony about when T.S.'s abnormal arm movements began.

### c)   *Testimony of Other Family Members*

In the December 3, 2025 oral argument, Ms. Roquemore suggested that if Ms. Sanchez's testimony were found not credible, then the testimony of Mr. Sanchez could fill this gap. Tr. 4616. To some extent, this argument is fair. Although there is clear and convincing evidence that Ms. Sanchez engaged in litigation misconduct, Mr. Sanchez has not been implicated. Usually, the acts of wife are not imputed to the husband. Thus, Mr. Sanchez's honesty as a witness has not been impeached as Ms. Sanchez's has been.

Nonetheless, Mr. Sanchez's written testimony (Exhibit 4 ¶¶ 6-12) and oral testimony (Tr. 175-98) that T.S.'s arm contortions began in February 2009 and continued for several months is not credited. Special masters have sometimes rejected testimony that is not consistent with medical records created contemporaneously because of concerns about the accuracy of the

---

[43] On the other hand, when asked about the email to Dr. Gusella that Ms. Sanchez wrote in 2010, Ms. Sanchez acknowledged the correctness of the chronology in which T.S.'s multi-week illness preceded the onset of abnormal arm movements. Exhibit U at 771; Tr. 4171-72. The email is credited as reliable.

recollection, not the witness's honesty.  See Hodge v. Sec'y of Health & Hum. Servs., No. 09-453V, 2023 WL 4186513, at *71 (Fed. Cl. Spec. Mstr. May 24, 2023), mot. for rev. denied, 168 Fed. Cl. 117 (2023); Barnett v. Sec'y of Health & Hum. Servs., No. 19-1578V, 2021 WL 6211590, at *6 (Fed. Cl. Spec. Mstr. Dec. 10, 2021); Duda v. Sec'y of Health & Hum. Servs., No. 19-31V, 2021 WL 4735857, at *8 (Fed. Cl. Spec. Mstr. Aug. 10, 2021); Mueller v. Sec'y of Health & Hum. Servs., No. 06-775V, 2011 WL 1467938, at *9 (Fed. Cl. Spec. Mstr. Mar. 16, 2011); Velchek v. Sec'y of Health & Hum. Servs., No. 02-1479, 2005 WL 2847451, at *17 (Fed. Cl. Spec. Mstr. Oct. 28, 2005); Bradley v. Sec'y of Health & Hum. Servs., 24 Cl. Ct. 641, 642 (1991), aff'd, 991 F.2d 1570 (Fed. Cir. 1993).  Mr. Sanchez's testimony that T.S. started to contort his arm and continued to contort his arm multiple times per day every day for months is implicitly contradicted by the medical records of Mr. Luna, Dr. Seleem, and Dr. Brown.  Mr. Sanchez's testimony is also contradicted by the histories presented in medical records from Ms. Hwang, Dr. Dipple, and Dr. Friedman that state that T.S. deteriorated after he experienced an illness lasting weeks or a month.  Finally, Mr. Sanchez's testimony is not consistent with the email that his wife and he wrote to Dr. Gusella.

### E.    Findings Based Upon All Evidence, Including Newly Produced Evidence

Special masters are required to consider the entire record.  42 U.S.C. § 300aa-13.  The Court of Federal Claims has explained: "when considering the provisions and legislative history of the Vaccine Act, the language of the Vaccine Rules, and the case law, one factor that has remained constant in the Vaccine Program is the necessary and important role of special masters in conducting proceedings and rendering decisions in Vaccine Act cases."  Snyder ex rel. Snyder v. Sec'y of Health & Hum. Servs., 88 Fed. Cl. 706, 718 (2009).  As a consequence, the undersigned's role is to weigh the evidence and to determine how the evidence preponderates.[44]

As the Secretary pointed out during oral argument, one medical record is unlikely to be dispositive.  Tr. 4586.  Instead, the record must be considered as a whole.  The presence of some inconsistent evidence does not necessarily invalidate a finding of fact.  Doe 11 v. Sec'y of Health and Hum. Servs., 601 F.3d 1349, 1355 (Fed. Cir. 2010).  Consideration of the entire record is especially necessary when evaluating a motion to reopen because this motion should not be granted when the newly produced evidence is cumulative with previously produced evidence.

