# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**

| | | |
|---|---|---|
| GERMAIN SANCHEZ and JENNIFER SANCHEZ, *parents of T.S.*, Petitioners, v. SECRETARY OF HEALTH AND HUMAN SERVICES, Respondent. | * | No. 11-685V<br>Special Master Christian J. Moran<br><br>Filed: July 30, 2026 |

Lisa A. Roquemore, Law Offices of Lisa A. Roquemore, Rancho Santa Margarita, CA, and Richard Gage, Richard Gage, P.C., Cheyenne, WY, for petitioners;
Jennifer L. Reynaud and Madylan Yarc, United States Dep't of Justice, Washington, DC, for respondent.

**DECISION ON REMAND DENYING COMPENSATION**[1]

Germain and Jennifer Sanchez claim that various childhood vaccinations given to their son, T.S., on February 5, 2009, harmed him by causing a neurologic problem. Pet., filed Oct. 17, 2011. They were found not entitled to compensation because the evidence did not support a finding that T.S. developed neurologic problems close in time to the vaccinations. However, the Federal Circuit viewed the evidence differently, found that Mr. and Ms. Sanchez were entitled to compensation, and remanded for the purposes of determining compensation.

In 2023, during the damages phase, it was discovered that Ms. Sanchez and the petitioners' attorney, Lisa Roquemore, possessed evidence that should have been filed into the

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material before posting the decision.

record when the case began in 2011. Thus, all previous adjudications, including the Federal Circuit's finding of entitlement, rested upon an incomplete and, therefore, flawed, record.

Now, the entire evidentiary record has been established. The evidence produced after remand preponderantly shows that T.S. did not manifest his neurologic problem until approximately 14 weeks after the vaccination. This much time is not consistent with an inference of causation.

Accordingly, Mr. and Ms. Sanchez are found not entitled to compensation. A change in outcome on remand is permitted when, as here, the evidence differs. See Rembrandt Vision Technologies, L.P. v. Johnson & Johnson Vision Care, Inc., 818 F.3d 1320, 1329 (Fed. Cir. 2016) (ruling a district court abused its discretion in denying a motion for a new trial and noting that the mandate rule did not preclude the granting of a motion for a new trial); Tronzo v. Biomet, Inc., 236 F.3d 1342, 1349 (Fed. Cir. 2001) (recognizing that trial courts "have considered revisiting issues otherwise foreclosed where there has been a substantial change in the evidence"); Vant Erve v. Sec'y of Health & Hum. Servs., 39 Fed. Cl. 607, 612 (1997), aff'd after intervening proceedings, 232 F.3d 914 (Fed. Cir. 2000); cf., Packet Intelligence LLC v. NetScout Systems, Inc., 100 F.4th 1378, 1384 (Fed. Cir. 2024) (stating that "our precedents hold that remanded patent cases remain vulnerable to post-mandate developments concerning patentability, even if liability – including patent validity – has already been conclusively resolved by appellate review").

## I. Procedural History

The procedural history of this case, which has been pending since 2011, is quite lengthy. A comprehensive account of the procedural history may be found in the previously published decisions and orders. The most recent order providing a full summary was filed on February 17, 2026. Order Reopening Entitlement, 2026 WL 776449. A brief summary of key events is provided here.

Mr. and Ms. Sanchez filed their petition on October 17, 2011, alleging that various childhood vaccinations given to T.S. on February 5, 2009, caused him to suffer from a neurologic condition. In conjunction with the petition, Mr. and Ms. Sanchez filed some medical records with certain pages omitted. The lack of full disclosure affects the course of litigation as described below.

Early in the case, one issue was when T.S. first displayed any symptoms of a neurologic problem. After several rounds of litigation and appeals, the Federal Circuit found that T.S.'s abnormal arm movements, a likely neurologic symptom, began close in time to the vaccinations and persisted for months, and that Mr. and Ms. Sanchez were therefore entitled to compensation. Second Federal Circuit Opinion, 34 F.4th 1350 (Fed. Cir. 2022). In making this finding, the Federal Circuit relied primarily upon testimony from Mr. and Ms. Sanchez regarding the February 2009 onset of T.S.'s abnormal arm movements and the continuation of the arm movements over the following months. The documentary record at the time did not directly contradict their testimony. The Federal Circuit remanded the case to the Office of Special Masters for the sole issue of damages. Id. at 1356.

In 2023, while investigating the amount of compensation to which Mr. and Ms. Sanchez were entitled, the Secretary received medical records that Mr. and Ms. Sanchez should have produced years and years earlier. After subpoenaing additional records in light of that discovery, the Secretary identified several other previously available records that the Sanchezes had not filed. These records showed the following:

- Approximately two months before the petition was filed, Attorney Roquemore and Ms. Sanchez planned for Ms. Sanchez to request that one of T.S.'s treating doctors, Philip Brown, clarify a medical record from May 13, 2009, in which Dr. Brown did not memorialize any complaints about abnormal arm movements. In August 2011, Dr. Brown disagreed with Ms. Sanchez's assertion that she told Dr. Brown that T.S. moved his arm abnormally. Dr. Brown explained that if he had heard this complaint, he would have memorialized it and ordered tests, such as an EEG or MRI, to respond to the complaint. Exhibit T at 17.

- Other newly produced medical records showed that Ms. Sanchez communicated a history in which T.S. received the vaccinations, experienced an extended illness, then started having significant developmental problems after the extended illness. Because other medical records show that T.S.'s extended illness was in April and May 2009, these chronologies placed the onset of developmental problems around May 2009. This sequence of events (vaccinations—illness—developmental problems) was also reflected in an email that Ms. Sanchez wrote. This email, too, was among the records produced after the Federal Circuit's finding of entitlement.

For more details about the newly produced documents, see Order Reopening Entitlement, 2026 WL 776449, at *24-26, *52 Appendix C; see also Resp't's Comp. Br. at 11-14 and Appendix, filed Jan. 11, 2024.

Based upon the newly produced documents, the Secretary moved to reopen the issue of entitlement, arguing that this evidence was sufficient to undermine the previous finding of fact. The Sanchezes maintained that the newly produced evidence was cumulative with previous evidence. The Sanchezes also argued that their failure to produce documents was excused because the Secretary should have requested the missing documents earlier in the litigation.