Here, the newly produced evidence is not cumulative with previously produced evidence.  The newly produced evidence includes Dr. Valencia's August 6, 2011 medical record and Dr.

---

[44] By way of contrast, although the Second Federal Circuit opinion made findings of fact based upon the (incomplete) evidence before it, the undersigned is not tasked with predicting how the Federal Circuit might view the evidence.  As Snyder points out, "the Court of Federal Claims on review, and the Federal Circuit on appeal, do not merely rubber stamp special master final decisions.  Decisions from both courts demonstrate a willingness to reverse the decision of a special master when the special master has failed to adequately develop the record, failed to consider facts critical to the case, failed to give adequate consideration to a viable medical theory, or otherwise misapplied the law."  88 Fed. Cl. at 718.

Brown's August 19, 2011 medical record. Dr. Brown's record is particularly different from other evidence because Dr. Brown explicitly denied hearing Ms. Sanchez complain that T.S. was moving his arms abnormally in May 2009. Dr. Brown's medical record also differs from the other evidence in that Dr. Brown explicitly explained how he would have responded to such a complaint, which was by documenting the complaint and ordering more tests.

Another piece of newly discovered evidence that is not cumulative is the Sanchezes' email to Dr. Gusella. This email is not cumulative because it is information coming directly from Mr. and Ms. Sanchez. This first-hand account is not mediated through a doctor or other medical professional. Thus, the petitioners cannot blame someone else for failing to write down information or for misstating information.

The absence of the newly produced evidence impaired the Secretary's ability to respond to the Sanchezes' claim for compensation. For example, the Secretary could not have asked Ms. Sanchez or Mr. Sanchez about the email with Dr. Gusella during the May 2012 fact hearing because the email with Dr. Gusella was not evidence. Then, after the Secretary's subpoena led to the discovery of the Dr. Gusella email in July 2023, Ms. Sanchez was asked about it. She testified that this was the chronology: T.S. received his six-month vaccinations, got sick, and then after getting sick, he started losing his developmental milestones and making abnormal arm movements. Tr. 4171. Similarly, the Secretary was not aware in 2012 when the parties were presenting evidence and arguments about onset that Ms. Sanchez had solicited a correction of T.S.'s medical records from Dr. Valencia and Dr. Brown in August 2011. Thus, the Secretary was not able to solicit testimony from them.

Because Mr. and Ms. Sanchez were responsible for the failure to produce all of T.S.'s medical records at the beginning of the case and because the newly produced evidence is not cumulative with other evidence, a reassessment of the evidence is required. After the discovery of missing medical records, the Secretary has advocated for a chronology in which T.S. was sick and then started having abnormal arm movements. See Resp't's Mot. to Reopen, filed Aug. 16, 2023, at 9, 12; see also Tr. 4564, 4577.

The Secretary sought a new finding on only one topic, which is when T.S. first started to move his arms abnormally. See Resp't's Mot. to Reopen, filed Aug. 16, 2023, at 11-13; see also Tr. 4618. The Secretary disclaimed any interest in revisiting the finding about when T.S. started to experience developmental delay. Tr. 4623.

The evidence preponderates in favor of finding that T.S. began to move his arm abnormally on August 1, 2009. Multiple pieces of evidence contribute to this finding. First, it is likely that T.S. did not experience *any* abnormal movements before his May 13, 2009 appointment with Dr. Brown. If T.S. had experienced abnormal arm movements, his mother would have communicated this information to Dr. Brown. Upon receiving this information, Dr. Brown would have memorialized the complaint and acted by, among other things, sending T.S. for an EEG. See Exhibit T at 17-18. However, Dr. Brown's May 13, 2009 medical record does not memorialize any complaint about abnormal arm movements. Exhibit 1 at 53. Thus, a fair inference is that T.S. had not moved his arm abnormally before May 13, 2009. See Bradley, 991 F.2d at 1574 (endorsing this reasoning). Dr. Seleem's April 29, 2009 medical record and Mr.