After one evidentiary hearing, one lengthy oral argument, and multiple rounds of briefing on the issue as well as subsidiary disputes, the entitlement phase of the case was reopened. In summary:

> The Secretary has satisfied the standards for reopening entitlement because the medical records produced in 2023 constitute newly discovered evidence that warrant a departure from the Federal Circuit's mandate. Mr. and Ms. Sanchez and their attorney, Lisa Roquemore, were responsible for the failure to file crucial medical records in 2011. Thus, the argument that the Secretary is responsible for the absence of missing records is not persuasive.

Order Reopening Entitlement, 2026 WL 776449, at *1.

When the newly produced records were considered in the context of the other evidence, preponderant evidence supported finding that T.S.'s initial abnormal arm movements occurred months later than previously found:

> Although the Second Entitlement Decision had found that T.S. had one abnormal arm movement in February 2009 and the Federal Circuit found that T.S. continued to have abnormal arm movements in the remainder of February 2009 as well as March, April, and May, those findings were based upon a different (and incomplete) evidentiary record. It is axiomatic that different evidence can produce different outcomes. The present (and complete) evidentiary record supports the finding that T.S.'s first abnormal arm movement was on approximately August 1, 2009.

<u>Order Reopening Entitlement</u>, 2026 WL 776449, at *51.

Whether the August 1, 2009 abnormal arm movements marked the earliest manifestation of T.S.'s condition was not yet clear. Throughout the case's history, the accuracy of Ms. Marin-Tucker's August 17, 2009 record that T.S. started to experience developmental delays 2-3 months prior has been accepted. <u>Ruling Finding Facts</u>, issued Apr. 10, 2013, 2013 WL 1880825, at *8 (¶ 18, 20); <u>First Entitlement Decision</u>, issued Oct. 9, 2018, 2018 WL 5856556, at *4. Perhaps, the start of developmental delays marked the manifestation of the condition. Thus, in accord with the request from Mr. and Ms. Sanchez, the parties were given the opportunity to have their experts review the case in light of the new factual finding. Order, issued Feb. 18, 2026.

Both parties declined to submit additional reports from experts. Jt. Status Rep., filed Mar. 5, 2026. The parties were then given the opportunity to advocate through briefs. The parties were instructed to focus their briefs on the <u>Althen</u> prongs, particularly the second and third prongs. Order, issued Mar. 6, 2026.

Mr. and Ms. Sanchez submitted their brief on April 16, 2026. Approximately half of the 65-page brief recounts the factual and procedural history of the case. The Secretary responded with an 11-page brief on June 1, 2026. Mr. and Ms. Sanchez did not file a reply.[2]

## II. <u>Standards for Adjudication</u>

To receive compensation, petitioners must establish five elements. 42 U.S.C. § 300aa–11(c)(1)(A) through (E); 42 U.S.C. § 300aa–13(a)(1)(A) (authorizing special masters to award compensation when petitioners establish items listed in section 11(c)(1)). The third element, which is found in paragraph (C) concerns causation.

To establish that a vaccine was the cause-in-fact of an illness, the petitioners must establish the elements set forth by the Federal Circuit. Petitioners bear a burden "to show by preponderant evidence that the vaccination brought about [the vaccinee's] injury by providing:

[2] Citations in this opinion to "Pet'rs' Br." and "Resp't's Br." refer to these April 16, 2026 and June 1, 2026 briefs. Citations to other briefs will include the date such briefs were filed.

(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274, 1278 (Fed. Cir. 2005).

Petitioners are required to establish their case by a preponderance of the evidence. 42 U.S.C. § 300aa–13(1)(a). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Hum. Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted). Proof of medical certainty is not required. Bunting v. Sec'y of Health & Hum. Servs., 931 F.2d 867, 873 (Fed. Cir. 1991).

Distinguishing between "preponderant evidence" and "medical certainty" is important because a special master should not impose an evidentiary burden that is too high. Andreu v. Sec'y of Health & Hum. Servs., 569 F.3d 1367, 1379-80 (Fed. Cir. 2009) (reversing special master's decision that petitioners were not entitled to compensation); see also Lampe v. Sec'y of Health & Hum. Servs., 219 F.3d 1357 (Fed. Cir. 2000); Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (disagreeing with dissenting judge's contention that the special master confused preponderance of the evidence with medical certainty).

In the sections that follow, each of the Althen prongs is evaluated. As explained below, the assessment begins with prong one because prong one is a foundation for the other Althen prongs. The evaluation of the third and second prongs, which are the contested prongs, sets forth the parties' arguments and then the analysis of those arguments.

## III. ***Althen* Prong I**

The finding that Mr. and Ms. Sanchez have met their burden under the first Althen prong is undisturbed.[3] Mr. and Ms. Sanchez asserted a theory based upon the vaccination causing a decompensating event. Although the underlying mechanism was debated, the basic premises were that the vaccines can cause a fever and a fever can cause a decompensating event. First Entitlement Decision, 2018 WL 5856556, at *11-12. Their evidence was credited. This aspect was not subject to a motion for review or an appeal. See First Federal Circuit Opinion, 34 F.4th at 1354 n.3 ("That [T.S.] satisfied prong one is not in dispute"); see also Second Entitlement Decision, issued Aug. 26, 2020, 2020 WL 5641872, at *22 ("Accordingly, the finding in the October 9, 2018 decision remains undisturbed. The theory that the DTaP vaccine can cause neurodegeneration, potentially through the intermediate step of a fever, is sound and reliable under prong 1"). Moreover, the parties have not introduced new evidence on this topic. Thus, the previous outcome appears to remain in effect.

[3] The Secretary maintains that although Mr. and Ms. Sanchez were found to have presented a "plausible" theory, they are required to establish a sound and reliable theory with preponderant evidence. However, the Secretary acknowledges his previous argument that this purported error was harmless and accepts that, therefore, the conclusion that Mr. and Ms. Sanchez satisfied their burden under prong one stands. Resp't's Br. at 5-7.

As the March 6, 2026 order for briefs explained, although the Althen prong one theory is apparently resolved, the theory remains important because it affects the remaining prongs. The first part of the third Althen prong, the "medically acceptable" portion, derives from the theory put forth under the first prong. Beckwith v. Sec'y of Health & Hum. Servs., 180 Fed. Cl. 368, 381 (2026); Langland v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 421, 443 (2013); cf. Koehn v. Sec'y of Health & Hum. Servs., 773 F.3d 1239, 1244 (Fed. Cir. 2014) (ruling that special master was not arbitrary in finding that a theory based upon cytokines would not produce a disease seven months later). The parties must present arguments, citing evidence, that connect the prong one theory to a medically acceptable timeframe under prong three.