Luna's February 17, 2009 medical record supplement Dr. Brown's medical record in that neither Dr. Seleem nor Mr. Luna memorialize any complaints about abnormal arm movements.  See id. at 48-49 (Mr. Luna); 52 (Dr. Seleem: "no neurological symptoms").

Second, Ms. Sanchez provided histories that T.S. was sick for weeks or a month and then started having abnormal movements.  These histories are found in the medical records created by physical therapist Hwang, Dr. Dipple, Dr. Friedman, and occupational therapist Latner.  This history is also found in the email Ms. Sanchez and Mr. Sanchez sent to Dr. Gusella on June 3, 2010.  Dr. Brown's May 13, 2009 medical record shows that T.S. was still sick.  Thus, the histories memorialized by Dr. Dipple and others tend to reinforce the finding that T.S. started having abnormal arm movements after he recovered from the illness for which Dr. Brown treated him on May 13, 2009.

Third, at the other end of the spectrum is Dr. Michelson's November 12, 2009 medical record.  Dr. Michelson stated that T.S. had moved his arms abnormally.  Exhibit 1 at 140.  Thus, this document establishes that the absolutely latest date that T.S. started having abnormal arm movements was November 11, 2009.  The ensuing question is when between May 13, 2009 and November 11, 2009 did the abnormal arm movements begin?

Fourth, within the six-month span from May 2009 to November 2009, the more probative evidence tends to coalesce around a finding of early August 2009.[45]  Admittedly, not all the records are perfectly consistent, but in any case with questions of fact, the evidence will be in conflict to some degree.  Doe 11, 601 F.3d at 1355.  Ms. Marin-Tucker's August 17, 2009 examination detected problems in T.S.'s muscle tone.[46]  On March 8, 2010, Ms. Sanchez told a staff member at the California Inland Regional Center that he moved his arms abnormally on August 8, 2009.  Exhibit 243 at 604; see also Tr. 4567-70.  August 8, 2009 was also the date of the baby shower.  Some of T.S.'s extended family testified that they observed T.S. was abnormal during the baby shower.  Tr. 25 (Lupe Sanchez), 45-46 (Bertha Sanchez), 158-60 (Emma Fernandez); Ruling Finding Facts, 2013 WL 1880825, at *8 (¶ 19).  Their observations may have prompted Ms. Sanchez to seek the medical attention that T.S. received in the August 17, 2009 appointment with Ms. Marin-Tucker.

---

[45] Dr. Dipple's February 22, 2010 record associates the onset of abnormal arm movements "around" the time of congestion.  This could arguably be consistent with an onset soon after the May 13, 2009 appointment with Dr. Brown, i.e., sometime in June or July 2009. However, as Ms. Sanchez did not seek medical treatment for T.S. between May 13 and August 17, 2009, an onset of June or July seems unlikely.  Even if the onset were in June, a June onset date is very different from an onset in February.

[46] Admittedly, Ms. Marin-Tucker's medical record does not memorialize a complaint about arm movements.  Thus, under the logic used to discount Mr. Luna's, Dr. Seleem's and Dr. Brown's medical record, it might be rational to find that T.S. started having abnormal arm movements after August 17, 2009.

Accordingly, for these reasons, the evidence preponderates in favor of finding that T.S. first moved his arm abnormally on August 1, 2009. This finding necessarily means that T.S. did not have any abnormal arm movements in February 2009 through the end of July 2009.

### F.    Consequences of Different Finding regarding First Abnormal Arm Movement

To establish that the vaccination was the cause-in-fact of T.S.'s injury, Mr. and Ms. Sanchez must present preponderant evidence on each of the Althen prongs. Second Federal Circuit Opinion, 34 F.4th at 1353. The critical aspect is the third prong, "a showing of a proximate temporal relationship between vaccination and injury." Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005). This prong contains two parts. A petitioner must show the "timeframe for which it is medically acceptable to infer causation" and the onset of the disease occurred in this period. Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 532, 542-43 (2011), recons. denied after remand on other grounds, 105 Fed. Cl. 353 (2012), aff'd without op., 503 F. App'x 952 (Fed. Cir. 2013).