Thus, given the importance of the prong one theory to the other Althen prongs, it is beneficial to briefly explain Mr. and Ms. Sanchez's theory once more. The First Entitlement Decision explained the theory:

> The Sanchezes argue that [T.S.]'s Leigh's syndrome was brought on by the vaccinations he received on February 5, 2009. To demonstrate that vaccinations can cause the onset of Leigh's syndrome, the Sanchezes provide evidence showing that the onset of Leigh's syndrome is associated with a *decompensating event*[4] and that vaccination could cause such a decompensating event. Though a link between vaccination and the onset of Leigh's syndrome has not been established to the standard of medical certainty, for the reasons elucidated below, the evidence presented is sufficient to conclude that the Sanchezes' theory is plausible insofar as it is consistent with contemporary understanding of the biological systems at play. Accordingly, the Sanchezes have met their statutory burden on this element as the Federal Circuit has defined it. See Hibbard v. Sec'y of Health and Human Servs., 698 F.3d 1355, 1365 (Fed. Cir. 2012) (noting that petitioners' burden is to provide a "viable medical theory by which a vaccine can cause the injury claimed by the petitioner").
>
> * * *
>
> For all this debate regarding the mechanisms that might be involved, the conclusion that the Sanchezes have met their burden to present a plausible medical theory explaining how [T.S.]'s vaccines may have caused his injury requires only two

---

[4] Footnote 13 of the First Entitlement Decision explains:

> Decompensation is a period of regression that is frequently seen in cases of Leigh's disease. Exhibit 148 (Rahman) at 1. Dr. Raymond testified that decompensation in individuals with Leigh's syndrome is clinically obvious and is characterized by encephalopathy, decreased consciousness, weakness, and motor difficulties. Tr. 794-95. Dr. Niyazov largely agreed with this characterization of decompensation, but noted that the decompensation can be followed by periods of prolonged stabilization and possibly even improvement. See Tr. 417.

> premises to be more-likely-than-not. First, that the vaccine that [T.S.] received is known to sometimes cause fever (regardless of the mechanistic causes of that fever). Second, fever can cause decompensation in someone with a preexisting mitochondrial disease.

First Entitlement Decision, 2018 WL 5856556, at *11.

In summary, the Sanchezes have met their burden under the first Althen prong by proffering a theory that the vaccination can induce a fever, and the fever can then lead to decompensation. The next question, then, is whether the Sanchezes have satisfied the remaining Althen prongs. This analysis begins with the third Althen prong because that one is dispositive.

## IV. *Althen* Prong III

The third Althen prong actually contains two parts. A petitioner must show the "timeframe for which it is medically acceptable to infer causation" and the onset of the disease occurred in this period. Shapiro v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 532, 542-43 (2011), recons. denied after remand on other grounds, 105 Fed. Cl. 353 (2012), aff'd without op., 503 F. App'x 952 (Fed. Cir. 2013).

### A. Medically Acceptable Timeframe

#### 1. Previous Adjudications

Acknowledging the limits of the available studies regarding appropriate onset timing, the First Entitlement Decision declined to set "a hard and fast deadline for when [T.S.]'s symptoms would have had to develop following the vaccination." Id. at *16 (citing Paluck v. Sec'y of Health & Hum. Servs., 786 F.3d 1373 (Fed. Cir. 2015). The Decision continued:

> Nonetheless, the undersigned must consider the evidence that as the post-vaccination interval extends beyond two weeks, the likelihood that the decompensation is attributable to a reaction to the vaccine, as opposed to another cause, drops. See Pafford, 451 F.3d at 1358 ("If, for example, symptoms normally first occur ten days after inoculation but petitioner's symptoms first occur several weeks after inoculation, then it is doubtful the vaccination is to blame").

Id.

The Second Entitlement Decision again found "that the evidence weighs in favor of finding that the neurodegeneration would occur within approximately two weeks from an allegedly inciting event." 2020 WL 5641872, at *24 n.3. "However, if [T.S.]'s neurologic decline were to occur slightly outside of two weeks, then the Sanchezes could meet their burden regarding Althen prong 3." Id. at *24.

The finding that an appropriate onset would be within approximately two weeks has remained undisturbed on review. See Second Federal Circuit Opinion, 34 F.4th at 1356 (finding that the Sanchezes met their burden under the second and third Althen prongs "because those contortions began within two weeks of [T.S.]'s vaccinations").

2. Arguments

Mr. and Ms. Sanchez appear to argue for an expansion of the approximately two-week timeframe used in previous adjudications. They note Dr. Niyazov's explanation "that the temporal relationship between the triggering event and neurodegeneration has not been firmly established due to a paucity of studies in this area" and that "developmental regression is not very obvious before it gets noticed by healthcare professionals while parents notice it sooner." Pet'rs' Br. at 54.

Mr. and Ms. Sanchez caution against "setting a hard and fast time frame in an uncertain area undergoing sustained scientific investigation [as such would be] contrary to the precepts governing the Vaccine Act." Pet'rs' Br. at 57 (citing Paluck, 786 F.3d 1373). They argue that "Even if there was a several month delay between the initial vaccines and the time that [T.S.]'s loss of skills began to be noticed, that delay, by itself, ought not necessarily be dispositive." Id. at 59.

The Secretary noted that the finding as to a medically appropriate onset was not disturbed on review. Resp't's Br. at 7.

3. Analysis

Previous decisions concluded that under the Sanchezes's theory, neurodegeneration occurs within approximately two weeks of the inciting event. There appears to be no basis for deviating from previous fact-finding regarding the temporal interval for which an inference of causation is appropriate, which is termed the first part of the third Althen prong. After the Second Federal Circuit Opinion remanded the case, additional medical records about T.S. were produced. This newly produced evidence fits in the second part of the third Althen prong, not the first part of the third Althen prong. The evidence, when considered as a whole, preponderates in favor of finding that Mr. and Ms. Sanchez's successful theory means that the vaccines would cause decompensation that would be apparent within approximately two weeks of the fever associated with the vaccination.

**B. Onset**

The key issue at this posture of the case is whether T.S. displayed neurologic symptoms within the appropriate timeframe—that is, within approximately two weeks of his vaccinations.