Here, the start of T.S.'s abnormal arm movements has changed. Although the Second Entitlement Decision had found that T.S. had one abnormal arm movement in February 2009 and the Federal Circuit found that T.S. continued to have abnormal arm movements in the remainder of February 2009 as well as March, April, and May, those findings were based upon a different (and incomplete) evidentiary record. It is axiomatic that different evidence can produce different outcomes. The present (and complete) evidentiary record supports the finding that T.S.'s first abnormal arm movement was on approximately August 1, 2009.

Whether this marks the earliest manifestation of the condition for which Mr. and Ms. Sanchez seek compensation is not clear. One finding that has remained throughout the case is the accuracy of Ms. Marin-Tucker's August 17, 2009 record that T.S. started to experience developmental delays 2-3 months prior. Ruling Finding Facts, 2013 WL 1880825, at *8 (¶ 18, 20); First Entitlement Decision, 2018 WL 5856556, at *4. Perhaps, the start of developmental delays marks the manifestation of the condition for which Mr. and Ms. Sanchez seek compensation.

In the Federal Circuit's first opinion, the Federal Circuit corrected the undersigned's error in which the undersigned stated that T.S. had one arm movement in February due to a cold without allowing the parties' experts to comment. First Federal Circuit Opinion, 809 F. App'x at 853. The present situation is roughly analogous. Although the Secretary suggested that additional expert reports are not necessary, Tr. 4624; Resp't's Comp. Br., filed Jan. 11, 2024, at 30-31, Mr. and Ms. Sanchez requested an opportunity to review any new fact finding. Tr. 4623-25; Pet'rs' Comp. Resp., filed May 9, 2024, at 52. This proposal from Mr. and Ms. Sanchez is sensible. Thus, the parties will be given an opportunity to present reports from their experts addressing Althen prong three. A separate scheduling order will issue regarding this topic.

V.    **Analysis Part Three: Motion for Sanctions**

As noted in the procedural history (section II.J, above), the Secretary initially argued that the admittedly drastic sanction of dismissal was appropriate due to the misconduct of Ms. Sanchez and Ms. Roquemore.  The Secretary also proposed that if dismissal were not appropriate, then an appropriate sanction would be an adverse inference that Ms. Roquemore received Dr. Brown's August 19, 2011 medical record.

However, during oral argument, the Secretary announced that the case should not be dismissed as a sanction, but should be resolved on its merits.  The Secretary further maintained that the Secretary anticipated renewing arguments about litigation misconduct in the context of any motion for attorneys' fees.  Tr. 4627.

Thus, to the extent that the Secretary's October 23, 2024 motion requested the sanction of dismissal or the sanction of an adverse inference, the motion no longer presents a live controversy.  An adverse inference is not necessary because, as found in the October 1, 2025 Findings of Fact, clear and convincing evidence supports the findings that Ms. Sanchez and Ms. Roquemore possessed Dr. Brown's August 19, 2011 medical record.  This finding was made solely upon the evidence.  2025 WL 3004761; see also Tr. 4658.  Likewise, the sanction of dismissal is no longer being pursued.  Therefore, the motion for sanctions is DENIED AS MOOT. The Secretary may determine if and when it is appropriate to bring a second motion for sanctions.[47]

VI.    **Conclusion**

Mr. and Ms. Sanchez filed their petition in 2011.  The fact that their case remains pending in 2026 is certainly unusual and features of its lengthy procedural history are recounted above.  While the actions of many people, including the undersigned, contribute to the unfortunately lengthy duration of the case, a prominent reason for the delay is that evidence produced in 2023 showed that the presentation of evidence in 2011 by Mr. and Ms. Sanchez was not complete.