1. Previous Adjudications and New Evidence

The undersigned previously determined the evidence preponderated in favor of finding that T.S.'s neurologic problem was first manifest no sooner than May 1, 2009. Second Entitlement Decision, 2020 WL 5641872, at *44-45. The basis for this finding was that T.S. experienced one incident of abnormal arm movements around February 16, 2009, the day after Ms. Sanchez's birthday, but did not otherwise experience abnormal arm movements. This singular episode thus did not signify neurodegeneration. Id. at *42. Another basis was that T.S.'s crying, fever, and fussiness after a vaccination did not automatically mean that the child experienced a neurologic problem. Id. at *30–31. Although Dr. Steinman and Dr. Niyazov opined that T.S.'s symptoms indicated neurodegeneration, Dr. Raymond opined that the

symptoms reflected T.S.'s cold. For reasons explained in the Second Entitlement Decision, Dr. Raymond was found to be more credible and persuasive. See id. at 33-40. Additionally, Ms. Sanchez told Ms. Marin-Tucker in August 2009 that she started to notice delays 2-3 months prior, suggesting a manifestation in May or June. Id. at *43.

Based on the evidentiary record before it, the Federal Circuit found that T.S. first began to contort his arms on February 16, 2009 and that this arm contortion persisted over the following months, "sometimes 'five to ten times per day.'" Second Federal Circuit Opinion, 34 F.4th at 1354-56. The primary reason was that "given the record and the prior findings," the Federal Circuit saw "no basis to reject the evidence that [T.S.] was experiencing arm contortions throughout the relevant period." Id. The Federal Circuit did not address whether the crying, fever, and fussiness were manifestations of a neurologic disorder. With this finding of continuous arm contortions, which are manifestations of a neurological problem, beginning within two weeks of vaccination, the Federal Circuit held that Mr. and Ms. Sanchez had satisfied the second and third Althen prongs.

New evidence has resulted in a departure from the Federal Circuit's finding of fact regarding the onset of T.S.'s abnormal arm movements, which in turn reopens the question as to whether Mr. and Ms. Sanchez have met their burden under the second and third Althen prongs. As explained thoroughly in the February 17, 2026 Order Reopening Entitlement, the evidence now preponderates in favor of finding that T.S began to move his arms abnormally on August 1, 2009, which necessarily means that T.S. did not have any abnormal arm movements from February 2009 through the end of July 2009. However, as the Order Reopening Entitlement explained:

> Whether this marks the earliest manifestation of the condition for which Mr. and Ms. Sanchez seek compensation is not clear. One finding that has remained throughout the case is the accuracy of Ms. Marin-Tucker's August 17, 2009 record that T.S. started to experience developmental delays 2-3 months prior. Ruling Finding Facts, 2013 WL 1880825, at *8 (¶ 18, 20); First Entitlement Decision, 2018 WL 5856556, at *4. Perhaps, the start of developmental delays marks the manifestation of the condition for which Mr. and Ms. Sanchez seek compensation.

Order Reopening Entitlement, 2026 WL 776449, at *51.

Mr. and Ms. Sanchez do not argue that the start of developmental delays on approximately May 17, 2009, marks the manifestation of T.S.'s condition. They instead raise two alternative arguments: first, that T.S.'s fever and inconsolable crying in early February 2009 were indicative of the inflammatory event triggering his regression, further evidenced by a seizure in mid-February, and second, that T.S. showed regression prior to May 17, 2009. These arguments are addressed in turn.

2. Fever and crying following vaccination

*a) Parties' Arguments*

Mr. and Ms. Sanchez currently argue:

> [T.S.]'s persistent, inconsolable crying that occurred within 48 hours of vaccine administration . . . served as the initial event that triggered a gradual process of developmental regression and aggravation leading to Leigh's syndrome over the next several months which became more evident around June (now May, 2009) (inconsolable crying, hypotension, arm contortions, etc.). However developmental regression was slowly developing ever since the crying and fever took place as a result of the vaccination.

Pet'rs' Br. at 48-49. They contend that the fever which ebbed and flowed followed by "the first manifestations of seizure and neurologic abnormality beginning 11 days after the immunizations . . . were the harbinger[s] of the findings of skill loss" in May 2009. Id. at 49. Mr. and Ms. Sanchez maintain that these symptoms in February, which are expected reactions to vaccines, were the first neurologic symptoms of T.S.'s Leigh's syndrome. Id. at 48. These symptoms indicated an inflammatory event, which Mr. and Ms. Sanchez contend began a gradual process of developmental regression "over the next several months which became more evident around June" and culminated in Leigh's syndrome. Id. at 48-49. They explain that, under Dr. Steinman's theories, "the manifestations of neurologic damage takes time," even months or years, "to appear clinically in almost all developmental neurologic diseases." Id. at 49, 51. Mr. and Ms. Sanchez argue that the timeline also aligns with Dr. Niyazov's theory, with the fever and crying serving as indicators of an inflammatory response that triggered a gradual, months-long developmental regression. Petr's' Br. at 53-54.

The Secretary disputes that the fever and inconsolable crying were neurological symptoms and/or indicative of a seizure. Resp't's Br. at 8 n.4.

*b) Analysis*

None of the newly produced evidence persuasively shows that T.S.'s fever and inconsolable crying in the days following vaccination or eleven days later were manifestations of a neurologic problem or evidence of a seizure. The Sanchezes have not made any new arguments based upon new evidence as to why these symptoms following vaccination manifested a neurologic injury rather than an expected reaction to vaccination. Instead, the Sanchezes are repeating arguments that have already been rejected. There is also no reliable or contemporaneous evidence that T.S. experienced a seizure in the weeks following his vaccination. Therefore, the finding that the fever, crying, and fussiness were not neurologic symptoms remains intact. With that finding, there is no persuasive indication that the manifestation of T.S.'s neurological injury was in February 2009.

3. Other neurologic symptoms in February – April 2009

*a) Parties' Arguments*

Mr. and Ms. Sanchez also suggest that T.S.'s delays might have actually started earlier than May 17, 2009, but went unnoticed by both his parents and medical providers. They raise a point acknowledged in previous decisions: initially, delays in a child as young as T.S. may not be "immediately noticed." Pet'rs' Br. at 59-60.