The Federal Circuit generally recognizes that its mandate can be set aside when, on remand, evidence is newly discovered.  The newly discovered evidence, most particularly Dr. Brown's August 19, 2011 medical record, justifies reopening the finding of entitlement.  Other newly discovered evidence preponderates in favor of placing the onset of T.S.'s abnormal arm movements on August 1, 2009.  Whether this change in the start of T.S.'s abnormal arm leads to a different outcome regarding a finding of entitlement remains to be determined.  The parties will have an opportunity to address the new finding through reports from experts.

---

[47] This Order does not address the question of the authority of special maters to impose sanctions, which was discussed at the December 3, 2025 oral argument.

**IT IS SO ORDERED**.

s/Christian J. Moran
Christian J. Moran
Special Master

## Appendix A: Published Decisions, Opinions, and Orders

| | Originally Filed | ECF | Citation | Court | Description |
|---|---|---|---|---|---|
| 1 | 4/10/2013 | 45 | 2013 WL 1880825 | OSM | Ruling Finding Facts |
| 2 | 2/17/2016 | 135 | 2016 WL 909186 | OSM | Published Decision Awarding Interim Attorneys' Fees and Costs |
| 3 | 10/9/2018 | 205 | 2018 WL 5856556 | OSM | Published Decision Denying Compensation |
| 4 | 2/11/2019 | 217 | 142 Fed.Cl. 247 | CFC | Opinion and Order Denying Motion for Review |
| 5 | 4/7/2020 | 221 | 809 Fed.Appx. 843 | CAFC | Decision Vacating and Remanding Decision Denying Compensation |
| 6 | 8/26/2020 | 253 | 2020 WL 5641872 | OSM | Published Decision on Remand Denying Compensation |
| 7 | 2/21/2021 | 273 | 152 Fed.Cl. 782 | CFC | Opinion Denying Motion for Review and Sustaining August 26, 2020 Decision |
| 8 | 12/8/2021 | 280 | 2021 WL 6211169 | OSM | Published Decision Awarding Attorneys' Fees and Costs on an Interim Basis for a Second Time |
| 9 | 5/20/2022 | 283 | 34 F.4th 1350 | CAFC | Opinion Reversing Decision on Remand Denying Compensation and Remanding for Damages |
| 10 | 3/17/2023 | 325 | 2023 WL 2885358 | OSM | Order Denying Respondent's Motion to File Out of Time and Ruling Finding Growth Rate |
| 11 | 3/22/2024 | 470 | 2024 WL 1637913 | CFC | Opinion and Order Denying Petitioners' Petition for Writ of Mandamus |
| 12 | 8/14/2024 | 500 | 2024 WL 4564656 | OSM | Published Order Denying Motion for a Protective Order |
| 13 | 10/28/2024 | 516 | 2024 WL 5467401 | OSM | Order Denying Second and Supplemental Motions for a Protective Order and Compelling Production of Mental Health Records |
| 14 | 12/2/2024 | 521 | 2024 WL 5414170 | CFC | Opinion and Order Denying Petitioners' Third Motion for a Protective Order |
| 15 | 2/13/2025 | 536 | 2025 WL 2783118 | OSM | Order Denying Motion for Protective Order Regarding Mrs. Sanchez's Testimony |

| 16 | 3/3/2025 | N/A | 2025 WL 670189 | CAFC | Order Denying Petitioners' Petition for Writ of Mandamus |
|---|---|---|---|---|---|
| 17 | 4/14/2025 | 571 | 2025 WL 2782907 | OSM | Order Denying Motion for Redaction of February 13, 2025 Order |
| 18 | 4/16/2025 | 573 | 2025 WL 4018958 | OSM | Order Denying Motion for Videorecording of Hearing |
| 19 | 9/30/2025 | 608 | 2025 WL 2988894 | OSM | Findings Regarding Day Planner |
| 20 | 10/1/2025 | 610 | 2025 WL 3004761 | OSM | Findings Regarding Dr. Valencia's and Dr. Brown's Medical Records |