The Secretary contends that T.S. did not manifest neurologic symptoms within two weeks of his February 5, 2009 vaccinations. Resp't's Br. at 7-8. Rather, "T.S.'s neurologic symptoms first manifested several months, not a couple weeks, post-vaccination." Id. at 8. The Secretary noted that Mr. and Ms. Sanchez "appear to maintain that the onset of T.S.'s neurologic condition was a seizure or seizures eleven days post vaccination," and that T.S.'s developmental delays began in February 2009 but went unnoticed by both the family and medical providers for several months. Id. at 8-9, 8 n.4. However, the Secretary contends that nothing in the record supports either argument. Id. The Sanchezes did not file a reply brief to counter these arguments.

*b) Analysis*

As explained, the finding that T.S. first moved his arms abnormally on August 1, 2009, means that he did not move them abnormally in February 2009 or in the ensuing months. There is also insufficient evidence to support an assertion that T.S. experienced any other neurologic symptoms in the weeks following the vaccination. Although affidavits from family members, which were discussed and analyzed in previous adjudications, recount unusual behaviors, Mr. and Ms. Sanchez did not seek any medical attention for T.S. until late April 2009 for his congestion, and the medical records from April and May 2009 do not document any of the symptoms reported in the affidavits. Furthermore, it was not until the August 8, 2009 baby shower that family members apparently alerted Ms. Sanchez that they, too, noticed something was amiss, perhaps leading Ms. Sanchez to bring T.S. to an appointment with Ms. Marin-Tucker on August 17, 2009.[5] Tr. 25 (Lupe Sanchez), 45-46 (Bertha Sanchez), 158-60 (Emma Fernandez); Ruling Finding Facts, 2013 WL 1880825, at *8 (¶ 19).

In the context of T.S.'s abnormal arm movements, the Order Reopening Entitlement discussed the Bradley case. In Bradley, Mrs. Bradley testified at a hearing before a special master that within days of vaccination, her daughter Rachel had a high temperature, lost her appetite and muscle tone, and had episodes of vacant staring and unresponsiveness. 24 Cl. Ct. 641, 642 (1991). Mrs. Bradley further testified that "she telephoned her doctor at least once to express her concern over Rachel's temperature and disposition. However, no visit was made to the doctor's office and no records substantiate[d] the events Mrs. Bradley described as having occurred in the three-day period immediately following" vaccination. Id. at 643. In a bench ruling, the special master determined "that the absence of any contemporaneous recordation in Rachel's medical records of the events immediately following the January inoculation rendered suspect the accuracy of Mrs. Bradley's testimony concerning those events and impaired its believability." Id. at 644. The special master reasoned that the behaviors Mrs. Bradley recalled were too significant to go unrecorded.

---

[5] The February 17, 2026 Order Reopening Entitlement occasionally refers to this appointment as having taken place on August 19, 2009. This appears to be a mix-up between the August 17, 2009 appointment with Ms. Marin-Tucker and the August 19, 2011 appointment with Dr. Brown. The correct date of the appointment with Ms. Marin-Tucker is August 17, 2009.

The Court of Federal Claims found that the special master was reasonable in rejecting Mrs. Bradley's testimony that her daughter Rachel showed symptoms within a few days of vaccination as no contemporaneous medical records substantiated the testimony:

> The special master's conclusion that the absence of any medical recordation of Rachel's post-inoculation symptoms was more telling than Mrs. Bradley's testimony was clearly reasonable given the dramatic nature of the symptoms claimed, the close medical attention that had been focused on Rachel since the time of her birth . . . and Mrs. Bradley's self-described preoccupation with her daughter's state of health . . . The rejection of Mrs. Bradley's testimony was a legitimate exercise of the special master's fact-finding function.

24 Cl. Ct. at 644. The Court of Appeals for the Federal Circuit affirmed, explaining that although a special master "may find the first symptom of an injury occurred within the applicable time frame, even if the occurrence of the symptom was not recorded," such a finding may not be made "based on the claims of a petitioner alone, unsubstantiated by medical records or by medical opinion." 991 F.2d 1570, 1574 (Fed. Cir. 1993) (quoting 42 U.S.C. § 300aa–13(a)(1)).

Drawing upon Bradley, the Order Reopening Entitlement reasoned that if T.S. was contorting his arms as frequently as Ms. Sanchez was asserting in her written and oral testimony, then Ms. Sanchez would have told T.S.'s doctors and a doctor would have memorialized this complaint.

This reasoning, used to determine when T.S.'s abnormal arm movements did (or did not) occur, readily applies to the onset of other neurologic symptoms as well. Years after T.S. was vaccinated, family members reported that they observed concerning behaviors in the months following vaccination. One relative even avers that she expressed her concerns to Mr. and Ms. Sanchez "on multiple occasions," beginning with her first interaction with T.S. in March 2009. Exhibit 7 at 2-3. However, T.S. was not taken to a doctor for these symptoms. Neurologic symptoms were neither reported nor observed during the February 17, 2009; April 29, 2009; and May 13, 2009 appointments. If the symptoms were as persistent and noticeable as the affidavits recalled, it seems likely that T.S. would have been taken to a medical provider sooner, and/or that these symptoms would have been recorded in the April and May 2009 records.[6] Instead, the retrospective accounts of neurologic symptoms are *negated* by these contemporaneous records, some of which expressly find no neurologic abnormalities. It stands to reason, then, that T.S. did not have any neurologic symptoms prior to May 13, 2009. Thus, these affidavits are not credited.

[6] An alternative argument the Sanchezes previously raised is that Ms. Sanchez reported these symptoms to Dr. Seleem and Dr. Brown, but that both doctors neglected to record these complaints. As explained in the Order Reopening Entitlement, this argument is not credited. Furthermore, it is contradicted by the August 19, 2011 letter written by Dr. Brown. Exhibit T at 17.