Appendix B: Key Opinions by Judicial Officers regarding Abnormal Arm Movements

| Citation | February 2009 | March – May 2009 |
|---|---|---|
| **Ruling Finding Facts**, 2013 WL 1880825 (April 10, 2013) | No abnormal arm movements. | No abnormal arm movements. |
| **First Entitlement Decision**, 2018 WL 5856556 (Oct. 9, 2018) | One abnormal arm movement due to a cold. | No abnormal arm movements. |
| **First Federal Circuit Opinion**, 809 Fed. App'x 843 (Apr. 7, 2020) | Error to connect abnormal arm movement to a cold without expert testimony. | No comment on findings. |
| **Second Entitlement Decision**, 2020 WL 5641872 (Aug. 26, 2020) | Expert testimony persuasively explained that the one abnormal arm movement was due to a cold. | Unchanged from previous findings.[1] |
| **Second Federal Circuit Opinion**, 34 F.4th 1350 (May 22, 2022) (split panel) | The finding of arm contortions on February 16, 2009 is law of the case. | T.S.'s abnormal arm movements persisted, per parents' testimony. |

---

[1] On remand, the parties did not argue for new findings regarding the absence of abnormal arm movements between March and May, 2009. See, e.g., Pet'rs' Post-Remand Br., filed July 29, 2020 at 6 ("The sole issue on appeal in regard to the arm contortions was the finding of whether the arm contortions were *consistent with a cold*."); Resp't's Post-Remand Br., filed July 29, 2020, at 14 (noting that "respondent's experts all testified in accordance with the 2013 Fact Ruling that [T.S.] 'did not exhibit arm contortions' until months after February 17, 2009" and with the "original fact finding that [T.S.]'s arm contortions began when he was about a year old.").

Appendix C: Medical Records

The evidence about T.S.'s health in 2009-10 is detailed in the order.  The chart brings forward the presentation of information (or the lack of information) on important topics.  For example, column E shows whether the history about T.S. suggests that he started developing problems when he was around six-months old.  Column F shows a related point --- whether the history suggests that T.S.'s problems started around the time of his vaccination.  Column G further refines the inquiry as to whether the history associates the onset of T.S.'s problem with his mother's birthday.  Column H addresses a different point.  Column H concerns whether the history documents a complaint about abnormal arm movements.  Column I discusses whether the history linked T.S.'s problem to an infection.  Finally, Column J notes whether the document is newly discovered.

| A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|
| # | Date | Person & Profession | Cite | Is 6 months of age mentioned ? | Is the vaccine mentioned ? | Is Ms. Sanchez's birthday mentioned ? | Arm Movements | Infection | New |
| 1 | 02/17/2009 | Jonathan P. Luna, Physician's Assistant | 1 at 48-49 | No | No | No | Not memorialized | Diagnosed with common cold and viral syndrome | No |
| 2 | 04/29/2009 | Dr. Nabil R. Seleem, Pediatrician | 1 at 50-52 | No. "Cough with congestion X 2 weeks." | No | No | Not memorialized | "Cough with congestion x 2 weeks", diagnosed with otitis media. | No |
| 3 | 05/13/2009 | Dr. Phillip Brown, Pediatrician | 1 at 53 | No | No | No | Not memorialized | "Still congested since 4/29/09 visit with Dr. Seleem", impression of resolving URI/viral URI infection and resolved otitis. | No |
| 4 | 08/19/2009 | Micaela Marin-Tucker, Physician's Assistant | 1 at 54-56 | No. "change in development about 2-3 months ago." | Mentioned in the context of being behind | No | Not memorialized | Not memorialized | No |