The evidence produced after the May 20, 2022 Federal Circuit remand also does not indicate that T.S.'s developmental delays began earlier than May 17, 2009. A newly produced record from an appointment with Occupational Therapist Stacey Cunningham on October 8, 2009 reads, "Pt's M [mother] states he decreased fx'ing [functioning] after 6 mos. shots." Exhibit 326 at 13. This statement from Ms. Sanchez to Ms. Cunningham does not elaborate as to what was meant by "decreased functioning," nor does it state *how long after* the shots T.S. began to regress. Thus, this record does not indicate that T.S. regressed earlier than May 2009. The strongest evidence regarding the onset of T.S.'s delays is from the August 17, 2009 appointment with Ms. Marin-Tucker during which Ms. Sanchez reported that she noticed a change 2-3 months prior, but "but since she had taken [T.S.] to HDPC with Dr. Brown she thought that [everything] was ok." Exhibit 1 at 54. Based upon this record, it appears that Ms. Sanchez noticed the change in T.S.'s development around May 17 or June 17, 2009. As she "had taken" T.S. to see Dr. Brown and no issues were detected, she did not seek additional treatment for another few months, at which point the delays had become more apparent to others. This timeline also aligns with Mr. and Ms. Sanchez's argument that "parents notice [developmental regression] sooner" than do medical providers, and that it can be a gradual progression over 2-3 months. Pet'rs' Br. at 54 (citing Exhibit 68 at 8).

Moreover, even if delays might not be immediately noticed, neurologic symptoms would be more readily apparent. As was also explained in previous decisions, the potential difficulty in detecting delays "does not account for the three-month period where the records show no indication of [T.S.] having, or the parents being concerned about, a neurological condition." First Entitlement Decision, 2018 WL 5856556, at *16. Put differently, even if the delays began earlier, this does not solve the primary flaw in the Sanchezes's case: they have not established that T.S.'s symptoms in February signified a neurologic event, and they do not explain why T.S. would start with symptoms, then have no symptoms while regressing, then show symptoms again after the regression became more apparent.

### C. Summary on *Althen* Prong III

Mr. and Ms. Sanchez point to T.S.'s fever and inconsolable crying in the days after vaccination as signals of an encephalopathy. Pet'rs' Br. at 18. They also note that Dr. Raymond recognized that high-pitched crying and fever can be encephalopathic. Id. at 19. While it is true that these symptoms *can* indicate an encephalopathy, it is not the case that they *likely* indicate an encephalopathy.

Furthermore, Mr. and Ms. Sanchez have not explained why there would be a months-long period afterwards during which no neurologic symptoms were observed. They argue that, under their experts' theories, it is common to see delays between the initial event and later manifestations. Pet'rs' Br. at 51. However, the fact remains that there is no credible and/or contemporaneous evidence indicating that T.S. experienced a seizure or that his post-vaccination symptoms in February 2009 were neurologic. Likewise, there is no indication that T.S.'s delays began earlier than mid-May 2009, the point at which, in hindsight, Ms. Sanchez first noticed a change. Thus, the interval between vaccination and onset of problems is excessively long. See Pafford v. Sec'y of Health & Human Servs., 451 F.3d 1352, 1358 (Fed. Cir. 2006) ("If, for example, symptoms normally first occur ten days after inoculation but petitioner's symptoms first occur several weeks after inoculation, then it is doubtful the vaccination is to blame.").

The lack of persuasive proof regarding Althen prong three means that Mr. and Ms. Sanchez are not entitled to compensation. Nevertheless, the remaining prong is address for completeness.

## V. *Althen* Prong II

The second Althen prong requires preponderant evidence for "a logical sequence of cause and effect showing that the vaccination was the reason for the injury." Althen, 418 F.3d at 1278. In their April 16, 2026 brief, the Sanchezes raise three points: (A) treating doctors, (B) challenge-rechallenge, and (C) course of disease. These are discussed below.

### A. Treating Doctors

With respect to Althen's second prong, the Federal Circuit has instructed special masters to consider carefully the views of a treating doctor. Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1326 (Fed. Cir. 2006). However, the views of a treating doctor are not absolute, Snyder v. Sec'y of Health & Hum. Servs., 88 Fed. Cl. 706, 745 n.67 (2009).

#### 1. Previous Adjudications

Rather than repeat the entire analysis from the Second Entitlement Decision for treating doctors, only its conclusion regarding treating doctors is restated:

> In summary, the records from four doctors who treated [T.S.] do not help the Sanchezes meet their burden of showing that the DTaP vaccination contributed to [T.S.]'s Leigh's syndrome. Dr. Friedman presented her opinion before [T.S.]'s Leigh's syndrome was diagnosed after genetic studies. Dr. Sharma and Dr. Haas obtained histories that are not entirely accurate. Even so, Dr. Sharma, Dr. Haas, and Dr. Wong appear to present temporal sequences. Accordingly, while these reports have been considered, they do not constitute persuasive evidence for the Sanchezes.

2020 WL 5641872 at *51.

#### 2. Parties' Arguments

Mr. and Ms. Sanchez noted "treating physicians indicating that the vaccination was the cause of [T.S.]'s issues." The records they cite are, in chronological order:

- Dr. Friedman on October 5, 2010, recording a differential diagnosis of "acute event associated with immunization or infection such as ADEM." Exhibit 1 at 185.

- Dr. Brown stating that an immunization reaction could not be totally discounted on August 19, 2011. Exhibit T at 17.

- Dr. Friedman on September 6, 2011, recording a differential diagnosis of "1. ADEM secondary to vaccine – consistent with MRI; 2. Other vaccine

toxicity; 3. Pre-existing condition with deterioration in setting of fever associated with vaccination." Exhibit 10 at 7.

- Dr. Haas making note on August 7, 2012 that T.S.'s regression and dystonia at six months of age was "following vaccination." This assessment was carried over into later appointments.[7] Exhibit 26 at 5-9, Exhibit 52 at 1-2, Exhibit 53 at 1-2.

- Dr. Sharma characterizing T.S.'s condition as a "probable vaccine induced injury" on October 2, 2013. Exhibit 137 at 1.

- Dr. Wong assessing T.S on January 28, 2016 with "developmental regression following vaccines and/or viral syndrome." Exhibit 139 at 5.

See Pet'rs' Br. at 42-43.

The Secretary did not address records from T.S.'s providers in his June 1, 2026 brief.

3. Analysis

The arguments by Mr. and Ms. Sanchez with respect to Dr. Friedman, Dr. Sharma, Dr. Haas, and Dr. Wong were extensively analyzed. Second Entitlement Decision, 2020 WL 5641872, at *48-51. Mr. and Ms. Sanchez do not meaningfully engage with this analysis in their April 16, 2026 brief.