| A # | B Date | C Person & Profession | D Cite | E Is 6 months of age mentioned? | F Is the vaccine mentioned? | G Is Ms. Sanchez's birthday mentioned? | H Arm Movements | I Infection | J New |
|---|---|---|---|---|---|---|---|---|---|
| 5 | 10/07/2009 | Micaela Marin-Tucker, Physician's Assistant | 1 at 57-58 | Yes. "Pt was normal until 6 months of age and got his shots." | Yes. "Pt was normal until 6 months of age and got his shots." | No | Not memorialized. Other problems such as lack of crawling and lack of sitting are documented | Not memorialized | No |
| 6 | 10/08/2009 | Stacey Cunningham, Occupational Therapist | 326 at 13 | "decreased f'xing" | Yes | No | Not memorialized | Not memorialized | Yes |
| 7 | 10/27/2009 | Lisa Hwang, Physical Therapist | 326 at 43 | Yes; onset: 2/5/2009 | Yes | No | Not memorialized | "got infection & was not the same since" | Yes |
| 8 | 11/12/2009 | Dr. David Michelson, Neurologist | 1 at 140-41 | No | No | No | Yes | Chronic illness denied | No |
| 9 | 02/11/2010 | Lisa Hwang, Physical Therapist | 326 at 49 | Yes | Yes | No | "difficulty with gross motor skills" | Pt. had infection after immunization and once resolved, began demonstrating difficulty with gross motor skills. | Yes |
| 10 | 02/22/2010 | Dr. Katrina Dipple, Pediatric Geneticist | 16 at 1 | Yes | No | No | Yes, associated with congestion | Congested for 4 weeks after around six months of age. | No |
| 11 | 03/08/2010 | Staff at Inland Regional Center | 243 at 4, 604 | No | No | No | Yes, on 8-8-2009 | Not memorialized | Yes |

| A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|
| # | Date | Person & Profession | Cite | Is 6 months of age mentioned? | Is the vaccine mentioned? | Is Ms. Sanchez's birthday mentioned? | Arm Movements | Infection | New |
| 12 | 06/03/2010 | Parent Email to Dr. Gusella | U at 771 | Yes | No | No | Yes, after infection | After T.S. was congested for about a month, "he wasn't quite the same." | Yes |
| 13 | 08/02/2010 | Dr. Jennifer Friedman, Neurologist | 1 at 194-99 | Yes | Yes | No | Yes, including one particularly bad night. Information about arm jerking is presented after information about being diagnosed with otitis media | Congestion developed after shots | No |
| 14 | 09/07/2010 | Dr. Michael Zimbric, Radiologist | 1 at 181-82 | Yes. "Jerking movements since six months of age." | No | No | Yes; jerking movements | Yes; jerking movements "evidently occurred after he became ill with an ear infection." | No |
| 15 | 09/21/2010 | Dr. Fred Levine, Metabolic Specialist | 1 at 200-01 | Yes, then febrile illness | Yes. "Parent[s] think a vaccine reaction is a possibility." | No | Not memorialized | "febrile illness associated with significant lethargy" | No |
| 16 | 11/05/2010 | Kenneth Latner, Occupational Therapist | 246 at 1877-80 | Yes, in context of vaccination | Yes | No | Yes: "shaking in bilateral upper extremities" | Yes. "Taken to medical doctor and prescribed antibiotics. [T.S.] stopped progressing with gross motor | Yes |

| A # | B Date | C Person & Profession | D Cite | E Is 6 months of age mentioned? | F Is the vaccine mentioned? | G Is Ms. Sanchez's birthday mentioned? | H Arm Movements | I Infection | J New |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | skills after this illness and began shaking in bilateral extremities." | |
| 17 | 12/07/2010 | Dr. Valerie Wong, Pediatrician | 246 at 1873-75 | Yes; then febrile illness for 4-5 days. | Yes. "Mother believes the vaccines caused the patient's state" | No | Not memorialized | "soon after this illness and the vaccinations, mother noted that the patient was no longer advancing in his milestones" | Yes |
| 18 | 08/07/2012 | Dr. Richard Haas, Mitochondrial Specialist | 26 at 1 | Yes | Yes. "Got his shots, then shortly developed fever and cranky." | No | Yes. "11 days after the vaccination, he had an episode of 'contortion' in the upper limbs." | Yes. "Saw PMD, Dx otitis media, gave Amox." | No |