With the production of more evidence after the Federal Circuit's May 20, 2022 remand, there is more evidence regarding views of treating doctors about causation. For example, Mr. and Ms. Sanchez cited Dr. Brown's August 19, 2011 medical record. Pet'rs' Br. at 17 n.10, 43. In pertinent part, Dr. Brown wrote:

> I do not know what disease process [T.S.] is suffering from. However, he showed no significant signs of neurologic disability before his immunizations or 3 months later. This is apparently some sort of degenerative neurologic process with an insidious onset that has left him significantly disabled. Based on the timing of the

[7] The Sanchezes also state that Dr. Haas recommended that T.S. not be vaccinated in the future. Pet'rs' Br. at 26, 43. This is an overstatement; in a medical record dated September 24, 2019, Dr. Haas wrote: "This boy's mitochondrial disease is life threatening and he can deteriorate with stress situations including the possibility of fever after immunization. For this reason it is medically acceptable for him to avoid immunizations." Exhibit 184 at 53. Saying it is "medically acceptable" to avoid vaccinations is not the same as recommending against vaccinations. In contrast, an email from Mr. and Ms. Sanchez to Dr. Friedman dated June 1, 2015, states that "To this day even Dr[.] Haas still feels a duty ethically to recommend we vaccinate [T.S.] because he is more susceptible to infection due to his disease even though he admits that its likely or possible that 'fever' not the vaccine can cause decompensation." Exhibit U at 4751.

> process and no conclusive diagnosis after 2 years of testing, an immunization reaction cannot be totally discounted.

Exhibit T at 17-18.

This passage does not weigh heavily in the Sanchezes' favor. To start, Dr. Brown expressed this opinion when T.S.'s condition was not known. Whether Dr. Brown would have made the same statement if Dr. Brown knew that T.S. suffered from Leigh's disease is not known. More importantly, the phrase "cannot be totally discounted" is not an affirmative statement that a vaccine caused an injury. Instead, the phrase "cannot be totally discounted" is comparable to a treating doctor saying that "it was not impossible" for a vaccine to have cause developmental delays. According to the Federal Circuit, a statement that "causation was 'not impossible' fails to provide support for causation at all." Paterek v. Sec'y of Health & Hum. Servs., 527 Fed. App'x 875, 883 (Fed. Cir. 2013) (reversing opinion of a judge from the Court of Federal Claims and reinstating decision of the special master).

Furthermore, although the Sanchezes cite to Dr. Friedman's differential diagnoses including vaccination-induced conditions in 2010 and 2011, a newly produced August 19, 2015 email from Dr. Friedman to Mr. and Ms. Sanchez reads:

> Though it is certainly possible that vaccines or the related fever exacerbated [T.S.]'s underlying condition, as we know fever or other illness can de-stabilize children with mitochondrial disease, unfortunately there is no way to prove this - only suspicion. Given regression following his shots it is certainly a reasonable assumption that the vaccine may have exacerbated his underlying condition. As it has been quite a while since I saw him, I do not recall if the deterioration immediately followed the immunization which would be a necessary aspect to suggest the vaccine or vaccine associated fever may have had an effect.

Exhibit U at 4750. Dr. Friedman acknowledged that was "possible" and a "reasonable assumption" that the vaccine "may" have exacerbated T.S.'s underlying condition, but also said it was "only suspicion." As with Dr. Brown's record, these statements are not an affirmative statement of vaccine causation. Moreover, Dr. Friedman noted that it would be necessary for deterioration to "immediately" follow the vaccine to even "suggest" that the vaccine and/or fever "may" have contributed. As explained, preponderant evidence does not support a finding that T.S. began to deteriorate in the weeks following his vaccination.

Thus, none of the newly produced evidence contributes to a change in the previous finding that reports from treating doctors do not weigh in favor of a finding of causation.

## B. Challenge-Rechallenge

### 1. Previous Adjudications

In accord with the April 7, 2020 First Federal Circuit Opinion remanding the case, the Second Entitlement Decision evaluated whether T.S. suffered a rechallenge following his August 17, 2009 vaccination. Second Entitlement Decision, 2020 WL 5641872, at *46-48. The main flaw, at that stage, was "the Sanchezes [had] not presented preponderant evidence that [T.S.]

suffered any neurologic problem within at least one month of the February 5, 2009 vaccine. And, by simple definition, without a 'challenge,' there can be no 'rechallenge.'" Id. at *47.

2. Parties' Arguments

Mr. and Ms. Sanchez argue that T.S.'s medical history showed a rechallenge in that he became sick and displayed further neurodegeneration after his second set of vaccinations in October 2009. Pet'rs' Br. at 43-47. Before receiving the second set, T.S. did not walk, stand, crawl, hold his head up while sitting, or attempt to move his lower extremities. Id. at 44 (citing Rulings Finding Facts, ¶ 20). After the second round of vaccinations, T.S. became sick and displayed tremors and twitching. At a November 12, 2009 appointment, he was positive for muscle spasms, developmental delay, weakness, and walking problems. His Babinski reflexes were absent, he was unable to sit without support at the trunk, and he did not support weight with his lower extremities. Id. (citing Exhibit 1 at 139-141). Dr. Haas later noted that T.S.'s regression "repeated with the next set of vaccines at 12 months." Id. at 45. Mr. and Ms. Sanchez assert that T.S.'s developmental regression was slow from the point of his February 2009 vaccines and the resultant fever and inconsolable crying. The second set of vaccines resulted in further neurodegeneration. Dr. Steinman and Dr. Niyazov both opined that this was an example of challenge-rechallenge, and Dr. Steinman testified that some of the most dramatic changes came after the second round of vaccines. Pet'rs' Br. at 45; Tr. 261.

The Secretary did not address challenge-rechallenge in his June 1, 2026 brief.

3. Analysis

The argument from Mr. and Ms. Sanchez that T.S. suffered a "challenge" within about one month of the February 5, 2009 vaccine is incompatible with the newly produced evidence, which underlies the finding of fact that T.S. did not suffer any abnormal arm movements until approximately August 1, 2009. For example, Mr. and Ms. Sanchez assert that T.S.'s "developmental regression was slowly developing ever since the crying and fever took place as the result of the vaccination." Pet'rs' Br. at 34. But, this assertion is in conflict with the February 17, 2026 findings of fact made in conjunction with the adjudication of the Secretary's motion to reopen. Thus, there is not preponderant evidence of a challenge-rechallenge.

**C. Course of Disease**

A logical presentation from Mr. and Ms. Sanchez could entail showing that T.S.'s reaction to the vaccines was consistent with the theory articulated by their experts. See Hibbard v. Sec'y of Health & Human Servs., 698 F.3d 1355, 1364 (Fed. Cir. 2012); Dodd v. Sec'y of Health & Human Servs., 114 Fed. Cl. 43, 52-57 (2013); La Londe v. Sec'y of Health & Human Servs., 110 Fed. Cl. 184, 205 (2013), aff'd, 746 F.3d 1334 (Fed. Cir. 2014).

1. Previous Adjudications

The First Entitlement Decision found that "[T.S.]'s actual course is entirely consistent with what is known about his genetic mutations." First Entitlement Decision, 2018 WL 5856556, at *25. No explicit finding was made as to whether the genetic mutations were the sole substantial cause of T.S.'s Leigh's syndrome. The Second Entitlement Decision went a step

farther and found that the T.S.'s genetic mutations "were the sole substantial cause of his Leigh's syndrome." Second Entitlement Decision, 2020 WL 5641872, at *58. However, after determining that the onset of T.S.'s Leigh's syndrome was in February 2009, the Federal Circuit found that there was "no evidence . . . that [T.S.]'s mutations would have resulted in the same progression and severity of his Leigh's syndrome absent the vaccine." Second Federal Circuit Opinion, 34 F.4th at 1356.

2. Parties' Arguments

Mr. and Ms. Sanchez contend that T.S.'s "response to the DTAP vaccine was consistent with the theories articulated." Pet'rs' Br. at 47. They explained that he "responded with fever, inconsolable crying and fussiness within the time indicated. He then, consistent with the three (3) medical theories articulated, had further fever and unexplained movements approximately 10-11 days after the vaccine; and later, further regression occurred." Id.

Relying on Dr. Raymond's testimony, the Secretary stated that T.S.'s clinical course was entirely consistent with Leigh's syndrome, and argued that the condition "first manifested several months after his vaccinations, which is too long to causally relate the two events." Resp't's Br. at 9. The Secretary contended that "The first manifestation of T.S.'s condition (loss of skills) occurred when he was about nine and a half months old [around mid-May 2009], within the three-to-twelve-month window typically seen in children with Leigh's syndrome." Id. The Secretary concludes that "the medical record evidence combined with the reliable medical literature, as explained by Dr. Raymond, establishes that T.S.'s genetics are more likely the cause of his neurologic condition than his February 2009 vaccines. Therefore, petitioners have failed to meet their burden under the second *Althen* prong." Id. at 9-10.

3. Analysis

This argument from Mr. and Ms. Sanchez actually contains two different parts, which are flawed for different reasons. The second part of this argument is that T.S. had "unexplained movements approximately 10-11 days after the vaccine." As just explained in the context of challenge-rechallenge, Mr. and Ms. Sanchez are making arguments that do not match the facts as found. The evidence preponderates against a finding that T.S. made any abnormal movements approximately 10-11 days after the vaccination. Thus, the second portion to the argument is rejected as factually flawed.

The first part of the argument is that T.S. responded to the vaccination with "fever, inconsolable crying and fussiness." Pet'r's Br. at 47. To extend some credit to Mr. and Ms. Sanchez, this argument is at least based upon facts that were preponderantly established—T.S. did cry extensively, did experience a fever, and was fussy for a few days.

However, Mr. and Ms. Sanchez overstate the significance of this crying / fever / fussiness. A child's crying, fever, and fussiness after a vaccination does not automatically mean that the child experienced a neurologic problem as extensively set forth previously. See Second Entitlement Decision, 2020 WL 5641872, at *30–31.

In light of this previous adjudication, Mr. and Ms. Sanchez would have been well served to cite evidence produced after the Federal Circuit's May 20, 2022 remand. But, their most

recent brief does not persuasively argue that any new evidence shows that T.S.'s crying, fever, and fussiness in early February 2009 marked the onset of a neurologic problem. Rather, the evidence produced after the remand preponderates in favor of finding that T.S. did not experience any abnormal arm movements until approximately August 1, 2009. Given this finding, it appears even less likely that T.S.'s fever, crying, and fussiness for a few days in early February 2009 were indicative of a neurologic injury. Rather, the timeline of T.S.'s regression aligns more with the infections he suffered in April-May 2009 being the trigger of his Leigh's disease.[8] See Winkler v. Sec'y of Health & Hum. Servs., 88 F.4th 958, 962 (Fed. Cir. 2023) (ruling special master did not err in considering a potential alternative cause in prong two); Stone v. Sec'y of Health & Hum. Servs., 676 F.3d 1373, 1380 (Fed. Cir. 2012).

For these reasons, the evidence with respect to a logical sequence of cause and effect, Mr. and Ms. Sanchez have failed to meet their burden of proof.

## VI. Conclusion

This decision is admittedly unusual in that the appellate tribunal ordered a determination of damages and now petitioners are being found not entitled to any compensation. But, this unusual result flows directly from another rare circumstance—the Sanchezes' failure to produce medical records that they were obligated to produce years ago. It cannot be the case that litigants can withhold documents and then profit from their withholding.

When the entire record is considered, the record preponderates in favor of finding that T.S. first manifested symptoms of the neurologic condition later recognized as Leigh's disease approximately 14 weeks after the allegedly causal vaccination. The latency between the vaccination and the onset is not one for which an inference of causation is appropriate. Mr. and Ms. Sanchez have also not established with preponderant evidence that there is a logical sequence of cause and effect linking the vaccinations to T.S.'s Leigh's syndrome.

The Clerk's Office is instructed to enter judgment in accord with this decision unless a motion for review is filed. Information about filing a motion for review, including the deadline, can be found in the Vaccine Rules, which are available on the website for the Court of Federal Claims.

---

[8] To be clear, this decision does not find that any of T.S.'s genetic mutations were the sole cause of his Leigh's syndrome. The Second Federal Circuit Opinion ruled that "the government did not meet its burden to establish [T.S.]'s Leigh's syndrome was the result of factors unrelated to the vaccine." 34 F.4th at 1356. The Federal Circuit's ruling remains the law of the case and the evidence produced after the May 20, 2022 Federal Circuit remand did not lead to a reopening of the genetics issue. A finding that the February 2009 vaccination did not cause T.S.'s neurologic problem simply means "that some other cause resulted in the injury." Bazan v. Sec'y of Health & Hum. Servs., 539 F.3d 1347, 1353 (Fed. Cir. 2008). This other cause need not be genetic.

IT IS SO ORDERED.

s/Christian J. Moran
Christian J. Moran
Special Master